KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700
Attorneys for Plaintiffs

**'07 CIV 7369**

UNITED STATES DISTRICT COURT



FOR THE SOUTHERN DISTRICT OF NEW YORK

FORTRESS CREDIT OPPORTUNITIES I, LP and
FORTRESS CREDIT OPPORTUNITIES II, LP,

      Plaintiffs,

      -against-

WAYNE C. COLEMAN, THE ROYALTY
COMPLIANCE ORGANIZATION and MOSS
ADAMS LLP

      Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

RECEIVED
AUG 1 7 2007
U.S.D.C. S.D. N.Y.
Case No CASHIERS

JURY TRIAL
DEMANDED

## COMPLAINT

Plaintiff Fortress Credit Opportunities I, LP, and Plaintiff Fortress Credit

Opportunities II, LP, by and through their undersigned counsel, Kasowitz, Benson,

Torres & Friedman LLP, for their complaint against defendants Wayne C. Coleman, the

Royalty Compliance Organization and Moss Adams LLP allege as follows:

## INTRODUCTION

1.     This dispute arises out of a March 1, 2004 loan agreement between

Fortress Credit Opportunities I, LP ("Fortress" and, together with Fortress Credit

Opportunities II, LP, "Plaintiffs") and The Songwriter Collective, LLC ("TSC") for $12.12 million (the "Loan"). TSC was created as a music publishing company owned by individual songwriters. TSC was intended to operate as a collective of those songwriters, who would consolidate their various rights to receive royalties on their published songs into this one entity and then to sell securities or otherwise obtain long term financing that would be financed by the royalty streams on those copyrighted works and secured by those rights. Fortress provided the Loan to serve as a bridge loan to allow start-up financing for TSC for a period up to one year while it prepared and implemented its business plan. The Loan was secured by the same copyrighted works that were being consolidated in TSC (the "Collateral").

2.     As a condition to making the Loan, TSC was required to provide Fortress with an appraisal of the valuation of the Collateral. TSC consulted with defendants Wayne C. Coleman ("Coleman"), the Royalty Compliance Organization ("RCO"), and Moss Adams LLP ("Moss Adams"), to provide a valuation and other analyses needed to determine the magnitude of TSC's future royalty streams. Upon information and belief, Coleman, RCO, and Moss Adams all knew that their valuations and analyses would be used by TSC to obtain a loan from Fortress. Plaintiffs relied on those valuations and analyses in assessing the amount and terms of a loan that could be adequately supported by TSC's future royalty revenues and adequately collateralized by the value of TSC's assets.

3.     Shortly after the Loan closed on March 1, 2004, TSC breached its obligations and the Loan entered into default. In May of 2005, Plaintiffs discovered that the valuations and analyses performed by Coleman, RCO, and Moss Adams, and on

2

which Plaintiff reasonably relied, were negligently made and grossly inaccurate. The royalty income and the Collateral value were substantially lower than Wayne Coleman and RCO had projected and Moss Adams had estimated.   As a result, Plaintiffs' recovery on their Collateral has been substantially less than the amount necessary to satisfy the Loan obligations and Plaintiffs have suffered and continue to suffer considerable economic harm.

4.      Accordingly, Plaintiffs seek to recover the damages they have suffered due to defendants' professional negligence as further alleged below.

### THE PARTIES

5.      Plaintiffs Fortress Credit Opportunities I, LP and Fortress Credit Opportunities II, LP, are Delaware limited partnerships having their principal place of business at 1345 Avenue of the Americas, New York, NY 10105.

6.      Defendant Wayne C. Coleman, CPA ("Coleman") is the founder, Chairman and Managing Partner of defendant Royalty Compliance Organization and is a resident of Missouri.

7.      Defendant Royalty Compliance Organization is headquartered in Missouri and maintains an affiliate office in Los Angeles, California.  Upon information and belief, RCO is wholly owned by defendant Coleman.

8.      Upon information and belief, defendant Moss Adams LLP is a limited liability partnership with its principal place of business in the state of Washington.

### JURISDICTION AND VENUE

3

9.    This Court's jurisdiction is founded upon section 1332(a)(1) of title 28 of the United States Code, in that this civil action is between citizens of different States and the amount in controversy exceeds $75,000.

10.    Venue in this Court is appropriate under section 1391(a)(2) of title 28 of the United States Code, in that a substantial part of the events giving rise to this claim occurred in New York City.

## THE SONGWRITERS' COLLECTIVE

11.    The Songwriter Collective LLC was created in 2002 as the first music publishing company owned by and run solely for the benefit of its songwriter members. TSC's member songwriters individually own royalty streams generated by their respective compositions (the "catalogue"). TSC's members pledged the royalty streams generated by their individual catalogues to TSC in return for an ownership share in TSC. TSC's business purpose was to securitize those individual streams or otherwise obtain long-term financing based on the value of the royalty stream that TSC's aggregate catalogue would generate.

12.    In December, 2003, TSC began to seek bridge financing from Plaintiffs to, among other things, support TSC's operations until the securitization or long-term financing could be  completed.  As a condition precedent of providing the loan, Plaintiffs required a valuation of TSC's catalogue.  The purpose of the valuation was to assure Plaintiffs, among other things, that: (i) TSC's royalty stream would be adequate to finance interest charges on the loan; and (ii) in the event TSC should default on the loan, the value of TSC's catalogue would adequately collateralize the principal amount of the loan.

4

13.     Two experts were retained to provide the required estimations, analyses,

and valuation of the Collateral on behalf of and for use by TSC and its lender.

## MOSS ADAMS' EXPERT SERVICES

14.     Upon information and belief, Moss Adams is the tenth largest certified

public accounting firm in the United States.  It provides accounting, tax, and consulting

services to public and private middle-market enterprises in many different industries.

Moss Adams's music industry clientele includes recording artists, songwriters, record

companies, music publishers, and licensors of music rights.

15.     TSC engaged Moss Adams to provide services in connection with its

royalty valuation and financing and for the purpose of obtaining bridge loan financing

from Plaintiffs.

16.     Pursuant to the terms of its engagement with TSC, Moss Adams provided

to TSC a "Due Diligence Report" dated February 17, 2004.  The Due Diligence Report

was provided to TSC and RCO by the Moss Adams office in Los Angeles, California.

Moss Adams's Due Diligence Report stated that it was prepared under the supervision of

Lewis J. Stark, who was then a partner in Moss Adams LLP.  Mr. Stark and other Moss

Adams employees prepared the Due Diligence Report from the Moss Adams offices

located in New York, New York.  Upon information and belief, Moss Adams closed its

New York office at around the time that the Due Diligence Report was completed.

17.     The Due Diligence Report stated that Mr. Stark had provided royalty

related accounting and financial services to the music industry since 1989 and that Mr.

Stark's "clients include recording artists, record companies, songwriters, music

publishers."  The Due Diligence Report also stated that prior to TSC's engagement of

Moss Adams, Mr. Stark had performed, among other things, numerous "intangible asset valuations" for "royalty securitizations." Moss Adams provided this information in order to induce TSC and its lender to rely on the expertise of Moss Adams and Mr. Stark to determine the size of the royalty streams and to enable TSC and its lender to value those royalty streams.

18.    To prepare its Due Diligence Report, Moss Adams used data that it gathered concerning the third party songwriter, publisher, artist, and producer royalties owned by the songwriter members of TSC and that would be pledged or assigned to TSC. Pursuant to its engagement with TSC, Moss Adams's Due Diligence Report was provided to TSC to calculate "historical royalty activity" and to enable "[TSC] and its representatives to determine the value of the royalty streams and to project future royalty earnings and cash flows" derived from the Collateral ("Future Earnings").

19.    Moss Adams's Due Diligence Report was provided to enable TSC and its lenders to determine the magnitude of future royalty cash flows and earnings that TSC could reasonably expect to garner from Future Earnings.

20.    Moss Adams stated in its Due Diligence Report that songwriters such as TSC's members generate royalties in one of four basic types of contractual structure. According to that Report, the amounts and percentages of royalties paid vary within each type of contractual structure. In addition, Moss Adams stated in its Due Diligence Report that the specific attributes of individual contracts under each basic type of contract can also vary. In preparing its Due Diligence Report, Moss Adams obtained access to and reviewed and analyzed some or all of the underlying royalty agreements.

6

21.    Moss Adams did not base its predictions solely on actual numbers contained in third party royalty statements that it had gathered and that had been provided to it by TSC and its members.

22.    The data provided to Moss Adams contained many gaps. Where Moss Adams did not have multi-year data, it "grossed-up" the data to estimate "average annual royalty payments" over several years. These "grossed up" estimates were not actual average annual royalty payments.

23.    Moss Adams performed its valuation analysis while missing as much as one third of the data needed to perform a thorough valuation analysis. Although Moss Adams's Due Diligence Report stated that it had "grossed up" missing data, Moss Adams at no time explained to or informed TSC or Fortress of the full extent or potential impact of the missing data.

24.    Moss Adams also "grossed-up" data for those individual performers for whom not even a full year's data was provided.

25.    Moss Adams based the estimates, analyses, and predictions in its Due Diligence Report on its "grossed-up" data.

26.    Moss Adams estimated that total royalties received by TSC's members would increase by 25%. Specifically, Moss Adams assumed *inter alia* that TSC members operating under one of the four types of contracts would "recapture" royalties that had been paid previously to third parties. Moss Adams's prediction was based on its professional knowledge of and familiarity with royalty contract structures in the music industry. Moss Adams represented that its statements of the royalty stream were based

on that professional expertise and knowledge and induced Plaintiffs to rely on that professional expertise in reviewing the Due Diligence Report.

27.    Additionally, Moss Adams assumed that TSC's members would benefit in the future from increased direct licensing contracts in foreign territories. Moss Adams predicted that foreign royalties payable to sub-publishers from revenue generated by TSC's assets would decline, and that foreign royalty payments payable to TSC would "accelerate" as a result. Moss Adams's prediction was based on its professional knowledge of and familiarity with royalty structures in the worldwide music industry. Moss Adams represented that its statements regarding the foreign royalty stream were based on that professional expertise and knowledge and induced Plaintiffs to rely on that professional expertise in reviewing the Due Diligence Report.

28.    Moss Adams represented that its presentation of the amount of net royalties earned was "most likely understated." Moss Adams reported annual net royalties earned on TSC members' catalogues of over $5,200,000.

29.    Upon information and belief, when Moss Adams issued its Due Diligence Report, it was aware that TSC was negotiating with only one potential lender.

30.    Moss Adams was aware upon its engagement that TSC would rely on its knowledge, familiarity, expertise and experience, and that of Mr. Stark specifically. Moss Adams was aware that TSC would provide its analysis of the earnings of TSC's members to the potential lender with which it was negotiating a loan as evidence of the sufficiency of its Collateral in regard to that potential loan.

31.    Moss Adams was aware that its Due Diligence Report would be provided to RCO in connection with RCO's valuation of the Collateral based on the Future

Earnings of the catalogue. Moss Adams was aware that the accuracy of its Due Diligence Report was necessary for RCO to prepare an accurate valuation of the Collateral.

32.     When Moss Adams issued its Due Diligence Report, it was aware that the potential provider of loan financing with which TSC was in negotiations would rely on the Due Diligence Report's representations regarding royalty streams in order to assess TSC's capability to repay a loan with interest.

## THE COLEMAN - RCO EXPERT SERVICES

33.     Defendant Wayne C. Coleman, CPA is the founder, Chairman and Managing Partner of defendant Royalty Compliance Organization and is a resident of Missouri.

34.     Upon information and belief Royalty Compliance Organization is wholly owned by Coleman. At the time it issued its Report to Fortress and TSC, RCO was headquartered in Missouri and maintained an affiliate office in Los Angeles, California.

35.     According to Coleman and RCO, prior to the TSC engagement, Coleman provided valuation services to borrowers, lenders and rating agencies that conduct transactions involving securitization of royalty revenue streams in the music industry. Additionally, prior to his engagement, Coleman conducted numerous valuations of music libraries for the principals in numerous such transactions.

36.     RCO claims to have performed various types of royalty accounting and valuation services on behalf of licensors, performers, songwriters, and other profit participants in the music industry for over thirty years.

37. Coleman and RCO were retained to provide TSC and Fortress with a valuation of the catalogue assets of TSC. Coleman and RCO hold themselves out as expert in the royalty accounting profession.

38. On or about January 30, 2004, and pursuant to the terms of its engagement, Coleman and RCO provided to Fortress and TSC a report setting forth a valuation of TSC's music catalogue assets.

39. According to Coleman and RCO, the report they provided to Fortress and TSC (the "RCO Report") was "designed to estimate the fair market value of [TSC's] Catalogs. . . and [is] intended to be used to assist [TSC] and their representatives in assigning value to those assets."

40. Coleman and RCO's analysis, conclusions and final valuations were based in part on data that Moss Adams provided to Coleman and RCO.

41. Coleman and RCO were aware at the time they conducted their valuation, that Moss Adams had adjusted or "grossed up" some of the individual accounts that make up TSC's music catalogue assets.

42. The RCO Report stated that its "projected valuation of the Songwriter Collective Catalogs is based on an estimate of future sales of CDs, cassettes, and videos and the recorded, broadcast and live performances of the copyrights." The RCO Report stated that it was based on *inter alia* "analysis of earning trends," [a]nalysis of financial statements," '[a]nalysis of some royalty statements," discussions with TSC personnel regarding its business and strategic plans, and "[r]eview of Industry Trends presented by various sources."

43.    Coleman then provided his expert views in the RCO Report concerning "music industry trends," the effects of "new technology," and the "characteristics of publishing income." Coleman then explained various expert valuation methodologies that he applied. The RCO Report stated that it determined the valuation of the catalogue "by projecting the future royalty streams and discounting such streams using an applicable discount rate to arrive at the projected value of the underlying assets."

44.    In preparing the RCO Report, Coleman made various adjustments to the Moss Adams data and applied his own expertise in determinng the projected value of the catalogue based on those adjusted numbers.

45.    Coleman and RCO were aware when they provided their Report to Fortress that Plaintiffs would rely on their expertise in valuing music catalogue assets to determine the amount and value of the Collateral supporting the Loan.

46.    Upon information and belief, Coleman and RCO were aware when they provided their Report to Fortress that Plaintiffs would rely on their expertise in valuing the music catalogue assets to determine the potential amount of Collateral that could be available to Plaintiffs in the event that TSC were to default on its obligation to Plaintiffs.

47.    Additionally, upon information and belief, Coleman and RCO were aware that TSC engaged them because they are widely known in the music industry as experts in valuing the precise type of asset that TSC engaged them to value in support of borrowers, lenders and rating agencies that conduct transactions involving financings based on royalty revenue streams in the music industry.

11

48.    In valuing the future royalty streams that TSC could reasonably expect to garner from its music catalogue, Coleman and RCO estimated the rate at which royalties would decline at a flat five percent (5%) per year.

49.    Coleman and RCO then provided a variety of valuation results based on the Moss Adams Due Diligence Report and their own adjustments to the figures provided by Moss Adams. Coleman and RCO estimated TSC's anticipated annual net royalties and estimated a net present value on TSC's catalogue assets ranging from $53,730,000 to $55,730,000. Coleman and RCO concluded that the correct net present valuation of the TSC catalogue was $55,732,412.

## THE LOAN

50.    In reliance on the Moss Adams Report and the RCO Report, Fortress closed on the Loan and provided the $12.12 million to TSC on March 1, 2004. Periodic interest charges were to be paid through TSC's royalty stream and the Loan was collateralized with TSC's catalogue assets. The principal on the Loan was due on March 1, 2005. Fortress assigned a 40% interest in the loan to plaintiff Fortress Credit Opportunities II, LP.

51.    Plaintiffs relied on the Moss Adams Due Diligence Report and the RCO Report prepared by Coleman to enter into the Loan and to justify the Loan amount. Specifically, Plaintiffs relied on each report to conclude that the royalty revenue streams used by TSC as Collateral were adequate to support the interest charges on the Loan amount and that the catalogue value adequately collateralized the principal and interest of the Loan.

52.    The Loan was collateralized by the TSC catalogue, based on the estimates, analyses, and valuations contained in the Moss Adams Due Diligence Report and the RCO Report.

53.    Almost immediately after origination of the Loan, the actual revenue streams generated by TSC's catalogue proved to be far below the estimates and valuation placed on them by Moss Adams and by Coleman and RCO. The actual royalty streams were wholly inadequate to support payments due. The Loan therefore collapsed.

## DEFENDANTS' NEGLIGENCE IS DISCOVERED

54.    In May, 2005, more than a year after the Loan was originated and while Plaintiffs were attempting to mitigate their damages by recovering some of the Loan proceeds from members of TSC and through payments from others affiliated with TSC, Plaintiffs discovered that Moss Adams, Coleman and RCO individually and collectively had been negligent in their estimations and valuation analyses.

55.    In May, 2005, Plaintiffs discovered that both the data and the analysis presented by Moss Adams and by Coleman and RCO were unreliable and inaccurate. The inaccuracies contained in their reports resulted in substantial overstatements of the actual royalty streams available to finance the Loan. The inaccuracies contained in the reports also resulted in overstatement of the Collateral available to cover the interest and principal amounts of the Loan once TSC defaulted. Plaintiffs determined in 2005 that the actual revenue stream and value of the TSC catalogue were far lower than Moss Adams and Coleman and RCO had represented.

<u>COUNT I</u>

**PROFESSIONAL NEGLIGENCE**
**<u>AGAINST DEFENDANTS COLEMAN AND RCO</u>**

56.     Plaintiffs repeat and re-allege paragraphs 1 through 55 above as though

fully set forth herein.

57.     In accepting their engagement to determine the magnitude of future

royalty cash flows that TSC could reasonably expect to garner from Future Earnings and

the value of TSC's catalogue, Coleman and RCO were aware that TSC intended to

present their valuation to Plaintiffs in an effort to induce Plaintiffs to provide loan

financing.

58.     Coleman and RCO addressed their valuation report to TSC and to Fortress

at its offices in New York City as well as to Fortress's joint venture partner, Northlight

Financial, LLC, at its offices in New York City.  Coleman and RCO intended that

Plaintiffs rely on their valuation and were aware that Plaintiffs intended to rely on their

valuation to provide loan financing to TSC.

59.     As professional experts and leaders in the field of music royalty valuation,

Coleman and RCO had a duty to exercise the same degree of skill, prudence, and

diligence as other members of the profession engaged in music royalty valuation

commonly possess and exercise.

60.     Coleman and RCO breached that duty by, *inter alia*, substantially

overstating TSC's anticipated future royalty revenue stream, underestimating the rate at

which the catalogue would decline in value, and overstating the present value of the

Collateral.

14

61.    Coleman and RCO's erroneous, inaccurate, and negligently prepared valuation of TSC's future royalty streams and catalogue value caused Plaintiffs to enter into the Loan based on a grossly over-valued appraisal of the catalogue that constituted the Collateral for the Loan. But for the erroneous valuation by Coleman and RCO, Plaintiffs would not have entered into this Loan. Plaintiffs agreed to the amount of the Loan based on the Collateral value as determined from the Coleman and RCO valuation, but the actual Collateral value was substantially lower than Coleman and RCO expressed in their valuation. As a result, there was insufficient Collateral value to satisfy the Loan deficiency following the default. Plaintiffs' losses were thus caused by Coleman and RCO's negligent preparation of their report.

62.    As a result of these breaches, the Loan collapsed and Plaintiffs have suffered economic loss resulting from that collapse.

63.    Plaintiffs have attempted to mitigate their damages through recoveries from principals and other responsible parties. However, Plaintiffs have been unable to recoup damages of at least five million dollars ($5,000,000).

### COUNT II

### PROFESSIONAL NEGLIGENCE AGAINST DEFENDANT MOSS ADAMS

64.    Plaintiffs repeat and re-allege paragraphs 1 through 55 above as though fully set forth herein.

65.    In accepting its engagement to determine the magnitude of royalty payments and cash flows that TSC could reasonably expect to garner from the TSC members' royalty rights, Moss Adams was aware that TSC intended to use its Due Diligence Report in its efforts to obtain loan financing.

15

66.    In performing its engagement, Moss Adams knew that TSC was in negotiations with a specific lender to obtain loan financing.

67.    Upon information and belief, Moss Adams was aware that TSC intended to provide the Due Diligence Report to the specific lender with which TSC was negotiating in order to induce that lender to provide loan financing.

68.    Upon information and belief, Moss Adams was aware that Coleman and RCO would rely in part on the data Moss Adams presented in preparing their Report.

69.    Upon information and belief, Moss Adams was aware that TSC intended to provide the Coleman and RCO Report to the specific lender with which TSC was negotiating in order to induce that lender to provide loan financing.

70.    As a professional accounting firm engaged in the analysis and valuation of music royalty streams, Moss Adams had the duty to use such skill, prudence, and diligence as other members of the accounting profession engaged in analysis and valuation of music royalty streams commonly possess and exercise.

71.    Moss Adams breached that duty by negligently over-estimating the revenue streams on the royalty catalogue and by doing so while missing as much as one third of the data needed to accurately perform such an analysis.  In the absence of such a large portion of the necessary data, Moss Adams's calculation of the purported revenue streams on the royalty catalogue was inherently unreliable and negligently prepared and submitted. Moss Adams failed to qualify the reliability of its Due Diligence Report or to disclose adequately in its Due Diligence Report the extent to which it was missing data necessary to calculate the revenue streams.

72.    Plaintiffs reasonably relied on the Moss Adams Due Diligence Report in deciding to provide the Loan to TSC. The erroneous, inaccurate and negligently prepared calculation and estimation of TSC's royalty streams presented by Moss Adams in its Due Diligence Report caused Plaintiffs to enter into a loan based on a grossly over-valued appraisal of TSC's future royalty streams. But for the erroneous analysis by Moss Adams, Plaintiffs would not have entered into this Loan. Plaintiffs agreed to the amount of the Loan based on the Collateral value as determined from the Moss Adams Due Diligence Report, but the actual Collateral value was substantially lower than the Moss Adams Due Diligence Report estimated. As a result, there was insufficient Collateral value to satisfy the Loan deficiency following the default and Plaintiffs' losses were caused by Moss Adams's negligent preparation of its Due Diligence Report.

73.    As a result of this breach, the Loan collapsed. Moss Adams's negligence thereby proximately caused Plaintiffs to suffer economic loss flowing from the Loan's collapse.

74.    Plaintiffs have attempted to mitigate their damages through recoveries from principals and other responsible parties. However, Plaintiffs have been unable to recoup damages of at least five million dollars ($5,000,000).

## CONCLUSION

**WHEREFORE**, Plaintiffs request a judgment awarding damages in an amount to be determined at trial but not less than $5,000,000, together with any such further and

additional relief as this Court may find just and proper, in addition to such costs and fees as may be awarded.

Dated: New York, New York
       August 17, 2007

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By: _____
    Michael C. Harwood  (MH-4227)

1633 Broadway
New York, New York  10019
212-506-1709