KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Michael C. Harwood (MH 4227)
1633 Broadway
New York, New York  10019
Tel:  (212) 506-1700
Fax: (212) 506-1800

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------x
                                                    :
FORTRESS CREDIT OPPORTUNITIES I, LP and             :
FORTRESS CREDIT OPPORTUNITIES II, LP,               :
                                                    :
                        Plaintiffs,                 :     07-CV-7369 (HB)(DCF)
                                                    :
            -against-                               :     JURY TRIAL
                                                    :     DEMANDED
WAYNE C. COLEMAN, THE ROYALTY                       :
COMPLIANCE ORGANIZATION and                         :
MOSS ADAMS LLP                                      :
                                                    :
                        Defendants.                 :
-----------------------------------------------------------------x
```

**PLAINTIFFS FORTRESS CREDIT OPPORTUNITIES I, LP AND FORTRESS
CREDIT OPPORTUNITIES II, LP'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT MOSS ADAMS LLP'S MOTION, PURSUANT
TO FED. R. CIV. P. 12(C), FOR JUDGMENT DISMISSING THE COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 3

ARGUMENT ........................................................................................................................ 8

I.    Defendant's Motion Is Untimely ............................................................................. 8

II.   The Statute Of Limitations Did Not Accrue Upon Receipt of Defendants'
      Work Product ........................................................................................................... 8

      A.    The Statute Of Limitations In Accounting Negligence Actions
            Begins To Run Three Years From The Time All Facts Necessary
            To The Action Have Occurred ...................................................................... 9

            1.    The Bright Line "Upon Receipt Of Work Product Rule" Is
                  Specific To Negligence In The Preparation Of Tax Returns .............. 9

            2.    In The Context Of Consummated Transactions, Reliance
                  And Injury Both Occur And The Statute Of Limitations
                  Accrues Upon Consummation ......................................................... 13

CONCLUSION .................................................................................................................. 17

# TABLE OF AUTHORITIES

**Page**

**Cases**

Ackerman v. Price Waterhouse, 84 N.Y.2d 535, 620 N.Y.S.2d 318
    (1994) ...................................................................................................10, 12, 13, 16

Bastys v. Rothschild, No. 97 Civ. 5154, 2000 U.S. Dist. LEXIS 17944
    (S.D.N.Y. Nov. 21, 2000)...................................................................9, 10, 12, 14

Booth v. Kriegel, 36 A.D.3d 312, 825 N.Y.S.2d 193 (1st Dep't 2006) ...........................11

Chemical Bank v. Sternbach & Co., 91 A.D.2d 518, 456 N.Y.S.2d 392
    (1st Dep't 1982)..................................................................................................14

Cohen v. Abrahams, 751 F. Supp. 472 (S.D.N.Y. 1990) ....................................................14

Credit Alliance Corp. v. Andersen & Co., 101 A.D.2d 231, 476 N.Y.S.2d 539
    (1st Dep't 1995), rev'd on other grounds, 65 N.Y.2d 536 (1985)..................16

Fleet Factors Corp. v. Werblin, 114 A.D.2d 996, 495 N.Y.S.2d 434
    (2d Dep't 1985) .............................................................................................13, 14

Funk v. F&K Supply, Inc., 43 F. Supp. 2d 205 (S.D.N.Y. 1999) .......................................8

IFD Constr. Corp. v. Corddry Carpenter Dietz and Zack, 253 A.D.2d 89,
    685 N.Y.S.2d 670 (1st Dep't 1999).............................................................. 15-16

Mitschele v. Schultz, 36 A.D.3d 249, 826 N.Y.S.2d 14 (1st Dep't 2006) ........................10

Williamson v. PricewaterhouseCoopers LLP, 9 N.Y.3d 1, 840 N.Y.S.2d 730
    (2007) ............................................................................................... 9-10, 12, 13

Plaintiffs Fortress Credit Opportunities I, LP and Fortress Credit Opportunities II, LP, by and through their undersigned attorneys, submit this Memorandum Of Law In Opposition To Defendant Moss Adams LLP's Motion, Pursuant To Fed. R. Civ. P. 12(c) For Judgment Dismissing The Complaint.

## PRELIMINARY STATEMENT

Defendant Moss Adams's motion to dismiss on statute of limitations grounds oversimplifies the law and ignores applicable principles that make it clear that Plaintiffs' cause of action accrued within the three year period for professional negligence. Moss Adams is a national accounting firm that prepared an expert report on behalf of its client for use in obtaining financing from Plaintiffs. Plaintiffs relied on Moss Adams's professional expertise when they agreed to enter into the loan on March 1, 2004, less than three years before the parties entered into a tolling agreement dated February 28, 2007.[1] The date that Plaintiffs relied on Moss Adams's expert analysis was the date of the closing on the loan because that is the date on which all facts necessary for Plaintiffs to state a claim for injury occurred. That is the law for professional negligence claims in New York.

Moss Adams relies instead on inapposite case law holding that a malpractice claim by a client against its accountant for negligently preparing tax returns or an annual audit accrues immediately upon receipt of the work product. But it ignores language in the cases it cites and in others discussed below demonstrating two fatal flaws in its argument: this is not a case where a client is suing its own accountant for malpractice

---

[1] Moss Adams provided a copy of its report to Plaintiff Fortress and does not argue on this motion that it was not in privity with Fortress.

and this case does not involve the receipt of financial documents that are final and ready to be filed upon receipt. Where the plaintiff is a third party that acted in reliance on work an accountant (or other professional) performed and where that work is the basis for a subsequent determination to enter into a transaction, the cause of action accrues when the plaintiff suffers injury by entering into the transaction. Moss Adams also ignores the fact that its analysis was intended to be reviewed by a second accounting and valuation expert so that Plaintiffs could have both analyses before deciding whether to enter into a loan with their borrower. That second report was delivered to Plaintiffs at the closing on the loan on March 1, 2004.

Thus, unlike a tax return provided to a client for filing, Moss Adams's report was not the final step necessary for Plaintiffs to determine whether to provide the loan. Where, as here, a third party receives a report from a professional for use in connection with other subsequently developed facts and negotiations in determining whether to enter into a transaction, the statute of limitations accrues when all facts necessary to allege an injury occur – and that was at the time that Plaintiffs closed the loan with their borrower on March 1, 2004. The statute of limitations here was tolled on February 28, 2007, which was within the three year limitations period. This action is timely.

## STATEMENT OF FACTS[2]

This dispute arises out of a March 1, 2004 loan agreement between Fortress

Credit Opportunities I, LP ("Fortress" and, together with Fortress Credit Opportunities II,

LP, "Plaintiffs") and The Songwriter Collective, LLC ("TSC") for $12.12 million (the

"Loan"). TSC was a music publishing company owned by individual songwriters that

was intended to consolidate their various rights to receive royalties on their published

songs into this one entity and then to sell securities or otherwise obtain long-term

financing that would be financed by the royalty streams on those copyrighted works and

secured by those rights. Fortress provided the Loan to serve as a bridge loan to allow

start-up financing for TSC for a period of up to one year while it prepared and

implemented its business plan. The Loan was secured by the same copyrighted works

that were being consolidated in TSC (the "Collateral").

As a condition to making the Loan, TSC was required to provide Fortress with an

appraisal of the Collateral at the time of the closing on the Loan, which occurred on

March 1, 2004. TSC consulted with defendants Wayne C. Coleman ("Coleman"), the

Royalty Compliance Organization ("RCO"), and Moss Adams LLP ("Moss Adams"), to

provide a valuation and other analyses needed to determine the magnitude of TSC's

---

[2] Simultaneously with filing this opposition, Plaintiffs are serving and filing a copy of an amended complaint (within the ten day period set forth in this Court's Rule 4) ("Am. Compl."). See Exhibit 2 to the Declaration of Michael C. Harwood. Inasmuch as Moss Adams filed an answer with its motion to dismiss, FRCP Rule 15 would appear to require leave to amend at this time as to Moss Adams. (Note however that since the other two defendants did not file answers, Plaintiffs are free to amend the complaint as to them as of right.) To the extent that such leave is required, Plaintiffs request that the Court deny the motion to dismiss and allow Plaintiffs to serve the Amended Complaint that is annexed to the Harwood Declaration. The facts set forth here are based on the amended complaint and are assumed to be true for the purposes of this motion to dismiss. Moss Adams has alternatively indicated that this Court may wish to convert its motion to one for summary judgment. Plaintiffs will await notice from the Court whether it has determined to take such action pursuant to FRCP Rule 12 (d) before submitting any summary judgment materials.

future royalty streams. This information was necessary for Plaintiffs to determine the amount of a loan that could be supported by the Collateral that TSC was providing and the terms and conditions of such a loan based on the risk inherent in that Collateral. Coleman, RCO, and Moss Adams all knew that their valuations and analyses would be used by TSC to obtain a loan from Fortress. Indeed, both RCO and Moss Adams provided copies of their reports directly to Fortress to assist in its analysis of the loan. Fortress did in fact rely on those valuations and analyses in assessing the amount and terms of a loan that could be adequately supported by TSC's future royalty revenues and adequately collateralized by the value of TSC's assets.

## The Songwriter Collective

The Songwriter Collective, LLC was created in 2002 as the first music publishing company owned by and run solely for the benefit of its songwriter members. TSC's members pledged the royalty streams generated by their individual song catalogues to TSC in return for an ownership share in TSC. TSC's business purpose was to securitize those individual streams or otherwise obtain long-term financing based on the value of the royalty stream that TSC's aggregate catalogue would generate.

In December 2003, TSC began to seek bridge financing from Fortress to, among other things, support TSC's operations until the long-term financing could be completed. As a condition precedent to providing the loan, Plaintiffs required a valuation of TSC's catalogue. The purpose of the valuation was to assist Plaintiffs in determining, among other things: (i) whether the amount and terms of the Loan would be commensurate with the value of the Collateral that TSC was providing; (ii) that TSC's royalty stream would be adequate to finance interest charges on the Loan while it remained outstanding; and (iii) in the event TSC should default on the Loan, that the value of TSC's catalogue

4

would adequately compensate Plaintiffs for any losses they might suffer from such a default.

TSC retained two expert firms to provide the required estimations, analyses, and valuation of the Collateral on behalf of and for use by TSC and its lender. TSC engaged one of those experts, Moss Adams, to calculate, estimate, and analyze the actual royalty streams that had been generated from the songbooks for the prior five years. This analysis and estimation was intended to be used by TSC, RCO, and Plaintiffs as part of the royalty valuation in connection with the bridge loan financing from Plaintiffs. Coleman and RCO, in turn, were retained to provide TSC and Fortress with an appraisal of the catalogue assets of TSC relying, in part on the Moss Adams data. Moss Adams understood that its report would be provided to TSC directly, and would also be provided to RCO and Coleman for further analysis so that RCO could provide its appraisal to TSC and to Fortress. Moss Adams also understood that Fortress would review and analyze its report, together with the corresponding valuation that RCO was going to prepare using that data, in order to determine whether and on what terms it would enter into the bridge loan with TSC.

Thus, pursuant to the terms of its engagement with TSC, Moss Adams prepared a "Due Diligence Report" dated February 17, 2004. The Due Diligence Report was provided to TSC, RCO, and Fortress by the Moss Adams office in Los Angeles, California. Upon information and belief, Moss Adams faxed its report to all three parties on February 17, 2004.

When Moss Adams issued its Due Diligence Report, it was aware that TSC and Fortress were negotiating a potential loan. Moss Adams was also aware that Fortress

would rely on the Due Diligence Report's representations regarding royalty streams in order to assess TSC's capability to repay a loan with interest.

In addition, however, Moss Adams knew it had to provide its Due Diligence Report simultaneously to RCO (in addition to TSC and Fortress) so that RCO could appraise the Collateral based on the future earnings of the catalogue. Moss Adams was aware that the accuracy of its Due Diligence Report was necessary for RCO to prepare an accurate appraisal. Thus, Moss Adams knew that, until the RCO appraisal was complete, its own Due Diligence Report was still subject to further analysis and consideration before TSC and Plaintiffs could rely on its conclusions and complete an agreement on a loan. Indeed, although Moss Adams referred to its February 17 report as "final," it also advised TSC that it would provide additional information and analysis, as needed. (Def. Ex. C.)

Some time after February 17, 2004, Coleman and RCO provided to Fortress and TSC an undated report setting forth a valuation of TSC's music catalogue assets as of January 30, 2004. According to Coleman and RCO, the report they provided to Fortress and TSC (the "RCO Report") was "designed to estimate the fair market value of [TSC's] Catalogs. . . and [is] intended to be used to assist [TSC] and their representatives in assigning value to those assets." Coleman and RCO's analysis, conclusions, and valuations were based in part on the data that Moss Adams had provided to Coleman and RCO on February 17, 2004. RCO subsequently updated this appraisal to provide Plaintiffs with a valuation as of February 25, 2004. (Am. Compl. ¶ 40.)

Pursuant to the loan agreement between TSC and Fortress, TSC was required to provide Fortress with "an asset valuation report of the Collateral prepared by an asset

6

valuation specialist" that was dated "as of the Closing Date." (Am. Compl. ¶ 12; Loan Agreement § 3.01(a)(xx), Harwood Dec. Ex. 1.) TSC delivered the final RCO Report to Fortress at the closing on March 1, 2004. In reliance on the Moss Adams Report and the RCO Report, Fortress closed on the Loan and provided the $12.12 million to TSC on March 1, 2004. (Fortress assigned a 40% interest in the loan to plaintiff Fortress Credit Opportunities II, LP in May 2004.)

Thus, Plaintiffs relied on the combined information and opinions contained in the Moss Adams Due Diligence Report and the RCO Report prepared by Coleman in deciding whether to enter into the Loan, to determine the terms of the Loan, and to justify the Loan amount. Specifically, Plaintiffs relied on both reports to conclude that the royalty revenue streams used by TSC as Collateral were adequate to support the interest charges on the Loan amount and that the catalogue value adequately collateralized the principal and interest of the Loan.

Within several months after origination of the Loan, the actual revenue streams generated by TSC's catalogue proved to be far below the estimates and valuation placed on them by Moss Adams and by Coleman and RCO. The actual royalty streams were wholly inadequate to support payments due. The Loan therefore collapsed. Plaintiffs provided notice of default to TSC in or about November 2004.

Plaintiffs entered into a tolling agreement with Moss Adams effective February 28, 2007, tolling the statute of limitations for six months. Plaintiffs commenced this action on August 17, 2007, within the six-month tolling period.

## ARGUMENT

### I.    Defendant's Motion Is Untimely

Plaintiff served its complaint upon defendant Moss Adams on August 22, 2007.
(Docket Entry 4.)  Therefore, defendant's opposition was due twenty days later on
September 11, 2007, as noted in docket entry 4.  Instead, defendant served its answer and
its motion to dismiss belatedly, a week later, on September 18, 2007.  Defendant did not
seek or obtain an extension of time to file its motion and answer.  Therefore, its motion to
dismiss on statute of limitations grounds is untimely.  "The general rule in this Circuit is
that the statute of limitations 'must be asserted in a party's responsive pleading "at the
earliest possible moment" and is a personal defense that is waived if not promptly
pleaded.'"  Funk v. F&K Supply, Inc., 43 F. Supp. 2d 205, 221 (S.D.N.Y. 1999)
(citations omitted).  Defendant did not assert this defense "at the earliest possible
moment," but waited until a week after its time to respond had passed.  Where defendant
is seeking to assert a timeliness defense to avoid liability, it is incumbent on that
defendant to meet the time requirements as well.  Here, defendant did not do so and its
assertion of the statute of limitations has been waived.

### II.    The Statute Of Limitations Did Not Accrue Upon Receipt of Defendants' Work Product

Moss Adams mistakenly argues that the statute of limitations applicable in all
accounting malpractice actions begins to run when the accountant's work product is
received by a plaintiff.  Defendant is wrong, for two reasons.  First, Moss Adams cites
two inapposite cases for this proposition, and then contradicts its own argument with a
third case holding that an accounting malpractice action "accrues when an injury

8

occurs."[3]  The date that the injury occurs will not always be the same date as when the accountant's work product is received -- and that is certainly not when the injury occurred here.  Second, New York law distinguishes between an "accounting malpractice" action between a client and its accountant, as discussed in all three cases Moss Adams cites, and a negligence action such as here between a lender and the accountant retained by its potential borrower.  There, again, the court must determine when the plaintiff's injury occurred.

As the complaint alleges, it was not until March 1, 2004 that Fortress could have relied on and could have been injured by Moss Adams's work product.  (Am. Compl. ¶¶ 53, 54.)  That is when Fortress received the final RCO Report that incorporated the data that Moss Adams had gathered and analyzed.  That is also the date on which Fortress was injured, because that is when Fortress closed the Loan in reliance on Moss Adams's findings as subsequently reviewed and adopted in the RCO Report delivered at closing. (Am. Compl. ¶ 54.)  Accordingly, the statute of limitations did not accrue until March 1, 2004.

**A.     The Statute Of Limitations In Accounting Negligence Actions Begins To Run Three Years From The Time All Facts Necessary To The Action Have Occurred**

**1.     The Bright Line "Upon Receipt Of Work Product Rule" Is Specific To Negligence In The Preparation Of Tax Returns**

In New York, the statute of limitations in an accounting action accrues "'when all the facts necessary to the cause of action have occurred and an injured party can obtain relief in court.'"  Williamson v. PricewaterhouseCoopers LLP, 9 N.Y.3d 1, 4-5, 840

---

[3] Defendant's Brief ("D. Br.") at 6, citing Bastys v. Rothschild, 97 Civ. 5154, 2000 U.S. Dist. LEXIS 17944 (S.D.N.Y. Nov. 21, 2000).

N.Y.S.2d 730, 733 (2007) (quoting Ackerman v. Price Waterhouse, 84 N.Y.2d 535, 541,

620 N.Y.S.2d 318, 320 (1994)).  This is normally the point at which a plaintiff

"reasonably relies on the accountant's skill and advice and, as a consequence of such

reliance," is injured.  Ackerman, 84 N.Y.2d at 541, N.Y.S.2d at 321.  Relying on

Ackerman, this court recognizes that under New York law, an accounting malpractice

action accrues "when an injury occurs".  Bastys v. Rothschild, No. 97 Civ. 5154, 2000

U.S. Dist. LEXIS 17944, *150 (S.D.N.Y. Nov. 21, 2000).

These are the only three cases that Moss Adams cites for its argument that the

statute of limitations accrued upon delivery of its report to Plaintiffs.  But Moss Adams

fails to consider the language in all three cases quoted above that the claim accrues when

the injury occurs and the plaintiff could have first alleged a cause of action against the

accountant.  By ignoring this language, Moss Adams mistakenly asserts that the statute of

limitations begins to run in New York -- as a matter of law, in every accounting action --

upon the receipt of the accountant's work product.  (D. Br. at 6.)

In contrast to the facts here, Ackerman and Williamson concerned an accountant's

negligent preparation of annual tax returns or audits.  See Ackerman, 84 N.Y.2d at 538,

620 N.Y.S.2d at 319; Williamson, 9 N.Y.3d at 2, 840 N.Y.S.2d at 730.  When an

accountant's work product is a tax return or an audit, it is normally ready to be filed by

the recipient as received and therefore may be relied on immediately.  In that context, the

Ackerman court held that receipt of the tax return from the accountant is "the first time

the client can rely on the alleged negligent work product," and it thus held that the statute

of limitations began to run upon receipt.  Ackerman, 84 N.Y.2d at 538, N.Y.S.2d at 319.

See also Mitschele v. Schultz, 36 A.D.3d 249, 252, 826 N.Y.S.2d 14, 18 (1st Dep't 2006)

("claim of negligently given incorrect accounting information or advice therefore normally accrues, under <u>Ackerman</u>, upon receipt of negligently prepared <u>tax documents</u>") (emphasis added); <u>Booth v. Kriegel</u>, 36 A.D.3d 312, 315, 825 N.Y.S.2d 193, 195 (1st Dep't 2006) (the receipt of work product rule applied where "the particular transactions at issue are the 14 annual federal tax returns" defendant prepared for plaintiff). Thus, in that context, the date of receipt and the date of reliance -- and therefore the date of injury -- will always be the same.

Here, the date of receipt was not the same as the date of reliance or the date when all facts necessary to allege injury occurred. Moss Adams was aware when it delivered its Due Diligence Report to TSC, RCO, and Fortress that its report would be used by RCO in RCO's appraisal of the Collateral. The complaint alleges that Moss Adams was aware that Plaintiffs would not rely on its report until RCO prepared a valuation of TSC's collateral based upon Moss Adams's data analysis. (Am. Compl. ¶ 32.) Prior to that further evaluation by RCO, all parties understood that Plaintiffs would not determine whether to accept that Collateral as sufficient to justify Plaintiffs' entry into the transaction and Plaintiffs could not have suffered any injury from Moss Adams's report. Consequently, no action could have accrued prior to RCO's further analysis.

Further, Moss Adams was aware when it issued its report that TSC was still in negotiations with Plaintiffs and, unlike the ministerial act of filing a tax return or an audited financial statement upon receipt, Moss Adams was aware that those negotiations would not be concluded on the same day that it sent its report to Plaintiffs. (Compl. ¶ 33; Def. Ex. C.) And Moss Adams stated when it delivered its Due Diligence Report to its

direct client, TSC, that it might require additional "information and analysis" after TSC received and reviewed it. (Def. Ex. C.)

Thus, Fortress was not, and could not have been, injured until it also received both the Moss Adams Report and the RCO Report, determined the terms, interest charges, and the loan amount that would be appropriate to TSC's catalogue value based on Moss Adams's and RCO's conclusions regarding the value of the royalty revenue streams used by TSC as Collateral, and relied on those reports by closing the Loan. (Am. Compl. ¶¶ 53, 54.)

The RCO Report was received at the closing and the Loan closed on March 1, 2004. (Compl. ¶ 50.) That is the date on which Plaintiffs "reasonably relie[d] on the accountant's skill and advice and, as a consequence of such reliance" could have been injured. Ackerman, 84 N.Y.2d at 541, N.Y.S.2d at 321. Moss Adams did not prepare any work product analogous to a tax return on which Plaintiffs could have possibly relied upon receipt. The analysis in Ackerman and Williamson regarding tax return and audit preparation is not applicable to the facts here involving a valuation of property to be pledged as collateral for a commercial loan.

Indeed, this court has recognized the distinction under New York law where an accounting malpractice action concerned a sale transaction rather than a tax filing -- in a case cited by Moss Adams. As noted above, the court in Bastys, 2000 U.S. Dist. LEXIS 17944, *150, stated that the cause of action accrues "when an injury occurs" (quoting Ackerman). There, the plaintiff transferred real property in 1992, relying on work performed by his accountant in 1989. The court found that the "alleged injury resulting from these negligent acts or omissions is the loss of Plaintiff's property in St. Croix in

12

1992, when Plaintiff transferred it." Id. at *151.  Accordingly, the court held that the

action accrued in 1992, at the time the transfer was consummated, and not at the time that

the accountant's report was received.  Id.

The bright line "upon receipt" rule applicable in tax return cases and urged by

Moss Adams is inapplicable here.

**2.    In The Context Of Consummated Transactions, Reliance And
Injury Both Occur And The Statute Of Limitations Accrues
Upon Consummation**

In its motion, Moss Adams also ignores a central distinction between the facts

alleged in the Complaint and the facts in Ackerman and Williamson.  In each of those

cases, the plaintiff was the direct client of the defendant accountant rather than a third

party lender to the accountant's client.  This distinction was expressly noted as relevant to

the analysis of when the statute of limitations accrues in Fleet Factors Corp. v. Werblin,

114 A.D.2d 996, 997, 495 N.Y.S.2d 434, 435-36 (2d Dep't 1985).  There, the plaintiff

approved advances to its borrower upon receipt of financial statements from its

borrower's accountant, and the court held:

> The Statute of Limitations for professional malpractice is three
> years, and in those cases where the plaintiff is the client of the
> professional the cause of action accrues upon the performance of the
> work by the professional [citations omitted].  However, where, as
> here, the action is brought by a third party who was not the client,
> the action is not strictly speaking one for malpractice, but is one for
> simple negligence.  And the statute begins to run, in such a case,
> from the date of the injury [citation omitted].

13

Id. The court dismissed the action because the plaintiff commenced the action more than three years after it provided advances to its borrower upon receipt of the defendant's negligently prepared financial reports. Id.[4]

Similarly, in Chemical Bank v. Sternbach & Co., 91 A.D.2d 518, 456 N.Y.S.2d 392 (1st Dep't 1982), the plaintiff lent money to a third party in reliance on financial statements it received from the defendant, the borrower's accountant. The court dismissed the action because the lender commenced the action "more than three years after it received and relied upon the certified statements to extend credit to [the borrower]." Id. (emphasis added).

This court in Cohen v. Abrahams, 751 F. Supp. 472 (S.D.N.Y. 1990), reached the same result. There, an accountant not retained by the plaintiff provided an assessment of the financial condition of corporations to which the plaintiff made loans. The court held that the action was time barred because it was brought, unlike here, more than three years after "the last loan made to any of [the] corporations in reliance upon" the defendant's work product. Id. at 473. This decision was made on a motion for summary judgment and the court noted that although the complaint, filed in 1987, alleged that loans had been made as late as 1985, plaintiffs produced no evidence showing any loans after 1982. Id. at 473-74.

It should be noted that while the courts in all four of the non-tax return cases discussed above (Batsys, Chemical Bank, Fleet, and Cohen) looked to when the plaintiffs actually relied on the financial statements that they had received, in both Fleet and Cohen

---

[4] The court first stated that it would look to when the lender received the reports but then relied on the dates that advances were made in determining that the lender apparently provided the advances upon receipt of the reports. Id.

14

the courts said that the claims accrued upon receipt of the financial statements because the loans could have been made at that time. Of course, the facts here are different. Moss Adams's delivery of its Due Diligence Report to TSC, RCO, and Fortress was just the first step necessary before the Plaintiffs could have relied on its analysis. Moss Adams and TSC knew that the RCO Report could not be completed until after Moss Adams provided its report and RCO had an opportunity to work with that analysis to prepare its appraisal. It was not until Plaintiffs received the final information and decided to enter into the Loan transaction with TSC that it could have relied upon the Moss Adams report. And the complaint specifically alleges that the RCO Report was delivered at the closing.

Thus, all of the facts necessary for Plaintiffs to assert that they were injured accrued on March 1, 2004 when the final reports were delivered at the closing and Plaintiffs relied on them by making the Loan to TSC.

This accrual rule is the same where a plaintiff enters into a transaction in reliance on the work of professionals in other fields besides accounting. IFD Constr. Corp. v. Corddry Carpenter Dietz and Zack, 253 A.D.2d 89, 685 N.Y.S.2d 670 (1st Dep't 1999), is particularly instructive in that it relies on the same body of law as the accounting cases cited above. There, the plaintiff received allegedly defective work product from an engineering firm it had not directly retained. The defendant had negligently misrepresented the condition of the property that it had been hired to assess, and the plaintiff formulated its offer "on the basis of documents and specifications prepared by the defendant."

The court first recognized "the differing rights of the owner who retained the engineer and a party outside of that relationship who is allegedly injured as a result of the engineer's negligence." Id. at 92, 685 N.Y.S.2d at 671. The court then cited Ackerman, supra, and Credit Alliance Corp. v. Andersen & Co., 101 A.D.2d 231, 476 N.Y.S.2d 539 (1st Dep't 1995), rev'd on other grounds, 65 N.Y.2d 536 (1985), for the proposition that "the date the work product is received . . . is the earliest date on which the injured party, who did not retain the professional, could have relied upon it [emphasis added]." In IFD, however, the court held that the statute of limitations began to run not upon receipt of the negligent report but when the plaintiff actually relied upon the report when it consummated the transaction. The court explained that "[h]aving allegedly relied on the [defendant's] negligent misrepresentations in the contract documents in formulating its supposed unrealistically low bid, [plaintiff] was, for purposes of the Statute of Limitations, injured" when it entered into the contract. 253 A.D.2d at 93, 685 N.Y.S.2d at 672.

The result is the same here because here, too, Plaintiffs did not and could not have relied on the Moss Adams Due Diligence Report immediately upon its receipt. Moss Adams provided its Due Diligence Report to RCO and was aware that RCO would use its report to determine the magnitude of the future royalty cash flows and earnings that TSC could reasonably expect to garner from future earnings. Moss Adams was aware that its report would not be the sole basis of Plaintiffs' reliance, that TSC might not consider its report to be final and complete upon delivery, and that the Due Diligence Report it provided to RCO was to be used by RCO in connection with RCO's appraisal of the Collateral. Moss Adams was aware that the accuracy of its Due Diligence Report was

16

necessary to an accurate valuation by RCO of the Collateral and of the royalty streams

TSC would use to pay principal and interest on the Loan. (Compl. ¶¶ 31, 32.) Plaintiffs

subsequently entered into the Loan, accepting TSC's Collateral as sufficient in reliance

on the estimates, analyses, and valuations contained in the RCO Report and the Moss

Adams Due Diligence Report. (Compl. ¶ 52.) Plaintiffs received the RCO Report at the

closing on March 1, 2004 and that is the date that the cause of action accrued. Plaintiffs

were not injured until they entered into the transaction and they could not have entered

into the transaction in reliance solely on the Moss Adams Report.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court deny

Defendant's Motion For Judgment Dismissing The Complaint.

Dated: New York, New York
       October 2, 2007

Respectfully submitted,

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By: _____
    Michael C. Harwood (MH 4227)
1633 Broadway
New York, New York  10019
Tel:    (212) 506-1700
Fax:    (212) 506-1800

Attorneys for Plaintiffs

17