# EXHIBIT 1 - Part 2

EXHIBIT A

FORM OF PROMISSORY NOTE

March 1, 2004

FOR VALUE RECEIVED, THE SONGWRITER COLLECTIVE, LLC, a Delaware limited liability company (the "Borrower"), hereby unconditionally promises to pay to the order of Fortress Credit Opportunities I LP ("Fortress"), in its capacity as agent for the Lenders under the Agreement described below (the "Agent") and as a lender, at Fortress' office located at 1251 Avenue of the Americas, New York, New York 10020 or to such other location or account as Fortress shall specify to the Borrower from time to time, in Federal or other immediately available funds in lawful money of the United States the principal amount of TWELVE MILLION ONE HUNDRED TWENTY THOUSAND DOLLARS ($12,120,000.00) plus the additional amounts of PIK Interest as of each Interest Calculation Date, if any, pursuant to the Agreement (as defined herein) in such amounts and on such dates as are determined pursuant to the Agreement.

The Borrower further promises to pay interest on the unpaid principal amount of the Loan made by the Lenders hereunder and under the Agreement and to pay the unpaid principal from time to time until the Loan is repaid in full, in like money at the rates and on the dates set forth in the Agreement.

To the extent not due prior to such time, the entire unpaid principal balance of this Note, together with accrued unpaid interest, shall be due and payable on the Maturity Date (as defined in the Agreement).

This Note is the Note referred to in and is entitled to the benefits and subject to the terms of, the Loan Agreement, dated as of March 1, 2004 (as amended, supplemented or modified from time to time, the "Agreement"), among the Borrower and Fortress, as Agent and the Lenders. The Agreement contains, among other things, provisions for acceleration of the maturity hereof upon the occurrence of certain stated events and also for prepayments on account of the principal hereof prior to the maturity hereof upon the terms and conditions specified therein.

Except as otherwise specified in the Agreement, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Agreement.

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW BUT OTHERWISE WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES).

A-1

THE SONGWRITER COLLECTIVE, LLC


By: _____
     Name:
     Title:

A-2

EXHIBIT B

## FORM OF ASSIGNMENT AND ACCEPTANCE

Dated _____, 200_

Reference is made to the Loan Agreement, dated as of March 1, 2004 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), among The Songwriter Collective, LLC, a Delaware limited liability company, as borrower (the "Borrower"), and Fortress Credit Opportunities I LP, a limited partnership, as a Lender (as hereinafter defined) and as Agent (as hereinafter defined) for the Lenders (as hereinafter defined) Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Loan Agreement.

_____ (the "Assignor") and _____ (the "Assignee") agree as follows:

1.     The Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, that interest in and to all of the Assignor's rights and obligations under the Loan Agreement as of the date hereof which represents the percentage interest specified in Section 1 of Schedule 1 hereto of all outstanding rights and obligations of the Assignor under the Loan Agreement, including such interest in the Loan made by the Assignor. After giving effect to such sale and assignment, the Assignee's amount of the Loan made by the Assignee will be as set forth in Section 2 of Schedule 1 hereto.

2.     The Assignor (i) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Loan Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Agreement or any other instrument or document furnished pursuant thereto; and (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or the performance or observance by the Borrower of any of its obligations under the Loan Agreement or any other instrument or document furnished pursuant thereto.

3.     The Assignee (i) confirms that it has received a copy of the Loan Agreement, together with copies of such financial statements and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon the Assignor and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action with respect to the Loan Agreement; (iii) confirms that it is an Eligible Assignee; (iv) appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Loan Agreement as are delegated to the Agent, by the terms thereof, together with such powers as are reasonably incidental thereto; and (v) agrees that it will perform in accordance with their terms all of the

obligations which by the terms of the Loan Agreement are required to be performed by it as a Lender.

4.    Following the execution of this Assignment and Acceptance by the Assignor and the Assignee, it will be delivered to the Agent for acceptance and recording by the Agent. The effective date of this Assignment and Acceptance (the "Assignment Date") shall be the date of acceptance hereof by the Agent, unless a later date is specified in Section 3 of Schedule 1.

5.    Upon such acceptance by the Agent and upon such recording by the Agent, as of the Assignment Date, (i) the Assignee shall be a party to the Loan Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Lender thereunder and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Loan Agreement.

6.    Upon such acceptance by the Agent and upon such recording by the Agent, from and after the Assignment Date, the Agent shall make, or cause to be made, all payments under the Loan Agreement in respect of the interest assigned hereby (including all payments of principal and interest with respect thereto) to the Assignee. The Assignor and Assignee shall make all appropriate adjustments in payments under the Loan Agreement for periods prior to the Assignment Date directly between themselves.

7.    THIS ASSIGNMENT AND ACCEPTANCE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW BUT OTHERWISE WITHOUT REGARD TO APPLICABLE CONFLICTS OF LAW PRINCIPLES).

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed by their respective officers thereunto duly authorized, as of the date first above written.

[ASSIGNOR]

By: _____
    Name:
    Title:

<u>Address for notices</u>
    [Address]

[ASSIGNEE]

By: _____
    Name:
    Title:

<u>Address for notices</u>
    [Address]

ACKNOWLEDGED AND ACCEPTED
this ___ day of _____, _____

FORTRESS CREDIT OPPORTUNITIES I LP,
as Agent

By: _____
    Name:
    Title:

B-3

Schedule 1
to
Assignment and Acceptance
Dated _____, 20___

Section 1.

    Percentage Interest:                         _____%

Section 2.

    Assignee's Loan:                       $_____
Section 3.

    Assignment Date: _____, 20___

B-4

EXHIBIT C

BACKUP MANAGEMENT LETTER AGREEMENT

**SESAC, INC.**
152 West 57th Street
57th Floor
New York, New York 10019

March 1, 2004

Fortress Credit Opportunities I, LP
1251 Avenue of the Americas
New York, New York 10020
Attention: Chief Financial Officer

The Collective Holding Company, LLC
The Songwriter Collective, LLC
Jean Mason
30015 Triunfo Drive
Agoura, California 91301

Re:    *Backup Management Services Agreement*

Dear Sirs:

Reference is made to the Loan Agreement, dated as of March 1, 2004 (the *"Loan Agreement"*), between The Songwriter Collective, LLC, as borrower (*"Borrower"*) and Fortress Credit Opportunities I, LP, as agent for the lender (in such capacity, *"Agent"*) and as a lender. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Loan Agreement.

The financing contemplated by the Loan Documents (the *"Financing"*) will require the waiver in part of the exclusive copyright administration rights of SESAC, Inc. (*"Backup Manager"*) pursuant to Section 3 ("Copyright Administration Services") of the SESAC Agreement, and the exclusive securitization management rights of Backup Manager pursuant Section 5 ("Securitization Management Services") of the SESAC Agreement.

Solely in order to facilitate the Financing strictly in accordance with the terms and conditions set forth in the Loan Documents (and, for the avoidance of doubt, not with respect to or in order to facilitate any other financing of any nature or description in lieu of or addition to the Financing), Backup Manager hereby grants such waivers, subject to the other terms and conditions of this letter agreement (this *"Agreement"*).

The parties to this Agreement acknowledge and agree that from and after the earliest of: (A) Backup Manager's receipt of notice from Agent of its election pursuant to Section 4.01 of the Loan Agreement to cause Management Services to be provided by Backup Manager; and (B) the closing of the Take-Out Financing; Backup Manager (or one or more of its subsidiaries) shall provide Management Services (as defined below) in respect of the Financing on customary terms and conditions that are reasonably acceptable to Backup Manager and Agent. For purposes of

C-1

2

this Agreement, *"Management Services"* means, collectively, protecting the Collateral, sending and enforcing letters of direction in respect of third-party payments generated by the Collateral, maintaining accurate books and records in respect of the Collateral, and preparing reports in respect of the foregoing to the extent reasonably requested by Agent; *provided* that Management Services shall not include any of the copyright administration services that are the subject of the letter, dated March 1, 2004, from Backup Manager to Borrower, The Collective Holding Company, LLC, and Jean Mason (the *"Backup Copyright Administration Agreement"*); *provided further* that such Management Services shall be contingent upon receipt by Backup Manager of adequate documentation in respect of the Collateral from Borrower.

In connection with performing Management Services, Backup Manager shall obtain Agent's prior written consent before commencing any legal proceedings on behalf of Borrower and shall make arrangements with Agent regarding the costs of such proceedings. Any legal proceedings shall be in the name of Borrower and Borrower hereby authorizes Backup Manager to take any actions on its behalf and in its name. While performing any Management Services hereunder, Backup Manager shall be the agent of Borrower; *subject, however,* to compliance with the directions of Agent in respect of Management Services.

SESAC acknowledges that the amounts paid to it under the Backup Copyright Administration Agreement shall also be compensation for performing Management Services hereunder, and that no additional amounts shall be payable hereunder. Neither Agent, the Lenders, nor the Borrower shall amend or otherwise modify the definitions of "Backup Manager Tier One Fees" or "Backup Manager Tier Two Fees" or change the order or priority of payment of such fees from Collections pursuant to Section 5.02 ("Accounts and Distributions—Distributions") of the Loan Agreement that would adversely affect Backup Manager without Backup Manager's agreement.

Agent shall have the right to terminate Backup Manager as the provider of Management Services (but shall have no right whatsoever to terminate the Backup Copyright Administration Agreement; provided that Backup Manager acknowledges and agrees that any Collateral sold by Agent or the Lenders in connection with the exercise of their rights in respect of such Collateral shall be sold free and clear of Backup Manager's copyright administration rights in respect of such Collateral under this Agreement or any other TSC Contract) at any time in its sole discretion; *provided* that any such termination shall not authorize or result in the termination of the Backup Copyright Administration Agreement or any reduction of the fees payable to Backup Manager thereunder (*i.e.*, the full amount of the fees payable pursuant to the Backup Copyright Administration Agreement shall continue to be paid to Backup Manager even after the termination of this Agreement). Backup Manager's duties to provide Management Services hereunder shall terminate automatically if the Backup Copyright Administration Agreement is terminated for any reason. Upon termination of Backup Manager as the provider of Management Services, Backup Manager shall deliver to the successor Backup Manager all documents and records in its possession relating to Management Services as soon as practicable after receipt of such notice but in no event later than ten Business Days after receipt of a termination notice from Agent.

Except for the consent and waivers expressly provided for above, nothing contained in this Agreement shall be deemed to impair, waive, or otherwise modify in any manner any rights or remedies Backup Manager or any of its Affiliates may have under the SESAC Agreement or any other TSC Contract, nor preclude Backup Manager or any of its Affiliates from or limit it in exercising or pursuing any such rights or remedies, whether available at law or in equity. Neither Backup Manager nor any of its Affiliates is hereby waiving any right to take action with respect to the existence of any defaults under the SESAC Agreement or any other TSC Contract or any other events that, with the giving of notice or lapse of time or both, would constitute a default thereunder.

C-2

3

Each party hereto acknowledges that irreparable damage may occur, and the other parties' remedies at law might be inadequate, if any term or provision of this Agreement was not performed or observed strictly in accordance with this Agreement and, in such circumstances, unconditionally and irrevocably waives any defense that may be available to it that any other party's remedies at law are adequate or that such party's injuries are not irreparable. Each party hereto shall be entitled to seek equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction, or any other equitable remedy that may then be available to it.

Notwithstanding anything to the contrary contained herein: (i) no party hereto or any of its Affiliates shall be liable to any other party hereto under or in connection with this Agreement for any, and each party hereto hereby waives to the fullest extent permitted by applicable Law, all consequential, incidental, indirect, punitive, exemplary, remote, speculative, or special damages of any kind, nature, or description whatsoever; and (ii) neither SESAC nor any of its Affiliates shall be liable to Borrower, The Collective Holding, LLC, Jean Mason, Agent, or any Lender or any of their respective Affiliates for, and Borrower, The Collective Holding, LLC, Jean Mason, Agent, and each Lender each hereby waives, on its own behalf and on behalf of each of its Affiliates, to the fullest extent permitted by applicable Law, all Losses based upon, resulting from, arising out of, or relating to, any action or omission by SESAC or any of its Affiliates in connection with providing any services to or on behalf of Borrower, Agent, or the Lenders or any of their respective Affiliates under or in connection with this Agreement, except to the extent that any such action or omission constitutes gross negligence or willful misconduct.

Sections 26.1 ("Certain Miscellaneous Terms—Further Action") (the first sentence thereof only), 26.3 ("—Expenses") (the first sentence thereof only), 26.4 ("—Public Announcements"), 26.5 ("—Notices"), 26.7 ("—Amendment; Waiver"), 26.8 ("—Entire Agreement"), 26.9 ("—Severability"), 26.10 ("—Successors and Assigns; No Third Party Beneficiaries") (excluding the proviso thereto), 26.11 ("—Cumulative Remedies"), 26.12 ("—Equitable Remedies"), 26.13 ("—Governing Law"), 26.14 ("—Waiver of Jury Trial"), 26.15 ("—Jurisdiction"), 26.16 ("—Service of Process"), 26.17 ("—Preparation and Negotiation of This Agreement"), 26.20 ("—Counterparts"), 26.21 ("—Delivery Via Telecopier") of the SESAC Agreement are incorporated herein by reference *mutatis mutandis* to the same extent as if set forth herein in full; *provided* that each reference therein to Holding Company, Operating Company, or Promoter shall also be and mean a reference to the Lenders and Agent.

Each of the parties represents that it is duly authorized to execute this Agreement.

[THE REMAINDER OF THE PAGE HAS BEEN INTENTIONALLY LEFT BLANK.]

4

If the above correctly sets forth the understanding among the parties hereto with respect to the subject matter hereof, please so indicate by signing and returning to the undersigned one of the enclosed duplicates of this Agreement.

Very truly yours,
SESAC, INC., on its own behalf and on behalf of its Affiliates

By:
Name:
Title:
ACKNOWLEDGED AND AGREED

FORTRESS CREDIT OPPORTUNITIES I,
    LP, as Agent

By: _____
Name:
Title:
THE SONGWRITER COLLECTIVE, LLC,
    as Borrower

By: _____
Name:
Title:

THE COLLECTIVE HOLDING
    COMPANY, LLC, as Guarantor

By: _____
Name:
Title:

_____
JEAN MASON

EXHIBIT D

RESERVE ACCOUNT DISTRIBUTION NOTICE

_____ ___, 200_

To: Fortress Credit Opportunities I, LP
1251 Avenue of the Americas
New York, New York 10020
Attn: Joshua Pack

Pursuant to the Loan Agreement, dated as of March 1, 2004, among The Songwriter Collective, LLC, a Delaware limited liability company, as borrower (the "Borrower"), and Fortress Credit Opportunities I LP, a limited partnership, as a lender and as Agent (the "Agent") for the lenders, the undersigned, an Authorized Officer of the Borrower hereby requests that $_____ be distributed from the Reserve Account on _____, 200_ for the purpose of [(i) paying operating expenses], [(ii) paying Take-Out Financing expenses and paying interest in the event of a shortfall in Collections for the related Collection Period, and such amount when added to the Take-Out Financing expenses paid to date does not exceed the Maximum Take-Out Financing Expenses amount set forth on Schedule IV], [(iii) making Class A Member Distributions,] [(iv) paying Existing Member Advance Amounts,] [(v) paying Rights Reserve Amounts] [(vi) paying a Post Closing Date Mandatory Repayment] [(vii) paying Deferred Expenses from Excess Additional Class A Member Amounts and from Excess Existing Member Advance Amounts, if any,] [in accordance with the permitted expenditures set forth on Schedule IV to the Agreement.]

[Add reference to any documents being delivered to the Agent.]

The uses and amounts stated above are in compliance with the requirements set forth in Sections 2.02(c) and 2.02(d) of the Agreement.

Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Agreement.

THE SONGWRITER COLLECTIVE, LLC

By: _____
            Authorized Officer

D-1

[ACKNOWLEDGED AND AGREED

FORTRESS CREDIT OPPORTUNITIES I, LP

By: _____]*
    Name:
    Title:

---

* For items (i), (ii) or (iii) above

EXHIBIT E

FORM OF AGREEMENT RE SALE OF COLLATERAL
UPON EVENT OF DEFAULT

**SESAC, INC.**
152 West 57th Street
57th Floor
New York, New York 10019


March 1, 2004


Fortress Credit Opportunities I, LP
1251 Avenue of the Americas
New York, New York 10020
Attention: Chief Financial Officer

The Collective Holding Company, LLC
The Songwriter Collective, LLC
Jean Mason
30015 Triunfo Drive
Agoura, California 91301


Re:     *Sale of Collateral Upon Event of Default*

Dear Sirs:

Reference is made to the Loan Agreement, dated as of March 1, 2004 (the *"Loan Agreement"*), between The Songwriter Collective, LLC, as borrower (the *"Borrower"*) and Fortress Credit Opportunities I, LP, as agent for the lender (in such capacity, the *"Agent"*) and as a lender. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Loan Agreement.

In order to permit Agent and the Lenders to exercise fully all of their rights pursuant to the Security Agreement in respect of the Collateral upon the occurrence of an Event of Default, the financing contemplated by the Loan Documents (the *"Financing"*) will require the waiver in part of the rights of SESAC, Inc. (*"SESAC"*) pursuant to Section 13 (*"Buyout Rights"*) of the SESAC Agreement (as amended through and including the date hereof), and the consent of SESAC under Section 3.1 (*"—No Transfers"*) of the SESAC Agreement to the encumbrances on the Collateral effected under the Loan Documents.

Solely in order to facilitate the Financing (and the exercise of the Lenders rights in respect of the Collateral in connection therewith) strictly in accordance with the terms and conditions set forth

in the Loan Documents (and, for the avoidance of doubt, not with respect to or in order to facilitate any other financing of any nature or description in lieu of or addition to the Financing), SESAC hereby grants such waiver and consents to such encumbrances with respect to the Collateral, subject to the other terms and conditions of this letter agreement (this "*Agreement*").

If after the occurrence of an Event of Default the Lenders make the determination to sell or otherwise transfer all or any portion of the Collateral in connection with the exercise of their remedies under the Loan Documents, Agent shall give SESAC written notice thereof (the "*Option Sale Notice*"). The Option Sale Notice shall specify the principal amount plus interest, costs, and expenses owing from Borrower to the Lenders and Agent under or in connection with the Loan Documents as of such date (as such amount may increase or decrease from time to time, the "*Payoff Amount*").

SESAC shall have the option, exercisable within fifteen Business Days after receipt of the Option Sale Notice, to cause the fair market value (the "*Fair Market Value*") of the Collateral (*i.e.*, the price an unaffiliated, willing purchaser would pay an unaffiliated, willing seller for the Collateral in the open market) to be determined. Fair Market Value shall take into account all facts and circumstances relevant to a valuation of the Collateral, including the fact that the Collateral will be sold free and clear of any copyright administration or management rights of SESAC under the SESAC Agreement. If SESAC wishes to exercise such option, SESAC shall give Borrower and Agent notice thereof (the "*Valuation Election Notice*") prior to expiration of such fifteen-Business Day period.

Within ten Business Days after Agent's receipt of the Valuation Election Notice, SESAC and Agent shall each engage an independent investment banking firm, accounting firm, or other Person of high international standing and good reputation with substantial experience in valuing music publishing businesses and music rights in the United States of America that is reasonably acceptable to the other party (each, a "*Representative Appraiser*"). SESAC and Agent shall cause their respective Representative Appraisers to engage a third, independent valuation expert with similar qualifications (the "*Independent Appraiser*" and, together with the Representative Appraisers, the "*Qualified Appraisers*") within ten Business Days after both Representative Appraisers have been engaged. SESAC and Agent shall cause the Qualified Appraisers independently to determine the Fair Market Value of the Collateral and to report their respective determinations to both of them within twenty Business Days after the Independent Appraiser has been engaged. If either Representative Appraiser fails timely to deliver its report as provided above, such Representative Appraiser's determination of the Fair Market Value of the Collateral shall not be used in calculating the Option Purchase Price or for any other purpose hereunder. If the Independent Appraiser fails or is reasonably likely to fail timely to deliver its report as provided above, SESAC and Agent shall use all commercially reasonable efforts to engage a substitute Independent Appraiser and to cause such substitute Independent Appraiser to determine the Fair Market Value of the Collateral and to report its determination to both of them as soon as possible.

The purchase price for the Collateral (the "*Option Purchase Price*") shall equal the greater of: (A) the Payoff Amount as of the purchase date; and (B) the average of the Fair Market Value determinations of the Qualified Appraisers; *provided, however,* that if the Fair Market Value determination of either Representative Appraiser is more than ten percent higher or lower than

the Fair Market Value determination of the Independent Appraiser, such Representative Appraiser's determination shall not be used in calculating the Option Purchase Price or for any other purpose hereunder. The Option Purchase Price as so determined shall be final, binding, and conclusive on both parties.

Borrower and its Subsidiaries shall provide the Qualified Appraisers, SESAC, and Agent with complete access to the books and records, projections and forecasts, business plans, Representatives, and all data and other information of Borrower and its Subsidiaries relevant to such Person's determination of the Fair Market Value of the Collateral as the Qualified Appraiser, SESAC, or Agent may request.

SESAC and Agent shall each be responsible for all costs and expenses of its own Representative Appraiser and for one-half of all costs and expenses of the Independent Appraiser.

SESAC shall have the option, exercisable within ten Business Days after the Option Purchase Price is determined, irrevocably to elect to purchase the Collateral on an as is, where is basis, without representations or warranties from Agent or the Lenders (except with respect to their acts), for an amount in cash equal to the Option Purchase Price. If SESAC wishes to exercise such option, SESAC shall give Borrower and Agent notice thereof (the "*Option Purchase Election Notice*") prior to expiration of such ten-Business Day period. SESAC and Agent shall use all commercially reasonable efforts to consummate the sale and purchase of the Collateral within thirty days after Agent's receipt of the Option Purchase Election Notice.

In no event shall Agent or the Lenders be obligated to sell the Collateral to SESAC if: (i) the Fair Market Value of the Collateral is determined pursuant hereto to be less than the Payoff Amount; or (ii) SESAC has not timely delivered a Valuation Election Notice or an Option Purchase Election Notice, has not timely consummated the sale and purchase of the Collateral after timely delivery of an Option Purchase Election Notice, or has notified Agent that it does not wish to purchase the Collateral. If SESAC has not timely delivered a Valuation Election Notice or an Option Purchase Election Notice, has not timely consummated the sale and purchase of the Collateral after timely delivery of an Option Purchase Election Notice, or has notified Agent that it does not wish to purchase the Collateral, then SESAC shall have not further rights to purchase the Collateral, and Agent may thereafter sell or cause the sale of the Collateral on any terms (subject to the restriction against the sale of Collateral to ASCAP or BMI set forth below). If the Fair Market Value of the Collateral is determined pursuant hereto to be less than the Payoff Amount and SESAC elects not to purchase the Collateral for the Payoff Amount or any other amount greater than the Fair Market Value of the Collateral as so determined, then Agent may sell or cause the sale of the Collateral to a Third Party (as defined in the SESAC Agreement) (a "*Permitted Sale*"), subject to the following. If Agent and the Lenders wish to consummate a Permitted Sale, Agent shall give SESAC notice thereof (a "*Third-Party Sale Notice*") not fewer than ten Business Days prior to the date on which Agent wishes to consummate such sale. Such Third-Party Sale Notice shall describe in reasonable detail all material terms and conditions of such sale, including the proposed consideration for the Collateral and the expected closing date. SESAC shall have the option, exercisable within ten Business Days after it actually receives the Third-Party Sale Notice, irrevocably to elect to purchase the Collateral upon the same terms and subject to the same conditions as outlined in such Third-Party Sale Notice; *provided* that if the consideration to be paid by such prospective Third-Party consists in whole or in part of anything

E-3

other than cash, SESAC shall have the right to match such consideration for a cash purchase price of equivalent value only. If SESAC wishes to exercise such option, SESAC shall give Borrower and Agent notice thereof (a "*Match Purchase Election Notice*") prior to expiration of such ten-Business Day period. SESAC and Agent shall use all commercially reasonable efforts to consummate the sale and purchase of the Collateral within thirty days after Agent's receipt of the Match Purchase Election Notice. If SESAC does not timely deliver a Match Purchase Election Notice or has notified Agent that it does not wish to purchase the Collateral, Agent can consummate the Permitted Sale upon any terms with any Person.

Notwithstanding anything to the contrary contained in this Agreement, if any action or omission: (i) by Agent, the Lenders, Agent's Representative Appraiser, the Independent Appraiser, or Borrower results in SESAC or SESAC's Representative Appraiser being unable to comply with any applicable time period hereunder, such time periods as they apply to SESAC shall automatically be extended to the extent reasonably necessary under the circumstances to permit such Person to comply with such time period; or (ii) by SESAC, SESAC's Representative Appraiser, the Independent Appraiser, or Borrower results in Agent or Agent's Representative Appraiser being unable to comply with any applicable time period hereunder, such time periods as they apply to Agent shall be automatically extended to the extent reasonably necessary under the circumstances to permit such Person to comply with such time period.

Notwithstanding anything to the contrary contained in this Agreement, if as a result of any action or omission of Agent, the Lenders, Borrower, or the Independent Appraiser any applicable time period hereunder is not or cannot be complied with by SESAC or its Representative Appraiser, such time period shall automatically be extended to the extent reasonably necessary under the circumstances to permit such Person to comply with such time period.

Notwithstanding anything to the contrary contained in this Agreement or any other TSC Contract (as defined in the SESAC Agreement), neither SESAC nor any of its Affiliates shall have any continuing right to provide copyright administration or management services in respect of any Collateral after the consummation of any Permitted Sale in respect of such Collateral in accordance herewith, and SESAC hereby waives its rights under the Backup Copyright Administration Agreement and any other TSC Contract to provide copyright administration or management services in respect of such Collateral after such Permitted Sale.

Notwithstanding anything to the contrary contained in this Agreement, under no circumstances shall Agent or the Lenders directly or indirectly sell or otherwise transfer any of the Collateral to Broadcast Music, Inc. or the American Society of Composers, Authors and Publishers or any of their respective Affiliates.

Except as expressly provided above, the provisions of Section 13 ("Buyout Rights") of the SESAC Agreement shall remain in full force and effect in all respects.

Except for the waiver expressly provided for above, nothing contained in this Agreement shall be deemed to impair, waive, or otherwise modify in any manner any rights or remedies SESAC or any of its Affiliates may have under the SESAC Agreement or any other TSC Contract, nor preclude SESAC or any of its Affiliates from or limit it in exercising or pursuing any such rights or remedies, whether available at law or in equity. Neither SESAC nor any of its Affiliates is

hereby waiving any right to take action with respect to the existence of any defaults under the SESAC Agreement or any other TSC Contract or any other events that, with the giving of notice or lapse of time or both, would constitute a default thereunder.

Each party hereto acknowledges that irreparable damage may occur, and the other parties' remedies at law might be inadequate, if any term or provision of this Agreement was not performed or observed strictly in accordance with this Agreement, and, in such circumstances, unconditionally and irrevocably waives any defense that may be available to it that any other party's remedies at law are adequate or that such party's injuries are not irreparable. Each party hereto shall be entitled to seek equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction, or any other equitable remedy that may then be available to it.

Notwithstanding anything to the contrary contained herein: (i) no party hereto or any of its Affiliates shall be liable to any other party hereto under or in connection with this Agreement for any, and each party hereto hereby waives to the fullest extent permitted by applicable Law, all consequential, incidental, indirect, punitive, exemplary, remote, speculative, or special damages of any kind, nature, or description whatsoever; and (ii) neither SESAC nor any of its Affiliates shall be liable to Borrower, The Collective Holding, LLC, Jean Mason, Agent, or any Lender or any of their respective Affiliates for, and Borrower, The Collective Holding, LLC, Jean Mason, Agent, and each Lender each hereby waives, on its own behalf and on behalf of each of its Affiliates, to the fullest extent permitted by applicable Law, all Losses based upon, resulting from, arising out of, or relating to, any action or omission by SESAC or any of its Affiliates in connection with providing any services to or on behalf of Borrower, Agent, or the Lenders or any of their respective Affiliates under or in connection with this Agreement, except to the extent that any such action or omission constitutes gross negligence or willful misconduct.

Sections 26.1 ("Certain Miscellaneous Terms—Further Action") (the first sentence thereof only), 26.3 ("—Expenses") (the first sentence thereof only), 26.4 ("—Public Announcements"), 26.5 ("—Notices"), 26.7 ("—Amendment; Waiver"), 26.8 ("—Entire Agreement"), 26.9 ("—Severability"), 26.10 ("—Successors and Assigns; No Third Party Beneficiaries") (excluding the proviso thereto), 26.11 ("—Cumulative Remedies"), 26.12 ("—Equitable Remedies"), 26.13 ("—Governing Law"), 26.14 ("—Waiver of Jury Trial"), 26.15 ("—Jurisdiction"), 26.16 ("—Service of Process"), 26.17 ("—Preparation and Negotiation of This Agreement"), 26.20 ("—Counterparts"), 26.21 ("—Delivery Via Telecopier") of the SESAC Agreement are incorporated herein by reference *mutatis mutandis* to the same extent as if set forth herein in full; *provided* that each reference therein to Holding Company, Operating Company, or Promoter shall also be and mean a reference to the Lenders and Agent.

Each of the parties hereto represents that it is duly authorized to execute this Agreement.

[THE REMAINDER OF THE PAGE HAS BEEN INTENTIONALLY LEFT BLANK.]

E-5

If the above correctly sets forth the understanding among the parties hereto with respect to the subject matter hereof, please so indicate by signing and returning to the undersigned one of the enclosed duplicates of this Agreement.

Very truly yours,

SESAC, INC., on its own behalf and on
    behalf of its Affiliates


By: _____
Name:
Title:


ACKNOWLEDGED AND AGREED

FORTRESS CREDIT OPPORTUNITIES I,
    LP, as Agent


By: _____
Name:
Title:


THE SONGWRITER COLLECTIVE, LLC,
    as Borrower


By: _____
Name:
Title:


THE COLLECTIVE HOLDING
    COMPANY, LLC, as Guarantor


By: _____
Name:
Title:


_____
JEAN MASON


E-6

SCHEDULE I

## LIST OF CLASS A MEMBERS

1. Baker, Gary
2. Barnhill, Gregory W.
3. Giles, Richard
4. Hogin, Sam
5. Johnson, Tim
6. Lamar, Holly
7. Makin Friends Music
8. Malloy, David
9. Marty, Tony
10. McDonald, Richard "Ritchie"
11. McHugh, Thom
12. Nazareth, including Nazareth (Dumferline) Ltd.
13. Robbins, Dennis including Trevcor Music Corp.
14. Robinson, William
15. Roboff, Annie
16. Rogers, Ronnie (Randall)
17. Roman, Arnie
18. Vrana, Jono including Sound Dust Limited
19. Stewart, Larry
20. Tritt, Travis including Post Oak Publishing, Inc. and DBA Post Oak Publishing
21. Walker, Billy Joe Jr. including Marathon Key Music

SCHEDULE II

## CLASS A MEMBER DISTRIBUTIONS

### Writer Distribution of Bridge Proceeds

| Name | Revenue Contribution | Distribution Amount |
|---|---|---|
| Baker, Gary | $770,049.00 | $231,014.70 |
| Barnhill, Greg | $130,888.00 | $39,266.40 |
| Giles, Richard | $367,896.00 | $110,368.80 |
| Hogin, Sam | $167,891.00 | $50,367.30 |
| Johnson, Timothy | $179,623.00 | $53,886.90 |
| Lamar, Holly | $519,258.00 | $155,777.40 |
| Makin' Friends Music | $68,907.00 | $20,672.10 |
| Malloy, David | $289,225.00 | $86,767.50 |
| Marty, Tony | $52,617.00 | $15,785.10 |
| McDonald, Ritchie | $206,385.00 | $61,915.50 |
| McHugh, Thom | $317,551.00 | $200,000.00 |
| Nazareth | $475,678.00 | $339,493.20 |
| Robbins, Dennis | $172,341.00 | $121,977.00 |
| Robinson, Will | $84,667.00 | $25,400.10 |
| Roboff, Annie | $1,272,956.00 | $600,000.00 |
| Rogers, Ronnie | $488,327.00 | $146,498.10 |
| Roman, Arnie | $320,704.00 | $96,211.20 |
| Larry Stewart | $8001.00 | $2,400.30 |
| Tritt, Travis | $412,091.00 | $123,627.30 |
| Vrana, Jono | $188,051.00 | $56,415.30 |
| Walker, Jr., Billy Joe | $220,889.00 | $66,266.70 |
|  |  | $2,604,110.90 |

SCHEDULE III

## CLASS A MEMBERS UN-RECOUPED BALANCE PAY SCHEDULE
## TERM LOAN RESERVE ACCOUNT

| CLASS A MEMBER | PAYEE | PAY OFF AMOUNT |
|---|---|---|
| Barnhill, Greg | Chrysalis Music | $40,282.00 |
| Giles, Richard | EMI/Blackwood | $118,451.00 |
| Hogin, Sam | Sony/ATV | $190,587.08 |
| Lamar, Holly | Warner/Chappell | $87,593.46 |
| Malloy, David | Famous Music | $250,000.00 |
| Malloy, David | Warner/Chappell | $67,582.00 |
| Marty, Tony | Curb Congregation Songs | $100,000.00 |
| McDonald, Ritchie | Sony/ATV | $423,778.00 |
| Robbins, Dennis | Warner/Chappell | $  -- |
| Robinson, William | EMI | $  -- |
| Roboff, Annie | ASCAP | $  -- |
| Rogers, Randall | Sony/ATV | $243,935.35 |
| Roman, Arnie | W&R Productions | $234,792.00 |
| Vrana, Jono | EMI Music Publishing | $25,000.00 |
| Walker, Billy Joe | Songs of Universal | $17,208.00 |
| Walker, Billy Joe | Warner/Chappell Music | $75,000.00 |
| | Subtotal | $1,874,208.89 |

SIII-1

SCHEDULE IV

## SOURCES AND USES OF FUNDS

**Borrower:**

**Source:**

| | | |
|---|---|---|
| Gross proceeds | $ | 12,120,000.00 |

**Uses:**

| | | |
|---|---|---|
| Reserved for Substitute Collateral | $ | 1,986,630.00 |
| Structuring & placement fees | | 1,446,095.23 |
| SESAC Loan & legal | | 1,048,449.72 |
| Annie Roboff reimbursement | | 50,000.00 |
| Thom McHugh reimbursement | | - |
| Reimbursed costs | | 392,784.40 |
| First Year Operating Budget | | 1,048,350.89 |
| Unrecouped Balance Reserve | | 1,874,208.89 |
| Lien release payments | | 968,215.27 |
| Unresolved Collateral Reserve | | 561,154.70 |
| Dennis Robbins Legal Settlement Reserve | | 85,000.00 |
| Additional Reserves | | 55,000.00 |
| Writer Distribution | | 2,604,110.90 |
| | $ | 12,120,000.00 |

## PAYMENTS TO BE MADE AT CLOSING

| | | | |
|---|---|---|---|
| **TRANSACTION EXPENSES:** | | | |
| **LEGAL:** | | | |
| Hunter, Maclean, Exley & Dunn | Hunter, Maclean, Exley & Dunn | Fees | $100,000.00 |
| Hunter, Maclean, Exley & Dunn | Professional Services: Deborah Wagnon | | 100,000.00 |
| Jenkens & Gilchrist, Parker Chapin, LLP | Jenkins & Gilchrist, Parker & Chapin | Fees | 235,000.00 |
| Baker Mckenzie | Baker Mckenzie (Est) | Fees | – |
| Pryor, Cashman | Pryor Cashman (old) | Fees | – |
| Sidley Austin Brown & Wood LLP | Lender's counsel (net of $50K retainer) | Fees | 170,000.00 |
| Pryor, Cashman | Lender's counsel | Fees | 110,250.00 |
| Fortress Credit Opportunities I LP | Lender's post closing | Fees | 10,000.00 |
| Fortress Credit Opportunities I LP | Lender's out of pocket | Expenses | 8,000.00 |
| Fortress Credit Opportunities I LP | Expense Deposit by Borrower | | (50,000.00) |
| **CONTROL ACCOUNT** | | | |
| Wilimington Trust | Custodial Account | Fee | 15,000.00 |
| **ACCOUNTING/VALUATION:** | | | |
| Prager & Fenton | Prager & Fenton | Fees | – |
| Moss-Adams | Moss Adams | Fees & Costs | 100,000.00 |
| Royalty Information Technology Services | Royalty Information Tech Services | Fees | 50,000.00 |
| **UNDERWRITING FEES:** | | | |
| UCC Capital Corporation | UCC Capital Corp | Fees | 84,005.00 |
| UCC Capital Corporation | UCC Capital Corp | Fees (1.5% of Term Loan) | 180,000.00 |
| **ORIGINATION:** | | | |
| Fortress Credit Opportunities I LP | Fortress | Fees | 300,000.00 |
| **TITLE AND TAX LIEN SEARCHES:** | | | |
| Jack, Lyon Jones PA | Jack Lyons Jones | Copyright Title Searches | 10,513.23 |
| Corporation Services | Corporation Services (Lien Searches) | Tax Lien Searches | 23,327.00 |
| | | **Total** | **$1,446,095.23** |

| | |
|---|---|
| **SESAC LOAN AND LEGAL** | |
| SESAC Loan and Legal | $927,249.72 |
| Commitment Fee | 121,200.00 |
| **Total** | **$1,048,449.72** |

| | |
|---|---|
| **SONGWRITER REIMBURSEMENT** | |
| Annie Roboff | $50,000.00 |
| Thom McHugh | – |
| **Total** | **$50,000.00** |

SIV-2

**REIMBURSEMENTS**

**LEGAL DUE DILIGENCE/SECURITIZATION AND TERM LOAN:**

| | | | |
|---|---|---|---|
| Burton J. Weiss, Esq. | Legal Due Diligence | Fees | $10,000.00 |
| Chuck McNeal | Writer Relations/Nashville | Fees | 20,000.00 |

**MANAGEMENT PRE-CLOSING FEES:**

| | | | |
|---|---|---|---|
| Budd Carr | CEO | Fees | 50,000.00 |
| Murray Weiss | Financial Advisor/Acting CFO | Fees | 25,000.00 |

**PROMOTER COST REIMBURSEMENT:**

| | | | |
|---|---|---|---|
| E. Jean Mason | President & COO | Out-of-Pocket Expenses | 250,000.00 |

**RISK MANAGEMENT:**

| | | | |
|---|---|---|---|
| Arthur Gallagher | Risk Management Package | | 5,000.00 |

**CONSULTANTS:**

| | | | |
|---|---|---|---|
| Herb Jordan | | Fees | 15,000.00 |

**INSURANCE PREMIUM**

| | | | |
|---|---|---|---|
| Arthur Gallagher | D&O Insurance | | 17,784.40 |

**OUTSIDE/THIRD PARTY LEGAL:**

| | | | |
|---|---|---|---|
| Marc Jacobson, Esq. | Counsel: Pledge Guarantor | Fees | – |
| Kenneth Kraus, Esq. | Counsel: Pledge Guarantor | Fees | – |
| | | Total | $392,784.40 |

**CLASS A MEMBER LIEN REPAYMENT FROM PROCEEDS**

| | | |
|---|---|---|
| Makin' Friends Music | SunTrust Bank | $156,190.12 |
| Travis Tritt | SunTrust Bank | 475,214.69 |
| Travis Tritt | State of Georgia | – |
| Greg Barnhill | SunTrust Bank | 9,781.89 |
| Ronnie Rogers | SunTrust Bank | 327,028.56 |
| | | $968,215.27 |

**FIRST MONTH OPERATING BUDGET**

| | | |
|---|---|---|
| March 2004 | | $197,003.00 |
| | Total | $197,003.00 |

**WRITER DISTRIBUTION**

| | | |
|---|---|---|
| Barnhill, Greg | 130,888.00 | $39,266.40 |
| Lamar, Holly | 519,258.00 | 155,777.40 |
| Making Friends Music | 68,907.00 | 20,672.10 |
| Marty, Tony | 52,617.00 | 15,785.10 |
| McDonald, Ritchie | 206,385.00 | 61,915.50 |
| McHugh, Thom | 317,551.00 | 200,000.00 |
| Nazareth | 475,678.00 | 339,493.20 |
| Robinson, Will | 84,667.00 | 25,400.10 |
| Roboff, Annie | 1,272,956.00 | 600,000.00 |
| Roman, Arnie | 320,704.00 | 96,211.20 |
| Stewart, Larry | 8,001.00 | 2,400.30 |
| Vrana, Jono | 188,051.00 | 56,415.30 |
| | Total | $1,613,336.60 |

**TOTAL PAYMENTS AT CLOSING**      $5,715,884.22

SIV-3

## SUNTRUST RESERVE ACCOUNT

### CLASS A MEMBERS UN-RECOUPED BALANCE PAY SCHEDULE

| CLASS A MEMBER | PAYEE | |
|---|---|---|
| Barnhill, Greg | Chrysalis Music | $40,282.00 |
| Giles, Richard | EMI/Blackwood | 118,451.00 |
| Hogin, Sam | Sony/ATV | 190,587.08 |
| Lamar, Holly | Warner/Chappell | 87,593.46 |
| Malloy, David | Famous Music | 250,000.00 |
| Malloy, David | Warner/Chappell | 67,582.00 |
| Marty, Tony | Curb Congregation Songs | 100,000.00 |
| McDonald, Ritchie | Sony/ATV | 423,778.00 |
| Robbins, Dennis | Warner/Chappell | – |
| Robinson, William | EMI | – |
| Roboff, Annie | ASCAP | – |
| Rogers, Randall | Sony/ATV | 243,935.35 |
| Roman, Arnie | W&R Productions | 234,792.00 |
| Vrana, Jono | EMI Music Publishing | 25,000.00 |
| Walker, Billy Joe | Songs of Universal | 17,208.00 |
| Walker, Billy Joe | Warner/Chappell Music | 75,000.00 |
| | Total | $1,874,208.89 |

### WRITER DISTRIBUTION

| Class A Member | Revenue Contribution | Distribution |
|---|---|---|
| Baker, Gary | $770,049.00 | $231,014.70 |
| Giles, Richard | 367,896.00 | 110,368.80 |
| Hogin, Sam | 167,891.00 | 50,367.30 |
| Johnson, Timothy Jon | 179,623.00 | 53,886.90 |
| Malloy, David | 289,225.00 | 86,767.50 |
| Robbins, Dennis | 172,341.00 | 121,977.00 |
| Rogers, Ronnie | 488,327.00 | 146,498.10 |
| Tritt, Travis | 412,091.00 | 123,627.30 |
| Walker, Billy Joe | 220,889.00 | 66,266.70 |
| Total Writer Distribution | $3,068,332.00 | $990,774.30 |

### PRE-SECURITIZATION REIMBURSEMENTS

| | | |
|---|---|---|
| SESAC | | $100,000.00 |
| Legal Fees | | |
| BUSINESS MANAGEMENT: | | |
| RK Business Management | Business Plan/Owner Accounts | 10,000.00 |
| CONSULTANTS: | | |
| Robin Godrey-Cass | Publishing Consultant | – |
| Bill Roberts | Financial Forecasting, VP of Finance | – |
| Murray Weiss | Financial Consultant | – |
| ACCOUNTING/VALUATION: | | |
| Moss Adams | | 35,000.00 |
| Royalty Information Technology Services | Valuation for Securitization | 25,000.00 |
| RATINGS AGENCY: | | |
| Moody's | | 100,000.00 |

SIV-4

**LEGAL:**

| | | |
|---|---|---|
| Jenkens & Gilchrist, Parker Chapin, LLP | | 125,000.00 |
| KMZRosenman | | 50,000.00 |
| Baker Mckenzie | | 100,000.00 |
| Adjustment (Refunded through unrecouped pickups and operating cash flow) | | (490,000.00) |
| | Total | $55,000.00 |

**DENNIS ROBBINS LEGAL SETTLEMENT RESERVE**

| | | |
|---|---|---|
| Dennis Robbins | Warren Haynes Legal Settlement | 85,000.00 |
| | Total | $85,000.00 |

**UNRESOLVED COLLATERAL RESERVE**

| | | |
|---|---|---|
| Baker, Gary | | $385,594.79 |
| Johnson, Tim | | 138,470.08 |
| Rogers, Ronnie | | 37,089.83 |
| | Total | $561,154.70 |

**SUBSTITUTE COLLATERAL RESERVE**

| | | |
|---|---|---|
| April 2004 – August 2004 | | $1,986,630.00 |
| | Total | $1,986,630.00 |

**OPERATING BUDGET**

| | | |
|---|---|---|
| April 2004 – August 2004 | | $851,347.89 |
| | Total | $851,347.89 |

**TOTAL RESERVE ACCOUNT FUNDS**     $6,404,115.78

SCHEDULE V

COMPOSITIONS, ETC.

Please see attached

SV-1

SCHEDULE VI

RIGHTS TO INCOME

Please see attached

SVI-1

SCHEDULE VII

BORROWER'S PLACE OF BUSINESS

3717 E. Thousand Oaks Boulevard #242
Westlake Village, CA 91362
Telephone: 805-413-1307
Fax: 805-413-1308

151 Sturbridge Drive
Franklin, TN 37064
Telephone: 615-595-2555
Fax: 615-595-2555

SVII-1

SCHEDULE VIII

## TAX RETURNS, LIENS, WAIVERS AND LETTERS OF DIRECTION

| | | | | | |
|---|---|---|---|---|---|
| Gary Baker | Complete | None | Consent | Received | No |
| Gregory W. Barnhill | Complete | Payoff Received | No | Received | Yes |
| Richard Giles | Complete | None | Consent & Waiver | Received | No |
| Sam Hogin | Complete | None | Yes | Received | No |
| Tim Johnson | No | None | Waiver | Needed | No |
| Holly Lamar | Complete | None | No | Received | Yes |
| Makin Friends Music | Complete | Payoff Received | No | Received | Yes |
| David Malloy | Complete | None | Waiver | Received | No |
| Billy Joe Walker | Complete | None | Waiver | Received | No |
| Marathon Key Music LLC | Complete | None | Walver | Received | No |
| Marathon Key Music II LLC | Complete | None | No | Received | Yes |
| Tony Marty | Complete | None | No | Received | Yes |
| Richard "Ritchie" McDonald | Complete | Yes | No | Received | Yes |
| Thom McHugh | Complete | None | No | Received | Yes |
| Nazareth | Complete | None | No | Received | Yos |
| Dennis Robbins | No | Yes | No | Received | No |
| William Robinson | Complete | None | No | Received | Yes |
| Annie Roboff | Complete | None | No | Received | Yes |
| Ronnie (Randall) Rogers | Complete | Payoff Received | waiver | Received | No |
| Arnie Roman | Complete | None | No | Received | Yes |
| Jona Vrana | Complete | None | No | Received | Yes |
| Larry Stewart | Complete | None | No | Received | Yes |
| Travis Tritt | No | Payoff Received for Sun Trust not GA | consent | Needed | No |

[1] Payoff Received means *amount of liens reserved for in disbursement*
[2] *See the table below for details on the issues to be resolved*

The following are the issues related to the matters open in the column above entitled Consents and Waivers Needed:

| SONGWRITER | MATCING RIGHT OR CONSENT ISSUE |
|---|---|
| Tim Johnson | Need waiver of matching rights and right of first refusal from EMI |
| Travis Tritt | Need consent to assignment from Sony |
| Ronnie Rogers | Need waiver from Sony which, Sony indicated willingness to provide if repays unrecouped balance of $243,935.35 |
| Rich Giles | Need waiver of matching right from EMI/Blackwood<br>Need waiver of matching rights from BMG Songs |
| David Malloy | Need waiver of matching rights from Starstruck Angel Music |
| Billy Joe Walker | Need waivers from WB Music |

SVIII-1

| Marathon Key Music II | Need waivers from WB Music (same agreement as Billy Joe Walker above) |
| Gary Baker | Need consent to assignment from Zomba |
| Sam Hogin | Need waiver of matching rights from Sony ATV |

SVIII-2

SCHEDULE IX

ROYALTY RECEIPTS

**The Songwriter Collective, LLC**
**Initial DSCR Schedule**

| Month | Monthly % of cash received | Annual Initial Cash Flows | Monthly Pro-forma Cash Flows | Actual Cash Flows | TTM | DSCR | DSCR % |
|---|---|---|---|---|---|---|---|
| Mar-03 | 20.4% | ####### | 932,303 | - | - | - | - |
| Apr-03 | 13.9% | ####### | 637,705 | - | - | - | - |
| May-03 | 0.0% | ####### | 1,793 | - | - | - | - |
| Jun-03 | 3.1% | ####### | 141,581 | - | - | - | - |
| Jul-03 | 10.1% | ####### | 460,962 | - | - | - | - |
| Aug-03 | 0.0% | ####### | 1,989 | - | - | - | - |
| Sep-03 | 23.3% | ####### | 1,066,915 | - | - | - | - |
| Oct-03 | 15.8% | ####### | 724,515 | - | - | - | - |
| Nov-03 | 0.0% | ####### | 979 | - | - | - | - |
| Dec-03 | 3.0% | ####### | 138,055 | - | - | - | - |
| Jan-04 | 10.3% | ####### | 470,279 | - | - | - | - |
| Feb-04 | 0.0% | ####### | 1,925 | - | 4,579,000 | 3,166,237 | 1.45 |
| Mar-04 | 20% | | | 897,490 | 4,544,187 | 3,166,237 | 1.44 |
| Apr-04 | 14% | | | 673,118 | 4,579,600 | 2,653,085 | 1.73 |
| May-04 | 0% | | | - | 4,577,807 | 2,653,085 | 1.73 |
| Jun-04 | 3% | | | 224,373 | 4,660,599 | 2,653,085 | 1.76 |
| Jul-04 | 10% | | | 448,745 | 4,648,382 | 2,653,085 | 1.75 |
| Aug-04 | 0% | | | - | 4,646,392 | 2,653,085 | 1.75 |
| Sep-04 | 23% | | | 1,121,863 | 4,701,341 | 2,653,085 | 1.77 |
| Oct-04 | 16% | | | 673,118 | 4,649,944 | 2,653,085 | 1.75 |
| Nov-04 | 0% | | | - | 4,648,965 | 2,653,085 | 1.75 |
| Dec-04 | 3% | | | - | 4,510,910 | 2,653,085 | 1.70 |
| Jan-05 | 10% | | | 448,745 | 4,489,377 | 2,653,085 | 1.69 |
| Feb-05 | 0% | | | - | 4,487,452 | 2,653,085 | 1.69 |
| | | | | | | | |
| 2004 Summary | 100% | | 4,579,000 | - | 4,579,000 | 3,166,237 | 145% |
| 2005 Summary | 100% | | - | 4,487,452 | 4,487,452 | 2,653,085 | 169% |
| Accumulated Summary | | | 4,579,000 | 4,487,452 | 9,123,187 | 5,306,170 | 172% |

SIX-1

SCHEDULE X

## RIGHTS RESERVE SCHEDULE

| Name | Rights Reserve Amount |
| --- | --- |
| Gary Baker | $385,109.63* |
| Will Robinson | $   2,403.26* |
| Ronnie Rogers | $  36,753.45* |

*Amount subject to final completion.

SX-1

SCHEDULE XI

### DEFERRED EXPENSES

**SUBSTITUTE COLLATERAL RESERVE PAYMENTS**

| | | |
|---|---|---|
| Hunter, Maclean, Exley & Dunn | Fees | $ 53,735.44 |
| Hunter, Maclean, Exley & Dunn | Professional Services: Deborah Wagnon | 50,000.00 |
| Jenkens & Gilchrist, Parker Chapin, LLP | Fees | 100,000.00 |
| Pryor, Cashman | Pryor Cashman (old) | 3,839.00 |
| Prager & Fenton | Fees | 8,500.00 |
| Moss Adams | Fees & Costs | 8,588.00 |
| Royalty Information Tech Services | Fees | 25,000.00 |
| Thom McHugh | Accelerated Bonus | 150,000.00 |
| Barton J. Weiss, Esq. | Legal Due Diligence | 40,000.00 |
| Chuck McNeal | Writer Relations/Nashville | 30,000.00 |
| Budd Carr | CEO | 160,000.00 |
| Murray Weiss | Financial Advisor/Acting CFO | 50,000.00 |
| E. Jean Mason | President & COO | 452,736.88 |
| Herb Jordan | Fees | 12,000.00 |
| Marc Jacobson, Esq. | Counsel:  Pledge Guarantor | 15,000.00 |
| Kenneth Kraus, Esq | Counsel:  Pledge Guarantor | 7,500.00 |
| Writers' Distribution and Unrecouped Balances | | 819,730.68 |
| | | $ 1,986,630.00 |

**TOTAL RESERVE ACCOUNT FUNDS**

**UNRESOLVED COLLATERAL RESERVE PAYMENTS**

| | | |
|---|---|---|
| Robin Godrey-Cass | Publishing Consultant | $ 75,000.00 |
| Bill Roberts | Financial Forecasting, VP of Finance | 40,000.00 |
| Murray Weiss | Financial Consultant | 25,000.00 |
| Jenkens & Gilchrist, Parker Chapin, LLP | Fees | 15,000.00 |
| Arthur Gallagher | D&O Insurance | 71,137.60 |
| Pre-securitization expenses | | 176,045.07 |
| Operating Budget | | 158,972.03 |
| | | $ 561,154.70 |

SXI-1