KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Michael C. Harwood (MH 4227)
1633 Broadway
New York, New York  10019
Tel:  (212) 506-1700
Fax: (212) 506-1800

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------x
                                              :
FORTRESS CREDIT OPPORTUNITIES I, LP and       :
FORTRESS CREDIT OPPORTUNITIES II, LP,         :
                                              :
                    Plaintiffs,               :    07-CV-7369 (HB)(DCF)
                                              :
         -against-                            :       JURY TRIAL
                                              :       DEMANDED
WAYNE C. COLEMAN, THE ROYALTY                 :
COMPLIANCE ORGANIZATION and                   :
MOSS ADAMS LLP                                :
                                              :
                    Defendants.               :
------------------------------------------------------------------x
```

## DECLARATION OF MICHAEL C. HARWOOD

      Michael C. Harwood, an attorney duly admitted to practice law by and before the

Courts of the State of New York hereby declares, pursuant to 28 U.S.C. §1746, under

penalties of perjury as follows:

      1.     I am a member of Kasowitz, Benson, Torres & Friedman LLP, counsel for

Plaintiffs Fortress Credit Opportunities I, LP and Fortress Credit Opportunities II, LP

("Plaintiffs") in this matter.

2.    Attached hereto as Exhibit 1 is a true and correct copy of an Execution Copy of the Loan Agreement between The Songwriter Collective, LLC, as borrower, and Fortress Credit Opportunities I, LP, as Lender and Agent for the Lenders, dated as of March 1, 2004.

3.    Attached hereto as Exhibit 2 is Plaintiffs' Amended Complaint in this action.

MICHAEL C. HARWOOD (MH 4227)

Dated: October 2, 2007
       New York, New York

2

EXECUTION COPY

THE SONGWRITER COLLECTIVE, LLC,
as Borrower,

and

FORTRESS CREDIT OPPORTUNITIES I, LP,
as Lender and as Agent for the Lenders

LOAN AGREEMENT

Dated as of March 1, 2004

TABLE OF CONTENTS                                        Page

ARTICLE I

DEFINITIONS

Section 1.01. Definitions and Interpretation.............................................    1
Section 1.02. Accounting Terms and Determinations ...............................    15
Section 1.03. Times .................................................................................    15

ARTICLE II

THE LOAN

Section 2.01. Loan ...................................................................................    15
Section 2.02. Purpose of Loan; Reserve Account ...................................    15
Section 2.03. Note ...................................................................................    17
Section 2.04. Interest ..............................................................................    17
Section 2.05. Repayment .........................................................................    18
Section 2.06. Prepayment ........................................................................    18
Section 2.07. Taxes..................................................................................    18
Section 2.08. Maximum Interest..............................................................    19

ARTICLE III

CONDITIONS PRECEDENT

Section 3.01. Closing Conditions .............................................................    20
Section 3.02. Post Closing Conditions .....................................................    23

ARTICLE IV

MANAGEMENT SERVICES

Section 4.01. Administration of Collateral................................................    25

ARTICLE V

ACCOUNTS AND DISTRIBUTIONS

Section 5.01. Accounts.............................................................................    25
Section 5.02. Distributions ......................................................................    26
Section 5.03. Insurance Proceeds ............................................................    26
Section 5.04. Mandatory Repayments.......................................................    26

i

Page

ARTICLE VI

REPRESENTATIONS AND WARRANTIES

Section 6.01. Representations And Warranties ............................................. 27

ARTICLE VII

AFFIRMATIVE COVENANTS

Section 7.01. Affirmative Covenants ....................................................... 32

ARTICLE VIII

NEGATIVE COVENANTS

Section 8.01. Negative Covenants .......................................................... 37

ARTICLE IX

EVENTS OF DEFAULT

Section 9.01. Events Of Default ........................................................... 39

ARTICLE X

RIGHTS AND REMEDIES

Section 10.01. Rights and Remedies of the Agent ........................................ 41
Section 10.02. Power of Attorney ......................................................... 41
Section 10.03. Costs and Expenses ....................................................... 42

ARTICLE XI

ASSIGNMENTS; PARTICIPATIONS

Section 11.01. Assignments and Participations ........................................... 42

ARTICLE XII

THE AGENT

Section 12.01. Authorization and Action ................................................. 44
Section 12.02. Delegation of Duties ..................................................... 44
Section 12.03. Exculpatory Provisions ................................................... 44
Section 12.04. Reliance .................................................................. 44

ii

Page

Section 12.05.  Non-Reliance on the Agent and Other Lenders.............................. 45
Section 12.06.  Reimbursement and Indemnification.......................................... 45
Section 12.07.  Agent in its Individual Capacity............................................. 45
Section 12.08.  Successor Agent .................................................................... 45

ARTICLE XIII

MISCELLANEOUS

Section 13.01.  Indemnification...................................................................... 46
Section 13.02.  Payment of Certain Expenses.................................................. 46
Section 13.03.  No Waivers; Remedies Cumulative .......................................... 46
Section 13.04.  Amendments; Waivers............................................................ 47
Section 13.05.  Notices.................................................................................. 47
Section 13.06.  GOVERNING LAW ............................................................... 47
Section 13.07.  Survival................................................................................. 47
Section 13.08.  Severability ........................................................................... 48
Section 13.09.  Merger and Integration .......................................................... 48
Section 13.10.  WAIVER OF JURY TRIAL .................................................... 48
Section 13.11.  Counterparts........................................................................... 48

EXHIBITS

Exhibit A - Form of Promissory Note............................................................. A-1
Exhibit B - Form of Assignment and Acceptance ............................................ B-1
Exhibit C - Form of Backup Management Letter Agreement ............................ C-1
Exhibit D - Form of Reserve Account Distribution Notice ............................... D-1
Exhibit E - Form of Agreement re Sale of Collateral Upon Event of Default ....................... E-1

SCHEDULES

Schedule I        - List of Class A Members......................................................... SI-1
Schedule II       - Class A Member Distributions ................................................ SII-1
Schedule III      - Existing Advance Schedule..................................................... SIII-1
Schedule IV      - Source and Uses.................................................................... SIV-1
Schedule V       - Compositions, Etc................................................................. SV-1
Schedule VI      - Rights to Income.................................................................. SVI-1
Schedule VII     - Borrower's Place of Business ................................................. SVII-1
Schedule VIII    - Tax Returns, Liens, Consents and Letters of Direction......................... SVIII-1
Schedule IX      - Royalty Receipts ................................................................. IX-1
Schedule X       - Rights Reserve Schedule ....................................................... X-1
Schedule XI      - Deferred Expenses ............................................................... XI-1

iii

# LOAN AGREEMENT

THIS LOAN AGREEMENT ("Agreement") is made this 1st day of March, 2004, among The Songwriter Collective, LLC, a Delaware limited liability company, as borrower (the "Borrower"), and Fortress Credit Opportunities I, LP, a limited partnership, as a Lender (as hereinafter defined) and as Agent (as hereinafter defined) for the Lenders (as hereinafter defined).

## RECITALS

WHEREAS, the Borrower has requested that the Lenders extend to the Borrower a Loan (as hereinafter defined), such Loan to be secured by all of the assets of the Borrower including existing or hereinafter acquired rights in certain musical compositions, the rights to payment therefrom, all registered copyrights relating thereto and certain related assets of the Borrower; and

WHEREAS, the Lenders are willing to make such Loan to the Borrower upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01. <u>Definitions and Interpretation</u>.

(a)     Whenever used in this Agreement, unless the context otherwise requires, the following words and phrases shall have the following meanings:

"<u>Accounts</u>" means the Collection Account, the Funding Account and the Reserve Account.

"<u>Additional Class A Member Amount</u>" shall mean, as of the Post Closing Date, an amount equal to the product of the Class A Member Unallocated Amount and a fraction equal to the grossed up annual average income for each Additional Class A Member (as set forth on the updated Wayne Coleman report covering such Additional Class A Member) divided by the Class A Member Unallocated Average Annual Income Amount.

"<u>Additional Class A Member Reserved Amount</u>" shall mean, as of the Post Closing Date, for the Additional Class A Members, the aggregate amount of Class A Member Distributions to the Additional Class of Members plus, if applicable, the aggregate Existing Member Advance Amounts, Rights Reserve Amounts and other amounts required to be withheld from the Additional Class A Member Amount to pay Liens or other encumbrances.

"Additional Class A Members" shall mean those Members approved by the Agent, which have satisfied the conditions set forth on Section 3.02 and that are admitted on the Post Closing Date.

"Affiliate" of any Person means any other Person that (i) directly or indirectly controls, is controlled by or is under common control with such Person (excluding any trustee under, or any committee with responsibility for administering, any Benefit Plan) or (ii) is an officer, director, member or partner of such Person. For purposes of this definition, a Person shall be deemed to be "controlled by" another Person if such other Person possesses, directly or indirectly, the power (i) to vote 5% or more of the securities (on a fully diluted basis) having ordinary voting power for the election of directors, members or managing partners of such Person or (ii) to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agent" shall mean Fortress Credit, in its capacity as agent for the Lenders under this Agreement and its successors and assigns.

"Agreement" shall mean this Loan Agreement.

"Annualized Debt Service" shall mean, an amount determined as of each Reporting Date, equal to the sum of (i) the product of the Interest Rate and the Outstanding Balance of the Loan and (ii) an amount equal to the annual principal payment required to fully amortize the Outstanding Balance of the Loan assuming equal annual payments, a rate of interest equal to the Interest Rate and an amortization period of seven years.

"Applicable Law" shall mean, as to any Person, any law, statute, rule, treaty, regulation or determination of an arbitrator, court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its properties or to which such Person or any of its properties may be bound or affected.

"Assignment and Acceptance" shall mean an assignment and acceptance agreement between a Lender and an Eligible Assignee, substantially in the form attached hereto as Exhibit B.

"Authorized Officer" shall mean either the Chief Executive Officer or Chief Operating Officer or such other officer of the Borrower as the Lender may approve in writing.

"Available Reserve Amount" shall mean, (i) prior to the Post Closing Date, an amount equal to Loan proceeds deposited into the Reserve Account on the Closing Date less the sum of (A) the Class A Member Unallocated Amount and (B) the aggregate amount withdrawn from the Reserve Account prior to the date of determination and (ii) on and after the Post Closing Date, an amount equal to Loan proceeds deposited into the Reserve Account on the Closing Date less the aggregate amount withdrawn from the Reserve Account prior to the date of determination including any Post Closing Date Mandatory Repayment, if any, plus the Additional Class A Member Amount to the extent not distributed on the Post Closing Date.

2

"Backup Copyright Administration Agreement" shall mean the letter agreement, dated as of the Closing Date, among SESAC, The Collective Holding Company, LLC, the Borrower and Jean Mason.

"Backup Management Letter Agreement" shall mean the backup management letter agreement, dated as of the Closing Date, among the Borrower, SESAC, the Agent, The Collective Holding Company, LLC, and Jean Mason, a copy of which is attached hereto as Exhibit C.

"Backup Manager" shall mean SESAC as Backup Manager under the Backup Management Letter Agreement.

"Backup Manager Tier One Fees" shall mean with respect to a Copyright or Catalog for which there is no third-party administration arrangement, 17.5% of the net collections with respect thereto.

"Backup Manager Tier Two Fees" shall mean with respect to a Copyright or Catalog for which there is a third party administration arrangement, 17.5% of the net collections with respect thereto.

"Backup Manager Triggering Event" shall mean any of the following acts or occurrences:

    (i)    the Borrower shall fail to comply with Section 4.01;

    (ii)    an Event of Default; or

    (ii)    the occurrence, as of any Reporting Date, of a Triggering Event.

"Bankruptcy Code" shall mean Title 11 of the United States Bankruptcy Code.

"Basic Documents" shall mean the Subscription Agreement, the LLC Agreement and the Marketing Documents.

"Benefit Plan" means any employee benefit plan as defined in Section 3(3) of ERISA in respect of which the Borrower or any ERISA Affiliate of the Borrower (i) is, or at any time during the immediately preceding six years was, an "employer" as defined in Section 3(5) of ERISA or (ii) maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by the Borrower or any such ERISA Affiliate.

"Business Day" shall mean any day of the year other than a Saturday, Sunday or other day on which the New York Stock Exchange is closed or commercial banks in New York, Delaware or in the State in which the principal offices of the Servicer is located are authorized or required by law or executive order to be closed.

"Business Premises" shall mean the Borrower's chief executive office located at 3717 East Thousand Oaks Blvd., Westlake Village, California 91362.

3

"Catalog" shall mean, as to each Class A Member, such Class A Member's catalog of musical Compositions contributed to the Borrower by such Class A Member, as more particularly set forth on Schedule V, and the right to and interest in any and all revenues and licenses derived from such Compositions, and all rights in and to such Compositions under the Copyright Act and all other applicable laws throughout the universe.

"Class A Debt Mandatory Repayment" shall have the meaning set forth in Section 5.04(a).

"Class A Member Debt" shall mean, with respect to each Class A Member, as of any date of determination, an amount equal to the product of the Outstanding Balance of the Loan multiplied by such Class A Member's Pro Rata Share.

"Class A Member Distributions" shall mean the distributions to be made to the Initial Class A Members from the proceeds of the Loan, and, as of the Post Closing Date, to the Additional Class A Members, as more particularly set forth on Schedule II.

"Class A Member's Pro Rata Share" shall mean, as of the Closing Date, a fraction the numerator of which is the Fair Market Value of the Catalog contributed by such Initial Class A Member on the Closing Date and the denominator of which is equal to the sum of (i) the aggregate Fair Market Value of all of the Catalogs contributed by all of the Initial Class A Members plus (ii) an amount equal to the Class A Member Unallocated Amount, and as of the Post Closing Date, a fraction the numerator of which is the Fair Market Value of the Catalog contributed by such Class A Member on the Closing Date or the Post Closing Date, as applicable, and the denominator of which is the aggregate Fair Market Value of all of the Catalogs contributed by all of the Class A Members.

"Class A Member Unallocated Amount" shall mean $1,986,630.

"Class A Member Unallocated Average Annual Income Amount" shall mean $1,104,181.

"Class A Members" shall mean, as of the Closing Date, the Initial Class A Members and, as of the Post Closing Date, the Initial Class A Members and the Additional Class A Members, if any.

"Closing Date" shall mean March 1, 2004.

"Code" shall mean the Internal Revenue Code of 1986.

"Collateral" shall have the meaning set forth in the Security Agreement.

"Collection Account" shall mean account number 65081-0 maintained with the Collection Account Bank pursuant to the Collection Account Control Agreement or such other account as may be agreed to in writing by the Borrower and the Agent from time to time, and into which all Collections received by the Collection Account Bank will be deposited on the day received.

4

"<u>Collection Account Bank</u>" shall mean Wilmington Trust Company or any other Eligible Institution with which the Borrower may establish the Collection Account as may be agreed to in writing by the Borrower and the Agent from time to time.

"<u>Collection Account Control Agreement</u>" shall mean the control agreement among the Borrower, the Agent, the Servicer and the Collection Account Bank.

"<u>Collection Period</u>" shall mean, with respect to any Payment Date, the three calendar months immediately preceding the month in which such Payment Date occurs, except that, in the case of the first Payment Date, the related Collection Period will be the period from the Closing Date through and including the last day of May, 2004.

"<u>Collections</u>" shall mean, with respect to any Collection Period, all payments collected or received by or on behalf of the Borrower in respect of the Collateral during such Collection Period, including all Royalty Receipts and any other net proceeds from the Collateral in respect of such Collection Period.

"<u>Collective Holding Guaranty</u>" shall mean a guaranty of the indebtedness of the Borrower by The Collective Holding Company, LLC.

"<u>Compositions</u>" means all of the musical compositions contained in the Catalogs initially contributed to the Borrower by the Class A Members, as more particularly set forth on Schedule V, including the Copyrights therein and any and all renewals and extensions thereof, throughout the universe and all claims and causes of action related to the Compositions accruing at any time and all other rights of any nature whatsoever in the Compositions, including the titles, words and music of the Compositions and each and every arrangement, adaptation and version thereof.

"<u>Control Agreements</u>" shall mean the Collection Account Control Agreement, the Funding Account Control Agreement and the Reserve Account Control Agreement.

"<u>Control Bank</u>" shall mean the Collection Account Control Bank, the Funding Account Control Bank and the Reserve Account Control Bank or any of them.

"<u>Copyright Act</u>" shall mean the Copyright Act of 1909, as applicable and the Copyright Act of 1978.

"<u>Copyright</u>" means, with respect to each Composition and all components thereof, all common law and statutory copyrights, rights in copyrights, interests in copyrights, applications for copyrights and renewals and extensions of copyrights, throughout the universe, from time to time with respect to such Composition and components thereof.

"<u>Copyright Mortgage</u>" shall mean the Copyright Mortgage, dated as of the Closing Date, between the Borrower and the Agent.

"<u>Current Cash Pay Interest</u>" shall have the meaning set forth in Section 2.03.

"Debt Service Coverage Ratio" shall mean, as of each Reporting Date, the ratio obtained by dividing an amount equal to the total Royalty Receipts for the twelve calendar months immediately preceding the related Reporting Date by the Annualized Debt Service.

"Deferred Expenses" shall mean that portion of the transaction fees and Take-Out Financing expenses reduced prior to the Closing Date, as more particularly set forth on Schedule XI.

"Eligible Assignee" shall mean (i) any Affiliate of Fortress Credit and (ii) any other Person approved by the Borrower, which approval shall not be unreasonably withheld or delayed.

"Eligible Institution" means a depository institution or trust company, (i) the commercial paper or other short-term unsecured debt obligations of which are rated at least "A-1" by Standard & Poor's and at least "Prime-1" by Moody's; provided, however, that any long term rating issued by Moody's for such entity must be at least "A2" or (ii) having corporate trust powers and organized under the laws of the United States, any State or the Commonwealth of Puerto Rico that has a long-term deposit rating from (a) Moody's of at least "Baa3" or (b) Standard & Poor's of at least "BBB-" (or such lower rating as the Agent shall approve in writing).

"Entitlement Holder" has the meaning set forth in Section 8-102 of the UCC.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and, unless the context otherwise requires, the regulations promulgated thereunder.

"ERISA Affiliate" means any member of a "controlled group of corporations" or of a group of two or more "trades or businesses under common control" (as such terms are defined, respectively, in Section 414(b), (c), (m) and (o) of the Code and the regulations thereunder) of which the Borrower is a party.

"Event of Default" shall mean any of the events described in Section 9 hereof.

"Excess Additional Class A Member Amount" shall mean, as of the Post Closing Date, the amount by which the Additional Class A Member Amount to the extent not distributed on the Post Closing Date exceeds the Additional Class A Member Reserved Amount.

"Excess Existing Member Advance Amount" shall mean, to the extent that one or more Payout Amounts have been received for Existing Advance Class A Members, the difference between the aggregate Existing Member Advance Amounts and the Payout Amounts.

"Exchange Act" shall mean the Securities Exchange Act of 1934.

"Existing Advance Class A Member" shall mean each Class A Member whose name is set forth on Schedule III.

"Existing Member Advance Amount" shall mean the amount set forth opposite an Existing Advance Class A Member's name on Schedule III.

6

"Existing Member Advances" shall mean amounts owed to third parties from time to time by an Existing Advance Class A Member in respect of advances made against future payments to such Existing Advance Class A Member relating to the exploitation of such Member's rights in Compositions and related Collateral.

"Exit Transaction" shall mean the occurrence of (i) the conversion of the Borrower from a limited liability company under applicable Delaware law to a corporation under any state law through any mechanism and a subsequent initial public offering of such corporation's shares of common stock; (ii) the election by the Borrower to be treated as an entity other than a partnership for federal income tax purposes; (iii) the consummation of the sale of all or substantially all of the Borrower's assets or Membership Interests; or (iv) the restructuring, recapitalization, merger, consolidation, amalgamation or other form of business combination regarding the Borrower under the Delaware Limited Liability Company Act.

"FDIC" means the Federal Deposit Insurance Corporation.

"Financing Statement" shall mean any UCC financing statement, amendment, partial termination statement, continuation statement or termination statement prepared or filed at any time with respect to any portion of or all of the Collateral, as the case may be, in each case in form and substance agreed to by the Borrower and the Agent prior to the filing thereof.

"FNMA" means the Federal National Mortgage Association.

"Fortress Credit" shall mean Fortress Credit Opportunities I LP, and its permitted successors and assigns.

"Funding Account" shall mean account number 1000014155872 maintained with the Funding Account Bank or such other account as may be agreed to in writing by the Borrower and the Agent from time to time.

"Funding Account Bank" shall mean the Eligible Institution with which the Borrower has established the Funding Account.

"Funding Account Control Agreement" means the control agreement among the Borrower, the Agent and the Funding Account Bank.

"GAAP" shall mean generally accepted accounting principles as in effect in the United States of America from time to time.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Highest Lawful Rate" shall have the meaning set forth in Section 2.08.

"Indebtedness" shall include all items which would properly be included in the liability section of a balance sheet or in a footnote to a financial statement in accordance with GAAP, and shall also include all contingent liabilities,

7

"Indemnified Party" shall mean each of the Agent, each Lender and any of their respective officers, directors, employees, agents or Affiliates.

"Initial Class A Members" shall mean those Members approved by the Agent that are admitted on the Closing Date.

"Interest Calculation Date" shall mean the second Business Day following the Reporting Date, commencing with the first such day to occur after the Closing Date.

"Interest Period" shall mean, with respect to any Interest Calculation Date, the period from but excluding the last Interest Calculation Date to but including the current Interest Calculation Date, except that, in the case of the first Interest Period, the period will be from and including the Closing Date to and including the first Interest Calculation Date.

"Interest Rate" shall mean a fixed rate of nineteen percent (19.0%) per annum, provided, that following the occurrence and during the continuance of an Event of Default such rate shall increase to twenty-two percent (22.0%) per annum.

"Investment Company Act" shall mean the Investment Company Act of 1940.

"LLC Agreement" shall mean the amended and restated limited liability company agreement of the Borrower dated as of January 1, 2004, among The Collective Holding Company, LLC and the Members, as amended by Amendment No. 1 to the LLC Agreement and Amendment No. 2 to the LLC Agreement.

"Laws" shall mean all ordinances, statutes, rules, regulations, orders, injunctions, writs or decrees of any Governmental Authority or political subdivision or agency thereof, or any court or similar entity established by any thereof.

"Lender" or "Lenders" shall mean any of Fortress Credit and each other Person that agrees, pursuant to an Assignment and Acceptance, to become a party hereunder.

"Lender Register" shall mean the register, maintained by the Agent pursuant to Section 11.01(c), for the recordation of the names, addresses and the portion of the principal amount of the Loan made by each Lender.

"Letters of Direction" shall mean one or more letters of direction from each Class A Member addressed to each third party obligor which makes a payment to such Class A Member relating to the Collateral.

"Licenses" shall mean any and all contractual agreements of every type and character relating to any Composition.

"Lien" shall mean any statutory or common law consensual or non-consensual mortgage, pledge, security interest, encumbrance, lien, right of setoff, bona fide claim or charge of any kind, including, without limitation, any conditional sale or other title retention transaction, any lease transaction in the nature thereof and any secured transaction under the UCC.

8

"Loan" shall mean the loan made to the Borrower pursuant to Section 2.01 hereof.

"Loan Documents" shall mean this Agreement, the Note, the Security Agreement, the Copyright Mortgage, the Backup Management Letter Agreement, the Sale of Collateral Letter Agreement, the Servicing Agreement, the Control Agreements and any and all agreements, contracts, promissory notes, security agreements, assignments, subordination agreements, pledge or hypothecation agreements, mortgages, deeds of trust, leases, guaranties, instruments, letters of credit, letter of credit agreements and documents now and hereafter existing between the Lenders and the Borrower, executed and/or delivered pursuant to this Agreement.

"Loss" shall mean, with respect to any Person, any and all losses, liabilities, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements, including reasonable fees and expenses of counsel to such Person.

"Majority Lenders" shall mean, as of any date, Lenders holding in excess of 50% of the Outstanding Balance of the Loan.

"Management Services" shall have the meaning set forth in the Backup Management Letter Agreement.

"Marketing Materials" shall mean the Songwriter Collective Handbook dated December 2003 and the Summary of the LLC Agreement, together with the Subscription Agreement and the LLC Agreement.

"Material Adverse Change" shall mean a material adverse change in (i) the business, operations, properties or condition, financial or otherwise, taken as a whole, of the Borrower or (ii) the ability of the Borrower to perform its obligations under the Loan Documents.

"Material Agreements" shall mean the LLC Agreement, the Subscription Agreement and the SESAC Agreement.

"Mandatory Repayments" shall mean the Class A Debt Mandatory Repayment and the Post Closing Date Mandatory Repayment.

"Maturity Date" shall mean February 28, 2005.

"Maximum Take-Out Financing Expenses" shall mean the maximum amount of Take-Out Financing expenses payable from the proceeds of the Loan as set forth on Schedule IV.

"Members" shall mean the parties that are members of The Songwriter Collective, LLC pursuant to the LLC Agreement from time to time.

"Membership Buyout" shall mean a buyout by a Class A Member of its Membership Interest in accordance with Section 11.2 of the LLC Agreement.

"Membership Interests" shall have the meaning set forth in the LLC Agreement.

"Moody's" shall mean Moody's Investors Service, Inc.

9

"Note" shall mean the promissory note, dated the Closing Date, executed by the Borrower, payable to the order of the Agent, as agent for the Lenders, evidencing the Loan and all renewals, replacements and extensions thereof.

"Obligations" shall mean the full and punctual observance and performance of all present and future duties, covenants and responsibilities due to the Lenders and the Agent by the Borrower under this Agreement, the Note and the other Loan Documents, all present and future obligations and liabilities of the Borrower to the Lenders and the Agent for the payment of money under this Agreement, the Note and the other Loan Documents (extending to all principal amounts, interest, late charges, fees and all other charges and sums, as well as all costs and expenses payable by the Borrower under this Agreement, the Note, the other Loan Documents and otherwise), whether direct or indirect, contingent or noncontingent, matured or unmatured, accrued or not accrued, related (directly or indirectly) to this Agreement, whether or not now contemplated, whether or not any instrument or agreement relating thereto specifically refers to this Agreement and whether or not of the same character or class as Borrower's obligations under this Agreement or the Note.

"Origination Fee" shall mean the fee in the amount of $300,000 payable by the Borrower to the Agent on the Closing Date.

"Outstanding Balance" shall mean the Loan minus any Mandatory Repayments received by the Agent and any principal payments made by the Borrower pursuant to Section 5.02(f).

"PIK Interest" shall have the meaning as set forth in Section 2.04.

"Payment Date" shall mean the second Business Day following the Reporting Date in the months of June, September and December, 2004 and February, 2005, or if such day is not a Business Day, the immediately succeeding Business Day, commencing with the first such date succeeding the Closing Date.

"Payout Amount" shall have the meaning set forth in Section 2.02(d)(i).

"Permitted Investment" shall mean, at any time, any one or more of the following obligations, instruments and securities:

    (i)    obligations of, and obligations fully guaranteed as to timely payment of principal and interest by, the United States or any agency thereof, provided such obligations are backed by the full faith and credit of the United States;

    (ii)    general obligations of or obligations guaranteed by FNMA or any State; provided that such obligations have the highest available credit rating from each Rating Agency for such obligations, or, with respect to ratings issued by Moody's, have a long term rating of at least "A2" and/or a short term rating of at least "Prime-1";

    (iii)    securities bearing interest or sold at a discount issued by any limited liability company or any entity formed or incorporated, as the case may be, under the laws of the United States or any State; provided, that at the time of such investment or contractual commitment providing for such investment, either (a) the long-term

10

unsecured debt of such entity has the highest available rating from each Rating Agency for such obligations, or, with respect to ratings issued by Moody's, have a long term rating of at least "A2" and/or a short term rating of at least "Prime-1," or (b) the commercial paper or other short-term debt of such entity that is then rated has the highest available credit rating of each Rating Agency for such obligations, or, with respect to ratings issued by Moody's, have a short term rating of at least "Prime-1";

    (iv)    certificates of deposit issued by any depository institution or trust company (including the Control Bank) incorporated under the laws of the United States or any State and subject to supervision and examination by banking authorities of one or more of such jurisdictions; provided that the short-term unsecured debt obligations of such depository institution or trust company have the highest available credit rating of each Rating Agency for such obligations, or, with respect to ratings issued by Moody's, have a short term rating of at least "Prime-1";

    (v)    certificates of deposit that are issued by any bank, trust company, savings bank or other savings institution and fully insured by the FDIC;

    (vi)    investments in money market funds (including funds for which the Control Bank or any of its Affiliates is investment manager or advisor) having a rating from Standard & Poor's of "AAA-m" or "AAAm-G" and from Moody's of "Aaa"; and

    (vii)    such other obligations, instruments and securities as may be directed by the Borrower and acceptable to the Agent;

provided, that, with respect to the Collection Account, each of the foregoing obligations, instruments and securities shall mature no later than two Business Days preceding the Payment Date immediately succeeding the Collection Period in which such investment is made (other than in the case of the investment of monies in obligations, instruments and securities of which the entity at which the Collection Account is located is the obligor, which may mature on the related Payment Date).

    Notwithstanding the foregoing, (i) no Permitted Investment may be purchased at a premium and (ii) no obligation or security may be a "Permitted Investment" unless (a) the Control Bank has control over such obligation or security and (b) at the time such obligation or security was delivered to the Control Bank or the Control Bank became the related Entitlement Holder, the Control Bank did not have notice of any adverse claim with respect thereto within the meaning of Section 8-105 of the UCC.

    For purposes of this definition, any reference to the highest available credit rating of an obligation shall mean the highest available credit rating for such obligation (excluding any "+" signs associated with such rating) or such lower credit rating as approved in writing by the Agent, acting at the direction of the Majority Lenders.

    "Permitted Liens" shall mean (a) Liens of the Agent on behalf of the Lenders, (b) Liens for taxes not delinquent or for taxes being diligently contested in good faith by the Borrower by appropriate proceedings, (c) mechanic's, workman's, materialman's, landlord's, carrier's and other like Liens arising in the ordinary course of business with respect to obligations which are

11

not due or which are being diligently contested in good faith by the Borrower by appropriate proceedings provided that such Liens did not arise in connection with the borrowing of money or the obtaining of advances or credit and do not, in the Agent's discretion, in the aggregate materially detract from the value of the Borrower's assets or materially impair the use thereof, (d) Liens relating to equipment leases and purchase money security interests entered into in the ordinary course of the Borrower's business, and (e) Liens specifically consented to by the Agent in writing.

"Person" shall include natural persons, corporations, associations, limited liability companies, partnerships, joint ventures, trusts, governments and agencies and departments thereof and every other entity of every kind.

"Post Closing Date" shall mean the Business Day agreed upon by the Agent and the Borrower as the date for the admission of Additional Class A Members, and there shall only be one Post Closing Date, which date shall not be earlier than the 60th day following the Closing Date and shall not be later than the six month anniversary of the Closing Date.

"Post Closing Date Mandatory Repayment" shall have the meaning set forth in Section 5.04(b).

"Rating Agency" shall mean Moody's or Standard & Poor's.

"Remaining Take-Out Financing Expense Amount" shall mean, as of any date of determination, an amount equal to the difference between (a) the Maximum Take-Out Financing Expenses and (b) an amount equal to the sum of (i) the Take-Out Financing expenses paid prior to the date of determination and (ii) any interest paid from the Reserve Account prior to the date of determination.

"Reporting Date" shall mean the 10th day of each month or, if such day is not a Business Day, the immediately preceding Business Day, commencing with the first such day to occur after the Closing Date.

"Requirement of Law" shall mean, as to any Person, any law, statute, rule, treaty, regulation or determination of an arbitrator, court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its properties or to which such Person or any of its properties may be bound or affected.

"Reserve Account" shall mean account number 1000014155930 maintained with the Reserve Account Bank or such other account as may be agreed to in writing by the Borrower and the Agent from time to time.

"Reserve Account Bank" shall mean the Eligible Institution with which the Borrower has established the Reserve Account.

"Reserve Account Control Agreement" means the control agreement among the Borrower, the Agent and the Reserve Account Bank.

12

"Reserve Account Distribution Notice" shall mean a notice substantially in the form of Exhibit D, executed by an Authorized Officer.

"Responsible Officer" shall mean the president, any vice president, chief operating officer, chief executive officer, chief financial officer or treasurer of the Borrower.

"Rights to Income" shall mean all income, accounts, Royalty Receipts, general intangibles and other payment intangibles and any and all current or future income streams emanating from the Compositions, as listed on Schedule VI.

"Rights Reserve Amount" shall mean the amounts set forth opposite each Rights Reserve Class A Member.

"Rights Reserve Class A Member" shall mean each Class A Member set forth on Schedule X.

"Royalty Receipts" shall mean all amounts received by the Borrower in respect of Catalogs, Compositions, Copyrights and Licenses on or after the Closing Date; provided, that, for the purposes of calculating the Debt Service Coverage Ratio, the net amounts for the applicable months are the amounts set forth on Schedule VIII.

"Sale of Collateral Letter Agreement" shall mean the sale of collateral upon event of default letter agreement, dated as of the Closing Date, among the Borrower, SESAC, the Agent, The Collective Holding Company, LLC and Jean Mason, a copy of which is attached hereto as Exhibit E.

"SEC" shall mean the Securities and Exchange Commission.

"SESAC" shall mean SESAC, Inc., a New York corporation.

"SESAC Agreement" means the Agreement dated as of July 3, 2003 among SESAC, The Collective Holding Company, LLC, the Borrower and E. Jean Mason.

"Securities Act" means the Securities Act of 1933.

"Security Agreement" shall mean the copyright mortgage and security agreement, dated as of March 1, 2004, between the Borrower and the Agent.

"Servicer" shall mean UCC Servicing, Inc.

"Solvent" shall mean, with respect to any Person at any time, having a state of affairs such that all of the following conditions are met: (i) the fair value of the property of such Person is greater than the amount of such Person's liabilities (including disputed, contingent and unliquidated liabilities) as such value is established and liabilities evaluated for purposes of Section 101(31) of the Bankruptcy Code, (ii) the present fair salable value of the property of such Person in an orderly liquidation of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (iii) such Person is able to realize upon its property and pay its debts and other

liabilities (including disputed, contingent and unliquidated liabilities) as they mature in the normal course of business, (iv) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature, and (v) such Person is not engaged in a business or a transaction, and is not about to engage in a business or a transaction, for which such Person's property would constitute unreasonably small capital.

"Standard & Poor's" shall mean Standard & Poor's, a Division of The McGraw-Hill Companies, Inc.

"State" shall mean any state of the United States, Puerto Rico or the District of Columbia.

"Subscription Agreement" shall mean the subscription agreements among The Songwriter Collective, LLC, The Collective Holding Company, LLC and the Class A Members.

"Subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, partnership, trust or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors, members or other managers of such corporation, limited liability company, partnership or other entity (or to direct operation of a trust) are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.

"Take-Out Financing" shall mean the Initial Loan Closing (as defined in the LLC Agreement).

"Taxes" shall mean any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities (including penalties, interest and expenses) with respect thereto, excluding, such taxes (including income or franchise taxes) as are imposed on or measured by a Lender's net income.

"Third Party Consents" shall mean those consents to assignment of Copyrights or Rights to Income or waiver of matching rights identified on Schedule VIII, each in a form reasonably satisfactory to the Agent in its sole and absolute discretion.

"Triggering Event" shall occur, as of any Reporting Date, when the Debt Service Coverage Ratio is below 1.4 to 1.

"UCC" shall mean the Uniform Commercial Code as in effect in the applicable jurisdiction.

"United States" shall mean the United States of America.

(b)    Unless the context otherwise requires, (i) references to agreements include all Exhibits and Schedules thereto and shall be deemed to mean and include such agreements as the same may be amended, restated, supplemented and otherwise modified from time to time; (ii) references to parties to agreements shall be deemed to include the permitted successors and

14

assigns of such parties; (iii) references to statutes or regulations shall be deemed to include such statutes or regulations as the same may be amended, supplemented or otherwise modified or replaced from time to time; (iv) the term "include" and all variations thereof shall mean "include without limitation"; (v) references to an Article or Section such as "Article One" or "Section 1.01" shall refer to the applicable Article or Section of the related agreement; (vi) references to the term "or" shall include "and/or"; (vii) the term "proceeds" shall have the meaning ascribed to such term in the UCC; (viii) in the computation of a period of time from a specified date to a later specified dated, the word "from" shall mean "from and including" and the words "to" and "until" shall mean "to but excluding"; (ix) terms include, as appropriate, all genders and the plural as well as the singular; (x) references to words such as "herein," "hereof" and the like shall refer to the related agreement as a whole and not to any particular part, Article or Section therein; and (xi) references to Schedules in this Agreement shall be deemed to mean and include such Schedules as the same may be modified as of the Post Closing Date.

Section 1.02. <u>Accounting Terms and Determinations</u>. Unless otherwise defined or specified herein, all accounting terms shall be construed herein, all accounting determinations hereunder shall be made, all financial statements required to be delivered hereunder shall be prepared and all financial records shall be maintained, in accordance with GAAP.

Section 1.03. <u>Times</u>. Unless otherwise indicated herein, each reference to time herein shall refer to the time in New York, New York. For example, a reference to 3:30 p.m. shall mean 3:30 p.m. (New York, New York time).

ARTICLE II

THE LOAN

Section 2.01. <u>Loan</u>. Subject to the terms and conditions hereinafter set forth, on the Closing Date, the Lenders shall loan to Borrower and Borrower shall borrow from the Lenders, on the Closing Date, an amount equal to Twelve Million One Hundred Twenty Thousand Dollars ($12,120,000.00). Thereafter, on each Interest Calculation Date on which PIK Interest arises, the Lenders will be deemed to have made an additional loan to the Borrower in an amount equal to such PIK Interest as of such Interest Calculation Date.

Section 2.02. <u>Purpose of Loan; Reserve Account</u>.

(a)    The purpose of the Loan is to provide funds (i) necessary for the Borrower to continue its operations and to pay its costs and expenses prior to, and certain additional future expenses associated with, a Take-Out Financing by the Borrower, (ii) to make the Class A Member Distributions, (iii) to pay Existing Member Advance Amounts, (iv) to pay Rights Reserve Amounts, (v) to pay interest in the event of a shortfall in Collections for a related Collection Period, each as more fully set forth in Section 2.02(d) and on Schedule IV, (vi) to pay the Post Closing Date Mandatory Repayment, if any, and (vii) to pay Deferred Expenses from Excess Additional Class A Member Amounts or from Excess Existing Member Advance Amounts.

15

(b)    On the Closing Date, (i) the Lender shall disburse the proceeds of the Loan in accordance with Schedule IV under the heading "Payments to be made at Closing," and (ii) all remaining proceeds shall be deposited into the Reserve Account including the Class A Member Unallocated Amount.

(c)    At any time prior to the delivery by the Agent of a notice to the Reserve Account Bank in accordance with the Reserve Account Control Agreement, the Borrower may, subject to the terms and conditions set forth in this Section 2.02(c) and in Section 2.02(d), withdraw amounts from the Available Reserve Amount on deposit in the Reserve Account by delivering to the Agent, by overnight courier, a Reserve Account Distribution Notice at least three Business Days prior to the date proposed for such distribution, which, in the case of requests for withdrawal of amounts set forth in Sections 2.02(d)(i), (ii) and (iii), the Agent shall have acknowledged in writing to the Borrower, in a timely manner, either that the Borrower has satisfied such conditions, or that the Agent objects to the withdrawal covered by such Reserve Account Distribution Notice.

(d)    Subject to satisfaction of the conditions set forth in Section 2.02(c), the Borrower may withdraw the following amounts from the Available Reserve Amount on deposit in the Reserve Account, except that with respect to (vi), no Reserve Account Distribution Notice shall be required and any Post Closing Date Mandatory Repayment shall be made to the Agent by the Borrower on the Post Closing Date:

(i)    for each Existing Advance Class A Member, an amount not to exceed such Class A Member's Existing Member Advance Amount with respect to the third party payee, upon receipt by the Agent of documentation reasonably satisfactory to the Agent in its sole and absolute discretion evidencing (A) the payment or settlement, or written agreement of a third party obligee to accept a payment in settlement (collectively, the "Payout Amount"), (B) executed Letters of Direction, and (C) Third Party Consents, if any; provided that the Excess Existing Member Advance Amounts shall be retained in the Reserve Account and used by the Borrower to pay monthly operating expenses in accordance with the Source and Uses set forth on Schedule IV and for periods extending beyond those originally contemplated and to pay Deferred Expenses;

(ii)    for each Class A Member, the Class A Member Distribution Amount, upon receipt by the Agent of documentation reasonably satisfactory to it in its sole and absolute discretion (A) evidencing the tax filings, together with an official receipt or cancelled checks evidencing payment, for each of the years 1998-2003, (B) the release of, or the written agreement of, the third party to release the applicable Liens or other encumbrances on the Collateral, together with a direction to make payment of such amounts to such third party, (C) executed Letters of Direction and (D) Third Party Consents, if any;

(iii)    for each Rights Reserve Class A Member, the Rights Reserve Amount, upon receipt by the Agent of the Third Party Consents;

16

(iv)    the amounts necessary to cover operating expenses and other contemplated uses of the Borrower for the next succeeding month as set forth in Schedule IV;

(v)    any necessary Take-Out Financing expenses (including, if applicable, an amount equal to the shortfall, if any, in Collections available for interest payments to be paid to the Borrower on a Payment Date; provided, however, that in relation to any Take-Out Financing expenses or interest payments, the Borrower shall certify that such amount does not exceed the Remaining Take-Out Financing Expense Amount);

(vi)    on the Post Closing Date, the Post Closing Date Mandatory Repayment, if any; and

(vii)    on or after the Post Closing Date, to pay Deferred Expenses from Excess Additional Class A Member Amounts; provided that, any Excess Additional Class A Member Amount remaining after payment of the Deferred Expenses shall be used to pay operating expenses and Take-Out Financing expenses.

Section 2.03. Note.  Borrower's obligation to repay the Loan with interest shall be evidenced by the Note.

Section 2.04. Interest.

(a)    Until the principal amount thereof and all interest thereon shall be paid in full (whether by demand, stated maturity, acceleration or otherwise), all principal sums outstanding under the Note shall bear interest at the Interest Rate.  Interest shall be calculated on each Reporting Date for the immediately preceding Interest Period at the Interest Rate and on the basis of a year of 360 days based upon the actual number of days elapsed; provided, that, for the first six Reporting Dates, if no Event of Default has occurred and is continuing and the Borrower so elects, that portion of the interest exceeding a rate of 12.0% per annum (the "PIK Interest") shall be added to the principal balance of the Loan, and such PIK Interest will then accrue interest at the Interest Rate; provided, that, when PIK Interest is calculated on a Reporting Date which coincides with a Payment Date and Collections are available to pay any or all of such PIK Interest after payment of any amounts set forth in Subsections 5.02(a) through (d), such Collections will be applied to pay such PIK Interest and the amount of PIK Interest paid will not be added to the principal balance of the Loan.  That portion of the interest equal to a rate of 12.0% per annum (the "Cash Pay Interest") will be payable to the Agent on the next succeeding Payment Date.  On the seventh Reporting Date and each Reporting Date thereafter, interest shall be calculated on the then outstanding balance of the Loan at the Interest Rate and the amount of interest shall be payable by the Borrower on the next succeeding Payment Date.

(b)    All accrued and unpaid interest on the Loan as of the end of each Interest Period shall be payable in arrears quarterly on the related Payment Date during the term of this Agreement.

17

Section 2.05. Repayment. The Loan shall be repaid by the Borrower in accordance with Article V hereof; provided, that all Obligations shall be due and payable in full on the Maturity Date or, if earlier, the date of demand therefor under Section 10.01 hereof.

Section 2.06. Prepayment. The Borrower may at its option prepay the Loan in whole at any time but not in part; provided, that, any prepayment of the Loan prior to the six month anniversary of the Closing Date shall require that the Borrower (i) prepay the Loan in full, (ii) pay all accrued and unpaid interest (other than PIK Interest that shall have been added to the principal of the Loan and shall be paid under the foregoing clause (i)) on the Loan, and (iii) pay a prepayment premium in an amount (not less than zero) equal to the excess, if any, of (A) six months' interest on the amount of the Loan on the Closing Date at the Interest Rate over (B) any interest on the Loan theretofore paid in cash. The foregoing sentence shall apply to any voluntary prepayments and to any Mandatory Repayments pursuant to Section 5.04.

Section 2.07. Taxes.

(a)     All payments by the Borrower of principal of, and interest on, the Loan and all other amounts payable hereunder and under any other Loan Document shall be made free and clear of and without deduction for any Taxes. In the event that any withholding or deduction from any payment to be made by the Borrower hereunder is required with respect to any Taxes pursuant to any applicable law, then the Borrower will (a) pay directly to the relevant authority the full amount required to be so withheld or deducted; (b) promptly forward to the Agent an official receipt or other documentation satisfactory to the Agent evidencing such payment to such authority; and (c) pay to the Agent for the account of the Agent or such Lender such additional amount or amounts as is necessary to ensure that the net amount actually received by the Agent or such Lender will equal the full amount the Agent or such Lender would have received had no such withholding or deduction been required. Moreover, if any Taxes are directly asserted against the Agent or any Lender with respect to any payment received by the Agent or such Lender hereunder, the Agent or such Lender may pay such Taxes and the Borrower will promptly pay such additional amounts (including any penalties, interest or expenses) as is necessary in order that the net amount received by such Person after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount such Person would have received had such Taxes not been asserted.

(b)     If the Borrower fails to pay any Taxes referred to above when due to the appropriate taxing authority or fails to remit to the Agent, for the account of the Agent or any Lender, the required receipts or other required documentary evidence, the Borrower shall indemnify the Agent or such Lender for any incremental Taxes, interest or penalties that may become payable by the Agent and such Lender as a result of any such failure. For purposes of this Section, a distribution hereunder by the Agent or any Lender to or for the account of the Agent or any Lender shall be deemed a payment by the Borrower.

(c)     Each Lender which is organized under the laws of a jurisdiction outside the United States shall, (i) on the day that such Lender becomes a lender and a party to this Agreement in accordance with the terms hereof and (ii) from time to time thereafter if requested by the Borrower or the Agent, provide the Agent and the Borrower with the forms prescribed by the Internal Revenue Service of the United States certifying as to such Lender's status for

18

purposes of determining exemption from United States withholding taxes with respect to all payments to be made to such Lender hereunder and under the other Loan Documents or other documents satisfactory to such Lender, the Borrower and the Agent and indicating that all payments to be made to such Lender hereunder and under the other Loan Documents are not subject to United States withholding tax. Unless the Borrower and the Agent shall have received such forms or such documents indicating that payments to such Lender hereunder and under the other Loan Documents are not subject to United States withholding tax, the Borrower and the Agent shall be entitled to withhold United States withholding taxes from such payments at the applicable statutory rate.

Section 2.08. <u>Maximum Interest</u>.  It is the intention of the parties hereto to conform strictly to applicable usury laws and, anything herein to the contrary notwithstanding, the obligations of the Borrower to each Lender under this Agreement shall be subject to the limitation that payments of interest shall not be required to the extent that receipt thereof would be contrary to provisions of law applicable to such Lender limiting rates of interest which may be charged or collected by such Lender.  Accordingly, if the transactions contemplated hereby would be usurious under applicable law (including the laws of the United States, any State, or of any other jurisdiction whose laws may be mandatorily applicable) with respect to a Lender then, in that event, notwithstanding anything to the contrary in this Agreement, it is agreed as follows:

    (a)    the provisions of this Section shall govern and control;

    (b)    the aggregate of all consideration which constitutes interest under applicable law that is contracted for, charged or received under this Agreement, or under any of the other Loan Documents or otherwise in connection with this Agreement by such Lender shall under no circumstances exceed the maximum amount of interest allowed by applicable law (such maximum lawful interest rate, if any, with respect to such Lender herein called the "Highest Lawful Rate"), and any excess shall be credited to the Borrower by such Lender (or, if such consideration shall have been paid in full, such excess promptly refunded to the Borrower);

    (c)    all sums paid, or agreed to be paid, to such Lender for the use, forbearance and detention of the Obligations of the Borrower to such Lender hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such Obligations until payment in full so that the actual rate of interest is uniform throughout the full term thereof; and

    (d)    if at any time the interest provided pursuant to Section 2.03 together with any other fees payable pursuant to this Agreement and deemed interest under applicable law, exceeds that amount which would have accrued at the Highest Lawful Rate, the amount of interest and any such fees to accrue to such Lender pursuant to this Agreement shall be limited, notwithstanding anything to the contrary in this Agreement, to that amount which would have accrued at the Highest Lawful Rate.

19

# ARTICLE III

## CONDITIONS PRECEDENT

Section 3.01. <u>Closing Conditions</u>. The funding of the Loan is subject to fulfillment of the following conditions precedent, on or before the Closing Date:

(a)     <u>Receipt of Documents</u>.    The Agent shall have received each of the following documents, each dated (unless otherwise indicated) as of the Closing Date, in form and substance satisfactory to the Agent and its counsel:

(i)     this Agreement, executed and delivered by each party hereto;

(ii)     the Note, executed and delivered by the Borrower;

(iii)     the Control Agreements;

(iv)     the Security Agreement;

(v)     the Servicing Agreement;

(vi)     the Backup Management Letter Agreement;

(vii)     the Collective Holding Guaranty;

(viii)     each other Basic Document executed and delivered by each party thereto and all other third party license, distribution, and management agreements pursuant to which the Borrower operates, each in form and substance reasonably satisfactory to the Agent;

(ix)     copies of any material third party agreements relating to third party obligations, contracts, and, if any, management/administration agreements for the Collateral;

(x)     each of the Schedules to this Agreement completed to the satisfaction of the Agent;

(xi)     evidence satisfactory to the Agent that all insurance coverages and all insurance clauses or endorsements required pursuant to this Agreement and the Loan Documents are in effect, together with copies of all insurance policies and endorsements except that the copyright or trademark infringement, defamation, disparagement, trade libel and other related tort claim insurance shall be delivered within 45 days after the Closing Date;

(xii)     a certificate of the Secretary of the Borrower including an attestation of such Secretary's incumbency by another duly authorized officer, certifying;

20

(A)    that attached thereto are true and correct copies of each of the following, each of which is true, correct and complete as of the Closing Date and none of which has been amended, modified, revoked or rescinded as of the Closing Date;

(1)    the LLC Agreement, including all restatements thereof and amendments thereto, certified by the Secretary of State of the State of its formation;

(2)    bylaws, including all restatements thereof and amendments thereto; and

(3)    resolutions authorizing the execution, delivery and performance by the Borrower of each Loan Document; and

(B)    the names and the signatures of the officers authorized to sign the Loan Documents;

(xiii)    good standing certificate of the Borrower in Delaware;

(xiv)    written opinion of counsel to the Borrower, dated as of Closing Date, addressed to the Agent and the Lenders, as to the following matters:

(A)    authorization, execution, delivery and enforceability of the LLC Agreement and the Subscription Agreement;

(B)    the due organization, valid existence and good standing in the State of its organization, power, authority and licensing of the Borrower;

(C)    the non-contravention of Requirements of Law or Material Agreements of the Borrower;

(D)    validity and perfection of the security interest of the Agent in the Collateral;

(E)    no registration or filing with the SEC is required in connection with the offering of the Membership Interests;

(F)    the validity of the assignment by the Class A Members of the Collateral; and

(G)    such other matters as the Agent or its counsel may reasonably request.

(xv)    written opinion of counsel to the Servicer in form and substance satisfactory to the Agent and its counsel;

21

(xvi)   UCC search reports and tax lien searches for the Borrower and each of the Members;

(xvii)   release of any Liens against the Class A Members including the SESAC and SunTrust Bank Liens;

(xviii)   evidence satisfactory to the Agent that all actions necessary to perfect the security interests contemplated by the Security Agreement have been taken, including filing under the Copyright Act, the UCC-1 Financing Statement filed to perfect the security interests of the Agent, for the benefit of the Lenders, in all existing Copyrights, Licenses and other rights, and all income derived therefrom;

(xix)   letters of direction signed by the Borrower and each of the Class A Members, as applicable, for purposes of re-directing to the Collection Account any payments that would otherwise be made to the Class A Members, in each case satisfactory to the Agent in its sole and absolute discretion;

(xx)   an asset valuation report of the Collateral prepared by an asset valuation specialist approved by the Agent in its reasonable discretion showing a valuation of not less than three (3) times the amount of the Loan;

(xxi)   a true and correct copy of each Class A Member's Copyright or Income Right assignment;

(xxii)   such other documents, agreements and statements evidencing ownership of the Collateral as the Agent may reasonably request;

(xxiii)   such other documents as the Agent's counsel deems reasonably necessary to secure the Loan; and

(xxiv)   the Agent shall have received such financial and other information regarding the Borrower as the Agent may reasonably request.

(b)   *Fees and Expenses*.   The Agent shall have received payment of the Origination Fee and any other fees due to the Agent and all reasonable expenses of the Agent, including the fees and expenses of its counsel and any third party costs and expenses.

(c)   *Material Adverse Change*.   No Material Adverse Change shall have occurred with respect to the Borrower.

(d)   *No Event of Default*.   On the Closing Date, the Agent shall be fully satisfied that (a) all of the covenants, conditions, warranties and representations set forth herein and in the Loan Documents have been complied with and are true and complete on and as of such time with the same effect as though such covenants, conditions, warranties and representations had been made on and as of such time, (b) no Event of Default nor any event which, upon the giving of notice and/or the lapse of time, could constitute an

22

Event of Default shall have occurred, and (c) the documents and matters required to be executed, delivered, opined and/or certified pursuant to Subsection 3.01(a) hereof shall be in full force and effect and/or true and complete, as the case may be.

Section 3.02. Post Closing Conditions. The admission of Additional Class A Members on the Post Closing Date is subject to fulfillment of the following conditions on the Post Closing Date:

(a)    Receipt of Documents.  The Agent shall have received each of the following documents, each dated (unless otherwise indicated) as of the Post Closing Date, in form and substance satisfactory to the Agent and its counsel:

(i)    an LLC Agreement and a Subscription Agreement executed and delivered by each Additional Class A Member together with copies of any third party agreements relating to each Additional Class A Member's Catalog including any licenses, rights of first refusal, third party administration agreements for the Catalog or Third Party Consents;

(ii)    each of the Schedules to this Agreement updated to the Post Closing Date and completed to the satisfaction of the Agent including the information for each Additional Class A Member as to the Class A Member Distributions for each Additional Class A Member (calculated in accordance with the formula used to calculate the Class A Member Distributions for the Initial Class A Members) and, the extent applicable, Existing Member Advance Amounts, Rights Reserve Amounts or other amounts required to pay Liens or other encumbrances;

(iii)    evidence satisfactory to the Agent that insurance covering copyright or trademark infringement, defamation, disparagement, trade libel and other related tort claim insurance has been obtained by the Borrower;

(iv)    a certificate of the Secretary of the Borrower stating that (a) all of the covenants, conditions, warranties and representations set forth herein and in the Loan Documents have been complied with and are true and complete on and as of the Post Closing Date with the same effect as though such covenants, conditions, warranties and representations had been made on and as of such time, (b) no Event of Default nor any event which, upon the giving of notice and/or the lapse of time, could constitute an Event of Default shall have occurred and be continuing, and (c) no Material Adverse Change shall have occurred since the Closing Date.

(v)    written opinion of counsel to the Borrower, dated as of Post Closing Date, addressed to the Agent and the Lenders, as to the following matters:

(A)    authorization, execution, delivery and enforceability of LLC Agreement and the Subscription Agreement;

23

(B)    the due organization, valid existence and good standing in the State of its organization, power, authority and licensing of the Borrower;

(C)    the non-contravention of Requirements of Law or Material Agreements of the Borrower;

(D)    no registration or filing with the SEC is required in connection with the offering of the Membership Interests to the Additional Class A Members;

(E)    the validity of the assignment by the Additional Class A Members of the applicable Collateral; and

(F)    such other matters as the Agent or its counsel may reasonably request.

(vi)    UCC search reports, judgment and tax lien searches for each of the Additional Class A Members;

(vii)    release of any Liens against the Additional Class A Members;

(viii)    Letters of Direction signed by the Borrower and each of the Additional Class A Members, as applicable, for purposes of re-directing to the Collection Account any payments that would otherwise be made to the Additional Class A Members, in each case satisfactory to the Agent in its sole and absolute discretion;

(ix)    an asset valuation report of the Collateral prepared by an asset valuation specialist approved by the Agent in its reasonable discretion showing a Loan to value ratio for the Catalogs of the Additional Class A Members substantially similar to the Loan to value ratio for the Catalogs of the Initial Class A Members as approved by the Agent in its sole discretion;

(x)    a true and correct copy of each Additional Class A Member's Copyright or Income Right assignment;

(xi)    such other documents, agreements and statements evidencing ownership of the Additional Class A Member's Catalog as the Agent may reasonably request;

(xii)    such other documents as the Agent's counsel deems reasonably necessary to secure the Loan; and

(xiii)    the Agent shall have received such financial and other information regarding the Borrower as the Agent may reasonably request.

24

(b) <u>Fees and Expenses</u>.  The Agent shall have received payment of all reasonable expenses of the Agent incurred between the Closing Date and the Post Closing Date, including the fees and expenses of its counsel and any third party costs and expenses.

(c) <u>Post Closing Date Mandatory Repayment</u>.  The Agent shall have received payment of any Post Closing Date Mandatory Repayment.

(d) <u>Material Adverse Change</u>.  No Material Adverse Change shall have occurred with respect to the Borrower.

(e). <u>No Event of Default</u>.  No Event of Default nor any event which, upon the giving of notice and/or the lapse of time, could constitute an Event of Default shall have occurred and be continuing.

## ARTICLE IV

## MANAGEMENT SERVICES

Section 4.01. <u>Administration of Collateral</u>.  The Borrower shall perform the Management Services in accordance with its fiduciary duties set forth in the LLC Agreement. Upon the occurrence of a Backup Manager Triggering Event, the Agent may notify the Borrower that these functions will thereafter be performed by the Backup Manager in accordance with the terms of the Backup Management Letter Agreement.

## ARTICLE V

## ACCOUNTS AND DISTRIBUTIONS

Section 5.01. <u>Accounts</u>.

(a) The Borrower shall, prior to the Closing Date, establish and maintain the Accounts each in the name of "The Songwriters Collective, LLC for the benefit of Fortress Credit Opportunities I LP, as Agent" (or such other name as agreed upon by the Borrower and the Agent). All amounts (and Permitted Investments) from time to time on deposit in the Accounts shall constitute part of the Collateral. The Accounts shall be under the sole dominion and control of the Agent; provided, that, the Borrower may make deposits to, and until an Event of Default has occurred, direct the Control Bank in writing to make withdrawals from the Accounts in accordance with the terms of this Agreement and the Control Agreements. In the event that either Control Bank is no longer an Eligible Institution, the Borrower shall, with the assistance of the applicable Control Bank cause the applicable Account to be moved to an Eligible Institution reasonably acceptable to the Agent and the Borrower.

(b) To the extent permitted by applicable laws, rules and regulations, the Borrower shall direct all amounts held in the Accounts to be invested by the Control Bank in Permitted Investments selected in writing by the Borrower or maintained in cash. Earnings on investment of funds in the Accounts (net of losses and investment expenses) shall be deposited into the Collection Account on the related Payment Date.

25

Section 5.02. <u>Distributions</u>. On each Payment Date, the Servicer is required to direct the Collection Account Bank to distribute all Collections for the related Collection Period on deposit in the Collection Account in the following order and priority:

    (a)    the fees of each of the Control Banks, the Backup Manager Tier One Fees and the Lenders expenses incurred in relation to Section 10.03, if any;

    (b)    to the Agent, on behalf of the Lenders, for the payment of accrued and unpaid interest on the Loan at the applicable Interest Rate as provided in Section 2.04;

    (c)    to the Servicer, for the payment of the Servicer Fee;

    (d)    to Class A Members, an amount equal to the aggregate tax allocation amounts allocable for the payment of income taxes arising from Membership Interests in the Borrower, if any; and

    (e)    PIK Interest, if any, calculated with respect to such Payment Date;

    (f)    any remaining amounts for distribution as follows: (i) fifty percent (50%) of the remaining amount will be distributed to the Agent, for the benefit of the Lenders, which amount may be, at the option of the Borrower, (A) deposited to an interest bearing account and held by the Agent as security for the Loan or (B) applied to the Outstanding Balance of the Loan and (ii) fifty percent (50%) of the remaining amount to be applied first in payment of the Backup Manager Tier Two Fee (subject to any cap set forth in the Backup Management Agreement, if applicable) and any thereafter any remaining amount to the Borrower; provided, that, following the occurrence and during continuance of an Event of Default or Triggering Event, all remaining amounts shall be paid to the Agent, for the benefit of the Lenders, to be applied to the Outstanding Balance of the Loan and any other Obligations due hereunder.

Section 5.03. <u>Insurance Proceeds</u>. Upon receipt, the Borrower shall remit to the Agent proceeds of any insurance relating to the Collateral to the extent that the insurance proceeds represent amounts that would have been Collections if such amounts had been received during a Collection Period. The Agent shall apply such Insurance Proceeds in repayment of the Loan by application of such Insurance Proceeds, first to any accrued and unpaid interest on the Loan and then in reduction of the Outstanding Balance of the Loan.

Section 5.04. <u>Mandatory Repayments</u>.

    (a)    Notwithstanding the occurrence and continuance of an Event of Default, the Borrower shall be permitted to obtain a release of Collateral in connection with a Membership Buyout and the Lien of the Agent on the Collateral shall be released upon receipt of payment by the Agent of the Class A Member Debt plus interest together with the premium, if any, applicable to a prepayment prior to the six month anniversary of the Closing Date and a prepayment premium equal to twenty percent of the Class A Member's share of the Class A Member Debt (a "Class A Debt Mandatory Repayment"). Upon the occurrence of a Membership Buyout and the payment of the amount of the Class A Debt Mandatory Repayment, the Borrower shall make a repayment of the Loan

26

in such amount; provided, that, neither Annie Roboff nor Thomas McHugh shall be permitted to exercise a Membership Buyout for a period of six months following the Closing Date. Upon any such release, the Agent will, promptly at the Borrower's expense, execute and deliver to the Borrower such documents, and take such other action as the Borrower shall reasonably request to evidence such release.

(b)     In the event that (i) no Additional Class A Members become Members of the Borrower on the Post Closing Date, the Borrower shall make a repayment of the Loan in an amount equal to the Class A Member Unallocated Amount or (ii) Additional Class A Members are admitted on the Post Closing Date and the Class A Member Unallocated Amount exceeds the Additional Class A Member Amount, an amount equal to such excess shall be paid by the Borrower to the Agent, and in each case the Borrower shall direct that such amount be paid to the Agent from the Reserve Account (each, a "Post Closing Date Mandatory Repayment").

(c)     Upon receipt of a Mandatory Repayment, the Agent shall apply such amount in repayment of the Loan, first to any accrued and unpaid interest on the Loan or any fees relating thereto and then in reduction of the Outstanding Balance of the Loan.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES

Section 6.01. Representations And Warranties. To induce the Agent and the Lenders to enter into this Agreement, and the related documentation and to make the Loan hereunder, the Borrower hereby severally represents and warrants to the Agent and the Lenders as of the Closing Date as follows (each of which such representation and warranty shall survive the execution and delivery of this Agreement):

(a)     State of Incorporation and Legal Name. The Borrower's state of organization and exact legal name are set forth in the first paragraph of this Agreement.

(b)     Existence. The Borrower is duly organized, validly existing and in good standing as a limited liability company under the laws of the State of its organization, has the power to own its property and to carry on its business and is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned by it therein or in which the transaction of its business makes such qualification necessary except where the failure to be so qualified and in good standing would not be reasonably likely to result in a Material Adverse Effect.

(c)     Power and Authority; Authorization. The Borrower has the requisite power and authority to execute and deliver the enter into this Agreement, to make the borrowings hereunder, to execute and deliver the Loan Documents and the Basic Documents to which it is a party and to carry out the terms and provisions thereof on its part to be performed and to own, pledge, mortgage, lease and operate its properties and conduct the business in which it is engaged. The Borrower has all requisite limited liability company other power, and has all governmental licenses, authorizations,

27

consents and approvals necessary to own its assets and carry on its business as now being or as proposed to be conducted, except where the lack of such licenses, authorizations, consents and approvals would not be reasonably likely to have a material adverse effect. The execution, delivery and performance by the Borrower of each Loan Documents and each Basic Document to which it is a party and the transactions contemplated thereby and the granting of the security interests and the borrowings contemplated thereby have been duly authorized by all necessary limited liability company or other action on the part of the Borrower.

(d)    Enforceability. Each Loan Document and each Basic Document to which the Borrower is a party has been duly executed and delivered by the Borrower and is a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general equitable principles regardless of whether enforcement is sought in a proceeding in equity or at law.

(e)    No Violation, Conflict or Liens. Neither the execution or delivery of the Loan Documents or the Basic Documents to which it is a party nor the consummation of the transactions contemplated thereby, nor compliance with the provisions thereof, will (i) violate any provision of the organizational documents of the Borrower or any Requirement of Law, (ii) conflict with, or result in the breach of, or constitute a default under, any material indenture, mortgage, deed of trust, agreement or other instrument or contractual obligation to which the Borrower is a party or by which it or any of its property may be bound or affected, including the Material Agreements, or (iii) result in the creation or imposition of any Lien upon any property of the Borrower thereunder, other than Permitted Liens.

(f)    No Litigation. There is no pending or, to the knowledge of the Borrower, threatened, action, suit or other proceeding by or against the Borrower before any court, arbitrator or other Governmental Authority that (i) individually or in the aggregate, if adversely determined, could reasonably be likely to have a material adverse effect or (ii) would require, if the Borrower were a reporting company for the purposes of the Exchange Act, filing with the SEC in accordance with the Exchange Act, or the rules of the SEC promulgated thereunder (other than those filings on file with the SEC).

(g)    Tax Liability. The Borrower and, to the best knowledge of the Borrower after due inquiry, each Class A Member receiving a Class A Member Distribution on the Closing Date, has timely filed or caused to be filed all material tax returns (federal, state and local) that are required to be filed or has timely requested requests for extensions which are routinely granted, and the Borrower and each such Class A Member has paid all Taxes, including those which have become due pursuant to such returns or pursuant to any assessments made against it or any of its properties, as the case may be, and all other Taxes or other charges imposed on it or any of its properties by any Governmental Authority, except for any such Taxes as are being appropriately contested in good faith and appropriate proceedings diligently conducted and with respect to which adequate

28

reserves have been provided so long as no Liens in respect thereof have been filed. The charges, accruals and reserves on the books of the Borrower in respect of Taxes and other governmental charges are, in the opinion of the Borrower, accurate. To the knowledge of the Borrower, no Liens have been filed with respect to any of its property or the property of any Class A Member, in respect of the foregoing.

(h)  Place of Business.  The Borrower's principal place of business and chief executive office is located at the Business Premises and the Borrower has such other business locations as are set forth on Schedule VII. The Borrower will not change the location of the Business Premises or open additional business locations (other than those locations heretofore disclosed to Agent) without 30 days prior written notice to the Agent.

(i)  Financial Information.  All financial statements, schedules, reports and other information supplied to the Agent by or on behalf of the Borrower heretofore and hereafter are and will be true and complete.

(j)  Licenses and Permits.  The Borrower has duly obtained and now holds all licenses, permits, certifications, approvals and the like required by federal, state and local laws of the jurisdictions in which the Borrower conducts its business, except where the lack of such licenses, permits, certificates, approvals and the like would not be reasonably likely to have a Material Adverse Effect and each remains valid and in full force and effect.

(k)  Copyright Assignments.  The Borrower has acquired from each Class A Member all right, title and interest of the Class A Member now known or existing, or which may hereinafter come into existence or be acquired, in all of the Compositions set forth on Schedule V to this Agreement and has obtained all consents to assignment required under the terms thereof, as more particularly set forth, and except as otherwise provided, on Schedule V, including, all titles, words and music thereof, any and all Copyrights (whether registered or unregistered) and the full and unlimited right in any case to secure Copyright registrations therein to any unregistered Compositions, whether any of the foregoing items is now or hereafter owned beneficially or of record and whether now or hereafter owned individually, jointly or otherwise, and in connection with all of the foregoing, all other applications and other pending items, all income, accounts, license royalties, general intangibles and other payment intangibles, any and all claims or causes of action whether asserted or not relating thereto, any and all current or future income streams emanating therefrom, all proceeds of infringement suits and other proceeds, all rights to sue for past, present and future infringement, all rights corresponding thereto throughout the world, and any and all reissues, divisions, continuations, renewals, extensions, derivative works and other rights of Copyright thereof, all in the Borrower's name (including, without limitation, during the pendency of any bankruptcy-related proceeding), together, in each case, with all products and proceeds thereof, all collections, payments and other distributions and realizations with respect thereto, any and all other rights, powers, privileges, remedies and interests of the Class A Member therein, thereto or thereunder; but excluding the right, title and interest

29

in any proceeds resulting from any ongoing audit as of the date of the acquisition by the Borrower.

(l)    _Assignment of Rights of Income._  The Borrower has acquired from each Class A Member all right, title and interest, now known or existing, or which may hereinafter come into existence or be acquired, of the Class A Member in and to all income, accounts, License royalties, general intangibles and other payment intangibles and any and all current or future income streams emanating therefrom generated by the Compositions (collectively, the "Rights to Income") as more particularly set forth, and except as otherwise provided, on Schedule VI, in each case, whether any of the foregoing items is now or hereafter owned beneficially or of record and whether now or hereafter owned individually, jointly or otherwise, together with the products and proceeds thereof, to all collections, payments and other distributions and realizations with respect thereto, any and all other rights, powers, privileges, remedies and interests of the Class A Member therein, thereto or thereunder

(m)    _Title to Rights._  (i) The Compositions are wholly originals of the applicable Class A Members, susceptible of copyright and other protection throughout the world; (ii) The Compositions do not and will not infringe upon or violate the copyrights, property or privacy rights or any other rights whatsoever of any person or entity; (iii) The Borrower has no notice of an adverse claim, and to the best of the Borrower's knowledge, after due inquiry, no adverse claim exists, with respect to any of the Compositions and/or Rights to Income; (iv) The Borrower owns and controls the Compositions and Rights to Income to the extent of its interest therein and any and all rights throughout the world, subject to any pre-existing publishing agreement with respect to the Compositions listed on Schedule V; (v) The Compositions and Rights to Income are owned by the Borrower, with a good and marketable title thereto, free and clear of all Liens.

(n)    _Certain Indebtedness._  The Borrower does not have any Indebtedness. The Borrower does not provide, nor maintain any plans which provide, deferred compensation, severance, or medical or other welfare benefits that extend beyond the date of an employee's termination of employment except as required by law or which meet the requirements of Section 401 et. seq. of the Internal Revenue Code of 1986, as amended.

(o)    _Broker's or Finder's Commissions._  Except for the fees payable on the Closing Date to UCC Capital, Inc. and to the Agent, no broker's or finder's fee or commission is or will be payable in connection with this Agreement or the transactions contemplated hereby, and the Borrower agrees to save harmless and indemnify the Agent from and against any claim, demand, action, suit, proceeding or liability for any such fee or commission, including any costs and expenses (including reasonable attorney's fees) incurred by the Agent in connection therewith.  The provisions of this Subsection shall survive the termination of this Agreement and the payment of all other Obligations.

(p)    _Regulation U._  The Borrower does not own or presently intend to acquire any "margin stock" as defined in Regulation U (12 CFR Part 221) of the Board of

Governors of the Federal Reserve System. None of the proceeds of the Loan hereunder will be used, directly or indirectly, for the purpose of purchasing or carrying any margin stock or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry a margin stock or for any other purpose which might cause this transaction to be deemed a "purpose credit" within the meaning of Regulation U. Neither the Borrower nor any agent acting on its behalf has taken or will take any action which might cause this Agreement to violate Regulation U or any other regulation of the Board of Governors of the Federal Reserve System or to violate the Exchange Act, in each case as in effect now or as the same may hereafter be in effect.

(q)    Patents, Trademarks, etc. The Borrower owns, possesses or has the right to use all necessary patents, patent rights, licenses, trademarks, trade names, trade name rights, and franchises to conduct its business as now conducted, without any known conflict with any patent, patent right, license, trademark, trademark rights, trade name right, trade name, copyright or franchise right of any other person.

(r)    The Investment Company Act. The Borrower is not, nor is it controlled by, an "investment company" within the meaning of the Investment Company Act.

(s)    Borrower Solvent. The Borrower is Solvent, and neither the performance by the Borrower of the transactions contemplated by the Basic Documents nor the fulfillment of the terms thereof by the Borrower will impair the Borrower's status as being Solvent.

(t)    Collection Account. The Borrower and each Class A Member, as applicable, have notified the parties making payments to it with respect to the Collateral to send the payments directly to the Collection Account and such notices assign such payments to the Borrower and will cause such payments to be made directly to the Borrower.

(u)    Royalties. The information provided to the Agent by the Borrower and the Class A Members as to the Royalty Receipts during the five years preceding the Closing Date are true and accurate.

(v)    SESAC Agreement. The SESAC Agreement is a valid agreement of the Borrower and the Borrower is not in breach of the SESAC Agreement nor is it aware of any potential breaches thereof.

(w)    Private Placement. The Borrower has complied with all securities laws in connection with the offering of the Membership Interests to the Class A Members.

(x)    Existing Member Advances. The information set forth on Schedule III is true and correct. The Schedule reflects all Existing Member Advances known to the Borrower after due inquiry and there are no other outstanding advances to the Class A Members from any performing rights society, subpublisher, printer or other person, film or corporation.

31

(y)   Class A Member Distributions.  Schedule II accurately reflects the Class A Member Distributions, such amounts have been approved by the Class A Members and represent substantially the same pro rata amounts as would be used to determine the amount of the Class A Member Debt applicable to a Member Buyout.

(z)   Insurance.  The Borrower maintains or will obtain within 45 days of the Closing Date, appropriate insurance (as determined in the sole discretion of the Board of Directors) covering all material assets, properties and risks including any and all potential claims, actions and suits or other proceedings relating to copyright infringement, defamation, disparagement, trade libel or other related tort claims, any right of privacy or right of publicity claims and any and all other claims or potential claims in connection with any Compositions, Licenses or Catalogs, in such types and amounts and covering such risks as are consistent with customary practices and standards of companies engaged in business and operations similar to the Borrower.  The policies name the Borrower and the Agent on behalf of the Lenders, as beneficiaries thereunder.

(aa)   Tax Treatment.  The Borrower is treated as a partnership for tax purposes.

(bb)   Basic Documents.  The Borrower has been provided with true and complete copies of the Basic Documents.

(cc)   Marketing Materials.  The Marketing Materials are the only written materials which were used by the Borrower in connection with the sale of the Membership Interests to the Class A Members.  To the best knowledge of the Borrower, the Marketing Materials do not contain any material misstatement nor is there an omission of any material fact therefrom.  No other material representations or statements were made by the Borrower to a Class A Member in connection with the sale of the Membership Interests.

## ARTICLE VII

## AFFIRMATIVE COVENANTS

Section 7.01.  Affirmative Covenants.  Until all of the Obligations have been paid in full, the Borrower will, unless otherwise agreed to by the Majority Lenders:

(a)   Financial Statements.  Furnish to the Agent in writing; (a) as soon as available, but in no event more than 45 days after the close of each fiscal quarter during each fiscal year, the balance sheet, profit and loss statement and statement of cash flow of the Borrower as of the close of such period, all as prepared and certified by the chief financial officer or other duly authorized officer; (b) as soon as available, but in no event more than 90 days after the close of each fiscal year, a copy of the annual financial statement of the Borrower, prepared in accordance with GAAP and audited by an independent certified public accountant satisfactory to the Agent, which financial statement shall include a balance sheet of the Borrower as of the end of such fiscal year and a statement of income and changes in ownership of the Borrower for such fiscal year and a statement (including all calculations) that the Borrower is in compliance with all of

32

the covenants contained herein and, if not, stating the facts with respect thereto and certifying that no Event of Default exists or is believed to exist; and (c) such additional information, reports or statements as the Agent may from time to time reasonably request.

(b)  Taxes.  Pay and discharge all taxes, assessments and governmental charges upon the Borrower, its income and properties, prior to the date on which penalties attach thereto unless and to the extent only that the same are being diligently contested by the Borrower in good faith in the normal course of business by appropriate proceedings, provided, however, that: (a) the Agent shall have been given reasonable prior written notice of intention to contest; (b) nonpayment of the same will not, in the Agent's reasonable discretion, materially impair any of the Collateral or the Agent's rights or remedies with respect thereto or the prospect for full and punctual payment of all of the Obligations; (c) the Borrower at all times effectively stays or prevents any official or judicial sale of or action or filing against any of the Collateral by reason of nonpayment of the same; and (d) the Borrower establishes reasonable reserves for any liabilities being contested and for expenses arising out of such contest.

(c)  Limited Liability Company Existence, Continuation of Business and Compliance with Laws.  Maintain its limited liability company existence in good standing; continue its business operations as now being conducted; and comply in all material respects with all applicable federal, state and local laws, rules, ordinances, regulations and orders unless and to the extent only that the validity or applicability thereof is being diligently contested by the Borrower in good faith by appropriate proceedings, provided, however, that: (a) the Agent shall have been given reasonable prior written notice of intention to contest; (b) such noncompliance will not, in the Agent's sole discretion, materially impair any of the Collateral or the Agent's rights or remedies with respect thereto or the prospect for full and punctual payment of all of the Obligations; (c) the Borrower at all times effectively stays or prevents any official or judicial sale of or action or filing against any of the Collateral by reason of such noncompliance; and (d) the Borrower establishes reasonable reserves for any liabilities or expenses which may arise out of such noncompliance and contest.

(d)  Civil and Criminal Proceedings.  Promptly notify the Agent in writing of (a) the filing of any criminal referral form or the threatened in writing or actual commencement of a criminal proceeding or investigation or (b) any action, suit or proceeding at law or in equity by or before any court, governmental agency or instrumentality which could result in any material adverse change in the business, operations, prospects, properties or assets or in the condition, financial or otherwise, of the Borrower.

(e)  Extraordinary Loss.  Promptly notify the Agent in writing of any event causing extraordinary loss or depreciation of the value of the Borrower's assets (whether or not insured) and the facts with respect thereto.

(f)  Books and Records.  Keep and maintain at the Business Premises proper and current books and records in accordance with GAAP and permit access by the Agent

33

to, reproduction by the Agent of and copying by the Agent from, such books and records during normal business hours and upon reasonable prior notice. All reasonable costs and expenses of such inspections and examinations shall be paid by the Borrower.

(g)    Conferences with Officers. Permit the Agent to discuss the Borrower's affairs, finances and accounts with any officers or accountants of the Borrower.

(h)    Patents, Franchises, etc. Maintain, preserve and protect all patents, franchises, trademarks and trade names of the Borrower or licensed by Borrower which are necessary to the conduct of the business of the Borrower as now conducted, free of any conflict with the rights of any other person.

(i)    Insurance. Maintain with duly licensed insurers and in amounts satisfactory to the Agent insurance covering all material assets, properties and risks including any and all potential claims, actions and suits or other proceedings relating to copyright or trademark infringement, defamation, disparagement, trade libel or other related tort claims, any right of privacy or right of publicity claims and any and all other claims or potential claims in connection with any Compositions, Licenses or Catalogs, in such types and amounts and covering such risks as are consistent with customary practices and standards of companies engaged in business and operations similar to the Borrower and naming the Borrower and the Agent on behalf of the Lenders, as beneficiaries thereunder, except that the Borrower will not have insurance covering copyright or trademark infringement, defamation, disparagement, trade libel or other related tort claim insurance until 45 days after the Closing Date.

(j)    Further Assurances and Corrective Instruments. Promptly execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, to the Agent from time to time such supplements hereto, such financing statements and other instruments and documents as may be reasonably requested by the Agent to protect and preserve the Collateral, the Agent's security interest therein and perfection of the Agent's security interest and such releases, discharges or financing statement terminations as may be necessary to remove any Liens on the Collateral.

(k)    Financial Information. Deliver to the Agent promptly upon the Agent's request, and periodically if the Agent shall so require (which prior to the occurrence of an Event of Default shall not to exceed once per month), such written statements, schedules or reports (which shall be certified if required by the Agent) in such form, containing such information and accompanied by such documents as may be satisfactory to the Agent from time to time concerning the Collateral, the Borrower's financial condition or business operations or any other matter or matters, including, without limitation, copies of federal, State and local tax returns of the Borrower, and permit the Agent, its agents and designees, to discuss the Borrower's financial condition and business operations with the Borrower's senior officers.

(l)    Notice of Event of Default. Immediately notify the Agent in writing of the occurrence of any Event of Default or any event or existing condition which, with the giving of notice and/or the lapse of time, could constitute an Event of Default or which

34

might materially and adversely affect the financial conditions or operations of the Borrower and the facts with respect thereto.

(m)    ERISA. If at any time the Borrower has any employee benefit plan, the Borrower shall: (a) at all times maintain such employee benefit plan in conformity with the applicable provisions of ERISA and other federal statutes relating to employee benefit plans; (b) at all times make prompt payments of contributions required to meet the minimum funding standards set forth in Sections 302 and 305 of ERISA with respect to each such plan; (c) if requested by the Agent, promptly after the filing thereof, furnish to the Agent copies of each annual report required to be filed pursuant to Section 103 of ERISA in connection with each such plan for each plan year, including any certified financial statements or actuarial statements required pursuant to said Section 103; (d) notify the Agent immediately of any fact, including, without limitation, any "Reportable Event" (as that term is defined in Section 4043(b) of ERISA) arising in connection with any such plan which might constitute grounds for the termination thereof by the Pension Benefit Guaranty Corporation or for the appointment by the appropriate United States District Court of a trustee to administer the plan; and (e) furnish to the Agent, promptly upon its request therefor, such additional information concerning any such plan as the Agent may request.

(n)    Continuance of Business. Continue to operate the business as presently conducted and in accordance with the terms of the LLC Agreement. The Borrower will not acquire or operate any other business enterprise without the Agent's prior consent.

(o)    Document Delivery. The Borrower shall deliver copies of all agreements relating to the Compositions and Rights to Income to the Agent on the Closing Date and on the Post Closing Date, as applicable, and shall make copies of all such agreements available to the Agent for inspection prior thereto.

(p)    Take-Out Financing. The Borrower shall use its commercially reasonable efforts to execute a Take-Out Financing and immediately upon receipt will deliver to the Agent the proceeds of any Take-Out Financing in an amount sufficient to pay the related Obligations; provided that to the extent such proceeds exceed the Obligations of the Borrower to the Agent hereunder, the Borrower shall deliver a portion of the proceeds sufficient to satisfy such Obligations.

(q)    Deposits to the Collection Account. On each Business Day following the receipt thereof, the Borrower shall remit, or if applicable, cause each Class A Member to remit, all payments received from whatever source relating to the Collateral into the Collection Account including any payments made to the Borrower in connection with a Membership Buyout.

(r)    Reserve Account. The Borrower shall only apply amounts on deposit in the Reserve Account for payment of (i) Existing Member Advance Amounts, (ii) Class A Member Distributions, (iii) Rights Reserve Amounts, (iv) on a monthly basis, operating expenses for the next succeeding month and other contemplated uses of the Borrower set forth on Schedule IV, (v) Take-Out Financing expenses including paying interest in the

35

event of a shortfall in Collections for the related Collection Period, provided, that the aggregate amount used to pay such expenses when added to the Remaining Take-Out Financing Expense Amount does not exceed the Maximum Take-Out Financing Expenses set forth on Schedule IV, (vi) a Post Closing Date Mandatory Repayment, if any, and (vii) Deferred Expenses from Excess Additional Class A Member Amounts and Excess Existing Member Advance Amounts, if any, each of the foregoing at the time and in the manner, and subject to the applicable conditions, set forth in Section 2.02.

(s)     Royalty Receipt Statements.   Promptly upon receipt the Borrower shall deliver to the Agent copies of Royalty Receipt statements received from third party payors.

(t)     UCC Lien Searches and Copyright Filings.   On the Post Closing Date the Borrower shall deliver to the Agent (i) copies of UCC Lien searches, dated within 14 days of the date of delivery, containing the search results for each Class A Member, including each such members "doing business as" name or names and any entity names that such member utilized in conducting business relating to the Collateral, in each jurisdiction where such Class A Member resided or a related entity was located or had its principal place of business, in each case during the five years preceding the Closing Date or such other evidence satisfactory to the Agent that no liens exist on the Collateral and (ii) copies of the Copyright assignments from each of the Class A Members file stamped by the Library of Congress; provided that, with respect to the Additional Class A Members, such file stamped Copyright assignments shall be delivered within 60 days of the Post Closing Date.

(u)     Offering of Membership Interests.   The Borrower shall comply with all applicable Securities Laws in connection with any offering of additional Membership Interests; provided, however, that a sale of any additional Membership Interests will only be effected upon repayment of the Obligations hereunder in full.

(v)     Consents.   The Borrower shall obtain with respect to each Class A Member the applicable Third Party Consents together with each Class A Member's signature to the LLC Agreement for delivery to the Agent within 30 days of the Closing Date. The assignment by such Class A Member to the Borrower absent such Third Party Consent shall not have a material adverse effect on the rights of the Lender in the Collateral.

(w)     Termination of Certain Agreements.   The Borrower shall promptly notify the Agent of the termination of the Backup Copyright Administration Agreement.

(x)     Letters of Direction.   The Borrower shall promptly mail the Letters of Direction via United States certified mail, return receipt requested and shall promptly notify the Agent of any undeliverable or returned Letters of Direction, the failure by a third party obligor to execute and return any Letters of Direction or any disputes with third party obligors regarding the Letters of Direction.

36