ARTICLE VIII

NEGATIVE COVENANTS

Section 8.01. <u>Negative Covenants</u>. The Borrower covenants and agrees with the Agent that, until (a) all Obligations have been paid in full and (b) there exists no commitment by the Lenders which could give rise to any Obligations, the Borrower will not, directly or indirectly, without the Agent's prior written consent:

(a)    <u>Indebtedness</u>. Create, incur, assume or permit to exist, directly or indirectly, any Indebtedness except: (a) Indebtedness to the Lenders; (b) trade Indebtedness (which shall not include any borrowing, trade acceptance or notes given in settlement of trade Indebtedness) or Indebtedness otherwise incurred in connection with Permitted Liens incurred in the ordinary course of business; and (c) Indebtedness set forth on Schedule IV and any other Indebtedness which shall be consented to by the Agent in writing in advance, in the Agent's sole but reasonable discretion, and if required by the Agent, subordinated to the Obligations by a written agreement satisfactory to the Agent in form and substance.

(b)    <u>Liens</u>. Create, incur, assume or permit to exist, directly or indirectly, any Lien upon any of the Borrower's properties or assets, now owned by the Borrower including any Liens existing at the time of acquisition of Collateral by the Borrower from a Class A Member, other than Permitted Liens.

(c)    <u>Merger</u>. Enter into or be a party to any merger, consolidation, reorganization or exchange of stock or assets.

(d)    <u>Sale of Assets, etc.</u> Other than in connection with any Membership Buyouts, sell, assign, transfer, convey or lease any of the Copyrights or any interest in all or any substantial part of its property except in the ordinary course of the Borrower's business as now being conducted, or purchase or otherwise acquire all or substantially all of the assets of any other Person or Persons or any shares of stock of, or similar interest in, any other Person or Persons.

(e)    <u>Investments</u>. Except for special purpose entities created in connection with a Take-Out Financing, make any capital contribution to any other Person or purchase or acquire a beneficial interest in any stock, securities or evidences of Indebtedness of, or make any investment or acquire any interest in, any other Person.

(f)    <u>Fiscal Year</u>. Change the Borrower's fiscal year.

(g)    <u>Subsidiaries</u>. Except for special purpose entities created in connection with a Take-Out Financing, organize or cause to exist any Subsidiaries without the Agent's prior written consent, which consent may be conditioned, without limitation, upon the granting by such Subsidiary of a guarantee of payment of the Note and all other indebtedness of the Borrower to the Lenders. The Agent shall have the right at any time and from time to time at its sole discretion to require any existing Subsidiaries to guarantee the Obligations.

37

(h)    Change of Name or Jurisdiction of Organization.  Change the name of the Borrower or its jurisdiction of organization.

(i)    Trade Names.    Use any trade name other than the Borrower's true corporate name.

(j)    ERISA Compliance.  Engage, directly or indirectly, in any non-exempt prohibited transaction (as defined in Section 4975 of the Internal Revenue Code; incur any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived; or terminate any pension plan in a manner which could result in the imposition of a Lien on the property of the Borrower pursuant to Section 4068 of ERISA.

(k)    Distributions to Members.  Except for the Class A Member Distributions and any payments permitted under Section 5.02(d), directly or indirectly make any distribution with respect to (whether by reduction of capital or otherwise), any member interest or make any advances or loans to members.

(l)    Use of Proceeds.  Use the proceeds of the Loan for any purpose other than as set forth in Sections 2.01 and 2.02.

(m)    Sale of Additional Membership Interests.    Except for any Membership Buyouts or Additional Class A Members approved by the Agent, admit any additional Members or otherwise convey, transfer, assign, pledge or otherwise encumber any of interest in the Borrower to any Person.

(n)    Loans and Guaranties.  Loan or make advances to any other Person or guarantee, indorse or otherwise be or become liable or contingently liable in connection with the obligations or Indebtedness of any other Person, firm or corporation, directly or indirectly, except:

(i)    as an endorser of negotiable instruments for the payment of money deposited to the Borrower's bank account for collection in the ordinary course of business;

(ii)    trade credit extended in the ordinary course of the Borrower's business; or

(iii)    advances made in the usual course of business to officers and employees of the Borrower for travel and other out-of-pocket expenses incurred by them on behalf of the Borrower in connection with such business.

(o)    Exit Transaction.  The Borrower shall not enter into an Exit Transaction without the prior written consent of the Agent in its sole and absolute discretion.

(p)    LLC Agreement.  The Borrower shall not amend the LLC Agreement in any manner which adversely affects the ability of the Borrower to repay the Outstanding Balance of the Loan or impairs the Collateral without the prior written consent of the Agent in its sole and absolute discretion; provided, that, any proposed amendment shall

be distributed to the Agent five Business Days prior to distribution to the Members and if the Agent has not objected to the proposed amendment within three Business Days of receipt thereof, the Agent shall be deemed to have no objection to the proposed amendment.

(q)    Voluntary Withdrawal.    The Borrower shall not permit any Member to voluntarily withdraw from the LLC Agreement.

ARTICLE IX

EVENTS OF DEFAULT

Section 9.01. Events Of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)    Failure to Pay.    The failure of the Borrower to (i) pay any of the Obligations (including any failure by the Borrower to deliver, or cause to be delivered by any Class A Member, to the Collection Account for distribution to or for the account of a Lender, any amounts received by the Borrower or a Class A Member and required to be delivered to the Collection Account pursuant to this Agreement but excluding any failure by the Borrower to pay on any Payment Date due to the failure of the Servicer to comply with Section 5.02) as and when due and payable, and such failure shall have continued for a period of two Business Days or (ii) to make a Post Closing Date Mandatory Repayment, if any, on the Post Closing Date;

(b)    Reserve Account Distribution Notice.    The Borrower shall make a withdrawal of (i) an Existing Member Advance Amount, a Class A Member Distribution Amount or a Rights Reserve Amount from the Reserve Account without the written consent of the Agent, (ii) monthly operating expenses or other uses in an amount or for a period other than as specified in Schedule IV or Schedule XI or (iii) the Class A Member Unallocated Amount prior to the Post Closing Date.

(c)    Covenants and Agreements.    The failure of the Borrower to perform or observe the requirements of (i) Sections 7.01(i), (r), (t), (v) or 8.01(n), (ii) Section 7.01(n), (o), (q) or (s) or Section 8.01(b), (c), (d), (h), (k) or (l) and such failure shall continue unremedied for a period of seven Business Days, (iii) Section 7.01(p) and such failure shall continue unremedied for a period of thirty Business Days or (iv) any other covenant, agreement or provision contained in this Agreement or any other Loan Document on its part to be performed and such failure shall remain unremedied for a period of fifteen days;

(d)    Information, Representations and Warranties.    If any representation or warranty made by the Borrower or if any information contained in any financial statement, application, schedule, report or any other document given by the Borrower in connection with the Obligations, with the Collateral, or with any of the Loan Documents is not in all material respects true and accurate or if the Borrower omitted to state any material fact or any fact necessary to make such information not misleading.

39

(e)  <u>Default on Other Obligations</u>.  The occurrence of any default and acceleration of the maturity of any note, loan or other agreement between the Borrower and any Person other than the Agent evidencing a monetary obligation of the Borrower of $100,000 or more.

(f)  <u>Insolvency</u>.  The Borrower shall not be Solvent or the Borrower shall be unable to pay its debts as they become due, or admit in writing to such insolvency or to such inability to pay its debts as they become due.

(g)  <u>Involuntary Bankruptcy</u>.  There shall be filed against the Borrower an involuntary petition or other pleading seeking the entry of a decree or order for relief under the Bankruptcy Code or any similar federal or state insolvency or similar laws ordering: (a) the liquidation of the Borrower or (b) a reorganization of the Borrower or the business and affairs of Borrower, or (c) the appointment of a receiver, liquidator, assignee, custodian, trustee or similar official for the Borrower of the property of the Borrower and, in each case, the failure to have such petition or other pleading denied or dismissed within 45 calendar days from the date of filing.

(h)  <u>Voluntary Bankruptcy</u>.  The commencement by the Borrower of a voluntary case under the federal bankruptcy laws or any federal or state insolvency or similar laws or the consent by the Borrower to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian or similar official for the Borrower of any of the property of the Borrower or the making by the Borrower of an assignment for the benefit of creditors, or the failure by the Borrower generally to pay its debts as the debts become due.

(i)  <u>Judgments, Awards</u>.  The entry of one or more judgments, orders, awards or decrees against the Borrower for more than $100,000, and the same shall remain outstanding and not be stayed pending appeal for a period of 90 days or more, and a determination by the Agent, in good faith but in its sole discretion, that the same, when aggregated with all other judgments, orders, awards and decrees outstanding against the Borrower could reasonably be expected to have a material adverse effect on the prospect for the Agent and the Lenders to fully and punctually realize the full benefits conferred on them by this Agreement.

(j)  <u>Injunction</u>.  The injunction or restraint of the Borrower in any manner from conducting its business in whole or in part for a period of 90 days or more and a determination by the Agent, in good faith but in its sole discretion, that the same could reasonably be expected to have a material adverse effect on the prospect for the Agent and the Lenders to fully and punctually realize the full benefits conferred on them by this Agreement.

(k)  <u>Attachment by Creditors</u>.  Any assets of the Borrower shall be attached, levied upon, seized or repossessed, or come into the possession of a trustee, receiver or other custodian and a determination by the Agent, in good faith but in its sole discretion, that the same could reasonably be expected to have a material adverse effect on the

40

prospect for the Agent and the Lenders to fully and punctually realize the full benefits conferred on them by this Agreement.

(l) <u>Dissolution, Merger, Consolidation, Reorganization</u>. The voluntary or involuntary dissolution, merger, consolidation, winding up or reorganization of the Borrower or the occurrence of any action preparatory thereto.

(m) <u>Adverse Change in Financial Condition</u>. The determination in good faith by the Agent that a Material Adverse Change has occurred with respect to the Borrower from the conditions set forth in the most recent financial statement of the Borrower heretofore furnished to the Agent or from the condition of the Borrower as heretofore most recently disclosed to the Agent in any other manner.

ARTICLE X

RIGHTS AND REMEDIES

Section 10.01. <u>Rights and Remedies of the Agent</u>. If an Event of Default shall have occurred and is continuing, then if such event is (i) an Event of Default referred to in Sections 9.01(f), (g), (h) or (l) above, the unpaid principal balance of the Note, together with all accrued and unpaid interest and all other Obligations then outstanding shall be automatically due and payable by the Borrower to the Agent without notice, presentment or demand or (ii) any other Event of Default, the Agent may, or acting at the direction of the Majority Lenders shall, (A) by notice to the Borrower declare the Note, all interest accrued and unpaid thereon and all other Obligations to be immediately due and payable and the same shall thereupon become immediately due and payable. Upon and after the occurrence and continuance of an Event of Default, Lender may, without notice or demand, exercise in any jurisdiction in which enforcement hereof is sought, in addition to the rights and remedies available to the Agent and the Lenders under the Loan Documents, the rights and remedies of a secured party under the UCC and all other rights and remedies available to the Agent and the Lenders under applicable law, all such rights and remedies being cumulative and enforceable alternatively, successively or concurrently.

Section 10.02. <u>Power of Attorney</u>. Effective upon the occurrence and continuance of an Event of Default, the Borrower hereby designates and appoints the Agent and its designees as attorney-in-fact of the Borrower, irrevocably and with power of substitution, with authority to endorse the Borrower's name on any notes, acceptances, checks, drafts, money orders, instruments or other evidences of payment or proceeds of the Collateral that may come into the Agent's possession; to execute proofs of claim and loss; to adjust and compromise any claims under insurance policies; and to perform all other acts necessary and advisable, in the Agent's sole discretion, to carry out and enforce this Agreement and the Loan Documents. All acts of said attorney or designee are hereby ratified and approved by the Borrower and said attorney or designee shall not be liable for any acts of commission or omission nor for any error of judgment or mistake of fact or law unless any such acts or errors of judgment or mistakes of fact or law were caused by the gross negligence, bad faith or willful misconduct of the Agent or its designees. This power of attorney is coupled with an interest and is irrevocable so long as any of

41

the Obligations remain unpaid or unperformed or there exists any commitment by the Lenders which could give rise to any Obligations.

Section 10.03. Costs and Expenses. The Borrower agrees to pay to the Agent on demand the amount of all reasonable expenses paid or incurred by the Agent in consulting with counsel concerning any of its rights hereunder, under the Loan Documents or under Applicable Law, all expenses, including attorneys' fees and court costs paid or incurred by the Agent in exercising or enforcing any of its rights hereunder, under the Loan Documents or under applicable law together with interest on all such expenses paid by the Agent at the highest rate and calculated in the manner provided in the Note. The provisions of this Subsection shall survive the termination of this Agreement and the Agent's security interest under the Security Agreement and the payment of all other Obligations.

ARTICLE XI

ASSIGNMENTS; PARTICIPATIONS

Section 11.01. Assignments and Participations.

(a)    A Lender may assign or participate to an Eligible Assignee all or a proportionate part of its rights and obligations under this Agreement; provided, however, that in the case of such an assignment or participation to an Affiliate of the Agent that is a "United States person" as defined in the Code, no such consent shall be required.  Upon the acceptance and the recording of the assignment pursuant to paragraph (d) of this Section by the Agent, from and after the effective date specified in each Assignment and Acceptance, which effective date shall be the date of acceptance thereof by the Agent, unless a later date is specified therein, (i) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Acceptance, have the rights and obligations of a Lender hereunder and (ii) the Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of the Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(b)    By executing and delivering an Assignment and Acceptance, the Lender assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other instrument or document furnished pursuant hereto; (ii) such assignor makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or the performance or observance by the Borrower of any of their respective obligations under this Agreement or any other instrument or document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of such financial statements and other documents and information as it has deemed appropriate to

42

make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the Agent, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) except as otherwise provided in the Assignment and Acceptance, such assignee appoints and authorizes the Agent to take such action as agent on its behalf and to exercise its powers under this Agreement by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(c)     The Agent shall maintain at its address referred to herein a copy of each Assignment and Acceptance delivered to and accepted by it and the Lender Register. The entries in the Lender Register shall be conclusive and binding for all purposes, absent manifest error, and the Lender, the Borrower and the Lender may treat each Person whose name is recorded in the Lender Register as a Lender hereunder for all purposes of this Agreement. The Lender Register shall be available for inspection by the Borrower, the Master Servicer or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)     Subject to Section 11.01(a), upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an assignee, the Agent shall, if such Assignment and Acceptance has been completed, accept such Assignment and Acceptance, and the Agent shall (i) then record the information contained therein in the Lender Register and (ii) give prompt notice thereof to the Borrower.

(e)     Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement (including all or a portion of each Loan owned by it); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. With respect to any participation described in this Section, the participant's rights as set forth in the agreement between such participant and the related Lender to agree to or to restrict the Lender's ability to agree to any modification, waiver or release of any of the terms of this Agreement or to exercise or refrain from exercising any powers or rights which the Lender may have under or in respect of this Agreement shall be limited to the right to consent to any of the matters set forth in Section 11.01.

(f)     Nothing herein shall prohibit any Lender from pledging or assigning as Collateral any of its rights under this Agreement to any Federal Reserve Bank in accordance with applicable law and any such pledge or Collateral assignment may be made without compliance with Section 11.01(a) or 11.01(b).

ARTICLE XII

THE AGENT

Section 12.01. Authorization and Action. Each Lender on behalf of itself and its assigns, hereby designates and appoints Fortress Credit as Agent hereunder, and authorizes the Agent to take such actions as agent on its behalf and to exercise such powers as are delegated to the Agent by the terms of this Agreement, together with such powers as are reasonably incidental thereto. The Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities on the part of the Agent shall be read into this Agreement or otherwise exist for the Agent. In performing its functions and duties hereunder, the Agent shall act solely as agent for the Lenders and does not assume nor shall be deemed to have assumed any obligation or relationship of trust or agency with or for the Borrower or any of its successors or assigns. The Agent shall not be required to take any action which exposes the Agent to personal liability or which is contrary to this Agreement or applicable law. The appointment and authority of the Agent hereunder shall terminate at the indefeasible payment in full of the Obligations.

Section 12.02. Delegation of Duties. The Agent may execute any of its duties under this Agreement by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Agent shall not be responsible for the gross negligence, bad faith or willful misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

Section 12.03. Exculpatory Provisions. Neither the Agent nor any of its directors, officers, agents or employees shall be (i) liable to any Lender for any action lawfully taken or omitted to be taken by it or them under or in connection with this Agreement (except for its, their or such Person's own gross negligence, bad faith or willful misconduct or the breach of its obligations expressly set forth in this Agreement) or (ii) responsible in any manner to any Lender for any recitals, statements, representations or warranties made by the Borrower contained in this Agreement or in any certificate, report, statement or other document referred to or provided for in, or received under or in connection with, this Agreement or any other Basic Document to which it is a party for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other document furnished in connection herewith, or for any failure of the Borrower to perform its obligations hereunder, or for the satisfaction of any condition specified in Article Three. The Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements or covenants contained in, or conditions of, this Agreement, or to inspect the properties, books or records of the Borrower. The Agent shall not be deemed to have knowledge of any Event of Default unless the Agent has received written notice thereof from the Borrower or any Lender.

Section 12.04. Reliance. The Agent shall in all cases be entitled to rely, and shall be fully protected in relying, upon any document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Agent. The Agent shall in all cases be fully justified in failing

44

or refusing to take any action under this Agreement or any other document furnished in connection herewith unless it shall first receive such advice or concurrence of any Lender as it deems appropriate or it shall first be indemnified to its satisfaction by such Lender; provided, that, unless and until the Agent shall have received such advice, the Agent may take or refrain from taking any action, as the Agent shall deem advisable and in the best interests of the Lender. The Agent shall in all cases be fully protected in acting, or in refraining from acting, in accordance with a request of any Lender, and such request and any action taken or failure to act pursuant thereto shall be binding upon all such Lenders.

Section 12.05. <u>Non-Reliance on the Agent and Other Lenders</u>. Each Lender expressly acknowledges that neither the Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates has made any representations or warranties to it and that no act by the Agent hereafter taken, including any review of the affairs of the Borrower, shall be deemed to constitute any representation or warranty by the Agent. Each Lender represents and warrants to the Agent that it has and will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, prospects, financial and other conditions and creditworthiness of the Borrower and made its own decision to enter into this Agreement.

Section 12.06. <u>Reimbursement and Indemnification</u>. The Lenders agree to reimburse and indemnify the Agent and each of its officers, directors, employees, representatives and agents ratably according to their respective pro rata shares, to the extent not paid or reimbursed by the Borrower for any (i) amounts for which the Agent, acting in its capacity as Agent, is entitled to reimbursement by the Borrower hereunder and (ii) other expenses incurred by the Agent, acting in its capacity as Agent and acting on behalf of the Lenders, in connection with the administration and enforcement of this Agreement; provided, however, any reimbursement or indemnification that the Lender provides as a result of the Agent acting in its capacity as Agent shall be limited to the pro rata share allocable to each Lender.

Section 12.07. <u>Agent in its Individual Capacity</u>. The Agent and each of its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower or any Affiliate of the Borrower as though the Agent were not the Agent hereunder. The Agent and its Affiliates shall have the same rights and powers under this Agreement as any Lender and may exercise the same as though it were not the Agent and the terms "Lender" and "Lenders" shall include the Agent in its individual capacity.

Section 12.08. <u>Successor Agent</u>. The Agent will not resign hereunder unless it is legally unable to perform its duties hereunder, or upon approval of the Borrower in connection with an Assignment, in which event, the Agent will provide five days' notice to the Borrower and the Lenders. In addition, the Agent will, upon the direction of all of the Lenders (other than the Agent, in its individual capacity) resign as Agent. If the Agent shall resign, then the Majority Lenders during such five-day period shall appoint a successor agent. If for any reason no successor Agent is appointed by the Majority Lenders during such five-day period, then effective upon the expiration of such five-day period, the Lenders shall perform all of the duties of the Agent hereunder and the Borrower shall make all payments in respect of the Obligations directly to the applicable Lender and for all purposes shall deal directly with the Lenders. After any

45

retiring Agent's resignation hereunder as Agent, the provisions of Article Eleven and Article Thirteen shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

## ARTICLE XIII

## MISCELLANEOUS

Section 13.01. Indemnification. The Borrower agrees to hold each Indemnified Party harmless from and indemnify each Indemnified Party against any Loss relating to or arising out of this Agreement, the Notes, any other Loan Document or any transaction contemplated hereby or thereby, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the Notes, any other Loan Document or any transaction contemplated hereby or thereby, that, in each case, results from anything other than such Indemnified Party's gross negligence, bad faith or willful misconduct. In any suit, proceeding or action brought by the Agent for any sum owing in connection with any Collateral, or to enforce any provisions thereof, the Borrower will save, indemnify and hold each Indemnified Party harmless from and against all Losses suffered by reason of any defense, set-off, counterclaim, recoupment or reduction or liability whatsoever of the obligor thereunder, arising out of a breach by the Borrower of any obligation thereunder or arising out of any other agreement, Obligations or liability at any time owing to or in favor of such obligor or its successors from the Borrower. The Borrower also agrees to reimburse the Agent as and when billed by the Agent for all the Agent's reasonable costs and expenses incurred in connection with the enforcement or the preservation of the Agent's or any Lender's rights under this Agreement, the Notes, any other Loan Document or any transaction contemplated hereby or thereby, including without limitation the fees and disbursements of its counsel (including all reasonable fees and disbursements incurred in any action or proceeding between the Borrower and the Agent or between the Agent and any third party relating hereto). The Borrower hereby acknowledges that, notwithstanding the fact that the Loan is secured by the Collateral, the obligation of the Borrower under the Loan is a non-recourse obligation of the Borrower, except that the Loan may be recourse against the Borrower to the extent of losses and expenses incurred by the Agent as a result of fraud, material and willfully intentional breaches of representations and warranties or the filing of a voluntary bankruptcy proceeding by the Borrower.

Section 13.02. Payment of Certain Expenses. Notwithstanding any other rights that the Lenders or the Agent may have for indemnification, the Borrower agrees to pay to the Agent, for the account of the Lenders, and to hold the Agent and the Lenders harmless from and against all reasonable out-of-pocket costs and expenses of the Agent incurred in connection with the administration of the transactions contemplated by the Basic Documents, including fees and disbursements of accountants and of counsel to the Agent and the Lenders, in connection with the Agent exercising its rights hereunder together with the reasonable costs and expenses relating to any amendments or modifications to the Basic Documents.

Section 13.03. No Waivers; Remedies Cumulative. Neither any failure nor any delay on the part of the Agent in exercising any right, power or remedy hereunder, under any of the Loan Documents or under applicable law shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right,

46

power or remedy. The rights, remedies, powers and privileges provided in this Agreement are cumulative and may be exercised singularly or concurrently and are not exclusive of any other rights, remedies, powers or privileges provided by law.

Section 13.04. <u>Amendments; Waivers</u>. This Agreement may not be amended, modified or otherwise supplemented except in writing signed by the parties hereto; provided, however, that, in the event a Lender makes an assignment or sells a participation pursuant to Article Eleven, this Agreement may be amended, modified or otherwise supplemented with the prior written consent of the Majority Lenders, except where such amendment, modification or supplement would have a material adverse effect. In the case of any waiver of an Event of Default, the event so waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Event of Default, or impair any right consequent thereon.

Section 13.05. <u>Notices</u>. Any notice or other communication in connection with this Agreement shall be, except as otherwise provided herein, in writing and delivered or mailed by first class mail, postage prepaid, hand delivery, prepaid courier service or facsimile transmission, and addressed in each case as follows:

(a)     If to Borrower, at The Songwriter Collective, LLC, at 3717 East Thousand Oaks Blvd., Westlake Village, California 91362 (telecopier no. (805) 413-1308), Attention: E. Jean Mason, with a copy to 151 Sturbridge, Nashville, Tennessee 37064 (telecopier no. (615) 595-2555), Attention: B. Jean Mason, and with a copy to Jenkens & Gilchrist Parker Chapin LLP, The Chrysler Building, 405 Lexington Avenue, New York, New York 10174 (telecopier no. (212) 704-6288) Attention: Mark A. Goldsmith, Esq.;

(b)     If to the Agent, at 1251 Avenue of the Americas, New York, New York, 10020 (telecopier no. (212) 247-0002), Attention: Chief Financial Officer; or

(c)     to any of the foregoing Persons, at such other address or telecopier number as shall be designated by such Person in a written notice to the other parties hereto.

Except as otherwise provided, each such notice, request or other communication shall be deemed delivered (i) if given by registered or certified mail, postage prepaid, return receipt requested, 72 hours after such communication is deposited in the mails in such fashion, (ii) if given by facsimile transmission, upon transmission to the fax number specified hereunder (as evidenced by electronic confirmation of such transmission) if such transmission is sent by 6 p.m. local time where the recipient is located or (iii) if given by any other means (including prepaid courier), when delivered to the address of the recipient for notices hereunder.

Section 13.06. <u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH, AND BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW BUT OTHERWISE WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES).

Section 13.07. <u>Survival</u>. All covenants, agreements, representations and warranties made herein and in the Loan Documents shall survive the execution and delivery hereof and thereof, shall survive making of the Loan and the execution and delivery by the Lenders of the

47

Loan Documents and shall continue in full force and effect until all Obligations have been paid in full.

Section 13.08. <u>Severability</u>. If any term, provision or condition, or any part thereof, of this Agreement or any of the Loan Documents shall for any reason be found or held invalid or unenforceable by any court or governmental agency of competent jurisdiction, such invalidity or unenforceability shall not affect the remainder of such term, provision or condition nor any other term, provision or condition, and this Agreement and the Loan Documents shall survive and be construed as if such invalid or unenforceable term, provision or condition had not been contained therein.

Section 13.09. <u>Merger and Integration</u>. This Agreement and the attached Schedules (if any) contain the entire agreement of the parties hereto with respect to the matters covered and the transactions contemplated hereby, and no other agreement, statement or promise made by any party hereto, or by any employee, officer, agent or attorney of any party hereto, which is not contained herein shall be valid or binding.

Section 13.10. <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY LITIGATION ARISING DIRECTLY OR INDIRECTLY UNDER OR IN CONNECTION WITH THIS AGREEMENT ANY OTHER LOAN DOCUMENTS.

Section 13.11. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original, but all such counterparts shall together constitute one and the same instrument.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have executed or caused this Agreement to be executed under seal as of the date first above written.

THE SONGWRITER COLLECTIVE, LLC,
as Borrower

By: *E Jean Cason*
Name: E. JEAN MASON
Title: PRESIDENT & COO

FORTRESS CREDIT OPPORTUNITIES I LP,
as Agent and as a Lender

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties hereto have executed or caused this Agreement to be executed under seal as of the date first above written.

THE SONGWRITER COLLECTIVE, LLC,
as Borrower

By: _____
  Name: _____
  Title: _____

FORTRESS CREDIT OPPORTUNITIES I LP,
as Agent and as a Lender

By: _____
  Name:    CONSTANTINE DAKOLIAS
  Title:    CHIEF CREDIT OFFICER

EXHIBIT A

FORM OF PROMISSORY NOTE

March 1, 2004

FOR VALUE RECEIVED, THE SONGWRITER COLLECTIVE, LLC, a Delaware limited liability company (the "Borrower"), hereby unconditionally promises to pay to the order of Fortress Credit Opportunities I LP ("Fortress"), in its capacity as agent for the Lenders under the Agreement described below (the "Agent") and as a lender, at Fortress' office located at 1251 Avenue of the Americas, New York, New York 10020 or to such other location or account as Fortress shall specify to the Borrower from time to time, in Federal or other immediately available funds in lawful money of the United States the principal amount of TWELVE MILLION ONE HUNDRED TWENTY THOUSAND DOLLARS ($12,120,000.00) plus the additional amounts of PIK Interest as of each Interest Calculation Date, if any, pursuant to the Agreement (as defined herein) in such amounts and on such dates as are determined pursuant to the Agreement.

The Borrower further promises to pay interest on the unpaid principal amount of the Loan made by the Lenders hereunder and under the Agreement and to pay the unpaid principal from time to time until the Loan is repaid in full, in like money at the rates and on the dates set forth in the Agreement.

To the extent not due prior to such time, the entire unpaid principal balance of this Note, together with accrued unpaid interest, shall be due and payable on the Maturity Date (as defined in the Agreement).

This Note is the Note referred to in and is entitled to the benefits and subject to the terms of, the Loan Agreement, dated as of March 1, 2004 (as amended, supplemented or modified from time to time, the "Agreement"), among the Borrower and Fortress, as Agent and the Lenders. The Agreement contains, among other things, provisions for acceleration of the maturity hereof upon the occurrence of certain stated events and also for prepayments on account of the principal hereof prior to the maturity hereof upon the terms and conditions specified therein.

Except as otherwise specified in the Agreement, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Agreement.

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW BUT OTHERWISE WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES).

THE SONGWRITER COLLECTIVE, LLC

By: _____
    Name:
    Title:

A-2

EXHIBIT B

## FORM OF ASSIGNMENT AND ACCEPTANCE

Dated _____, 200_

Reference is made to the Loan Agreement, dated as of March 1, 2004 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), among The Songwriter Collective, LLC, a Delaware limited liability company, as borrower (the "Borrower"), and Fortress Credit Opportunities I LP, a limited partnership, as a Lender (as hereinafter defined) and as Agent (as hereinafter defined) for the Lenders (as hereinafter defined) Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Loan Agreement.

_____ (the "Assignor") and _____ (the "Assignee") agree as follows:

1.     The Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, that interest in and to all of the Assignor's rights and obligations under the Loan Agreement as of the date hereof which represents the percentage interest specified in Section 1 of Schedule 1 hereto of all outstanding rights and obligations of the Assignor under the Loan Agreement, including such interest in the Loan made by the Assignor. After giving effect to such sale and assignment, the Assignee's amount of the Loan made by the Assignee will be as set forth in Section 2 of Schedule 1 hereto.

2.     The Assignor (i) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; (ii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Loan Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Agreement or any other instrument or document furnished pursuant thereto; and (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Borrower or the performance or observance by the Borrower of any of its obligations under the Loan Agreement or any other instrument or document furnished pursuant thereto.

3.     The Assignee (i) confirms that it has received a copy of the Loan Agreement, together with copies of such financial statements and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (ii) agrees that it will, independently and without reliance upon the Assignor and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action with respect to the Loan Agreement; (iii) confirms that it is an Eligible Assignee; (iv) appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Loan Agreement as are delegated to the Agent, by the terms thereof, together with such powers as are reasonably incidental thereto; and (v) agrees that it will perform in accordance with their terms all of the

B-1

obligations which by the terms of the Loan Agreement are required to be performed by it as a Lender.

4.    Following the execution of this Assignment and Acceptance by the Assignor and the Assignee, it will be delivered to the Agent for acceptance and recording by the Agent. The effective date of this Assignment and Acceptance (the "Assignment Date") shall be the date of acceptance hereof by the Agent, unless a later date is specified in Section 3 of Schedule 1.

5.    Upon such acceptance by the Agent and upon such recording by the Agent, as of the Assignment Date, (i) the Assignee shall be a party to the Loan Agreement and, to the extent provided in this Assignment and Acceptance, have the rights and obligations of a Lender thereunder and (ii) the Assignor shall, to the extent provided in this Assignment and Acceptance, relinquish its rights and be released from its obligations under the Loan Agreement.

6.    Upon such acceptance by the Agent and upon such recording by the Agent, from and after the Assignment Date, the Agent shall make, or cause to be made, all payments under the Loan Agreement in respect of the interest assigned hereby (including all payments of principal and interest with respect thereto) to the Assignee. The Assignor and Assignee shall make all appropriate adjustments in payments under the Loan Agreement for periods prior to the Assignment Date directly between themselves.

7.    THIS ASSIGNMENT AND ACCEPTANCE SHALL BE CONSTRUED IN ACCORDANCE WITH, AND BE GOVERNED BY, THE LAWS OF THE STATE OF NEW YORK (INCLUDING SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW BUT OTHERWISE WITHOUT REGARD TO APPLICABLE CONFLICTS OF LAW PRINCIPLES).

B-2

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed by their respective officers thereunto duly authorized, as of the date first above written.

[ASSIGNOR]

By: _____
    Name:
    Title:

Address for notices
    [Address]

[ASSIGNEE]

By: _____
    Name:
    Title:

Address for notices
    [Address]

ACKNOWLEDGED AND ACCEPTED
this ___ day of _____, ____

FORTRESS CREDIT OPPORTUNITIES I LP,
as Agent

By: _____
    Name:
    Title:

B-3

Schedule 1
to
Assignment and Acceptance
Dated _____, 20___

Section 1.

    Percentage Interest:                         _____%

Section 2.

    Assignee's Loan:                            $_____
Section 3.

    Assignment Date: _____, 20___

B-4

EXHIBIT C

BACKUP MANAGEMENT LETTER AGREEMENT

**SESAC, INC.**
152 West 57th Street
57th Floor
New York, New York 10019

March 1, 2004

Fortress Credit Opportunities I, LP
1251 Avenue of the Americas
New York, New York 10020
Attention: Chief Financial Officer

The Collective Holding Company, LLC
The Songwriter Collective, LLC
Jean Mason
30015 Triunfo Drive
Agoura, California 91301

Re:     *Backup Management Services Agreement*

Dear Sirs:

Reference is made to the Loan Agreement, dated as of March 1, 2004 (the *"Loan Agreement"*), between The Songwriter Collective, LLC, as borrower (*"Borrower"*) and Fortress Credit Opportunities I, LP, as agent for the lender (in such capacity, *"Agent"*) and as a lender. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Loan Agreement.

The financing contemplated by the Loan Documents (the *"Financing"*) will require the waiver in part of the exclusive copyright administration rights of SESAC, Inc. (*"Backup Manager"*) pursuant to Section 3 ("Copyright Administration Services") of the SESAC Agreement, and the exclusive securitization management rights of Backup Manager pursuant Section 5 ("Securitization Management Services") of the SESAC Agreement.

Solely in order to facilitate the Financing strictly in accordance with the terms and conditions set forth in the Loan Documents (and, for the avoidance of doubt, not with respect to or in order to facilitate any other financing of any nature or description in lieu of or addition to the Financing), Backup Manager hereby grants such waivers, subject to the other terms and conditions of this letter agreement (this *"Agreement"*).

The parties to this Agreement acknowledge and agree that from and after the earliest of: (A) Backup Manager's receipt of notice from Agent of its election pursuant to Section 4.01 of the Loan Agreement to cause Management Services to be provided by Backup Manager; and (B) the closing of the Take-Out Financing; Backup Manager (or one or more of its subsidiaries) shall provide Management Services (as defined below) in respect of the Financing on customary terms and conditions that are reasonably acceptable to Backup Manager and Agent. For purposes of

C-1

2

this Agreement, *"Management Services"* means, collectively, protecting the Collateral, sending and enforcing letters of direction in respect of third-party payments generated by the Collateral, maintaining accurate books and records in respect of the Collateral, and preparing reports in respect of the foregoing to the extent reasonably requested by Agent; *provided* that Management Services shall not include any of the copyright administration services that are the subject of the letter, dated March 1, 2004, from Backup Manager to Borrower, The Collective Holding Company, LLC, and Jean Mason (the *"Backup Copyright Administration Agreement"*); *provided further* that such Management Services shall be contingent upon receipt by Backup Manager of adequate documentation in respect of the Collateral from Borrower.

In connection with performing Management Services, Backup Manager shall obtain Agent's prior written consent before commencing any legal proceedings on behalf of Borrower and shall make arrangements with Agent regarding the costs of such proceedings. Any legal proceedings shall be in the name of Borrower and Borrower hereby authorizes Backup Manager to take any actions on its behalf and in its name. While performing any Management Services hereunder, Backup Manager shall be the agent of Borrower; *subject, however,* to compliance with the directions of Agent in respect of Management Services.

SESAC acknowledges that the amounts paid to it under the Backup Copyright Administration Agreement shall also be compensation for performing Management Services hereunder, and that no additional amounts shall be payable hereunder. Neither Agent, the Lenders, nor the Borrower shall amend or otherwise modify the definitions of "Backup Manager Tier One Fees" or "Backup Manager Tier Two Fees" or change the order or priority of payment of such fees from Collections pursuant to Section 5.02 ("Accounts and Distributions—Distributions") of the Loan Agreement that would adversely affect Backup Manager without Backup Manager's agreement.

Agent shall have the right to terminate Backup Manager as the provider of Management Services (but shall have no right whatsoever to terminate the Backup Copyright Administration Agreement; provided that Backup Manager acknowledges and agrees that any Collateral sold by Agent or the Lenders in connection with the exercise of their rights in respect of such Collateral shall be sold free and clear of Backup Manager's copyright administration rights in respect of such Collateral under this Agreement or any other TSC Contract) at any time in its sole discretion; *provided* that any such termination shall not authorize or result in the termination of the Backup Copyright Administration Agreement or any reduction of the fees payable to Backup Manager thereunder (*i.e.*, the full amount of the fees payable pursuant to the Backup Copyright Administration Agreement shall continue to be paid to Backup Manager even after the termination of this Agreement). Backup Manager's duties to provide Management Services hereunder shall terminate automatically if the Backup Copyright Administration Agreement is terminated for any reason. Upon termination of Backup Manager as the provider of Management Services, Backup Manager shall deliver to the successor Backup Manager all documents and records in its possession relating to Management Services as soon as practicable after receipt of such notice but in no event later than ten Business Days after receipt of a termination notice from Agent.

Except for the consent and waivers expressly provided for above, nothing contained in this Agreement shall be deemed to impair, waive, or otherwise modify in any manner any rights or remedies Backup Manager or any of its Affiliates may have under the SESAC Agreement or any other TSC Contract, nor preclude Backup Manager or any of its Affiliates from or limit it in exercising or pursuing any such rights or remedies, whether available at law or in equity. Neither Backup Manager nor any of its Affiliates is hereby waiving any right to take action with respect to the existence of any defaults under the SESAC Agreement or any other TSC Contract or any other events that, with the giving of notice or lapse of time or both, would constitute a default thereunder.

3

Each party hereto acknowledges that irreparable damage may occur, and the other parties' remedies at law might be inadequate, if any term or provision of this Agreement was not performed or observed strictly in accordance with this Agreement, and, in such circumstances, unconditionally and irrevocably waives any defense that may be available to it that any other party's remedies at law are adequate or that such party's injuries are not irreparable. Each party hereto shall be entitled to seek equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction, or any other equitable remedy that may then be available to it.

Notwithstanding anything to the contrary contained herein: (i) no party hereto or any of its Affiliates shall be liable to any other party hereto under or in connection with this Agreement for any, and each party hereto hereby waives to the fullest extent permitted by applicable Law, all consequential, incidental, indirect, punitive, exemplary, remote, speculative, or special damages of any kind, nature, or description whatsoever; and (ii) neither SESAC nor any of its Affiliates shall be liable to Borrower, The Collective Holding, LLC, Jean Mason, Agent, or any Lender or any of their respective Affiliates for, and Borrower, The Collective Holding, LLC, Jean Mason, Agent, and each Lender each hereby waives, on its own behalf and on behalf of each of its Affiliates, to the fullest extent permitted by applicable Law, all Losses based upon, resulting from, arising out of, or relating to, any action or omission by SESAC or any of its Affiliates in connection with providing any services to or on behalf of Borrower, Agent, or the Lenders or any of their respective Affiliates under or in connection with this Agreement, except to the extent that any such action or omission constitutes gross negligence or willful misconduct.

Sections 26.1 ("Certain Miscellaneous Terms—Further Action") (the first sentence thereof only), 26.3 ("—Expenses") (the first sentence thereof only), 26.4 ("—Public Announcements"), 26.5 ("—Notices"), 26.7 ("—Amendment; Waiver"), 26.8 ("—Entire Agreement"), 26.9 ("—Severability"), 26.10 ("—Successors and Assigns; No Third Party Beneficiaries") (excluding the proviso thereto), 26.11 ("—Cumulative Remedies"), 26.12 ("—Equitable Remedies"), 26.13 ("—Governing Law"), 26.14 ("—Waiver of Jury Trial"), 26.15 ("—Jurisdiction"), 26.16 ("—Service of Process"), 26.17 ("—Preparation and Negotiation of This Agreement"), 26.20 ("—Counterparts"), 26.21 ("—Delivery Via Telecopier") of the SESAC Agreement are incorporated herein by reference *mutatis mutandis* to the same extent as if set forth herein in full; *provided* that each reference therein to Holding Company, Operating Company, or Promoter shall also be and mean a reference to the Lenders and Agent.

Each of the parties represents that it is duly authorized to execute this Agreement.

[THE REMAINDER OF THE PAGE HAS BEEN INTENTIONALLY LEFT BLANK.]

4

If the above correctly sets forth the understanding among the parties hereto with respect to the subject matter hereof, please so indicate by signing and returning to the undersigned one of the enclosed duplicates of this Agreement.

Very truly yours,
SESAC, INC., on its own behalf and on behalf of its Affiliates

By:
Name:
Title:
ACKNOWLEDGED AND AGREED

FORTRESS CREDIT OPPORTUNITIES I,
   LP, as Agent

By: _____
Name:
Title:
THE SONGWRITER COLLECTIVE, LLC,
   as Borrower

By: _____
Name:
Title:

THE COLLECTIVE HOLDING
   COMPANY, LLC, as Guarantor

By: _____
Name:
Title:

_____
JEAN MASON

EXHIBIT D

RESERVE ACCOUNT DISTRIBUTION NOTICE

_____, 200_

To: Fortress Credit Opportunities I, LP
    1251 Avenue of the Americas
    New York, New York 10020
    Attn: Joshua Pack

       Pursuant to the Loan Agreement, dated as of March 1, 2004, among The Songwriter Collective, LLC, a Delaware limited liability company, as borrower (the "Borrower"), and Fortress Credit Opportunities I LP, a limited partnership, as a lender and as Agent (the "Agent") for the lenders, the undersigned, an Authorized Officer of the Borrower hereby requests that $_____ be distributed from the Reserve Account on _____, 200_ for the purpose of [(i) paying operating expenses], [(ii) paying Take-Out Financing expenses and paying interest in the event of a shortfall in Collections for the related Collection Period, and such amount when added to the Take-Out Financing expenses paid to date does not exceed the Maximum Take-Out Financing Expenses amount set forth on Schedule IV], [(iii) making Class A Member Distributions,] [(iv) paying Existing Member Advance Amounts,] [(v) paying Rights Reserve Amounts] [(vi) paying a Post Closing Date Mandatory Repayment] [(vii) paying Deferred Expenses from Excess Additional Class A Member Amounts and from Excess Existing Member Advance Amounts, if any,] [in accordance with the permitted expenditures set forth on Schedule IV to the Agreement.]

       [Add reference to any documents being delivered to the Agent.]

       The uses and amounts stated above are in compliance with the requirements set forth in Sections 2.02(c) and 2.02(d) of the Agreement.

       Capitalized terms used herein but not otherwise defined shall have the meanings set forth in the Agreement.

THE SONGWRITER COLLECTIVE, LLC

By: _____
                Authorized Officer

D-1

[ACKNOWLEDGED AND AGREED

FORTRESS CREDIT OPPORTUNITIES I, LP

By: _____ ]*
    Name:
    Title:

---

* For items (i), (ii) or (iii) above

D-2

EXHIBIT B

FORM OF AGREEMENT RE SALE OF COLLATERAL
UPON EVENT OF DEFAULT

**SESAC, INC.**
152 West 57th Street
57th Floor
New York, New York 10019

March 1, 2004

Fortress Credit Opportunities I, LP
1251 Avenue of the Americas
New York, New York 10020
Attention: Chief Financial Officer

The Collective Holding Company, LLC
The Songwriter Collective, LLC
Jean Mason
30015 Triunfo Drive
Agoura, California 91301

Re:     *Sale of Collateral Upon Event of Default*

Dear Sirs:

Reference is made to the Loan Agreement, dated as of March 1, 2004 (the *"Loan Agreement"*), between The Songwriter Collective, LLC, as borrower (the *"Borrower"*) and Fortress Credit Opportunities I, LP, as agent for the lender (in such capacity, the *"Agent"*) and as a lender. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Loan Agreement.

In order to permit Agent and the Lenders to exercise fully all of their rights pursuant to the Security Agreement in respect of the Collateral upon the occurrence of an Event of Default, the financing contemplated by the Loan Documents (the *"Financing"*) will require the waiver in part of the rights of SESAC, Inc. (*"SESAC"*) pursuant to Section 13 (*"Buyout Rights"*) of the SESAC Agreement (as amended through and including the date hereof), and the consent of SESAC under Section 3.1 (*"—No Transfers"*) of the SESAC Agreement to the encumbrances on the Collateral effected under the Loan Documents.

Solely in order to facilitate the Financing (and the exercise of the Lenders rights in respect of the Collateral in connection therewith) strictly in accordance with the terms and conditions set forth

E-1

in the Loan Documents (and, for the avoidance of doubt, not with respect to or in order to facilitate any other financing of any nature or description in lieu of or addition to the Financing), SESAC hereby grants such waiver and consents to such encumbrances with respect to the Collateral, subject to the other terms and conditions of this letter agreement (this "*Agreement*").

If after the occurrence of an Event of Default the Lenders make the determination to sell or otherwise transfer all or any portion of the Collateral in connection with the exercise of their remedies under the Loan Documents, Agent shall give SESAC written notice thereof (the "*Option Sale Notice*"). The Option Sale Notice shall specify the principal amount plus interest, costs, and expenses owing from Borrower to the Lenders and Agent under or in connection with the Loan Documents as of such date (as such amount may increase or decrease from time to time, the "*Payoff Amount*").

SESAC shall have the option, exercisable within fifteen Business Days after receipt of the Option Sale Notice, to cause the fair market value (the "*Fair Market Value*") of the Collateral (*i.e.*, the price an unaffiliated, willing purchaser would pay an unaffiliated, willing seller for the Collateral in the open market) to be determined. Fair Market Value shall take into account all facts and circumstances relevant to a valuation of the Collateral, including the fact that the Collateral will be sold free and clear of any copyright administration or management rights of SESAC under the SESAC Agreement. If SESAC wishes to exercise such option, SESAC shall give Borrower and Agent notice thereof (the "*Valuation Election Notice*") prior to expiration of such fifteen-Business Day period.

Within ten Business Days after Agent's receipt of the Valuation Election Notice, SESAC and Agent shall each engage an independent investment banking firm, accounting firm, or other Person of high international standing and good reputation with substantial experience in valuing music publishing businesses and music rights in the United States of America that is reasonably acceptable to the other party (each, a "*Representative Appraiser*"). SESAC and Agent shall cause their respective Representative Appraisers to engage a third, independent valuation expert with similar qualifications (the "*Independent Appraiser*" and, together with the Representative Appraisers, the "*Qualified Appraisers*") within ten Business Days after both Representative Appraisers have been engaged. SESAC and Agent shall cause the Qualified Appraisers independently to determine the Fair Market Value of the Collateral and to report their respective determinations to both of them within twenty Business Days after the Independent Appraiser has been engaged. If either Representative Appraiser fails timely to deliver its report as provided above, such Representative Appraiser's determination of the Fair Market Value of the Collateral shall not be used in calculating the Option Purchase Price or for any other purpose hereunder. If the Independent Appraiser fails or is reasonably likely to fail timely to deliver its report as provided above, SESAC and Agent shall use all commercially reasonable efforts to engage a substitute Independent Appraiser and to cause such substitute Independent Appraiser to determine the Fair Market Value of the Collateral and to report its determination to both of them as soon as possible.

The purchase price for the Collateral (the "*Option Purchase Price*") shall equal the greater of: (A) the Payoff Amount as of the purchase date; and (B) the average of the Fair Market Value determinations of the Qualified Appraisers; *provided, however*, that if the Fair Market Value determination of either Representative Appraiser is more than ten percent higher or lower than

E-2

the Fair Market Value determination of the Independent Appraiser, such Representative Appraiser's determination shall not be used in calculating the Option Purchase Price or for any other purpose hereunder. The Option Purchase Price as so determined shall be final, binding, and conclusive on both parties.

Borrower and its Subsidiaries shall provide the Qualified Appraisers, SESAC, and Agent with complete access to the books and records, projections and forecasts, business plans, Representatives, and all data and other information of Borrower and its Subsidiaries relevant to such Person's determination of the Fair Market Value of the Collateral as the Qualified Appraiser, SESAC, or Agent may request.

SESAC and Agent shall each be responsible for all costs and expenses of its own Representative Appraiser and for one-half of all costs and expenses of the Independent Appraiser.

SESAC shall have the option, exercisable within ten Business Days after the Option Purchase Price is determined, irrevocably to elect to purchase the Collateral on an as is, where is basis, without representations or warranties from Agent or the Lenders (except with respect to their acts), for an amount in cash equal to the Option Purchase Price. If SESAC wishes to exercise such option, SESAC shall give Borrower and Agent notice thereof (the *"Option Purchase Election Notice"*) prior to expiration of such ten-Business Day period. SESAC and Agent shall use all commercially reasonable efforts to consummate the sale and purchase of the Collateral within thirty days after Agent's receipt of the Option Purchase Election Notice.

In no event shall Agent or the Lenders be obligated to sell the Collateral to SESAC if: (i) the Fair Market Value of the Collateral is determined pursuant hereto to be less than the Payoff Amount; or (ii) SESAC has not timely delivered a Valuation Election Notice or an Option Purchase Election Notice, has not timely consummated the sale and purchase of the Collateral after timely delivery of an Option Purchase Election Notice, or has notified Agent that it does not wish to purchase the Collateral. If SESAC has not timely delivered a Valuation Election Notice or an Option Purchase Election Notice, has not timely consummated the sale and purchase of the Collateral after timely delivery of an Option Purchase Election Notice, or has notified Agent that it does not wish to purchase the Collateral, then SESAC shall have not further rights to purchase the Collateral, and Agent may thereafter sell or cause the sale of the Collateral on any terms (subject to the restriction against the sale of Collateral to ASCAP or BMI set forth below). If the Fair Market Value of the Collateral is determined pursuant hereto to be less than the Payoff Amount and SESAC elects not to purchase the Collateral for the Payoff Amount or any other amount greater than the Fair Market Value of the Collateral as so determined, then Agent may sell or cause the sale of the Collateral to a Third Party (as defined in the SESAC Agreement) (a *"Permitted Sale"*), subject to the following. If Agent and the Lenders wish to consummate a Permitted Sale, Agent shall give SESAC notice thereof (a *"Third-Party Sale Notice"*) not fewer than ten Business Days prior to the date on which Agent wishes to consummate such sale. Such Third-Party Sale Notice shall describe in reasonable detail all material terms and conditions of such sale, including the proposed consideration for the Collateral and the expected closing date. SESAC shall have the option, exercisable within ten Business Days after it actually receives the Third-Party Sale Notice, irrevocably to elect to purchase the Collateral upon the same terms and subject to the same conditions as outlined in such Third-Party Sale Notice; *provided* that if the consideration to be paid by such prospective Third-Party consists in whole or in part of anything

other than cash, SESAC shall have the right to match such consideration for a cash purchase price of equivalent value only. If SESAC wishes to exercise such option, SESAC shall give Borrower and Agent notice thereof (a "*Match Purchase Election Notice*") prior to expiration of such ten-Business Day period. SESAC and Agent shall use all commercially reasonable efforts to consummate the sale and purchase of the Collateral within thirty days after Agent's receipt of the Match Purchase Election Notice. If SESAC does not timely deliver a Match Purchase Election Notice or has notified Agent that it does not wish to purchase the Collateral, Agent can consummate the Permitted Sale upon any terms with any Person.

Notwithstanding anything to the contrary contained in this Agreement, if any action or omission: (i) by Agent, the Lenders, Agent's Representative Appraiser, the Independent Appraiser, or Borrower results in SESAC or SESAC's Representative Appraiser being unable to comply with any applicable time period hereunder, such time periods as they apply to SESAC shall automatically be extended to the extent reasonably necessary under the circumstances to permit such Person to comply with such time period; or (ii) by SESAC, SESAC's Representative Appraiser, the Independent Appraiser, or Borrower results in Agent or Agent's Representative Appraiser being unable to comply with any applicable time period hereunder, such time periods as they apply to Agent shall be automatically extended to the extent reasonably necessary under the circumstances to permit such Person to comply with such time period.

Notwithstanding anything to the contrary contained in this Agreement, if as a result of any action or omission of Agent, the Lenders, Borrower, or the Independent Appraiser any applicable time period hereunder is not or cannot be complied with by SESAC or its Representative Appraiser, such time period shall automatically be extended to the extent reasonably necessary under the circumstances to permit such Person to comply with such time period.

Notwithstanding anything to the contrary contained in this Agreement or any other TSC Contract (as defined in the SESAC Agreement), neither SESAC nor any of its Affiliates shall have any continuing right to provide copyright administration or management services in respect of any Collateral after the consummation of any Permitted Sale in respect of such Collateral in accordance herewith, and SESAC hereby waives its rights under the Backup Copyright Administration Agreement and any other TSC Contract to provide copyright administration or management services in respect of such Collateral after such Permitted Sale.

Notwithstanding anything to the contrary contained in this Agreement, under no circumstances shall Agent or the Lenders directly or indirectly sell or otherwise transfer any of the Collateral to Broadcast Music, Inc. or the American Society of Composers, Authors and Publishers or any of their respective Affiliates.

Except as expressly provided above, the provisions of Section 13 ("Buyout Rights") of the SESAC Agreement shall remain in full force and effect in all respects.

Except for the waiver expressly provided for above, nothing contained in this Agreement shall be deemed to impair, waive, or otherwise modify in any manner any rights or remedies SESAC or any of its Affiliates may have under the SESAC Agreement or any other TSC Contract, nor preclude SESAC or any of its Affiliates from or limit it in exercising or pursuing any such rights or remedies, whether available at law or in equity. Neither SESAC nor any of its Affiliates is

E-4

hereby waiving any right to take action with respect to the existence of any defaults under the SESAC Agreement or any other TSC Contract or any other events that, with the giving of notice or lapse of time or both, would constitute a default thereunder.

Each party hereto acknowledges that irreparable damage may occur, and the other parties' remedies at law might be inadequate, if any term or provision of this Agreement was not performed or observed strictly in accordance with this Agreement, and, in such circumstances, unconditionally and irrevocably waives any defense that may be available to it that any other party's remedies at law are adequate or that such party's injuries are not irreparable. Each party hereto shall be entitled to seek equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction, or any other equitable remedy that may then be available to it.

Notwithstanding anything to the contrary contained herein: (i) no party hereto or any of its Affiliates shall be liable to any other party hereto under or in connection with this Agreement for any, and each party hereto hereby waives to the fullest extent permitted by applicable Law, all consequential, incidental, indirect, punitive, exemplary, remote, speculative, or special damages of any kind, nature, or description whatsoever; and (ii) neither SESAC nor any of its Affiliates shall be liable to Borrower, The Collective Holding, LLC, Jean Mason, Agent, or any Lender or any of their respective Affiliates for, and Borrower, The Collective Holding, LLC, Jean Mason, Agent, and each Lender each hereby waives, on its own behalf and on behalf of each of its Affiliates, to the fullest extent permitted by applicable Law, all Losses based upon, resulting from, arising out of, or relating to, any action or omission by SESAC or any of its Affiliates in connection with providing any services to or on behalf of Borrower, Agent, or the Lenders or any of their respective Affiliates under or in connection with this Agreement, except to the extent that any such action or omission constitutes gross negligence or willful misconduct.

Sections 26.1 ("Certain Miscellaneous Terms—Further Action") (the first sentence thereof only), 26.3 ("—Expenses") (the first sentence thereof only), 26.4 ("—Public Announcements"), 26.5 ("—Notices"), 26.7 ("—Amendment; Waiver"), 26.8 ("—Entire Agreement"), 26.9 ("—Severability"), 26.10 ("—Successors and Assigns; No Third Party Beneficiaries") (excluding the proviso thereto), 26.11 ("—Cumulative Remedies"), 26.12 ("—Equitable Remedies"), 26.13 ("—Governing Law"), 26.14 ("—Waiver of Jury Trial"), 26.15 ("—Jurisdiction"), 26.16 ("—Service of Process"), 26.17 ("—Preparation and Negotiation of This Agreement"), 26.20 ("—Counterparts"), 26.21 ("—Delivery Via Telecopier") of the SESAC Agreement are incorporated herein by reference *mutatis mutandis* to the same extent as if set forth herein in full; *provided* that each reference therein to Holding Company, Operating Company, or Promoter shall also be and mean a reference to the Lenders and Agent.

Each of the parties hereto represents that it is duly authorized to execute this Agreement.

[THE REMAINDER OF THE PAGE HAS BEEN INTENTIONALLY LEFT BLANK.]

E-5

If the above correctly sets forth the understanding among the parties hereto with respect to the subject matter hereof, please so indicate by signing and returning to the undersigned one of the enclosed duplicates of this Agreement.

Very truly yours,

SESAC, INC., on its own behalf and on
    behalf of its Affiliates

By: _____
Name:
Title:


ACKNOWLEDGED AND AGREED

FORTRESS CREDIT OPPORTUNITIES I,
    LP, as Agent


By: _____
Name:
Title:


THE SONGWRITER COLLECTIVE, LLC,
    as Borrower


By: _____
Name:
Title:


THE COLLECTIVE HOLDING
    COMPANY, LLC, as Guarantor


By: _____
Name:
Title:


_____
JEAN MASON


E-6

SCHEDULE I

## LIST OF CLASS A MEMBERS

1.  Baker, Gary
2.  Barnhill, Gregory W.
3.  Giles, Richard
4.  Hogin, Sam
5.  Johnson, Tim
6.  Lamar, Holly
7.  Makin Friends Music
8.  Malloy, David
9.  Marty, Tony
10. McDonald, Richard "Ritchie"
11. McHugh, Thom
12. Nazareth, including Nazareth (Dumferline) Ltd.
13. Robbins, Dennis including Trevcor Music Corp.
14. Robinson, William
15. Roboff, Annie
16. Rogers, Ronnie (Randall)
17. Roman, Arnie
18. Vrana, Jono including Sound Dust Limited
19. Stewart, Larry
20. Tritt, Travis including Post Oak Publishing, Inc. and DBA Post Oak Publishing
21. Walker, Billy Joe Jr. including Marathon Key Music

SI-1

SCHEDULE II

## CLASS A MEMBER DISTRIBUTIONS

### Writer Distribution of Bridge Proceeds

| Name | Revenue Contribution | Distribution Amount |
| --- | --- | --- |
| Baker, Gary | $770,049.00 | $231,014.70 |
| Barnhill, Greg | $130,888.00 | $39,266.40 |
| Giles, Richard | $367,896.00 | $110,368.80 |
| Hogin, Sam | $167,891.00 | $50,367.30 |
| Johnson, Timothy | $179,623.00 | $53,886.90 |
| Lamar, Holly | $519,258.00 | $155,777.40 |
| Makin' Friends Music | $68,907.00 | $20,672.10 |
| Malloy, David | $289,225.00 | $86,767.50 |
| Marty, Tony | $52,617.00 | $15,785.10 |
| McDonald, Ritchie | $206,385.00 | $61,915.50 |
| McHugh, Thom | $317,551.00 | $200,000.00 |
| Nazareth | $475,678.00 | $339,493.20 |
| Robbins, Dennis | $172,341.00 | $121,977.00 |
| Robinson, Will | $84,667.00 | $25,400.10 |
| Roboff, Annie | $1,272,956.00 | $600,000.00 |
| Rogers, Ronnie | $488,327.00 | $146,498.10 |
| Roman, Arnie | $320,704.00 | $96,211.20 |
| Larry Stewart | $8001.00 | $2,400.30 |
| Tritt, Travis | $412,091.00 | $123,627.30 |
| Vrana, Jono | $188,051.00 | $56,415.30 |
| Walker, Jr., Billy Joe | $220,889.00 | $66,266.70 |
| | | $2,604,110.90 |

SCHEDULE III

## CLASS A MEMBERS UN-RECOUPED BALANCE PAY SCHEDULE
## TERM LOAN RESERVE ACCOUNT

| CLASS A MEMBER | PAYEE | PAY OFF AMOUNT |
|---|---|---|
| Barnhill, Greg | Chrysalis Music | $40,282.00 |
| Giles, Richard | EMI/Blackwood | $118,451.00 |
| Hogin, Sam | Sony/ATV | $190,587.08 |
| Lamar, Holly | Warner/Chappell | $87,593.46 |
| Malloy, David | Famous Music | $250,000.00 |
| Malloy, David | Warner/Chappell | $67,582.00 |
| Marty, Tony | Curb Congregation Songs | $100,000.00 |
| McDonald, Ritchie | Sony/ATV | $423,778.00 |
| Robbins, Dennis | Warner/Chappell | $   -- |
| Robinson, William | EMI | $   -- |
| Roboff, Annie | ASCAP | $   -- |
| Rogers, Randall | Sony/ATV | $243,935.35 |
| Roman, Arnie | W&R Productions | $234,792.00 |
| Vrana, Jono | EMI Music Publishing | $25,000.00 |
| Walker, Billy Joe | Songs of Universal | $17,208.00 |
| Walker, Billy Joe | Warner/Chappell Music | $75,000.00 |
| | Subtotal | $1,874,208.89 |

SIII-1

SCHEDULE IV

## SOURCES AND USES OF FUNDS

### Borrower:

| | | |
|---|---|---|
| **Source:** | | |
| Gross proceeds | $ | 12,120,000.00 |
| | | |
| **Uses:** | | |
| Reserved for Substitute Collateral | $ | 1,986,630.00 |
| Structuring & placement fees | | 1,446,095.23 |
| SESAC Loan & legal | | 1,048,449.72 |
| Annie Roboff reimbursement | | 50,000.00 |
| Thom McHugh reimbursement | | - |
| Reimbursed costs | | 392,784.40 |
| First Year Operating Budget | | 1,048,350.89 |
| Unrecouped Balance Reserve | | 1,874,208.89 |
| Lien release payments | | 968,215.27 |
| Unresolved Collateral Reserve | | 561,154.70 |
| Dennis Robbins Legal Settlement Reserve | | 85,000.00 |
| Additional Reserves | | 55,000.00 |
| Writer Distribution | | 2,604,110.90 |
| | | |
| | $ | 12,120,000.00 |

SIV-1

## PAYMENTS TO BE MADE AT CLOSING

**TRANSACTION EXPENSES:**
**LEGAL:**

| | | | |
|---|---|---|---|
| Hunter, Maclean, Exley & Dunn | Hunter, Maclean, Exley & Dunn | Fees | $100,000.00 |
| Hunter, Maclean, Exley & Dunn | Professional Services: Deborah Wagnon | | 100,000.00 |
| Jenkens & Gilchrist, Parker Chapin, LLP | Jenkins & Gilchrist, Parker & Chapin | Fees | 235,000.00 |
| Baker Mckenzie | Baker Mckenzie (Est) | Fees | – |
| Pryor, Cashman | Pryor Cashman (old) | Fees | 170,000.00 |
| Sidley Austin Brown & Wood LLP | Lender's counsel (net of $50K retainer) | Fees | 110,250.00 |
| Pryor, Cashman | Lender's counsel | Fees | 10,000.00 |
| Fortress Credit Opportunities I LP | Lender's post closing | Fees | 8,000.00 |
| Fortress Credit Opportunities I LP | Lender's out of pocket | Expenses | (50,000.00) |
| Fortress Credit Opportunities I LP | Expense Deposit by Borrower | | |
| **CONTROL ACCOUNT** | | | |
| Wilimington Trust | Custodial Account | Fee | 15,000.00 |
| **ACCOUNTING/VALUATION:** | | | |
| Prager & Fenton | Prager & Fenton | Fees | – |
| Moss-Adams | Moss Adams | Fees & Costs | 100,000.00 |
| Royalty Information Technology Services | Royalty Information Tech Services | Fees | 50,000.00 |
| **UNDERWRITING FEES:** | | | |
| UCC Capital Corporation | UCC Capital Corp | Fees | 84,005.00 |
| UCC Capital Corporation | UCC Capital Corp | Fees (1.5% of Term Loan) | 180,000.00 |
| | | | |
| **ORIGINATION:** | | | |
| Fortress Credit Opportunities I LP | Fortress | Fees | 300,000.00 |
| **TITLE AND TAX LIEN SEARCHES:** | | | |
| Jack, Lyon Jones PA | Jack Lyons Jones | Copyright Title Searches | 10,513.23 |
| Corporation Services | Corporation Services (Lien Searches) | Tax Lien Searches | 23,327.00 |
| | | **Total** | **$1,446,095.23** |

| | | | |
|---|---|---|---|
| **SESAC LOAN AND LEGAL** | | | $927,249.72 |
| SESAC Loan and Legal | | | 121,200.00 |
| Commitment Fee | | **Total** | **$1,048,449.72** |

| | | | |
|---|---|---|---|
| **SONGWRITER REIMBURSEMENT** | | | $50,000.00 |
| Annie Roboff | | | – |
| Thom McHugh | | **Total** | **$50,000.00** |

SIV-2

**REIMBURSEMENTS**
**LEGAL DUE DILIGENCE/SECURITIZATION AND TERM LOAN:**

| | | | |
|---|---|---|---|
| Burton J. Weiss, Esq. | Legal Due Diligence | Fees | $10,000.00 |
| Chuck McNeal | Writer Relations/Nashville | Fees | 20,000.00 |

**MANAGEMENT PRE-CLOSING FEES:**

| | | | |
|---|---|---|---|
| Budd Carr | CEO | Fees | 50,000.00 |
| Murray Weiss | Financial Advisor/Acting CFO | Fees | 25,000.00 |

**PROMOTER COST REIMBURSEMENT:**

| | | | |
|---|---|---|---|
| E. Jean Mason | President & COO | Out-of-Pocket Expenses | 250,000.00 |

**RISK MANAGEMENT:**

| | | | |
|---|---|---|---|
| Arthur Gallagher | Risk Management Package | | 5,000.00 |

**CONSULTANTS:**

| | | | |
|---|---|---|---|
| Herb Jordan | | Fees | 15,000.00 |

**INSURANCE PREMIUM**

| | | | |
|---|---|---|---|
| Arthur Gallagher | D&O Insurance | | 17,784.40 |

**OUTSIDE/THIRD PARTY LEGAL:**

| | | | |
|---|---|---|---|
| Marc Jacobson, Esq. | Counsel: Pledge Guarantor | Fees | -- |
| Kenneth Kraus, Esq | Counsel: Pledge Guarantor | Fees | -- |
| | | **Total** | **$392,784.40** |

**CLASS A MEMBER LIEN REPAYMENT FROM PROCEEDS**

| | | |
|---|---|---|
| Makin' Friends Music | SunTrust Bank | $156,190.12 |
| Travis Tritt | SunTrust Bank | 475,214.69 |
| Travis Tritt | State of Georgia | -- |
| Greg Barnhill | SunTrust Bank | 9,781.89 |
| Ronnie Rogers | SunTrust Bank | 327,028.56 |
| | | $968,215.27 |

**FIRST MONTH OPERATING BUDGET**

| | | |
|---|---|---|
| March 2004 | | $197,003.00 |
| | **Total** | **$197,003.00** |

**WRITER DISTRIBUTION**

| | | | |
|---|---|---|---|
| Barnhill, Greg | 130,888.00 | | $39,266.40 |
| Lamar, Holly | 519,258.00 | | 155,777.40 |
| Making Friends Music | 68,907.00 | | 20,672.10 |
| Marty, Tony | 52,617.00 | | 15,785.10 |
| McDonald, Ritchie | 206,385.00 | | 61,915.50 |
| McHugh, Thom | 317,551.00 | | 200,000.00 |
| Nazareth | 475,678.00 | | 339,493.20 |
| Robinson, Will | 84,667.00 | | 25,400.10 |
| Roboff, Annie | 1,272,956.00 | | 600,000.00 |
| Roman, Arnie | 320,704.00 | | 96,211.20 |
| Stewart, Larry | 8,001.00 | | 2,400.30 |
| Vrana, Jono | 188,051.00 | | 56,415.30 |
| | | **Total** | **$1,613,336.60** |

**TOTAL PAYMENTS AT CLOSING**

| | |
|---|---|
| | **$5,715,884.22** |

SIV-3

## SUNTRUST RESERVE ACCOUNT

**CLASS A MEMBERS UN-RECOUPED BALANCE PAY SCHEDULE**

| CLASS A MEMBER | PAYEE | |
|---|---|---|
| Barnhill, Greg | Chrysalis Music | $40,282.00 |
| Giles, Richard | EMI/Blackwood | 118,451.00 |
| Hogin, Sam | Sony/ATV | 190,587.08 |
| Lamar, Holly | Warner/Chappell | 87,593.46 |
| Malloy, David | Famous Music | 250,000.00 |
| Malloy, David | Warner/Chappell | 67,582.00 |
| Marty, Tony | Curb Congregation Songs | 100,000.00 |
| McDonald, Ritchie | Sony/ATV | 423,778.00 |
| Robbins, Dennis | Warner/Chappell | — |
| Robinson, William | EMI | — |
| Roboff, Annie | ASCAP | — |
| Rogers, Randall | Sony/ATV | 243,935.35 |
| Roman, Arnie | W&R Productions | 234,792.00 |
| Vrana, Jono | EMI Music Publishing | 25,000.00 |
| Walker, Billy Joe | Songs of Universal | 17,208.00 |
| Walker, Billy Joe | Warner/Chappell Music | 75,000.00 |
| | Total | $1,874,208.89 |

**WRITER DISTRIBUTION**

| Class A Member | Revenue Contribution | Distribution |
|---|---|---|
| Baker, Gary | $770,049.00 | $231,014.70 |
| Giles, Richard | 367,896.00 | 110,368.80 |
| Hogin, Sam | 167,891.00 | 50,367.30 |
| Johnson, Timothy Jon | 179,623.00 | 53,886.90 |
| Malloy, David | 289,225.00 | 86,767.50 |
| Robbins, Dennis | 172,341.00 | 121,977.00 |
| Rogers, Ronnie | 488,327.00 | 146,498.10 |
| Tritt, Travis | 412,091.00 | 123,627.30 |
| Walker, Billy Joe | 220,889.00 | 66,266.70 |
| Total Writer Distribution | $3,068,332.00 | $990,774.30 |

**PRE-SECURITIZATION REIMBURSEMENTS**

| | | |
|---|---|---|
| **SESAC** | | |
| Legal Fees | | $100,000.00 |
| **BUSINESS MANAGEMENT:** | | |
| RK Business Management | Business Plan/Owner Accounts | 10,000.00 |
| **CONSULTANTS:** | | |
| Robin Godrey-Cass | Publishing Consultant | — |
| Bill Roberts | Financial Forecasting, VP of Finance | — |
| Murray Weiss | Financial Consultant | — |
| **ACCOUNTING/VALUATION:** | | |
| Moss Adams | | 35,000.00 |
| Royalty Information Technology Services | Valuation for Securitization | 25,000.00 |
| **RATINGS AGENCY:** | | |
| Moody's | | 100,000.00 |

SIV-4

**LEGAL:**

| | | |
|---|---|---|
| Jenkens & Gilchrist, Parker Chapin, LLP | | 125,000.00 |
| KMZRosenman | | 50,000.00 |
| Baker Mckenzie | | 100,000.00 |
| Adjustment (Refunded through unrecouped pickups and operating cash flow) | | (490,000.00) |
| | Total | $55,000.00 |

**DENNIS ROBBINS LEGAL SETTLEMENT RESERVE**

| | | |
|---|---|---|
| Dennis Robbins | Warren Haynes Legal Settlement | 85,000.00 |
| | Total | $85,000.00 |

**UNRESOLVED COLLATERAL RESERVE**

| | | |
|---|---|---|
| Baker, Gary | | $385,594.79 |
| Johnson, Tim | | 138,470.08 |
| Rogers, Ronnie | | 37,089.83 |
| | Total | $561,154.70 |

**SUBSTITUTE COLLATERAL RESERVE**

| | | |
|---|---|---|
| April 2004 – August 2004 | | $1,986,630.00 |
| | Total | $1,986,630.00 |

**OPERATING BUDGET**

| | | |
|---|---|---|
| April 2004 – August 2004 | | $851,347.89 |
| | Total | $851,347.89 |

| | |
|---|---|
| **TOTAL RESERVE ACCOUNT FUNDS** | $6,404,115.78 |

SIV-5

SCHEDULE V

COMPOSITIONS, ETC.

Please see attached

SV-1

SCHEDULE VI

RIGHTS TO INCOME

Please see attached

SVI-1

SCHEDULE VII

## BORROWER'S PLACE OF BUSINESS

3717 E. Thousand Oaks Boulevard #242
Westlake Village, CA 91362
Telephone: 805-413-1307
Fax: 805-413-1308

151 Sturbridge Drive
Franklin, TN 37064
Telephone: 615-595-2555
Fax: 615-595-2555

SVII-1

SCHEDULE VIII

## TAX RETURNS, LIENS, WAIVERS AND LETTERS OF DIRECTION

| Name | | | | | |
|---|---|---|---|---|---|
| Gary Baker | Complete | None | Consent | Received | No |
| Gregory W. Barnhill | Complete | Payoff Received | No | Received | Yes |
| Richard Giles | Complete | None | Consent & Waiver | Received | No |
| Sam Hogin | Complete | None | Yes | Received | No |
| Tim Johnson | No | None | Waiver | Needed | No |
| Holly Lamar | Complete | None | No | Received | Yes |
| Makin Friends Music | Complete | Payoff Received | No | Received | Yes |
| David Malloy | Complete | None | Waiver | Received | No |
| Billy Joe Walker | Complete | None | Waiver | Received | No |
| Marathon Key Music LLC | Complete | None | Waiver | Received | No |
| Marathon Key Music II LLC | Complete | None | No | Received | Yes |
| Tony Marty | Complete | None | No | Received | Yes |
| Richard "Ritchie" McDonald | Complete | Yes | No | Received | Yes |
| Thom McHugh | Complete | None | No | Received | Yes |
| Nazareth | Complete | None | No | Received | Yes |
| Dennis Robbins | No | Yes | No | Received | No |
| William Robinson | Complete | None | No | Received | Yes |
| Annie Roboff | Complete | None | No | Received | Yes |
| Ronnie (Randall) Rogers | Complete | Payoff Received | waiver | Received | No |
| Arnie Roman | Complete | None | No | Received | Yes |
| Jona Vrana | Complete | None | No | Received | Yes |
| Larry Stewart | Complete | None | No | Received | Yes |
| Travis Tritt | No | Payoff Received for Sun Trust not GA | consent | Needed | No |

[1] Payoff Received means *amount of liens reserved for in disbursement*
[2] *See the table below for details on the issues to be resolved*

The following are the issues related to the matters open in the column above entitled Consents and Waivers Needed:

| SONGWRITER | MATCING RIGHT OR CONSENT ISSUE |
|---|---|
| Tim Johnson | Need waiver of matching rights and right of first refusal from EMI |
| Travis Tritt | Need consent to assignment from Sony |
| Ronnie Rogers | Need waiver from Sony which, Sony indicated willingness to provide if repays unrecouped balance of $243,935.35 |
| Rich Giles | Need waiver of matching right from EMI/Blackwood<br>Need waiver of matching rights from BMG Songs |
| David Malloy | Need waiver of matching rights from Starstruck Angel Music |
| Billy Joe Walker | Need waivers from WB Music |

SVIII-1

SCHEDULE IX

ROYALTY RECEIPTS

**The Songwriter Collective, LLC**
**Initial DSCR Schedule**

| Month | Monthly % of cash received | Annual Initial Cash Flows | Monthly Pro-forma Cash Flows | Actual Cash Flows | TTM | DSCR | DSCR % |
|---|---|---|---|---|---|---|---|
| Mar-03 | 20.4% | ####### | 932,303 | - | - | - | - |
| Apr-03 | 13.9% | ####### | 637,705 | - | - | - | - |
| May-03 | 0.0% | ####### | 1,793 | - | - | - | - |
| Jun-03 | 3.1% | ####### | 141,581 | - | - | - | - |
| Jul-03 | 10.1% | ####### | 460,962 | - | - | - | - |
| Aug-03 | 0.0% | ####### | 1,989 | - | - | - | - |
| Sep-03 | 23.3% | ####### | 1,066,915 | - | - | - | - |
| Oct-03 | 15.8% | ####### | 724,515 | - | - | - | - |
| Nov-03 | 0.0% | ####### | 979 | - | - | - | - |
| Dec-03 | 3.0% | ####### | 138,055 | - | - | - | - |
| Jan-04 | 10.3% | ####### | 470,279 | - | 4,579,000 | 3,166,237 | 1.45 |
| Feb-04 | 0.0% | ####### | 1,925 | - | 4,544,187 | 3,166,237 | 1.44 |
| Mar-04 | 20% | | | 897,490 | 4,579,600 | 2,653,085 | 1.73 |
| Apr-04 | 14% | | | 673,118 | 4,577,807 | 2,653,085 | 1.73 |
| May-04 | 0% | | | - | 4,660,599 | 2,653,085 | 1.76 |
| Jun-04 | 3% | | | 224,373 | 4,648,382 | 2,653,085 | 1.75 |
| Jul-04 | 10% | | | 448,745 | 4,646,393 | 2,653,085 | 1.75 |
| Aug-04 | 0% | | | - | 4,701,341 | 2,653,085 | 1.77 |
| Sep-04 | 23% | | | 1,121,863 | 4,649,944 | 2,653,085 | 1.75 |
| Oct-04 | 16% | | | 673,118 | 4,648,965 | 2,653,085 | 1.75 |
| Nov-04 | 0% | | | - | 4,510,910 | 2,653,085 | 1.70 |
| Dec-04 | 3% | | | 448,745 | 4,489,377 | 2,653,085 | 1.69 |
| Jan-05 | 10% | | | - | 4,487,452 | 2,653,085 | 1.69 |
| Feb-05 | 0% | | | | | | |
| | | | | | | | |
| 2004 Summary | 100% | | 4,579,000 | - | 4,579,000 | 3,166,237 | 145% |
| 2005 Summary | 100% | | - | 4,487,452 | 4,487,452 | 2,653,085 | 169% |
| Accumulated Summary | | | 4,579,000 | 4,487,452 | 9,123,187 | 5,306,170 | 172% |

SIX-1

SCHEDULE X

## RIGHTS RESERVE SCHEDULE

| Name | Rights Reserve Amount |
|------|----------------------|
| Gary Baker | $385,109.63* |
| Will Robinson | $  2,403.26* |
| Ronnie Rogers | $ 36,753.45* |

*Amount subject to final completion.

SX-1

SCHEDULE XI

## DEFERRED EXPENSES

**SUBSTITUTE COLLATERAL RESERVE PAYMENTS**

| | | |
|---|---|---:|
| Hunter, Maclean, Exley & Dunn | Fees | $ 53,735.44 |
| Hunter, Maclean, Exley & Dunn | Professional Services: Deborah Wagnon | 50,000.00 |
| Jenkens & Gilchrist, Parker Chapin, LLP | Fees | 100,000.00 |
| Pryor, Cashman | Pryor Cashman (old) | 3,839.00 |
| Prager & Fenton | Fees | 8,500.00 |
| Moss Adams | Fees & Costs | 8,588.00 |
| Royalty Information Tech Services | Fees | 25,000.00 |
| Thom McHugh | Accelerated Bonus | 150,000.00 |
| Barton J. Weiss, Esq. | Legal Due Diligence | 40,000.00 |
| Chuck McNeal | Writer Relations/Nashville | 30,000.00 |
| Budd Carr | CEO | 160,000.00 |
| Murray Weiss | Financial Advisor/Acting CFO | 50,000.00 |
| E. Jean Mason | President & COO | 452,736.88 |
| Herb Jordan | Fees | 12,000.00 |
| Marc Jacobson, Esq. | Counsel: Pledge Guarantor | 15,000.00 |
| Kenneth Kraus, Esq | Counsel: Pledge Guarantor | 7,500.00 |
| Writers' Distribution and Unrecouped Balances | | 819,730.68 |
| | | $ 1,986,630.00 |

**TOTAL RESERVE ACCOUNT FUNDS**

**UNRESOLVED COLLATERAL RESERVE PAYMENTS**

| | | |
|---|---|---:|
| Robin Godrey-Cass | Publishing Consultant | $ 75,000.00 |
| Bill Roberts | Financial Forecasting, VP of Finance | 40,000.00 |
| Murray Weiss | Financial Consultant | 25,000.00 |
| Jenkens & Gilchrist, Parker Chapin, LLP | Fees | 15,000.00 |
| Arthur Gallagher | D&O Insurance | 71,137.60 |
| Pre-securitization expenses | | 176,045.07 |
| Operating Budget | | 158,972.03 |
| | | $ 561,154.70 |

SXI-1