6 Misc.3d 1005(A)                                                                                          Page 1
6 Misc.3d 1005(A), 800 N.Y.S.2d 357, 2004 WL 3086862 (N.Y.Sup.), 2004 N.Y. Slip Op. 51733(U)
**(Cite as: 6 Misc.3d 1005(A))**

CTesoriero v. Metlife
N.Y.Sup.,2004.
(The decision of the Court is referenced in a table in
the New York Supplement.)
Supreme Court, Kings County, New York.
Arlene TESORIERO, Plaintiff,
v.
METLIFE, et.al., Defendants.
**No. 46200/03.**

May 13, 2004.

CAROLYN E. DEMAREST, J.
**\*1** Defendant, MetLife, Inc. ("MetLife"), moves to
dismiss the complaint against it pursuant to CPLR
3211(a)(1), (5), and (7) on the grounds that Plaintiff's
action to recover damages for professional
negligence, fraud, and breach of fiduciary duty is
barred by the statute of limitations, the complaint
fails to state a cause of action, and there is a defense
founded upon documentary evidence. In a cross-
motion, Defendant Stephen Filoramo joins in the
motion to dismiss upon the grounds stated in
Metlife's motion to dismiss.

Plaintiff's complaint arises out of her purchase of two
"Life-Paid-up at Age 98" life insurance policies and a
variable annuity from Defendant Metlife. The life
insurance policies were issued on December 21,
1999, and the annuity was purchased on March 2,
2000. Plaintiff, who was age 60 at the time of
purchase, claims that she purchased the policies in
reliance upon oral representations made by Stephen
Filoramo, a MetLife broker, that they would generate
sufficient revenue to satisfy the payment of all
premiums on the policies and would meet her
specific financial needs after a period of seven years.
Plaintiff filed her complaint on November 26, 2003,
claiming that the revenues were not sufficient to meet
her specific financial needs and that the broker's
promise of vanishing premiums was false.

Defendants' motions to dismiss must be granted as to
the causes of action for professional negligence and
breach of fiduciary duty because Plaintiff filed her
complaint beyond the three-year period of limitations
applicable to those claims. CPLR § 214(6); Yatter v.
William Morris Agency, Inc., 256 A.D.2d 260, 261
(1st Dep't, 1998) ("Because plaintiff's breach of

fiduciary duty claim seeks only money damages, the
applicable limitations period is three years".)
Whereas a cause of action for professional negligence
accrues upon the rendering of the professional
services (Video Corporation of America v. Frederick
Flalto Associations, Inc., 85 A.D.2d 448, 453 (1st
Dep't, 1982); Sosnow v. Paul, 43 A.D.2d 978 (2d
Dep't, 1974)), in this case, upon the issuance of the
subject policies on December 21, 1999 and March 3,
2000, the filing of Plaintiff's complaint on November
26, 2003, was untimely. Moreover, inasmuch as
insurance brokers have been determined not to be
"professionals" within the ambit of CPLR § 214(6),
and the complaint does not describe a long-term
advisory relationship unrelated to the issuance of the
subject policies, the continuous representation
doctrine, of which Plaintiff seeks to avail herself, is
inapplicable. Chase Scientific Research, Inc. v. NIA
Group, 96 N.Y.2d 20, 30-31 (2001); Castle Oil Corp.
v. Thompson Pension Employee Plans, 299 A.D.2d
513 (2d Dep't 2002); Zaref v. Berk & Michaels, PC.,
192 A.D.2d 346, 348 (1st Dep't, 1993).

Addressing Defendants' other contentions, "the sole
criterion [when considering a motion to dismiss for
failure to state a cause of action] is whether the
pleading states a cause of action, and if from its four
corners factual allegations are discerned which taken
togethermanifest any cause of action cognizable at
law."Mastrocola v. County of Nassau, 248 A.D.2d
684 (2d Dep't, 1998), quoting Guggenheimer v.
Ginsberg, 43N.Y.2d 268, 275 (1977)."The pleadings
must be liberally construed, and the facts pleaded are
presumed to be true and are accorded every favorable
inference".Id. However, where, as here, documentary
evidence is submitted that arguably precludes
Plaintiff's recovery on her alleged causes of action, it
is the responsibility of the court to "determine
whether the proponent of the pleading has a cause of
action, not whether he or she has stated one".Steiner
v. Lazzaro & Gregory P .C., 271 A.D.2d 596 (2d
Dep't, 2000). In the face of documentary evidence of
the terms of the insurance policies which form the
only basis of Plaintiff's claims and which directly
contradict the allegations in the complaint, the Court
is not required to assume the reliability of the
contradicted allegations.O'Donnell, Fox & Gartner,
P.C. v. R-2000 Corporation, 198 A.D.2d 154 (1st
Dep't 1993). Plaintiff had the burden to provide
evidence in support of her claims in order to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6 Misc.3d 1005(A)                                                                                                    Page 2
6 Misc.3d 1005(A), 800 N.Y.S.2d 357, 2004 WL 3086862 (N.Y.Sup.), 2004 N.Y. Slip Op. 51733(U)
**(Cite as: 6 Misc.3d 1005(A))**

overcome the documentary evidence. She has failed to do so and her pleadings fail therefore to state any cause of action cognizable at law.

**\*2** Because insurance brokers are not "professionals", Plaintiff's first cause of action for professional negligence must fail. As defined by the Court of Appeals, a professional is someone who has had extensive formal training and is subject to licensure and regulation indicating a qualification to practice, a code of conduct imposing standards beyond those accepted in the marketplace, and a system of discipline for violation of those standards. The status of "professional" implicates a relationship of trust and confidence in which the professional assumes a duty to counsel and advise others. *Chase Scientific Research, Inc. v. NIA Group, Inc., supra,* 96 N.Y.2d at 29.It has been determined that while insurance brokers may be licensed, they are not required to engage in extensive specialized education and training and are not bound by a standard of conduct for which discipline might be imposed. *Chase Scientific Research, Inc. v. NIA Group, Inc.,, id.*

As heretofore noted, it is not alleged that Plaintiff had any dealings with Defendants prior to the purchase of the subject policies beginning on December 21, 1999. Although Plaintiff may have been influenced by the sales representations of broker Filoramo, she has no greater legal entitlement to recover for her dissatisfaction with the performance of Defendants' product than would be available in any other consumer transaction. Defendants assumed no greater duty to Plaintiff than to any other insured, according to the complaint. See *Kimmel v. Schaefer,* 89 N.Y.2d 257, 263 (1996): "[N]ot all representations made by a seller of goods or provider of services will give rise to a duty to speak with care."The absence of any particularized allegations of services rendered by Defendants outside or beyond the writing of the subject insurance policies precludes a finding that the complaint sufficiently states a claim for professional negligence.

It is further well settled that insurance brokers and insurance companies do not generally owe a fiduciary duty to insureds. *Murphy v. Kuhn,* 90 N.Y.2d 266 (1997). A fiduciary duty may arise if the facts of the particular relationship between the parties create an exceptional situation in which an insurance agent, through his or her conduct or by express or implied contract, assumes or acquires duties in addition to those fixed at common law. *Murphy v. Kuhn, id.* at

272;*Fortino v. Hersh,* 307 A.D.2d 899 (1st Dep't, 2003). Generally, of course, whether such a duty has been created is a question of fact. In *Murphy v. Kuhn,* however, the Court of Appeals declared unequivocally that "[i]nsurance agents or brokers are not personal financial counselors and risk managers, approaching guarantor status," noting that an insured is usually in the best position to judge her needs (90 N.Y.2d at 273).

While Plaintiff herein has alleged in her complaint that Defendant Filoramo "held himself out to the public and to plaintiff as having expertise as an investment, financial and insurance advisor" (paragraph 10) and that in March 2000, he "provided professional investment, financial and insurance advice" to Plaintiff (paragraph 11) and on March 3, 2000, "recommended and advised ... [the] purchase [of] certain variable universal insurance policies and annuity contracts" (paragraphs 12, 13) and that in reliance on Defendant Filoramo's advice, on the same date, such policies were purchased, in light of the public policy implications in overriding the settled rule against imposing a fiduciary duty on insurance brokers and providers (see *Murphy v. Kuhn, id.* at 273), this court does not find such general allegations relating solely to the purchase of the insurance policies at issue sufficient to state a cause of action for breach of fiduciary duty. Nor are Plaintiff's bald allegations that, following the purchase of the policies "on March 3, 2000", she continued to receive advice from Defendants while she continued to pay the premiums until April 7, 2003, sufficient to establish the kind of special relationship that would impose upon Defendants, retroactively, a fiduciary duty with respect to policies that had already been purchased.

**\*3** The facts alleged in Plaintiff's complaint are in sharp contrast to the circumstances in *Murphy v. Kuhn,* wherein the broker-insured relationship had continued for several decades prior to the events that were the basis of the lawsuit, and were nonetheless found to be inadequate to impose a greater duty on the broker. *Fortino v. Hersh, supra,* 307 A.D.2d 899, cited by Plaintiff, is actually closer to the facts presented in the complaint herein. While the majority in the First Department Appellate Division seems to have permitted the challenged action there to proceed largely for procedural reasons, this Court finds more persuasive the dissenting opinion of Justice Andrias who found the allegations, like those herein, insufficient to establish an "exceptional situation"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6 Misc.3d 1005(A)                                                                                         Page 3
6 Misc.3d 1005(A), 800 N.Y.S.2d 357, 2004 WL 3086862 (N.Y.Sup.), 2004 N.Y. Slip Op. 51733(U)
**(Cite as: 6 Misc.3d 1005(A))**

differing in any material respect from the "practice of the art of salesmanship" and would have dismissed the cause of action for breach of fiduciary duty.

Also to be distinguished from the instant case is _Davis v. CCF Capital Corp., 277 A.D.2d 342 (2d Dep't, 2000),_ in which claims for fraud and breach of fiduciary duty against a financial advisor who had accepted $130,000 for investment in risky mortgages survived dismissal on a motion under CPLR 3211(a)(7) based upon plaintiff's submission of documentary evidence in support of her claim. In contrast, Plaintiff here has failed to elucidate the substance of her conclusory allegations of a fiduciary relationship with any elaboration or evidentiary proof. In fact, the only evidence, submitted by Defendants in support of their motion pursuant to CPLR § 3211(a)(1), contradicts Plaintiff's position. As noted in _Davis, id._ at 343, even when a motion to dismiss is not converted to a summary judgment motion, affidavits by someone with knowledge are appropriately submitted to remedy inadequacies in pleading. No such submissions have been received here in response to Defendants' documentary evidence and legal arguments.

In her response in opposition to Defendants' motions to dismiss, Plaintiff relies upon her attorney's Affirmation in Opposition, which, in turn, relies exclusively on the Verified Complaint. No affidavit has been submitted from Plaintiff. The complaint clearly states that Plaintiff's relationship with the Defendants began on March 3, 2000 when the policies at issue were purchased. See paragraphs 11-17 of Verified Complaint. (The two Life Paid up at Age 98 policies were actually issued on December 21, 1999). While Plaintiff asserts at paragraphs 24 and 33 that "continuous professional investment, financial and insurance services and advice" were provided during the period up to April 7, 2003, during which she paid the premiums on these policies, there are no specific allegations to suggest that any relationship existed during this period other than insured and insurer. There are no specific allegations that Defendant Filoramo at any time advised Plaintiff regarding any other "investments". There is no indication in the complaint or otherwise that Stephen Filoramo did anything to assume or acquire duties above and beyond those imposed by the common law. Insureds bear the burden of showing that there was a specific undertaking to warrant the imposition of a greater duty._Murphy v. Kuhn, supra,_ 90 N.Y.2d at 273.That an insurance broker advised Plaintiff generally that her financial needs would be met is not so exceptional as to support imposition of a special or fiduciary duty. _Busker on the Roof Limited Partnership Co. v. M.E. Warrington,_ 283 A.D.2d 376 (1st Dep't, 2001). Plaintiff has failed to particularize any factual basis to support the existence of a special fiduciary relationship with Defendants. Therefore, the second cause of action for breach of fiduciary duty must be dismissed.

**\*4** Plaintiff's complaint also fails to state a cognizable cause of action for fraud. In order to state a claim for fraud relating to the issuance of an insurance policy, the plaintiff must allege a material omission or misrepresentation, made with knowledge of falsity and intent to deceive, reasonably relied upon by the purchaser, and consequent injury. _Gaidon v. Guardian Life Insurance Co.,_ 94 N.Y.2d 330, 348 (1999). In her complaint, Plaintiff asserts that the policies she purchased were falsely represented to be "low risk, high yield, secure, safe, sound and suitable" (paragraph 39) and that they would "generate sufficient revenue and/or value to satisfy the payment of any premiums after a period of seven (7) years and would generate sufficient income to satisfy plaintiff's needs" (paragraph 40). Plaintiff further alleges that such ambiguous representations were known to be false and were intended to deceive her and that she relied upon them to her detriment in purchasing the policies. Such alleged representations are, by their nature, too speculative and aspirational to be actionable. _Zaref v. Berk & Michaels, P.C., supra,_ 192 A.D.2d at 349.The only sufficiently factual, material representation which Plaintiff identifies, that revenues would cover premiums after seven years, is directly contradicted by the Premium Schedule contained within each of the "Life Paid-up at Age 98" policies which expressly states that premiums are payable for 38 years based upon Plaintiff's age of 60. The annuity policy does not appear to specify any pay-in obligations. The only fees expressed are an annual $20 administrative fee deducted from the "Account", which is inapplicable to accounts with a balance of $20,000 or more, and fees related to withdrawals. In the absence of any specific allegation concerning the substance of a particular representation and the manner in which it is claimed to be false, and the precise nature of the harm to plaintiff, the pleading is inadequate to state a cause of action for fraud. _107 Realty Corp.v. National Petroleum USA, Ltd.,_ 181 A.D.2d 817, 818 (2d Dep't, 1992); CPLR § 3016(b). It is further noted that,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6 Misc.3d 1005(A)                                                                                       Page 4
6 Misc.3d 1005(A), 800 N.Y.S.2d 357, 2004 WL 3086862 (N.Y.Sup.), 2004 N.Y. Slip Op. 51733(U)
**(Cite as: 6 Misc.3d 1005(A))**

whereas the gravamen of Plaintiff's complaint seems to be that the policies were not self-sustaining after seven years, since seven years have not elapsed, her claims are either premature or insufficiently articulated.

Moreover, Plaintiff cannot claim that she relied on the broker's oral representations to modify the express terms of the written policies in support of her cause of action for fraud. Where a writing is clear in its terms and purports to express the parties' entire agreement, evidence of oral communications between the parties that contradicts or varies the written terms of the agreement is generally barred by the parol evidence rule. Any "meaningful" discrepancy between the written contract and an alleged oral representation "negates a claim of reasonable reliance upon the oral representation."_Stone v. Schultz,_ 231 A.D.2d 707, 708 (2d Dep't, 1996). Here, the policies expressly provide that they, together with any riders, constitute the entire agreements between MetLife and the policyholder. They also state unambiguously that brokers have no authority to waive or change the terms of the policies and that any changes must be in writing and signed by the MetLife President, Secretary, or Vice President. The Life Paid-up at Age 98 policies state that they are to be paid over a period of thirty-eight years and that Plaintiff had sixty days to examine the policies and return them for a refund of any premiums already paid. Plaintiff had the right to return the Multifunded Annuity Contract for full refund within ten days following receipt. Plaintiff is conclusively presumed to have read, known, understood and have assented to the terms of the written policies. _Busker on the Roof Limited Partnership Co. v. M.E. Warrington, supra,_ 283 A.D.2d at 377.Although extrinsic parol evidence would be admissible to establish fraud in the inducement, and the merger clause contained in the policies at issue would not alone preclude such evidence, the complaint fails to set forth with sufficient particularity even the most rudimentary elements of fraud. See _Goshen v. Mutual Life Ins. Co. Of NY,_ 1997 WL 710669 (Sup.Ct., N.Y. Co.), _aff'd,_259 A.D.2d 360 (1st Dep't, 1999), _aff'd in relevant part,_94 N.Y.2d 330 (1999)). Only were this Court to disregard the clear terms of the written contracts, could the claim of fraud survive. Plaintiff cannot establish that she reasonably relied on the allegedly fraudulent representations of Defendant Filoramo that premiums would vanish after seven years when such allegations are so blatantly contradicted in writing. Plaintiff's cause of action for fraud must also fail.

**\*5** Since legal precedent and the documentary evidence adduced clearly indicate that Plaintiff has no viable cause of action based upon her pleading, Defendants' motion to dismiss all three causes of action pursuant to CPLR §§ 3211(a)(1),(5) and (7) is granted.

The foregoing constitutes the decision and order of the Court.

N.Y.Sup.,2004.
Tesoriero v. Metlife
6 Misc.3d 1005(A), 800 N.Y.S.2d 357, 2004 WL 3086862 (N.Y.Sup.), 2004 N.Y. Slip Op. 51733(U)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                 Page 1
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Cooper v. Parsky
S.D.N.Y.,1997.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Stanley COOPER, et al., Plaintiffs,
v.
Gerald L. PARSKY, et al., Defendants.
**No. 95CIV10543 (JGK)(NRB).**

Jan. 8, 1997.

Richard C. Stein, New York City, for Plaintiffs.
Russell F. Sauer, Jr., Gail A. Matthews, Latham & Watkins, New York City, for Defendant Wespar Ins. Brokerage.
Jay Erens, Ross E. Kimbarovsky, Hopkins & Sutter, Chicago, IL, for Defendant Michael J. Sacks.
Jack Wenik, Sills Cummis Zuckerman Radin Tischman Epstein & Gross, New York City, for Defendants IGI Boler, Inc., W. Ross Reucassel, Boler Petroleum Corp., The Intern. Group, Inc. (Delaware) and The Intern. Group, Inc. (Canada).
Lawrence Byrne, Gibson, Dunn & Crutcher, New York City, for Remaining Defendants except Richard Gottlieb and Elizabeth Cole.
K. Ann McDonald, New York City, for Defendants J. Michael Bell, John L. Long, Southwest Venture Partners II and BMG Partners, Inc.
Fein & Jakab, New York City.
Richard Gottlieb, Los Angeles, CA.

*REPORT AND RECOMMENDATION*
KOELTL, Judge.
**\*1** Defendants' motion to dismiss plaintiffs' amended complaint, filed on August 13, 1996, was referred to me for a report and recommendation by your Order dated August 20, 1996. Defendants have moved to dismiss the amended complaint on numerous grounds. I respectfully recommend that defendants' motion be granted.

BACKGROUND

Introduction

This case concerns plaintiff Stanley Cooper ("Cooper"), who established a corporation called U.S. Petroleum ("USP") in the mid-1980s. Soon after USP was organized, Cooper and his family

(hereinafter collectively referred to as "plaintiff" or "plaintiffs"), USP's majority stockholders, signed a number of agreements relinquishing control of USP to new investors. During the next several years various other large investors came to USP and gradually took over ownership of the corporation. Stanley Cooper was fired, and the Cooper family lost all the value it originally held in the corporation. Plaintiff is suing numerous defendants for fraud, breach of fiduciary duty, breach of contract, tortious interference, and intentional infliction of emotional distress based on a series of business transactions that resulted in the Cooper family not only losing its investment but also being prevented from collecting a large sum of money Cooper was awarded from USP in arbitration. We describe the complicated series of events based on information culled from plaintiff's submissions.

The Organization of USP and Signing of the Agreements

Cooper incorporated USP under Delaware law on October 8, 1986. (Am.Compl.¶ 39.) Its principal place of business was in New York City. (*Id.*) Cooper served as USP's initial Chairman and CEO. (Am.Compl.¶ 4.) He intended that USP would build the first stand-alone petroleum wax refinery processing plant in the United States, as well as acquire and develop other producing properties and refineries. (*Id.* ¶ 39.)

On December 22, 1987, USP entered into an Investment Agreement with defendant Southwest Venture Partners II ("Southwest"), a Texas limited partnership. (*Id.* ¶ 45.) Through its investment, Southwest became USP's principal lender and a substantial shareholder. (*Id.* ¶ 46.) Defendant BMG Partners, Inc. ("BMG"), a Texas corporation, was Southwest's general partner. (*Id.* ¶ 22.) As provided by a Loan Agreement, Southwest installed four directors to the board of USP, including defendant John H. Long, Jr. ("Long"). (*Id.* ¶ 45.)

Two other agreements were executed simultaneously with the Investment Agreement. One was a Voting Agreement between Southwest and the Cooper family. (*Id.* ¶ 48, Ex. B.) The other was an Employment Agreement between Southwest and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                     Page 2
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Stanley Cooper. (*Id.* ¶ 49, Ex. A.)

Pursuant to the Voting Agreement, plaintiffs gave the new USP board of directors a proxy to vote their 71% majority interest in USP for ten years, or until the occurrence of one of several specified triggering events. (*Id.* ¶ 48, Ex. B ¶¶ 1, 4.) Plaintiffs were assured by defendants J. Michael Bell ("Bell") and Long, both affiliated with Southwest, and investor Raymond F. Sebastian ("Sebastian"), that the voting of their shares would be "purely ministerial, and for administrative purposes." (*Id.* ¶ 48.) The Voting Agreement listed as one possible date of termination "such date as the number of shares of Common Stock of the Company owned by the [Cooper] Stockholders shall in the aggregate become less than 10% of the total then outstanding." (*Id.* Ex. B ¶ 4(c).) Plaintiff, however, understood that "[u]nder no circumstances was the Voting Trust to be used to dilute or eliminate the equity interest of the Coopers." (*Id.* ¶ 48.)

**\*2** On the same day, Cooper entered into a five-year Employment Agreement with USP. (*Id.* ¶ 49, Ex. A.) That agreement provided that Cooper was to serve as a senior employee, "consulting to the Board of Directors on corporate planning and strategy of the Company...." (*Id.* Ex. A ¶ 2.) He was to receive the same salary as the president of USP, less one dollar per annum, along with various corporate perquisites, and his employment was to be terminable only for cause. (*Id.* ¶¶ 3.02(a), 3.03(a)-(b), 4.01.) In the event of a dispute concerning his termination, Cooper was to continue receiving compensation until resolution of that dispute by an arbitrator. (*Id.* ¶ 6.)

### Firing of Plaintiff Cooper

During the phone conversations in November and December of 1987 that led up to the signing of the Voting and Employment Agreements, Cooper was assured by Bell, Long, and Sebastian that he would remain an important force at USP. (Am.Compl.¶ 49.) However, soon after the execution of the agreements, Cooper was subjected to personal harassment by USP officers and barred from board and policy meetings. (*Id.*) In late May of 1988, five months after signing the Agreements, Cooper was terminated and locked out of the USP premises. (*Id.*) Several months later, Cooper commenced an arbitration proceeding against USP for breach of his Employment Agreement. (*Id.*) He won an arbitration award, which was reduced to a court judgment in 1991 (see Section VIII below). (*Id.* Ex. E.)

### Transfer of Control of USP to the WSGP Group

On November 18, 1988, defendant WSGP-International, Inc. ("WSGP-Int'l") made an investment in USP. (Am.Compl.¶ 50.) WSGP-Int'l was a Delaware corporation with its principal place of business in Los Angeles, organized by defendants Gerald L. Parsky ("Parsky") and former United States Secretary of the Treasury William E. Simon ("Simon"). (*Id.* ¶ 14.) (The name WSGP is comprised of Simon and Parsky's initials).

On April 28, 1989, defendant WSGP-USP Inc. ("WSGP-USP"), an affiliate of WSGP-Int'l, arranged to sell new limited partnership interests in USP to qualified investors. (*Id.* ¶¶ 16, 52.) Simon and Parsky, who owned 50% of WSGP-USP, organized a new investment entity for this purpose, called WSGP-USP Limited Partnership ("WSGP-USP LP"). (*Id.* ¶¶ 17, 52.) New investors in WSGP-USP LP included, among others, defendants Bell, Long, Sebastian, Southwest, BMG, WSGP-Int'l, and Alan Andreini ("Andreini"). (*Id.* ¶ 97.) Plaintiffs were neither invited nor permitted to invest in this limited partnership. (*Id.* ¶ 53.)

On May 5, 1989, WSGP-USP LP purchased majority control (50.1%) of USP for $7.2 million in a backdated agreement. (*Id.* ¶ 54.) The investment was structured as $4,347,846 in cash, and the rest non-cash capital contributions that the WSGP-USP LP investors had previously made to USP as note holders and shareholders. (*Id.*)

The USP directors voted the Cooper stock in favor of this transaction, in which the Coopers were replaced as majority shareholders of USP. (*Id.* ¶ 55.) WSGP-USP LP became USP's new majority shareholder and lender. (*Id.* ¶ 58.) Its investment agreement provided that its general partner, WSGP-USP, was to designate the directors of USP. (*Id.*) The principal operating officers of USP were required to enter into employment agreements and six one-half year voting trust agreements, all of which guaranteed WSGP control of USP. (*Id.*) The newly designated directors included defendants Sebastian, Richard K. Gottlieb ("Gottlieb"), Charles G. Berg ("Berg"), and Andreini. (*Id.* ¶ 58.)

### The Formation of Petrowax and Further Dilution of Plaintiff's USP Holdings

Not Reported in F.Supp.                                                                                  Page 3
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**\*3** On December 6, 1989, Petrowax PA Inc. ("Petrowax") was organized as a wholly owned subsidiary of USP to acquire two wax refinery facilities. (Am.Compl.¶ 60.) Petrowax was a Delaware corporation that shared its principal place of business with USP in a New York City office. (*Id.* ¶ 40.) USP president and CEO Gene Blendermann's salary, upon which Cooper's salary was to be based under his Employment Agreement (less one dollar), was then split between USP and Petrowax. Blendermann's salary from USP was reduced from $225,000 per year to $27,500. (*Id.* ¶ 60.)

On April 23, 1990, USP's Certificate of Incorporation was amended, by a vote of USP stock, to increase the amount of common and preferred stock. (*Id.* ¶ 61.) The next day, a number of USP investors including defendants Andreini, Gottlieb, Michael J. Sacks ("Sacks") and WSGP-Int'l "recharacterized" their interests in a bridge loan to USP into preferred stock of USP to be applied "retroactively." (*Id.* ¶ 65.) Defendants Southwest and one of the WSGP entities, both secured lenders, also "retroactively recharacterized" their debts into preferred stock, and issued themselves a one-time dividend of common stock. (*Id.* ¶ 66.)

On April 30, 1990, Petrowax acquired the two wax refinery plants from Quaker State Corporation ("Quaker") for $30 million. (*Id.* ¶ 62.) Twenty million dollars was paid in cash, and the balance consisted of a subordinated debt evidenced by a promissory note from Petrowax. (*Id.* ¶ 62.) At the time of this transaction, Petrowax was undercapitalized and USP was insolvent. (*Id.* ¶ 67.) Nevertheless, USP transferred $4.8 million of questionable intangible assets to Petrowax as a capital contribution. (*Id.*) The same day, Sanwa Business Credit Corporation ("Sanwa") lent Petrowax $30 million, of which $20 million was paid to Quaker, and $10 million was retained by Petrowax as working capital. (*Id.* ¶ 63.) Sanwa received 5% of Petrowax stock, while USP retained the other 95%. (Am.Compl.¶ 63.) USP guaranteed this senior loan, and was reimbursed by Petrowax with $1.9 million in cash from the Sanwa transaction for distribution to various defendants, including WSGP-Int'l, which received $1.25 million. (*Id.* ¶¶ 63, 67.) That same day, the Executive Committee of USP's board of directors, including defendants Andreini, Bell, Berg and Gottlieb (all USP and Southwest nominees who were also majority directors of Petrowax), developed a stock option plan for officers and key employees to acquire new common stock in USP. (*Id.* ¶ 68.)

WSGP Group Takes Over Control and Ownership of Petrowax from USP

On April 9, 1991, another Simon and Parsky-created WSGP affiliate, WSGP Partners L.P. ("WSGP Partners"), a new lender to Petrowax, mailed a memo to the WSGP-USP LP investors asking if they would like to purchase non-voting preferred stock in Petrowax. (Am.Compl.¶ 71.) The memo revealed that USP's former 95% equity interest in Petrowax had been reduced and diluted to 44.96%, and if the new financing succeeded, it would be reduced to 15%. (*Id.* ¶ 72.) It also stated that WSGP Partners already held 52.67% of Petrowax common stock. (*Id.* ¶ 73.) The Coopers were not asked to invest in Petrowax. (*Id.*)

**\*4** On May 10 and June 5, 1991, USP stockholders were informed by mail that the USP Board of Directors had restructured Petrowax's debt and provided for new equity investment in Petrowax. (*Id.* ¶ 75, Ex. F.) The June 5 memo informed USP shareholders that if Petrowax did not obtain additional financing immediately, Petrowax and USP would have to file for bankruptcy. (*Id.* Ex. G at 2.) Following these mailings, new investors came to Petrowax, including defendants WSGP Group, Southwest, The International Group, Inc. of Delaware ("IGI-Delaware"), The International Group, Inc. of Canada ("IGI-Canada"), W. Ross Reucassel ("Reucassel"), and Peter Ackerman ("Ackerman"). (*Id.* ¶ 76.) The WSGP group assumed majority control of Petrowax. (*Id.* ¶ 78.)[FN1]

> [FN1.] On October 10, 1991, defendant Simon terminated his relationship with Parsky and the WSGP entities. (Am.Compl.¶ 79.) The successor in interest to WSGP Partners was called Aurora 1800 Partners L.P., which was then succeeded by defendant Century City 1800 Partners L.P. ("Century City"). (*Id.* ¶¶ 18, 19.)

On or about June 15, 1991, USP (then insolvent) transferred its stock in Petrowax (also insolvent) to Petrowax. This stock was the sole remaining asset of USP. (*Id.* ¶ 78.)

Petrowax Files for Bankruptcy

On February 24, 1992, Petrowax filed under Chapter

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 4
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

11 in Delaware Bankruptcy Court. (Am.Compl.¶ 82.) Petrowax denied having any obligation to Cooper under the arbitration awards and court judgment against USP. (*Id.*) In November of 1994 Cooper's claims against the estate were expunged and disallowed because the bankruptcy court found that Cooper's claims were enforceable solely against USP, which at that time was only a 2.98% shareholder of Petrowax. (Plaintiffs' Opposition to Motion to Dismiss for Failure to State a Claim, Failure of Particularity, Barred by Statute of Limitations ("Pls.' Opp'n 2") at 9, Ex. 7.) The case closed in 1995. (*Id.* at 3.) Petrowax was reorganized and presently conducts sales of about $100 million per year. (Am.Compl.¶ 40.)

                    USP Files for Bankruptcy

On August 30, 1992, USP filed for bankruptcy under Chapter 7 in the Bankruptcy Court of the Southern District of New York. (Am.Compl.¶ 85.) This proceeding was closed on July 22, 1994; but reopened in 1995. (Pls.' Opp'n 2 Ex. 6.) To date, Cooper has obtained no payments from the estate. (*Id.* at 5.)

                         Arbitration

On December 20, 1988, approximately seven months after being fired, Cooper initiated an arbitration proceeding at the American Arbitration Association against USP, seeking to enforce his Employment Agreement. (Am.Compl.¶ 51.) On August 2, 1989, Cooper received an Interim Award from the arbitrator. (*Id.* ¶ 59, Ex. C.) It provided that he continue to be paid salary pursuant to his Employment Agreement, dating from November 22, 1988 until resolution of the dispute. (*Id.* Ex. C at 2.)

On October 26, 1990, Cooper received a Second Partial/Final Award of Arbitrator. (Am.Compl.¶ 69, Ex. D.) The arbitrator found no "cause" basis for Cooper's termination, and that, although Cooper might have engaged in acts that showed he refused to recognize that he was no longer CEO of USP, USP did not provide him with sufficient advance notice that continuing such behavior could result in termination. (*Id.* Ex. D ¶¶ 1-2.) Cooper was awarded salary, bonuses, incentive compensation, and health insurance for the period from November 22, 1988 through December 31, 1992 (the end of his original five-year term). (*Id.* ¶¶ 2(a)-(b), (d).) The arbitrator

also found that USP could reinstate Cooper if it wished, providing Cooper recognized that he was an employee and subordinate to the president and board of directors. (*Id.* ¶ 4.)

**\*5** Pursuant to this decision, USP reinstated Cooper on December 17, 1990. (Am.Compl.¶ 69.) However, this relationship was short-lived. (*Id.*) USP attempted to key Cooper's compensation to the $27,500 Blendermann was then receiving from USP. (*Id.*) It also situated him in an off-premises office, removed him from USP operations, and terminated him again. (*Id.*)

On April 22, 1991, Justice Davis of the New York Supreme Court reduced the Interim Arbitration Award to a judgment against USP. (*Id.* ¶ 74, Ex. E.) The Court ordered that Cooper "recover of U.S. Petroleum Corp." a number of sums. (*Id.* Ex. E at 3-5.) These sums included an amount equal to the salary and bonuses paid "directly or indirectly by USP or any related entity" to Blendermann from November 22, 1988 through the end of the original five-year term less one dollar per annum, and any incentive plan or compensation benefits as those received "directly or indirectly by, or made available to Blendermann from USP or any related entity" during the same time period, plus interest. (*Id.* at 3, 5.) USP was to inform Cooper at quarterly intervals for the next approximately two years of the exact amount of compensation Blendermann received. (*Id.* at 4-5.) USP was also to pay Cooper his actual medical expenses from November 22, 1988 to December 17, 1990. (*Id.* at 4.) The arbitrator and the Court retained jurisdiction over the matter to determine amounts payable to Cooper by USP. (*Id.* at 7-8.)

On or about June 15, 1991, Cooper served a restraining order on USP to ensure payment of his award. (Am.Compl.¶ 78.) Immediately afterwards, USP transferred its sole remaining asset, its stock in Petrowax, to Petrowax. (*Id.*)

On February 6, 1992, the Supreme Court judgment in favor of Cooper was affirmed by the First Department of the Appellate Division. (*Id.* ¶ 81.)

Cooper received a Third Partial/Final Award of Arbitrator on April 1, 1992. (*Id.* ¶ 83, Ex. H.) The order instructed USP to reinstate Cooper's medical and dental insurance pending the Final Award. (*Id.*

Not Reported in F.Supp.                                                                      Page 5
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Ex. H ¶ 1.) The Final Award of Arbitrator was awarded on July 10, 1992. (*Id.* ¶ 84, Ex. I.) It ordered USP to pay $676,411.83 to Cooper within thirty days, with interest to accrue at 9% beginning on the thirty-first day until the date of payment. (*Id.* Ex. I ¶ 1.) Cooper was also awarded reimbursement by USP for arbitration fees and expenses. (*Id.* ¶¶ 4-5.)

On September 15, 1992, Cooper received a Disposition of Application for Modification of Award of Arbitration. (Am.Compl.¶ 86, Ex. J.) The arbitrator modified the Final Award to provide that until the Award was satisfied, USP was responsible for providing Cooper with health insurance. (*Id.* Ex. J ¶ B.) In addition, the arbitrator clarified that Cooper still retained contractual rights under his Employment Agreement. (*Id.* ¶ C.)

The arbitration award has never been satisfied, and health insurance for the Coopers was never reinstated. (Am.Compl.¶ 88.) Subsequent to Cooper's termination in May 1988, his son, plaintiff Michael Cooper, developed and was treated for a cancerous condition, making him uninsurable. (*Id.* ¶ 91.) The Coopers paid these medical bills without help from insurance. (*Id.* ¶ 184.)[FN2]

> FN2. Three defendants are not mentioned in these facts:
> Defendant Wespar Insurance Brokerage Inc. ("Wespar") provided insurance to USP and Petrowax. (Am.Compl.¶ 92.) Wespar's principal shareholders were defendants Simon and Parsky. (*Id.* ¶ 93.) USP and Petrowax prepaid numerous insurance premiums of $1 million to Wespar. (*Id.*)
> Defendant IGI-Boler Inc. ("IGI-Boler") finalized a 10 year sale and distribution agreement with Petrowax in November, 1991, which provided that IGI-Boler was to sell all of Petrowax's products. (*Id.* ¶ 80.) Defendant Reucassel, Chairman of IGI-Boler, was also a director of USP and Petrowax. (*Id.*) Defendant Boler Petroleum Corporation ("Boler Petroleum") is the predecessor of IGI-Boler. (*Id.* ¶ 25.)
> Defendant Elizabeth Cole was a vice-president of USP and a vice-president and director of Petrowax. Simon and Parsky installed her as their agent to oversee various WSGP entities. She eventually received stock in Petrowax. (*Id.* ¶ 37.)

### The Current Lawsuit

**\*6** On December 14, 1995, the Cooper family filed an amended complaint against twenty-two individual and corporate defendants. (Am. Compl. at 1.) The complaint seeks monetary damages for the following causes of action: fraud, conspiracy, and acts in furtherance of conspiracy to defraud; freezing out, self-dealing, and siphoning of corporate assets; breach and substantial assistance in breach of fiduciary duty; piercing the corporate veil; breach of contract on behalf of plaintiffs as parties and as third party beneficiaries; tortious interference with contractual relations, prospective business advantage, and enforcement of arbitration awards and judgment; and intentional infliction of emotional distress. (*Id.* at 37, 43, 47, 53, 59, 63, 67, 69.)

### DISCUSSION

Defendants Parsky, Berg, Andreini, Ackerman, WSGP-Int'l, WSGP-USP, Century City, Simon, Wespar, Sacks, Sebastian, Bell, Long, Southwest, BMG, IGI-Boler, Reucassel, Boler Petroleum, IGI-Delaware and IGI-Canada [FN3] (hereinafter collectively referred to as "defendant" or "defendants") have moved to dismiss plaintiff's complaint on four grounds: lack of subject matter jurisdiction, statutes of limitation, failure to state any claim upon which relief can be granted, and failure to plead fraud with particularity. In addition, defendants Bell, Long, BMG, Southwest, Reucassel, Sebastian, Sacks, and Wespar have moved to dismiss for lack of personal jurisdiction. We consider each ground in turn.

> FN3. Defendants Elizabeth Cole and Richard Gottlieb are not included on this list. Ms. Cole has not been served with the complaint or the amended complaint, and Mr. Gottlieb has been served but has not appeared in the case. (Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Amended Complaint ("Defs.' Mem.") at 1.)

### I. Subject Matter Jurisdiction

In a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), the allegations of the complaint are construed favorably to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                   Page 6
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Atlantic Mut. Ins. Co. v. Balfour Maclaine Intern. Ltd.,* 968 F.2d 196, 198 (2d Cir.1992). The court has broad discretion as to its mode of inquiry. *Gibbs v. Buck,* 307 U.S. 66, 71-72, 59 S.Ct. 725, 83 L.Ed. 1111 (1939). If disputed issues of fact arise, the court is not limited to the complaint, but may consider conflicting written and oral evidence and decide those factual issues for itself. 2A James W. Moore, *Moore's Federal Practice* ¶ 12.07, at 12-52 (2d ed.1996); *Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947), *overruled on other grounds, Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949); *Exchange Nat. Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1130-31 (2d Cir.1976), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). The burden of proof to establish the court's power to hear the case rests with the plaintiff. *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *United Food & Commercial Workers Union, Local 919, AFL-CIO v. CenterMark Properties Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir.1994).

Plaintiff bases federal jurisdiction on diversity of citizenship under 28 U.S.C. § 1332. The law under this statute is clear: there must be complete diversity of citizenship between every plaintiff and every defendant for an action to be adjudicated in federal court. *K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 130 (2d Cir.1995).

**\*7** Plaintiff alleges that all members of the Cooper family are New York citizens; and that all defendants reside or are incorporated or organized outside New York, with principal places of business outside New York. (Am.Compl.¶ 1.) However, defendants maintain that defendant Southwest, a limited partnership, is also a New York citizen and thus its presence destroys complete diversity.

Southwest has a limited partner called Crescent Investors, L.P. ("Crescent"). Crescent's general partner is an entity entitled PEI Investors, Inc. ("PEI"), a Delaware corporation which has its principal place of business in New York City. (Defs.' Mem. at 10.) Under the Supreme Court's decision in *Carden v. Arkoma Associates,* 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990), the citizenship

of a limited partnership is determined by the citizenship of all of its members. Since PEI is a New York citizen, so also is Crescent, and so also is defendant Southwest.

Plaintiff asserts several arguments to avoid the consequences of this lack of total diversity. We address each of these arguments in turn.

A. *Crescent*

With regard to Crescent, plaintiff requests that the Court ignore its presence as a limited partner of Southwest for two reasons. First, plaintiff submits to the Court an official 1996 notice from the Delaware Secretary of State which states that because of delinquency in paying its annual taxes, Crescent lost its "good standing" on June 1, 1995. (Plaintiffs' Opposition to Motion to Dismiss for Lack of Personal Jurisdiction and Subject Matter ("Pls.' Opp'n") Ex. 11.) Plaintiff claims that this loss of standing, which had not been remedied as of the date of filing of the amended complaint, December 14, 1995, should deprive Crescent of "the power and privileges effecting [sic] diversity." (Pls.' Opp'n at 27.)

We find no merit to this argument. The same notice from the Secretary of State also makes clear that despite Crescent's loss of good standing, it "remains a domestic limited partnership." (Pls.' Opp'n Ex. 11.) Since Crescent remained in existence at the time the amended complaint was filed, its citizenship does affect the existence of diversity.

Second, plaintiff claims that Crescent was not a true substituted limited partner of Southwest, but only an "additional limited partner." (Pls.' Opp'n at 28-31.) Plaintiff argues that such a status might mean that Crescent would have no liability to plaintiff for the events that precipitated this lawsuit, and thus Crescent's presence should not be used to defeat diversity. (*Id.* at 29-30.)

We find no merit in this contention. We are satisfied that when Crescent purchased its partnership interest in Southwest from John Hancock Venture Capital Fund Limited Partnership ("Hancock") on February 16, 1995, (Bell Aff. Ex. A), it duly became a substituted limited partner of Southwest.[FN3] Therefore under *Carden* it must be considered when examining Southwest's citizenship for diversity purposes.

Not Reported in F.Supp.                                                                                                    Page 7
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

FN3. We find that Crescent complied with all the necessary technicalities to succeed Hancock as a limited partner. In accordance with Southwest's Restated Limited Partnership Agreement ("RLPA") § 8.1, (Bell Aff. Ex. B), Crescent properly obtained the approval of the general partner of Southwest (defendant BMG). Contrary to plaintiff's assertion, it is clear from the section's plain language that the approval of the other limited partners was not necessary. We find Article IX of the RLPA, regarding withdrawal of limited partners, under which plaintiff claims that Hancock did not withdraw from Southwest properly, irrelevant to Crescent's status as it seems to pertain only to those limited partners who withdraw their investments, rather than assign them to a new entity.

Crescent complied with all other necessary provisions of the RLPA: it executed a power of attorney under § 8.2, (Bell Aff. Ex. A); it obtained an opinion of counsel under § 7.1, (Webster Aff. at 4); and it completed an assignment and assumption Agreement at the behest of Southwest's general partner under § 7.2, (id. at 4). Finally, we find that according to RLPA § 7.2, Crescent did not need to assume all of Hancock's obligations to become a substituted limited partner. It was proper for Crescent to assume only those liabilities arising after January 1, 1995.

### B. PEI

**\*8** Plaintiff seems to argue that PEI does not exist, and thus should not be allowed to destroy complete diversity. (Pls.' Opp'n at 26-27.) To support this argument, plaintiff furnishes an official 1996 notice from the Delaware Secretary of State certifying that after March 1, 1995, PEI was "no longer in existence and good standing under the laws of the state of Delaware having become inoperative and void ... for non-payment of taxes." (Id. Ex. 12.)

Plaintiffs cite further evidence in support of their contention that PEI is a "phantom." (Id. at 27.) First, they argue that because PEI is listed in Crescent's certificate of limited partnership as receiving its mail "c/o Private Equity Investors, Inc., 115 East 62nd Street, New York, N.Y. 10021,"(id. Ex. 9), New York is "not necessarily [PEI's] absolute place of

business,"(id. at 25.) Second, plaintiff points out that PEI is not listed in the NYNEX Manhattan Business Telephone Directory. (Id. at 26.) Finally, plaintiff asserts that PEI has not filed to do business in New York, (id. at 27); however, the exhibit cited by plaintiff to support this assertion is a notice from the New York Secretary of State stating only that no certificate of limited partnership has been filed by Crescent, with no mention of PEI, (id. Ex. 10).

In response, defendant presents two affidavits from Charles P. Stetson, Jr., the president of PEI. Stetson states that PEI has been at all times an active and ongoing concern. (Stetson Reply Aff. ¶¶ 4-6.) He explains that PEI and Crescent fell out of favor in Delaware because the franchise tax bills for both entities were sent to a New York law firm, which inadvertently neglected to forward the bills. (Id. ¶¶ 3, 5.) Stetson claims that Crescent's loss of good standing was "unbeknownst" to him, and assures that the tax problems of both Crescent and PEI are "being remedied." (Id.) He lists the New York State and City tax returns filed by Crescent in 1995 and PEI in 1993 and 1994, and states that PEI has received an extension of time to file its 1995 New York tax returns. (Id. ¶¶ 4, 6.) Stetson states that he is also the president of Private Equity Investors, Inc., and that he has the mail for PEI sent to Private Equity Investors, Inc. "for reasons of convenience and to avoid confusing postal workers and delivery personnel." (Id. ¶ 6.)[FN4]

FN4. Stetson also states that Crescent had at least one other New York-based limited partner at the time Cooper's complaint was filed; namely, the Wenner-Gren Foundation For Anthropological Research, Inc., a non-profit entity with its principal place of business in New York City. (Stetson Reply Aff. ¶ 7.) This fact further supports our finding that diversity is lacking.

We credit the truthfulness of this affidavit, and find that plaintiff has not produced enough evidence to show that PEI, as a factual matter, did not exist in December of 1995. However, as a matter of law, we must consider the effect of Delaware's having declared PEI "no longer in existence" and "inoperative" for nonpayment of taxes on March 1, 1995, a situation which had not been rectified at the time the amended complaint was filed.

The Delaware Supreme Court addressed this issue in

Not Reported in F.Supp.                                                                                                   Page 8
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

*Frederic G. Krapf & Son, Inc. v. Gorson,* 243 A.2d 713 (Del.1968). *Krapf* involved similar facts: the president of a Delaware corporation had inadvertently neglected to file his annual reports and pay taxes. Consequently, his corporation acquired the same "inoperative" status as did PEI. Unaware, the president continued to do business under the corporate name. Ultimately he was sued upon a contract in his individual capacity, but the court found that forfeiture of the corporation's charter for nonpayment of taxes did not prevent the corporation from being sued. The court reasoned that failure to pay franchise taxes was an issue solely between the corporation and the state, and did not affect transactions between private parties as long as the corporate officers had acted in good faith. It also noted the ease with which corporations could be reinstated and all interim transactions validated simply by paying the overdue tax. *Id.* at 714-15.

**\*9** Accordingly, we find that PEI was capable of being sued at the time the amended complaint was filed on December 14, 1995. We find no evidence of bad faith on its president's part in inadvertently letting the corporation's charter lapse. Since PEI is a New York citizen, defendant Southwest is a New York citizen, and diversity of citizenship is defeated. Either Cooper must drop his claim against Southwest as he has proposed, (Am. Compl. ¶ 21; Pl's Opp'n at 24), or the case must be dismissed. We will assume for the purposes of this Report and Recommendation that plaintiff will drop Southwest as a defendant. Consequently, we also consider defendants' other bases for their motion to dismiss, assuming that Southwest is no longer a party to the action.

II. Personal Jurisdiction

Defendants Southwest, BMG, Bell, Long, Reucassel, Sacks, Sebastian, and Wespar have moved to dismiss for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2). As we consider Southwest no longer a party to the action, we will consider the motion only as it relates to the other defendants.

Since this is a diversity case, we apply the law of the forum state to determine whether there is personal jurisdiction over the remaining defendants. *Agency Rent A Car System, Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 29 (2d Cir.1996). Plaintiff concedes that all of these defendants are non-domiciliaries of New York. Therefore we analyze whether personal jurisdiction exists under N.Y. C.P.L.R. 301 and 302

(McKinney 1990).

C.P.L.R. 301 provides that "[a] court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." This provision provides for jurisdiction over a foreign corporation, with respect to any cause of action, that is "doing business" and is therefore "present" in New York. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 58 (2d Cir.1985). The business must be continuous and systematic. *Id.* Factors New York courts examine in deciding whether a corporation is doing business in New York include the existence of an office in the state, the solicitation of business in the state, the presence of bank accounts and other property in the state, and the presence of employees of the defendant in the state. *Id.*

C.P.L.R. 302, the long-arm statute, provides for personal jurisdiction over a nondomiciliary for causes of action "arising from" one of several acts enumerated in the statute. The nondomiciliary must be one who, in person, or through an agent,
(1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or
(2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
(3) commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
**\*10** (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or
(iii) owns, uses or possesses any real property situated within the state.

The standard for "transacting business" under this statute is less stringent than that for "doing business" under 301. *Hoffritz for Cutlery, Inc.,* 763 F.3d at 58. Factors a court will consider in determining whether an out-of-state defendant transacted business in New York include whether the defendant has an on-going contractual relationship with a New York corporation, whether the contract was negotiated or executed in New York, whether the defendant has visited New York to meet with parties to the contract regarding the relationship, and the choice-of-law

Not Reported in F.Supp.                                                                                    Page 9
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

clause in the contract. *Agency Rent A Car System, Inc.,* 98 F.3d at 29. The ultimate determination is based on a totality of the circumstances. *Id.* With respect to the "arising from" requirement, the statute requires a "substantial nexus between the business transacted and the cause of action sued upon." *Id.* at 31 (quotations and citations omitted).

Jurisdiction under either section must also satisfy the constitutional requirement of due process. *See id.* at 32. The exercise of jurisdiction must be based on defendants' "minimum contacts" with the state and must comport with "traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Plaintiff bears the burden of establishing jurisdiction over the defendant. *Hoffritz for Cutlery, Inc.,* 763 F.2d at 57. However, plaintiff need only make a prima facie showing that jurisdiction exists, and all pleadings and affidavits will be construed in the light most favorable to plaintiff. *Id.* Any doubts will be resolved in plaintiff's favor. *Id.*

### A. *BMG Partners, J. Michael Bell, and John L. Long, Jr.*

BMG Partners is the general partner of the limited partnership Southwest, which invested in USP on December 22, 1987. (Am.Compl.¶ 45.) As part of this transaction, Long, an employee of BMG, became a director of USP. (*Id.*) He remained a director until April 5, 1988, at which time he was replaced by Bell, who was and remains the managing general partner of BMG. (*Id.* ¶ 36; Bell Aff. ¶ 4.) BMG eventually became a limited partner in WSGP-USP LP, which replaced plaintiff as majority shareholder of USP on May 5, 1989. (Pl's Opp'n at 22; Am. Compl. ¶ 54.) Bell and Long are both domiciliaries and residents of Texas, and BMG is a Texas partnership with its sole place of business in Texas. (Bell Aff. ¶¶ 2, 3; Long Aff. ¶ 2.)

**\*11** Plaintiff alleges that these three defendants are subject to personal jurisdiction in New York by virtue of their involvement with USP and Petrowax, both New York corporations.[FN5]

> FN5. Both USP and Petrowax are corporations organized under Delaware law,

and both had their original principal places of business in the same office in New York City. (Am.Compl.¶¶ 39, 40.) Petrowax subsequently relocated outside of the state. (Pl.'s Opp'n at 23.)

### 1. *BMG Partners*[FN6]

> FN6. We note that although defendant Southwest, a limited partnership, has been dismissed from the action because its presence defeated diversity, its general partner BMG is still a proper defendant. The Supreme Court in *Carden* held only that a limited partnership's citizenship is determined by the citizenship of all of its partners. *Carden v. Arkoma Associates,* 494 U.S. at 1021; *Freeport-McMoRan, Inc. v. K N Energy. Inc.,* 498 U.S. 426, 428, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991). Since Southwest had a limited partner that was a New York citizen, it had to be dismissed. However, Southwest's general partner, BMG, has been sued as a separate entity. Since BMG is a Texas citizen, its presence does not destroy diversity, and subject matter jurisdiction exists over it as an individual entity apart from Southwest. *See Curley v. Brignoli, Curley & Roberts Associates,* 915 F.2d 81, 90 (2d Cir.1990) (dismissing limited partnership because its presence destroyed diversity, but retaining jurisdiction over the general partner of the limited partnership) *cert. denied,* 499 U.S. 955, 111 S.Ct. 1430, 113 L.Ed.2d 484 (1991).

Plaintiff alleges only the following connections between BMG and New York State: on December 22, 1987, BMG, as Southwest's managing general partner, (Bell Aff. ¶ 4), caused Southwest to execute an investment agreement with USP, (Am.Compl.¶ 45). Plaintiff alleges that BMG then "controlled" the entry of the WSGP group as investors in USP in late 1988, and "acted in concert" with WSGP when WSGP became a limited partner of WSGP, and helped WSGP take over majority ownership of USP in 1989. (Pls.' Opp'n at 22-23; Am. Compl. ¶¶ 54, 97.) Plaintiff asserts that BMG "joined forces" with the WSGP group, and that the business transactions that ensued constituted tortious acts against the plaintiffs. (*Id.* at 23-24.)

Not Reported in F.Supp.                                                                                  Page 10
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

These allegations do not meet the standards required for a New York court to assert personal jurisdiction over BMG under C.P.L.R. 301 or 302. For the purposes of 301, a corporation must be doing business in New York at the time of the filing of the amended complaint. *See Andros Compania Maritima S.A. v. Intertanker Ltd.,* 714 F.Supp. 669, 675 (S.D.N.Y.1989); *Arrow Trading Co., Inc. v. Sanyei Corp. (Hong Kong), Ltd.,* 576 F.Supp. 67, 69 (S.D.N.Y.1983). Plaintiffs do not allege that BMG was doing business in New York in 1995; in fact, plaintiffs do not allege any specific actions taken by BMG after 1989. Nor do plaintiffs allege that BMG was conducting business in New York on a continuous and systematic basis in 1995: they fail to allege that BMG had an office in the state, solicited business in the state, had bank accounts or other property in the state, or had any employees in the state. *Hoffritz for Cutlery, Inc.,* 763 F.2d at 58.

There is also not enough information in the record to support a finding of jurisdiction under the long-arm statute. Plaintiffs' allegations do not meet the "transacting business" standard: plaintiffs do not allege that BMG has an ongoing contractual relationship with a New York corporation, nor do they claim that the original investment agreement with the now-bankrupt USP was executed in New York, nor is any evidence given about the choice of law clause in that agreement. *Agency Rent A Car System. Inc.,* 98 F.3d at 29.

Even if BMG did transact business in New York, plaintiffs have not demonstrated how their causes of action for fraud, breach of fiduciary duty, breach of contract, tortious interference, or intentional infliction of emotional distress arose out of BMG's investment agreement with USP. Conclusory allegations that BMG joined forces with other investors and ran USP and Petrowax in a manner that proved "tortious and injurious" to the plaintiffs, leading to the bringing of these causes of action, are not enough of a nexus. (Pls.' Opp'n at 24.) In order to assert jurisdiction under C.P.L.R. 302(a)(1), plaintiff's claim must arise out of the business conducted or the contract to supply goods or services itself, "[f]or instance ... when the plaintiff's claim is directly related to the activity purposefully directed at New York by the defendant." *Laumann Mfg. Corp. v. Castings USA, Inc.,* 913 F.Supp. 712, 716 (E.D.N.Y.1996). Plaintiffs have not shown that their claims are directly related to, or have any connection to, the investment agreement between Southwest and USP.

*12 There is also no ground to assert jurisdiction over BMG for tortious behavior since, as we find below, plaintiffs' complaint fails to state any tort cause of action. Even if BMG's investment in USP somehow constituted tortious conduct toward the plaintiffs, plaintiffs fail to allege any tortious behavior that took place in New York under C.P.L.R. 302(a)(2). If plaintiffs are claiming that the alleged torts took place outside the state, they have failed to allege the other necessary components of C.P.L.R. 302(a)(3)(i), (ii), or (iii).

### 2. J. Michael Bell and John L. Long, Jr.

We also find that there is no personal jurisdiction over J. Michael Bell. Bell was a managing general partner of BMG, an outside director of USP from 1988-1991, and a Petrowax board member. (Bell Aff. ¶¶ 4, 11.) We also find no personal jurisdiction over John L. Long, Jr., who during the late 1980s was also a general partner of BMG, and served as an outside director of USP from late December of 1987 to early April of 1988. (Long Aff. ¶ 11; Pls.' Opp'n at 20.) Both Bell and Long are domiciled in Texas and transact all of their business in Texas. (Bell Aff. ¶¶ 2, 4; Long Aff. ¶¶ 2, 4.) Plaintiff alleges that both Bell and Long made certain misrepresentations to him over the phone and at their Texas offices that led him to sign the Voting and Employment Agreements in late December of 1987. (Am. Compl. ¶¶ 48, 49; Bell Aff. ¶ 10; Long Aff. ¶ 10.) Plaintiff also alleges that Bell and Long controlled BMG's business transactions in New York, and as part of the boards of USP and Petrowax controlled those entities' actions also. (Pls.' Opp'n at 19, 21, 23.)

Even if true, these statements fail to allege facts sufficient for the Court to assert jurisdiction over these two defendants. Plaintiff does not allege that either defendant personally does business in New York. We have already found that BMG did not do or transact business in New York. Misrepresentations made over the phone or in Texas do not meet the requirements of 302(a)(3) because even if they constituted tortious activity outside the state that caused harm inside, plaintiff has failed to allege the other necessary components of 302(a)(3)(i), (ii), or (iii).

As for Bell and Long's serving as outside directors of USP and on the board of Petrowax, that in itself does

Not Reported in F.Supp.                                                          Page 11
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

not support jurisdiction. Merely serving on the board of directors of a corporation doing business in New York is not enough to subject directors to personal jurisdiction in New York, without allegations that those directors dominated and controlled the corporation or otherwise used it to further their own personal business rather than corporate business. *See Seiko Time Corp. v. Pascual,* 117 F.R.D. 354, 356 (S.D.N.Y.1987); *Faim Information Services, Inc. v. Borchert,* 395 F.Supp. 878, 880 (S.D.N.Y.1975). Plaintiff makes no such allegations. Even if serving as a director qualified as transacting business within the state, plaintiffs fail to allege the necessary nexus between actions taken by Bell or Long as directors and any injury to plaintiffs.[FN7]

> FN7. The only specific activity plaintiffs allege is that Bell consented to Petrowax filing for bankruptcy at a special board meeting in February of 1992. As we explain below, plaintiffs have alleged no nexus between Petrowax's reorganization and their injuries.

**\*13** Thus we find that there is no personal jurisdiction over BMG, Bell, or Long.

### B. *W. Ross Reucassel*

Defendant Reucassel, a Canada resident and domiciliary, is the CEO of defendant IGI-Delaware. (Reucassel Aff. ¶¶ 1, 2.) He signed an exclusive ten year distribution agreement between Petrowax and defendant IGI-Boler in November of 1991. (Am.Compl.¶ 80.) Plaintiff alleges that this agreement was not in Petrowax's best interest. (*Id.* ¶ 113.) Plaintiff also alleges that IGI-Boler continually breached this agreement, but the agreement was not enforced because Reucassel was a director of USP and Petrowax.[FN8] (*Id.* ¶¶ 38, 80.) Plaintiff also alleges that Reucassel invested $1 million with defendant Ackerman in the reorganization of Petrowax. (*Id.* ¶ 38.) Reucassel states in his affidavit that he was never a director of Petrowax, and that as a director of USP he attended two board meetings, one in New York and one in Pennsylvania. (Reucassel Aff. ¶ 5.) He also states that the $1 million investment was made by IGI, not him personally. (*Id.* ¶ 7.)

> FN8. As we discuss below in connection with plaintiff's breach of fiduciary duty allegations, claims concerning financial

damage to Petrowax are derivative in nature and belong to the corporation, not to plaintiff.

Plaintiff makes no assertions to support a finding that Reucassel conducts ongoing business in New York such that he would be subject to jurisdiction under C.P.L.R. 301. Presumably, plaintiff relies on C.P.L.R. 302 when he asserts that because Reucassel served on the board of USP, and was CEO of IGI-Boler, he should be held responsible for those corporations' perceived wrongdoings towards plaintiff. (Pls.' Opp'n at 33, 34.)

However, this ground is insufficient for the Court to assert personal jurisdiction over a nondomiciliary. As we noted above, a director of a corporation will not be found to be transacting business in New York under 302(a)(1) in the absence of allegations that he treated the corporation as an alter ego through which he conducted personal business. Plaintiff has supplied no evidence that either USP or IGI-Boler were alter egos for Reucassel. If a corporation is not an alter ego, a director will only be held personally liable to the corporation or to shareholders if he does not fulfill his responsibility to act in the best interest of the corporation, or if he is inattentive to his responsibilities. 19 *Fletcher Cyc. Corp.* § 3:10.5 (Perm. Ed.). Plaintiff nowhere alleges that Reucassel failed to act in the best interest of USP, nor that he was inattentive to any responsibilities to the corporation.

There are also no allegations that Reucassel committed a tort in New York, other than vague allegations that as part of the USP board he didn't "oppose [ ] or disagree[ ]" with any alleged wrongdoing. (Pls.' Opp'n at 33.) There is also no allegation that Reucassel committed a tort outside New York which had an effect inside the state. Therefore we find that there is no personal jurisdiction over this defendant.

### C. *Michael J. Sacks*

The only specific allegations plaintiff makes about defendant Sacks is that he was an investor in USP. (Am.Compl.¶ 34.) Plaintiff alleges that certain activity in connection with that investment, specifically, the retroactive conversion of a bridge loan to USP into preferred stock, was a fraudulent, tortious act that damaged the plaintiff's shareholdings

Not Reported in F.Supp.                                                                                      Page 12
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

in USP. (*Id.* ¶ 65; Pls.' Opp'n at 36.) Plaintiff also alleges that Sacks knew about and acquiesced in any wrongdoing by other investors. (Pls.' Opp'n at 38.)

**\*14** These allegations fail to make out a prima facie case for personal jurisdiction over this defendant. The complaint does not allege that Sacks, an Illinois domiciliary, does business in New York as contemplated by C.P.L.R. 301. As for C.P.L.R. 302, the only business transacted in New York that plaintiff alleges is an investment in USP.[FN9] We have already seen that a nonresident director of a New York corporation will not be subject to personal jurisdiction on the basis of that status alone. The same is true for a New York corporation's shareholders. Even a controlling shareholder will not be subject to personal jurisdiction unless the record justifies piercing the corporate veil. *Ferrante Equipment Co. v. Lasker-Goldman Corp.,* 26 N.Y.2d 280, 283, 309 N.Y.S.2d 913, 916, 258 N.E.2d 202 (1970). Since this record does not justify piercing the corporate veil, as we explain below, we may examine only Sacks' individual actions in determining whether there is personal jurisdiction over him. *Id.* We find that Sacks, as a minority shareholder in USP who was not present in New York in connection with any of the transactions or events alleged in the complaint, is not subject to jurisdiction under C.P.L.R. 302. (Sacks Aff. ¶ 11.)

> FN9. Plaintiff alleges that the conversion of the loan into preferred stock was tortious and fraudulent, but he supports that claim only with allegations that the restructuring was done for defendants' pecuniary benefit, and that Petrowax's bankruptcy application described the loan inconsistently with an earlier description written by Deloitte & Touche in an audit of USP. (Compl. ¶ 65; Pl.'s Opp'n 2 at 36-37.) Even if the restructuring were somehow a tortious act committed by Sacks, plaintiff fails to allege C.P.L.R. § 302(a)(3)(ii)'s additional requirement that an out-of-state tortfeasor who expects his acts to have consequences in New York must also derive substantial revenue from interstate or international commerce.

D. *Raymond F. Sebastian*

The only allegations plaintiff makes about defendant Sebastian, a California domiciliary, that are relevant

to this case [FN10] are that he was a director of USP, that he participated with defendants Bell and Long in convincing plaintiff to sign the Employment and Voting Agreements over the phone or in Texas, and that he invested in USP and Petrowax. (Am.Compl.¶¶ 33, 48, 49, 97.) For the reasons stated earlier, we find that these allegations do not meet the requirements of C.P.L.R. 301 or 302, and we find that there is no personal jurisdiction over Sebastian.

> FN10. Plaintiffs also mention Sebastian's employment and investment in other unrelated oil and gas ventures, presumably to establish a basis for jurisdiction under C.P.L.R. § 301. (Am.Compl.¶ 33.) However, we credit Sebastian's affidavit, in which he states that he did not conduct any business in New York with respect to these other ventures, and find that he does not "do business" in New York. (Sebastian Aff. ¶¶ 2, 3.)

E. *Wespar Insurance Brokerage, Inc.*

Plaintiff states that Wespar is a corporation, owned by defendants Simon and Parsky, that provided insurance to USP and Petrowax. (Am.Compl.¶ 20.) The only allegation against Wespar is that it caused USP and Petrowax to prepay insurance premiums of at least $1 million, and that these payments were fraudulent because they came from insolvent corporations, and constituted self-dealing by Simon and Parsky. (*Id.* ¶ 93, 112,309 N.Y.S.2d 913, 258 N.E.2d 202.) Plaintiff Cooper alleges that these payments were detrimental to his position as a creditor. (*Id.* ¶ 93, 309 N.Y.S.2d 913, 258 N.E.2d 202).

Plaintiff seeks to assert jurisdiction over Wespar pursuant to C.P.L.R. 301 because it "continually" did business with New York entities USP and Petrowax. (Pls.' Opp'n at 41.) However, plaintiff has not alleged that Wespar was "doing business" at the time the complaint was filed. *See Andros Compania Maritima S.A.,* 714 F.Supp. at 675;*Arrow Trading Co., Inc.,* 576 F.Supp. at 69. According to an affidavit from an officer of Wespar, Wespar has been inactive since 1992, while the amended complaint was filed in 1995. (Cregan Aff. ¶ 4.) In addition, before that time, Wespar maintained no offices in New York, and had no employees, bank accounts, or property in New York. (*Id.* ¶ 6.) It seldom transacted business in New York, and negotiations with regard to Wespar's

Not Reported in F.Supp.                                                                                    Page 13
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

insuring USP and Petrowax were held mainly in Pennsylvania. (*Id.* ¶¶ 6, 7.) We therefore find that Wespar is not "present" and doing business in New York under C.P.L.R. 301.

**\*15** Jurisdiction also does not exist under the long-arm statute. Even if supplying USP and Petrowax with insurance in 1990, (Cregan Aff. ¶ 8), and presumably ceasing to do so when Wespar became inactive in 1992, constituted transacting business within the state or contracting anywhere to supply goods or services in the state, plaintiff has not shown how his cause of action arises from this transaction. Wespar's only alleged wrongdoing was to have "caused" its insurance premiums to be prepaid by USP and Petrowax, which plaintiff alleges were insolvent at the time, without interest. (Am.Compl.¶¶ 93, 112.) Plaintiff has not demonstrated the required "substantial nexus" between the insurance contract and his own causes of action. *Agency Rent A Car,* 98 F.3d at 31. The only connection plaintiff alleges is that the payment of those insurance premiums to Wespar was essentially fraudulent self-dealing by Simon and Parsky that hurt his claim as a creditor. (Am. Compl. ¶ 93; Pls.' Opp'n at 41.) This claim is not directly related to the insurance agreement between Wespar and USP or Petrowax, nor to the insurance services that Wespar purposefully directed at New York. *Laumann Mfg. Corp.,* 913 F.Supp. at 716. Therefore, we find that no long-arm jurisdiction exists over Wespar.

### III. Claim By Claim Analysis

#### A. *Fraud*

Plaintiff's Count I seeks damages based on fraud and civil conspiracy. (Am. Compl. at 37.) Because New York does not recognize a tort action for civil conspiracy, we will address the fraud claim only. *Ivy Mar Co., Inc. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 562 n. 13 (E.D.N.Y.1995); *Wall Street Transcript Corp. v. Ziff Communications Co.,* 225 A.D.2d 322, 638 N.Y.S.2d 640 (1st Dep't.1996).

Plaintiff claims that defendants engaged in numerous fraudulent activities as part of a plan to take over ownership and control of USP and Petrowax and use the companies for their own personal gain, to the detriment of plaintiff. (Am. Compl. ¶ 95, 100, 101; Pls.' Opp'n 2 at 36.) The allegedly fraudulent steps include fraudulent representations by BMG Partners,

Long, Bell and Sebastian to induce the plaintiff to enter into the Voting and Employment Agreements, (Am.Compl.¶ 98, 99); fraudulent takeover of majority control of USP by Simon Parsky, the WSGP group, BMG, Bell, Long, Andreini, and Sebastian, (*id.* ¶ 97); fraudulent creation and funding of Petrowax, (Pls.' Opp'n 2 at 36); fraudulent masking of Blendermann's salary by all defendants by placing him on both the Petrowax and USP payrolls, (Am.Compl.¶ 89); fraudulent assumption of majority control of Petrowax by Ackerman and WSGP, (*id.*); defrauding of shareholders and creditors of USP by all defendants, (*id.* ¶ 101); fraudulent dismantling of USP by all defendants, (*id.* ¶ 13); fraudulent transfer of assets from USP to Petrowax by all defendants except Wespar, (*id.* ¶ 102); fraudulent causing of the plaintiff's insurance to be terminated by all defendants, (*id.* ¶ 90); fraudulent avoidance of compliance with the arbitration and judgment against USP by each of the defendants except Wespar, (*id.* ¶ 103); fraud upon the general public by disregarding the judicial system by all the defendants except Wespar, (*id.*); fraudulent treatment of creditors and the general public by defendants who filed for bankruptcy on behalf of USP and Petrowax in two different jurisdictions, (*id.* ¶ 40); and fraudulent "freezeout" of the plaintiff during bankruptcy, (Pls.' Opp'n 2 at 36).

**\*16** Defendants have moved to dismiss the fraud claim on a number of grounds. We consider each in turn.

#### 1. *Failure to State a Claim*

Defendants move under Fed.R.Civ.P. 12(b)(6) to dismiss the fraud claims for failure to state a claim upon which relief can be granted. Such a motion tests the legal sufficiency of the complaint, and should be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The movant bears the burden of persuasion, and the facts alleged by the nonmovant are assumed to be true. *Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). However, "[w]hile the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996).

To maintain a claim for fraud, plaintiff must prove: "(1) the defendant made a material false

Not Reported in F.Supp.                                                                                                     Page 14
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., Revenue Recovery, Inc., George Beladino,* 98 F.3d 13, 19 (2d Cir.1996) (quoting *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank,* 57 F.3d 146, 153 (2d Cir.1995)).

Almost all of the events plaintiffs claim were fraudulent fall outside of this definition by virtue of the fact that they did not involve any representations by any defendant to any of the plaintiffs. Most of the fraud alleged consists of corporate transactions entered into long after plaintiff Cooper was fired. The only alleged fraudulent events that did involve representations to the plaintiffs were statements made by defendants Long, Bell and Sebastian to induce the plaintiffs to enter into the Voting and Employment Agreements. However, as we discuss below, even if defendants intended to defraud the plaintiffs with these statements, plaintiffs cannot maintain a claim for fraud because they were not justified in relying upon those statements.

Plaintiffs allege that in order to convince them to enter into the Voting Agreement, defendants Long, Bell, and Sebastian told plaintiffs that the voting of their shares would be "purely ministerial, and for administrative purposes." Plaintiffs claim that these statements were false at the time they were made, and were spoken to conceal the "true objective of having the power to dilute the Cooper holdings." (Am.Compl.¶ 48.)

When they signed the Voting Agreement, plaintiffs forfeited the power to vote their 71% interest in USP for 10 years. According to the Agreement, they did so "to enhance the continuity of the management of the company." (*Id.* Ex. B at 1.) Defendants argue that plaintiffs could not have justifiably relied on statements that such voting would be purely ministerial and administrative. We agree. Plaintiffs voluntarily turned over total power and control to the new investors to vote all of their shares. The agreement specifically stated that the new directors "shall not be held by this Agreement to any specified standard of care." (*Id.* at 3.)

*\*17* It is a basic rule that a party may not rely on representations made during negotiations when the

"plain and unequivocal language" of the written agreement makes no mention of any earlier understanding. *See SKR Resources, Inc. v. Players Sports, Inc.,* 938 F.Supp. 235, 240 (S.D.N.Y.1996). When the terms of a written agreement contradict alleged oral representations "in a meaningful fashion ... the conflict between the provisions of the written contract and the oral representations negates the claim of reliance upon the latter." *Bango v. Naughton,* 184 A.D.2d 961, 963, 584 N.Y.S.2d 942, 944 (3d Dep't.1992); *M.H. Segan Ltd. Partnership v. Hasbro, Inc.,* 924 F.Supp. 512, 527 (S.D.N.Y.1996); *AFG Industries, Inc. v. Empire Glass Co., Inc.,* 226 A.D.2d 487, 641 N.Y.S.2d 106 (2d Dep't.1996). The plain language of the Voting Agreement states that the plaintiffs delegated all power to vote their shares, and specified that the voters would not be bound by any fiduciary duty. In light of those provisions, plaintiffs were not justified in believing the alleged oral representations that such a huge delegation of power would be treated by the new board of directors as a mere administrative convenience, and that "no radical or policy making decisions would be taken unilaterally" without plaintiffs' advice and consent. (Am.Compl.¶ 98.)

With regard to the Employment Agreement, plaintiff alleges that he was promised by the same three defendants that in exchange for giving up his position as Chairman and CEO, he would be kept informed of all day to day activities, and participate in all policy making decisions of the USP board of directors. (*Id.* ¶ 49.) Again, defendant argues that plaintiff was not justified in relying on any other statements besides those in the written agreement. We agree.

The Employment Agreement states only that Cooper was to serve as a "senior employee consulting to the Board of Directors on corporate planning and strategy of the Company." (Am. Compl. Ex. A ¶ 2.) The agreement also contains an integration clause, which states, inter alia, that it contains "the entire understanding and agreement between the parties ... and supersedes any prior understanding or agreement...." (*Id.* ¶ 13.) In light of the plain language in the contract stating that Cooper was to serve only as a senior consultant, he was not justified in relying on any oral representations stating that he would retain a very involved role, where those representations were not memorialized in his contract.[FN11] Since plaintiff's claims either do not involve any representations made to plaintiff, or fail to satisfy the requirement of justifiable reliance, we

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 15
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

find that his allegations of fraud fail to state a claim upon which relief can be granted.

> FN11. We note that if plaintiff had chosen to plead fraud in the inducement with respect to these alleged misrepresentations, such a claim would also fail. To sustain this cause of action under New York law, plaintiff must prove (1) a misrepresentation by defendant; (2) of a material fact; (3) which was false; (4) and known to be false by defendant at the time it was made; (5) that the misrepresentation was made for the purposes of inducing plaintiff to rely on it; (6) that plaintiff rightfully relied on it; (7) in ignorance of its falsity; (8) to plaintiff's injury. *Kaplan v. Vincent,* 937 F.Supp. 307, 319 (S.D.N.Y.1996). As we discussed above, plaintiff cannot prove rightful reliance on any oral misrepresentations which conflicted with express provisions in the written agreements.

### 2. Failure to Plead Fraud with Particularity

Even if plaintiff had stated a claim for fraud, the fraud claim should be dismissed under Fed.R.Civ.P. 9(b) for failure to allege the circumstances constituting that fraud with particularity. To survive a motion to dismiss under Rule 9(b), plaintiff's complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993) (citing *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989)). A complaint must identify the particular misrepresentations made by the various defendants to each of the plaintiffs. *Butala v. Agashiwala,* 916 F.Supp. 314, 322 (S.D.N.Y.1996).

**\*18** Plaintiff's complaint fails throughout to allege concrete examples of fraudulent misrepresentation by any individual defendant to any individual plaintiff. Most of the fraud is alleged to have been perpetrated by all twenty-two defendants, with no mention of actual statements by any one of them. (Am.Compl.¶¶ 13, 89, 90, 101.) Such vague references to "defendants" as speakers is insufficient under Rule 9(b). *Lomaglio Associates Inc. v. LBK Marketing Corp.,* 876 F.Supp. 41, 44 (S.D.N.Y.1995).

The closest the complaint comes to specifying any fraudulent statements by individual defendants is plaintiff's allegation that defendants BMG, Long, Bell, and Sebastian "represent[ed] [to plaintiffs] ... that Cooper would continue in his operative capacity at U.S. Petroleum, and that in essence only his title as Chairman and CEO was being changed, and that the shares would be voted solely for administrative purposes, and that no radical or policy making decisions would be taken unilaterally." (Am.Compl.¶ 98.) These statements were made "in phone conversations during November and, December up to December 22, 1987. [There were also] ... personal conversations at [Bell, Long, and Sebastian's] respective offices." (Am.Compl.¶ 49.)

However, even this allegation fails to meet the 9(b) pleading standard. The complaint does not identify the specific plaintiffs to whom these representations were made, nor specifically which defendants made which representations. *Butala v. Agashiwala,* 916 F.Supp. at 322. Also, a period of months is not sufficient identification of the time of the statements for 9(b) purposes. *See Lomaglio Associates Inc. v. LBK Marketing Corp.,* 876 F.Supp. at 41.[FN12]

> FN12. Even if this allegation were pleaded with sufficient particularity, a cause of action for fraud relating to these events is time-barred (see below).

Also, to satisfy Rule 9(b), plaintiff must allege scienter. Although knowledge may be averred generally, plaintiff must plead an "ample factual basis" to support its charges. *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991). To survive dismissal, plaintiff must plead facts that give rise to a strong inference of fraudulent intent either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994). Claims of fraud based on speculation or conclusory allegations will not suffice. *O'Brien v. National Property Analysts Partners,* 936 F.2d at 676.

Plaintiff has failed to adequately plead scienter. Although the complaint avers scienter generally in numerous places, e.g., "each of the defendants ... engaged in deliberate, intentional and malicious acts," (Am.Compl.¶ 103), the complaint fails to

Not Reported in F.Supp.                                                                                      Page 16
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

provide anything more than conclusory allegations. No facts are provided upon which the Court could conclude that the management of USP and Petrowax was done with the intent to defraud plaintiff.

**\*19** The only motive that plaintiff suggests is defendants' desire for their own personal monetary gain. (Am.Compl.¶¶ 100, 101.) Although this may be a motive that leads to the commission of fraud in some instances, plaintiff has not offered any facts to evoke a strong inference that the investments and structuring that took place in this case were done with the intent to defraud plaintiff. We are supplied only with speculation and conclusory allegations as to defendants' "fraudulent intent to control a business, so as to milk it without interference, and eventually take it over entirely." (Pls.' Opp'n 2 at 32.) This is not enough information about defendants' state of mind to satisfy the pleading requirement of scienter under Rule 9(b).

We note that normally, a plaintiff whose cause of action is dismissed under Rule 9(b) is granted leave to amend the pleading. 2A James W. Moore, *Moore's Federal Practice* ¶ 9.03[5], at 9-58 (2d ed.1996). However, in light of the numerous infirmities contained in the rest of the amended complaint, granting such leave would not save the complaint and thus is not a viable option.

### 3. Statute of Limitations

Even if plaintiff had stated a claim for fraud and had pled it with the necessary particularity, he may recover only for those events which occurred after December 14, 1989.

Since this is a diversity action, we examine New York's choice-of-law rules in order to decide which statutes of limitation apply. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under New York law, New York residents such as the plaintiff get the benefit of New York's statute of limitations whether the cause of action accrued outside or inside the state. *See Stafford v. International Harvester Co.,* 668 F.2d 142, 152-54 (2d Cir.1981); C.P.L.R. 202.

Actions for fraud must be brought within six years of the commission of the wrong or two years from its discovery, whichever is later. C.P.L.R. 203(g), 213(8); *Lazzaro v. Kelly,* 87 A.D.2d 975, 450

N.Y.S.2d 102 (4th Dep't.), *aff'd,*57 N.Y.2d 630, 454 N.Y.S.2d 59, 439 N.E.2d 868 (1982).

Defendants claim that most of the instances of fraud plaintiff cites occurred more than six years before the amended complaint was filed on December 14, 1995, and that the plaintiff had been aware of the fraud for far longer than two years before that date. Plaintiff argues that his fraud claim should be analyzed under a "continuing wrong" theory, and that this theory should save from being time-barred those claims that accrued more than six years before the filing of the amended complaint.[FN13] Under the continuing wrong theory, the statute of limitations does not begin to run until the end of the completed fraud, which according to plaintiff was in 1995 with the completion of the Petrowax bankruptcy proceedings. (Pls.' Opp'n 2 at 36.)

> FN13. The fraudulent events alleged to have occurred prior to December 14, 1989 are the misrepresentations by Bell, Long and Sebastian in November and December of 1987, the signing of the Employment and Voting Agreements in December 1987, the acquisition of majority control of USP by the WSGP group in May 1989, and the formation of Petrowax on December 6, 1989.

We find that the continuing wrong doctrine does not apply in this case. The doctrine is meant to protect plaintiffs from unfair preclusion of suit based upon earlier events when the damages stemming from those events were not predictable until after the limitations period had run. *Kahn v. Kohlberg, Kravis, Roberts & Co.,* 970 F.2d 1030, 1039 (2d Cir.1992) (noting that federal courts had utilized the doctrine in the antitrust, civil rights, and copyright infringement contexts), *cert. denied,*506 U.S. 986, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992). On the contrary, in this case, plaintiff was well aware of his damages very soon after he signed the Agreements, when he was treated inconsistently with his contract and the defendants' assurances, in what he terms a fraudulent manner, and then terminated. The limitations period began to run from the time of this first wrongful act. "To permit him to wait and toll the running of the statute simply by asserting that a series of separate wrongs were committed pursuant to a conspiracy would be to enable him to defeat the purpose of the time-bar, which is to preclude the resuscitation of stale claims." *Singleton v. City of New York,* 632 F.2d

Not Reported in F.Supp.                                                                                    Page 17
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

185, 192 (2d Cir.1980), *cert. denied,*450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981); *see also Korry v. International Tel. & Tel. Corp.,* 444 F.Supp. 193 (S.D.N.Y.1978). These were a series of separate wrongs, and plaintiff may not sue upon the earliest items in the sequence by using the continuing wrong theory.

**\*20** Thus we find that those claims which accrued prior to December 14, 1989 are time-barred.

### B. *Breach of Fiduciary Duty and Piercing the Corporate Veil*

Plaintiff's Count II asks for damages stemming from "freezing out, self dealing and siphoning of corporate assets." (Am. Compl. at 43.) Count III requests damages for breach and substantial assistance in breach of fiduciary duty. (*Id.* at 47.) Count IV requests that the Court pierce the corporate veil. (*Id.* at 53.) We will consider these claims together, as they all involve breaches of fiduciary duty.

Plaintiffs claim that every named defendant, except the insurance company Wespar, owed them a fiduciary duty. (Pls.' Opp'n 2 at 21.) Plaintiffs assert that almost every action taken by defendants in connection with USP and Petrowax breached that duty, including numerous transactions that resulted in personal monetary gain to defendants, (Am.Compl.¶¶ 108-11, 115), and monetary loss to plaintiffs, (*id.* ¶ 117). Plaintiffs designate almost all of the transactions they claimed were fraudulent as also constituting breaches of fiduciary duty, including misuse of the voting agreement, fraudulent transfers between USP and Petrowax, and loan and stock manipulation. (*Id.* ¶ ¶ 121-23, 127-28, 130-34.) Plaintiffs ask the Court to pierce the corporate veils of the WSGP group, the Ackerman group,[FN14] the IGI-Boler group, and the Southwest group, to reach the individual defendants Simon, Parsky, Long, Andreini, Gottlieb, Berg, Ackerman, Bell, and Reucassel, because they dominated and controlled the affairs of USP and Petrowax and used the corporate shield to commit various torts. (*Id.* ¶¶ 54-55, 138.)

> FN14. Plaintiff does not make clear who constitutes the "Ackerman group" besides Petrowax investor Peter Ackerman.

Defendants have moved to dismiss the breach of fiduciary duty and related claims on the grounds that they fail to state a claim, and that they are barred by the statute of limitations. We address each ground.

### 1. *Failure to State a Claim for Breach of Fiduciary Duty*

Defendants move pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss these claims for failure to state a claim upon which relief can be granted. We analyze this motion, and all the 12(b)(6) motions below, under the legal standard set forth above in Section III.A.1.

The elements of breach of fiduciary duty that must be proven are, first, a fiduciary relationship between the parties, and second, that the duty has been breached. *Cramer v. Devon Group, Inc.,* 774 F.Supp. 176, 184 (S.D.N.Y.1991). The elements of aiding and abetting a breach of fiduciary duty are "a) that the fiduciary's conduct was wrongful; b) that the defendant had knowledge that the fiduciary's wrongful conduct was occurring; and c) that the defendant's conduct gave substantial assistance or encouragement to the fiduciary's wrongful conduct." *Crowthers McCall Pattern, Inc. v. Lewis,* 129 B.R. 992, 999 (S.D.N.Y.1991). We find that plaintiff has failed to state a claim for either cause of action.

Plaintiffs have several theories under which they claim that a fiduciary duty was owed.

### a. *Plaintiffs as Beneficiaries of the Voting Agreement*

**\*21** First, plaintiffs claim that a fiduciary duty was owed under the Voting Agreement by the voters of their shares, who were also the directors of USP. (Am. Compl. ¶¶ 55, 58, Ex. B ¶ 3.) Defendant argues that the agreement, signed by all the plaintiffs, explicitly states that "[i]n casting their votes, the Voters shall not be held by this Agreement to any specified standard of care on fiduciary responsibility and in no event shall they be liable to any of the Stockholders except for their gross negligence or wilful [sic] misconduct." (*Id.*) Although plaintiffs are suing for breach of fiduciary duty, their memorandum seems to concede that they waived any such duty when they agreed to this provision, in that plaintiff's memorandum states that plaintiffs are suing under the gross negligence and willful misconduct clause of the sentence. (Pls.' Opp'n 2 at 21.)

We agree with defendant that plaintiffs waived the fiduciary duty normally owed shareholders under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                        Page 18
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

voting trust agreements.<u>FN15</u> The terms of the Voting Agreement are explicit enough to effect the waiver. *See generally* <u>Renz v. Beeman,</u> 589 F.2d 735, 744-45 <u>(2d Cir.1978)</u> (finding that the trustee of a family trust was subject to a standard of undivided loyalty because although "[i]t is true that even a trustee's duty of 'utmost loyalty' can be reduced by means of language in the trust instrument ... or by express consent of the settlor.... Only the most explicit language can protect a fiduciary from liability in a conflict of interest with his Cestuis"), *cert. denied,* 444 U.S. 834, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). Plaintiffs may not sue upon a duty which was expressly excluded from the Agreement.

> FN15. We note that although plaintiffs' amended complaint and memoranda refer to the Voting Agreement as a "Voting Trust," the actual document itself is entitled "Voting Agreement" and nowhere contains the word "trust." (Am.Compl.Ex. B.)

Even if a fiduciary duty was owed to plaintiffs under the Agreement, the complaint fails to allege a breach of the voters' duty under the Agreement. The Agreement states only that the shares "shall be voted as a simple majority of the Voters shall direct," and that the votes were to be cast "in a manner consistent with the purposes and intent of ... the Investment Agreement." (Am. Compl, Ex. B ¶ 3.) Rather than alleging that their shares were voted inconsistently with these provisions, plaintiffs complain only that their shares were voted to deprive them of their original majority interest in USP by allowing the WSGP group to purchase 50.1% of the USP shares after WSGP invested $7.2 million in USP. (*Id.* ¶¶ 48, 54-55.) Aside from conclusory allegations that this vote was "an absolute abuse" and "fraudulent and malicious," (*id.* ¶¶ 55, 122), plaintiff fails to allege why this decision to grant a majority of the equity to the new investors was improper. The Agreement nowhere states, as plaintiff claims it does, that "[u]nder no circumstances was the Voting Trust to be used to dilute or eliminate the equity interest of the Coopers." (*Id.* ¶ 48.) To the contrary, the Agreement specifically lists as a possible date of its termination "such date as the number of shares ... owned by [plaintiff] shall in the aggregate become less than 10% of the total then outstanding." (*Id.* Ex. B ¶ 3(c).)

**\*22** We find that even if a fiduciary duty existed under the Voting Agreement between the voters and plaintiffs, a breach of this duty has not been

adequately alleged. Therefore plaintiff has also failed to state a claim for aiding and abetting a breach of that duty.

### b. *Plaintiffs as Majority Shareholders*

Plaintiffs also claim that a fiduciary duty was owed to them as shareholders, and that this duty was breached by various acts of self-dealing, insolvent transfers, and the dilution of plaintiffs' assets. (Am.Compl.¶¶ 100, 102.) Defendants argue that although duties of care and loyalty are owed to shareholders, plaintiffs lack standing to sue for their breach; such causes of action belong to the corporation and must be brought derivatively. Plaintiffs argue that they should be allowed to bring an independent action because they were owed a unique duty beyond that owed to shareholders generally because they were, at one time, majority shareholders. (Pls.' Opp'n 2 at 22.)

We agree with defendants. Plaintiffs have failed to allege facts that show they were owed any independent duty that would allow them to maintain an individual action for these breaches. <u>Ceribelli v. Elghanayan,</u> 990 F.2d 62, 63 <u>(2d Cir.1993)</u>. A corporation does not owe a special fiduciary duty to its majority shareholders; general fiduciary duties are owed to both majority and minority shareholders equally. <u>Alpert v. 28 Williams St. Corp.,</u> 63 N.Y.2d 557, 569, 483 N.Y.S.2d 667, 673, 473 N.E.2d 19 (1984). Injuries such as those the plaintiffs allege they suffered as shareholders, i.e., mismanagement and diversion of corporate assets by officers and directors for their own benefit, are considered injuries to the corporation only. <u>Abrams v. Donati,</u> 66 N.Y.2d 951, 953, 498 N.Y.S.2d 782, 783, 489 N.E.2d 751 (1985); <u>Hoheb v. Pathology Associates of Albany, P.C.,</u> 146 A.D.2d 919, 920, 536 N.Y.S.2d 894, 896 (3d Dep't.1989). Thus, only a derivative action can be maintained to recover for these wrongs. *Id.*

### c. *Cooper as Judgment Creditor*

Plaintiff Cooper also claims that he was owed a fiduciary duty as a judgment creditor. (Am. Compl. ¶¶ 132-33, Pls.' Opp'n 2 at 22.) Plaintiff became a judgment creditor of USP on April 22, 1991, when his Interim Arbitration Award was reduced to a judgment against USP. Under New York law, creditors are owed a fiduciary duty by officers and directors of a corporation only when the corporation is insolvent. <u>Clarkson Co. Ltd. v. Shaheen,</u> 660 F.2d

Not Reported in F.Supp.                                                                                    Page 19
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

506, 512 (2d Cir.1981) (citing _New York Credit Men's Adjustment Bureau v. Weiss,_ 305 N.Y. 1, 7, 110 N.E.2d 397 (1953)), _cert. denied,_ 455 U.S. 990 (1982). Plaintiff alleges that defendants breached this duty in several ways.

First, plaintiff claims that the transfer by USP of its sole remaining asset, its stock in Petrowax, to Petrowax on June 15, 1991 was a breach of duty and a violation of the New York Debtor and Creditor Law because both corporations were insolvent at the time. (Am.Compl.¶¶ 78, 131.) Although plaintiff may have stated a claim for breach of the duty owed him as a creditor to the extent this transfer was authorized by corporate officers and directors of USP, if these companies were indeed insolvent, any cause of action based upon that 1991 transfer is time-barred, as we discuss below.

**\*23** Second, plaintiff claims that duties owed to him as a creditor were breached by defendants Bell, Berg, Andreini, Gottlieb, Simon, Parsky, Ackerman, the WSGP group, and others during the bankruptcy proceedings of USP and Petrowax, culminating in the deliberate avoidance of plaintiff's judgment. (Am.Compl.¶¶ 108(e), 114, 115, 117, 128, 133, 146.) To begin, we note that only defendants who were officers and directors of USP and Petrowax could have owed plaintiff any duty as creditor. Thus, these allegations fail to state a claim against Simon, Parsky, Ackerman, the WSGP group, and all other defendants besides those whom plaintiff has alleged were USP and Petrowax directors, namely Gottlieb, Berg, Andreini, Sebastian, Bell, Long, Reucassel, and Cole.

The only allegations plaintiff makes against these defendants, specifically Bell, Berg, Andreini, and Gottlieb, is that they violated their fiduciary duty to plaintiff during the Petrowax bankruptcy proceedings by successfully objecting to plaintiff's claim as a creditor. (Am.Compl.¶ 133.) This objection resulted in Cooper's claims being expunged and disallowed in the Petrowax proceedings in November 1994. (Pls.' Opp'n 2 at 9.) [FN16] Plaintiff asserts that this objection was a breach of fiduciary duty because his judgment was enforceable not only against USP, but also against Petrowax "as a 'related entity,' " and that the principals of Petrowax knew this. (_Id._) However, we disagree with plaintiff's interpretation of his judgment. The New York Supreme Court's order affirming Cooper's arbitration award states that all recovery was to be had "of U.S. Petroleum." (Am.

Compl. Ex. E at 3-5.) Although recovery "of U.S. Petroleum" was to be of an amount "equal to the salary and bonuses paid directly or indirectly by U.S. Petroleum Corp. or any related entity to Gene Blendermann ..."(_id._ at 3), that does not mean that any related entity is responsible for the judgment. It only means that U.S. Petroleum was to pay Cooper the equivalent of any salary (minus one dollar) that Blendermann received from USP and Petrowax. The judgment utilizes the phrase "recover of U.S. Petroleum" numerous times. (_Id._ at 3, 5.) We find plaintiff's interpretation of the plain language of the judgment to be disingenuous.

> FN16. Plaintiff submits to the Court an undated "Exhibit A" which appears to be Petrowax's objections to claims submitted in its bankruptcy proceeding. (Pl.'s Opp'n 2 Ex. 7.) We assume that these are the grounds upon which the Bankruptcy Court expunged Cooper's claim in November of 1994. (_Id._ at 9.)
>
> It appears from this exhibit that Stanley Cooper submitted at least two claims in the Petrowax proceeding, each for $2.6 million. (_Id._ Ex. 7.) Petrowax's objection, apparently adopted by the Court, reads as follows:
> Debtor is not liable on the allegedly breached contract. Contract is with a third party which is a 2.98% shareholder of Debtor. Claimant performed no services for Debtor. On its face, claim appears filed in wrong case as it lists debtor as U.S. Petroleum, a chapter 7 proceeding ending in U.S. Bankruptcy Court, Southern District of New York, Case No. 92 B 44883.
> (_Id._)

Thus we find that although these defendants did owe plaintiff a fiduciary duty while the corporations were insolvent, no breach has been alleged that is not also time-barred. Thus, there can also be no claim for aiding and abetting a breach.

### 2. _Failure to State a Claim for Piercing the Corporate Veil_

Plaintiff's complaint asks that, as a remedy for these breaches of duty and other wrongdoing, the Court pierce the veils of USP and Petrowax in order to reach their investors, the WSGP group, IGI-Boler, and the Ackerman group, and then pierce the veils of those investors to reach individual defendants Long,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                  Page 20
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Gottlieb, Andreini, Berg, Reucassel, Simon, Parsky, and Ackerman. (Am.Com pl.¶¶ 136-53.) Plaintiff alleges that these individuals and their investment entities controlled USP and Petrowax, and used them to commit fraud, torts, various forms of self-dealing, and other illegalities in a deliberate effort to avoid paying plaintiff's judgment. (*Id.* ¶¶ 138, 139, 142-45, 147.) However, plaintiff's complaint fails to state a claim for piercing the corporate veil.

**\*24** New York courts are reluctant to pierce corporate veils and hold shareholders liable. *Bridgestone/Firestone, Inc.,* 98 F.3d at 17. The veil will be pierced only when the corporate " 'form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation ... and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego.' " *Id.* at 17-18 (quoting *Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir.1979)). To succeed in such an action, the plaintiff must prove the following elements: "1) the absence of corporate formalities; 2) inadequate capitalization; 3) personal use of corporate funds; and 4) perpetuation of fraud through the corporate vehicle." *Crabtree v. Tristar Automotive Group, Inc.,* 776 F.Supp. 155, 166 (S.D.N.Y.1991). The Court also looks to such indicators as the "intermingling of corporate and personal funds, ... failure to observe corporate formalities such as the maintenance of separate books and records, failure to pay dividends ... and the inactivity of other officers and directors." *Bridgestone/Firestone, Inc.,* 98 F.3d at 18.

Plaintiff's complaint nowhere alleges absence of corporate formalities or personal use of corporate funds, two of the four necessary elements of the cause of action. *Crabtree,* 776 F.Supp. at 166. It also fails to allege intermingling of corporate and personal funds, failure to keep separate books and records, and failure to pay dividends. In short, the complaint fails to allege that USP and Petrowax were alter egos used to conduct an individual's business rather than their own. *Bridgestone/Firestone, Inc.,* 98 F.3d at 18. Plaintiff alleges wrongdoing by shareholders, but none that rises to the level required to pierce the veil and hold them personally liable for the actions of the corporation.

### 3. *Statute of Limitations*

Even if plaintiff had stated a claim for breach of

fiduciary duty, almost all of his causes of action are time-barred. When a plaintiff seeks monetary damages for breach of fiduciary duty, the statute of limitations is governed by C.P.L.R. 214(4), as such an action is considered to be one to recover damages for an injury to property. This limitations period is three years. If a plaintiff seeks equitable relief, the statute of limitations is six years (the catch-all limitations period of C.P.L.R. 213(1)).

In the amended complaint, plaintiffs request only monetary damages. (Am. Compl. at 69.) However, in their opposition papers, plaintiffs assert that they are seeking

equitable relief ... for the tortious conduct of the defendants.... Although the relief sought in the instant action is for money damages, ... [a]n equitable action lies where the legal relief for tortious acts in violation of the NYDCL, or self dealing and siphoning are not done openly, but secretly, and not uncovered until years later. There is no adequate remedy at law when the puppeteers are maneuvering to foreclose opportunities for relief by masking activities, and withholding transactions from public view. (Pls.' Opp'n 2 at 41.) In short, plaintiff requests that the Court construe his suit as one at equity because the money damages are sought to compensate for unfair practices by defendant. However, legal monetary remedies do not become equitable remedies just because they might be granted to compensate for injustice. *See Geren v. Quantum Chemical Corp.,* 832 F.Supp. 728 (S.D.N.Y.1993), *aff'd.,* 99 F.3d 401 (2d Cir.1995).

**\*25** Accordingly, we find that a three year statute of limitations governs plaintiff's claims for breach of fiduciary duty. Thus any breach that occurred prior to December 14, 1992 (three years before the interposition of the claim in the amended complaint) is time-barred. Cooper does not allege any specific breaches of fiduciary duty occurring after that date. By that time, both USP and Petrowax were in bankruptcy proceedings. As we discussed above, the only fiduciary duty owed to plaintiff at that time was a duty to him as creditor, but plaintiff has failed to allege a breach of that duty.

### C. *Breach of Contract*

Count V of plaintiff's complaint requests damages for breach of contract. (Am. Compl. at 59.) Plaintiff claims that his Employment Agreement was breached when he was terminated from USP. (*Id.* ¶ 156.) He

Not Reported in F.Supp.                                                                                          Page 21
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

also claims that when this breach occurred, the Voting Agreement was simultaneously breached because the two were part of a unified package. (*Id.* ¶¶ 123, 160.)

Count VII requests damages on behalf of Sheila, Michael, and Adam Cooper as third party beneficiaries of Stanley Cooper's medical insurance coverage, which was due them pursuant to Stanley Cooper's Employment Agreement. (*Id.* at 67.) Health insurance for the Cooper family was terminated when Cooper's Employment Agreement was breached in May 1988, and never reinstated despite the arbitrator's 1992 order that it be revived. (*Id.* ¶ 183.) Plaintiff Michael Cooper developed a cancerous condition after the termination, and was not covered by insurance during his treatment. (*Id.* ¶ 184.)

### 1. *Failure to State a Claim*

The Employment Agreement was entered into by plaintiff Stanley Cooper and USP. (Am.Compl.Ex. A.) USP is not a defendant in this action. "It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract." *Crabtree,* 776 F.Supp. at 166. Since plaintiff does not allege that the contract was assigned to any of the named defendants, we find that plaintiff fails to state a claim against these defendants for breach of the employment contract.

The Voting Agreement was signed by all members of the Cooper family, USP, and defendants Long and Sebastian, who were then directors of USP and designated "voters" under the agreement. The complaint fails to state a claim for breach of contract against USP for the reasons stated above. To the extent the contract existed between plaintiff and Long and Sebastian, or any other USP directors who served as voters, plaintiff has failed to allege a breach of the Voting Agreement. As we noted above, the Agreement stated only that plaintiff's shares "shall be voted as a simple majority of the Voters shall direct," and that the votes were to be cast "in a manner consistent with the purposes and intent of ... the Investment Agreement." (Am. Compl. Ex. B ¶ 3.) Plaintiff does not allege that the shares were voted in a manner that breached this agreement.[FN17]

> FN17. Even if a breach of contract was alleged, that claim is time-barred, as we

explain below.

**\*26** As for the third party beneficiary allegations, they also fail to state a claim. Third party beneficiaries to contracts are subject to the same defenses as are the original promisees: that is, they step into the shoes of the promisee when trying to enforce the contract. *Benson v. Brower's Moving & Storage, Inc.,* 907 F.2d 310, 313 (2d Cir.), *cert. denied,* 498 U.S. 982, 111 S.Ct. 511, 112 L.Ed.2d 524 (1990). Thus, since plaintiff Stanley Cooper cannot sue these defendants for breach of his employment contract by USP, the third party beneficiaries of that contract similarly are prevented from bringing suit.

### 2. *Statute of Limitations*

Even if plaintiff had stated a claim for breach of contract, the action is time-barred. Breach of contract claims enjoy a six year limitations period, accruing at the time of the breach, regardless of plaintiff's knowledge of such breach. C.P.L.R. 203(1), 213(2); *Ely-Cruikshank Co., Inc. v. Bank of Montreal,* 81 N.Y.2d 399, 599 N.Y.S.2d 501, 615 N.E.2d 985 (1993). Plaintiff claims that the Employment Agreement was breached on or about May 26, 1988, and that the Voting Agreement was breached on the same date. (Am.Compl.¶¶ 156, 160.) Therefore, any claim based on that breach became time-barred on May 26, 1994. Thus the claim was time-barred at the time the amended complaint was filed.[FN18]

> FN18. We note that Cooper did timely file for arbitration as he was required to do under his Employment Agreement. During that arbitration, as mentioned above, his Employment Agreement was found to have been breached and he was awarded a substantial judgment.

It should be noted that plaintiff claims there was a second breach of the Employment Agreement when he was reinstated and quickly re-terminated in late 1990. (*Id.* ¶ 159, 599 N.Y.S.2d 501, 615 N.E.2d 985.) Cooper was reinstated pursuant to the arbitrator's second interim award, which stated that USP had the right to Cooper's services, considering it was obligated to pay his compensation through December 31, 1992. (*Id.* Ex. D ¶ 4.) We do not consider this short episode to be a reinstatement of Cooper's original contract and a re-breach of same.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-07369-HB    Document 28-2    Filed 11/16/2007    Page 26 of 29

Not Reported in F.Supp.                                                                                              Page 22
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Since third party beneficiaries are subject to the same contract defenses as promisees, those third parties are also subject to the six year statute of limitations for breach of contract. _Barr v. McGraw-Hill, Inc.,_ 710 F.Supp. 95, 98 (S.D.N.Y.1989). Thus Cooper's family is also time-barred from asserting their rights under a contract that was breached in May of 1988 because such claims should have been brought prior to May of 1994.

### D. *Tortious Interference*

Plaintiff's Count V also requests damages for tortious interference with contractual relations, tortious interference with prospective business advantage, and "tortious interference with enforcement of arbitration awards and judgment." (Am. Compl. at 59.) We address each of these claims in turn.

#### 1. *Tortious Interference with Contractual Relations*

Plaintiff alleges defendants Bell, Long, and BMG "[b]y their actions ... and by their control ... intentionally, and with malice" caused USP to breach the employment agreement, and, consequently, the voting agreement which was linked to the employment agreement as part of a unified package. (Am.Compl.¶¶ 157, 160.) Plaintiff also alleges that all of the other defendants, except Wespar, "sanctioned" the breach. (*Id.* ¶ 158.) Plaintiff further alleges that defendants Reucassel, IGI-Boler, Simon, Parsky, WSGP-Int'l, WSGP and its other affiliates caused USP to fire plaintiff a second time, after he was re-hired. (*Id.* ¶ 159.)

##### a. *Failure to State a Claim*

**\*27** The elements of a claim for tortious interference with contractual relations are "(1) a valid contract between plaintiff and a third party for a specific term; (2) defendant's knowledge of the contract; (3) defendant's intentional procuring of its breach; and (4) damages." _International Materials and Resources, Inc. v. Pappas,_ 761 F.Supp. 1068, 1074-75 (S.D.N.Y.1991) (citations omitted), *vacated on other grounds,* 96 F.3d 586 (2d Cir.1996). Plaintiff must also allege that defendant interfered with the business relationship by unlawful or improper means, or that defendant intended solely to harm plaintiff. _Nassau Diagnostic Imaging and Radiation Oncology Associates, P.C. v. Winthrop-University Hosp.,_ 197 A.D.2d 563, 564, 602 N.Y.S.2d 650, 651 (2d

Dep't.1993), *appeal denied,* 83 N.Y.2d 756, 614 N.Y.S.2d 386, 637 N.E.2d 277 (1994). To satisfy this requirement, plaintiff must not merely conclude, but must allege some facts to support this contention. *See* _EDP Hosp. Computer Systems, Inc. v. Bronx-Lebanon Hosp. Center,_ 212 A.D.2d 570, 571, 622 N.Y.S.2d 557, 558 (2d Dep't.1995).

Plaintiff's allegations with respect to this claim are consistent with those made throughout the complaint in that they are conclusory and muddled. Plaintiff fails to allege that a valid contract for a specific term was in existence when he was re-hired and then shortly fired. Plaintiff also fails to allege knowledge on the part of almost all defendants, except Bell, Long, and BMG, as to the existence of the Voting Agreement. As for defendant Long, as an actual signatory to the Voting Agreement, he cannot be charged with third party interference. _Minetos v. City University of New York,_ 925 F.Supp. 177, 187 (S.D.N.Y.1996). The allegations of defendants' intent are also bare: the complaint states only that the interference was done "intentionally, and with malice...." (Am.Compl.¶ 157.) The complaint supplies no facts whatsoever as to what unlawful or improper means were employed, nor are facts supplied to support the contention that any interference was done solely to harm the plaintiff. Thus we find that the complaint fails to state a claim for tortious interference with contractual relations.

##### b. *Statute of Limitations*

Even if the complaint did state a cause of action, that cause of action is time-barred. Claims for tortious interference with contractual relations fall under the three-year limitations period designated for injury to property, and they accrue at the time the contract is breached. C.P.L.R. 203, 214(4); _Schonberger v. Serchuk,_ 742 F.Supp. 108 (S.D.N.Y.1990). Thus the claim accrued in May 1988, when Stanley Cooper was terminated, and became time-barred in May 1991, more than four years before the filing of the amended complaint.

#### 2. *Tortious Interference with Prospective Business Advantage*

Plaintiff's complaint asks for damages against defendants for their alleged tortious interference with his prospective business advantage, but nowhere in the complaint does plaintiff allege what that prospect

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 23

was. In his memorandum in opposition to this motion, plaintiff expands upon this claim and alleges that before any of the defendants came to USP, Cooper had retained the investment banking firm Salomon Brothers to arrange for USP's financing. (Pls.' Opp'n 2 at 30.) Plaintiff claims that defendant investor WSGP then terminated the services of Salomon Brothers and raised the capital itself, thus depriving Cooper of the business opportunity he had originally created. As a second prospect, plaintiff claims that when USP re-hired Cooper in 1991 during the arbitration process, it did so with knowledge that it thereby prevented Cooper from developing a new business opportunity. *Id.*

### a. *Failure to State a Claim*

**\*28** This tort has also been called tortious interference with business advantage, business relations, economic relations, and prospective economic advantage. The elements remain the same. *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266, 269 (2d Cir.1987). To state a claim, plaintiff must allege the following: "(1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Riddell Sports Inc. v. Brooks,* 872 F.Supp. 73, 78 (S.D.N.Y.1995) (quoting *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994)). To survive a motion to dismiss, plaintiff must allege that, but for defendant's conduct, his business prospects would have become actual contracts. *Id.*

Plaintiff has failed to meet this pleading standard. First, with regard to the plaintiff's prospective business relations with Salomon Brothers, plaintiff alleges that he paid the firm $100,000 as a retainer fee. (Am.Compl.¶ 43.) However, plaintiff admits that Salomon Brothers was only "contemplating" funding USP. (Pls.' Opp'n 2 at 30.) The nature of the "interference" alleged was WSGP's decision to raise the capital itself. (*Id.*) There is no allegation that this was done solely to harm the plaintiff, or in a dishonest, unfair, or improper manner. There is also no allegation that WSGP's decision to borrow the money from Sanwa, rather than allow Salomon Brothers to locate investors, injured plaintiff.

With regard to the second allegation of interference, it is far too vague to support a cognizable claim.

Plaintiff alleges only that when the officers and directors of USP re-hired Stanley Cooper for a short time in 1990-91, they "were aware" that Cooper "had to forego pursuing a lucrative business opportunity"; and that they "knew [the rehiring] would prevent Cooper from continuing his new private project." (Pls.' Opp'n 2 at 30.) These vague hints do not satisfy the requirements that plaintiff must show it had business relations with a third party, that defendants acted with the sole purpose of harming plaintiff or used dishonest, unfair, or improper means; nor that an actual contract would have been executed but for defendants' interference.

### b. *Statute of Limitations*

Even if plaintiff stated a claim for tortious interference with prospective business advantage, that claim would be time-barred. The limitations period for this action is also analyzed as a three-year injury to property claim under C.P.L.R. 214(4). *See, e.g., Riddell* at 75-76. Salomon Brothers was retained by Cooper at the time he "was organizing" USP. (Am.Compl.¶ 43.) USP was organized in 1986, and the loan WSGP procured from Sanwa was made on April 30, 1990. Therefore, the latest a claim for tortious interference with Cooper's business relationship with Salomon Brothers could have been brought would have been April 30, 1993. As for the unspecified "lucrative business opportunity," it was allegedly interfered with when Cooper was re-hired on December 17, 1990. A claim for this interference became time-barred on December 17, 1993.

### 3. *Tortious Interference with Enforcement of Arbitration Awards and Judgment*

**\*29** Plaintiff alleges that all the defendants, except Wespar, conspired to avoid the enforcement of his arbitration awards and judgment. (Am.Compl.¶¶ 159, 161.) Plaintiff also asserts that these defendants maliciously withheld information from the arbitrator, resulting in an erroneously low judgment award. (*Id.* ¶ 164.)

Defendants point out that no cause of action exists for tortious interference with enforcement of arbitration awards and judgment. They assert that the proper course of action would be for plaintiff to bring an action to enforce his arbitration award or judgment, and that any interference with that action would constitute contempt of court. (Defs.' Mem. at 43.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 24
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Plaintiff does not dispute this assertion. Instead, he argues that the deliberate avoidance of the judgment is a violation of public policy and demonstrates contempt for the judicial system. (Pls.' Opp'n 2 at 30.)

We find that this cause of action fails to state a claim. The tort plaintiff alleges does not exist. Although some of the defendants may have been at fault for USP's failure to satisfy plaintiff's judgment, our allowing plaintiff to create a novel cause of action is neither a satisfactory nor necessary solution.

### E. Intentional Infliction of Emotional Distress

Count VI requests damages for intentional infliction of emotional distress. (Am. Compl. at 63.) Plaintiff alleges that he has been subject to a six-year campaign of terror, harassment, and intimidation by all defendants except Wespar. (*Id.* ¶ 169.) Plaintiff alleges that defendants took over his business, prevented him from participating in it, deprived him of his equity, prevented him from performing under his employment agreement, prevented him from enforcing his arbitration victory, deprived him and his family of their health insurance, and caused him to incur hundreds of thousands of dollars in legal fees. (*Id.*) Plaintiff states that these acts were deliberate and malicious, and were done for the purpose of injuring him. (*Id.* ¶ 170.) He suffered severe emotional stress and mental anguish as a result of the demolition of his family's holdings in USP, and the family's concurrent loss of status and lifestyle. (*Id.* ¶¶ 176, 179.)

#### 1. Failure to State a Claim

Even taking these allegations as true, plaintiff has failed to state a claim for intentional infliction of emotional distress. The elements of the claim are as follows: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir.1996). The New York Court of Appeals has adopted the Restatement (Second) of Torts' definition of this cause of action, which notes that "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Fischer v. Maloney,* 43 N.Y.2d 553,

557, 402 N.Y.S.2d 991, 993, 373 N.E.2d 1215 (1978). The New York Court of Appeals has not yet sustained a claim under this cause of action. *Howell v. New York Post Co., Inc.,* 81 N.Y.2d 115, 122, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699,*aff'd in part,*82 N.Y.2d 690, 601 N.Y.S.2d 572, 619 N.E.2d 650 (1993).

**\*30** This standard is extremely high and exacting. *Stella Stylianou v. St. Luke's/Roosevelt Hosp. Center,* 902 F.Supp. 54, 58 (S.D.N.Y.1995). Cases akin to plaintiff's have been found not to satisfy it. For example, in *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983), the New York Court of Appeals upheld dismissal in an action wherein the plaintiff was fired from his job and ordered to leave immediately, was forcibly and publicly escorted from the building by guards when he returned to pick up his belongings, and had his belonging dumped in the street. In *Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1158 (2d Cir.1993), the Second Circuit affirmed summary judgment for defendants despite plaintiff's allegations of a two-year campaign of harassment and intimidation by his supervisors that resulted in severe stress-related health problems.

We find that plaintiff's allegations do not meet this rigorous standard. The series of business transactions and defendants' motivations for pursuing them, even if they occurred as plaintiff alleges, are not extreme and outrageous conduct. They do not go beyond all possible bounds of decency, and are not utterly intolerable in a civilized community, as New York courts have construed those limits in the aforementioned analogous cases.

#### b. Statute of Limitations

Even if plaintiff had stated a cause of action for intentional infliction of emotional distress, the action is time-barred. The limitations period for this intentional tort is one year. C.P.L.R. 215. All of the defendants' actions that plaintiff describes occurred prior to December 14, 1994. (Am.Com pl.¶¶ 171-77.)

Plaintiff argues that emotional distress was intentionally inflicted upon him within one year of suit when the Petrowax reorganization concluded and it became clear that Petrowax would not satisfy plaintiff's judgment against USP. (Pl's. Opp'n 2 at 54.) Plaintiff describes this realization as a traumatic

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 25
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

emotional shock. (*Id.*) However, we find that any action based upon this failure to satisfy the judgment is untimely, because plaintiff's claim was officially expunged by the bankruptcy court in November of 1994, more than one year before the filing of the amended complaint. (*Id.* at 9.)

CONCLUSION

Since we have found that all of plaintiffs' causes of action fail to state a claim upon which relief can be granted, are time-barred, or have not been pled with particularity, defendants' motion to dismiss the complaint should be granted.

Copies of this Report and Recommendation have been mailed to all parties, who are hereby instructed that any objections to the Report and Recommendation must in accordance with Fed.R.Civ.P. 72 be filed with Your Honor within 10 days from this date, unless an extension of time is granted by you. Failure to object to the report within 10 days will preclude appellate review. 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 6(a), 6(e), and 72.

S.D.N.Y.,1997.
Cooper v. Parsky
Not Reported in F.Supp., 1997 WL 242534 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.