KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Michael C. Harwood (MH 4227)
Jon Avins (JA 1417)
1633 Broadway
New York, New York  10019
Tel:  (212) 506-1700
Fax:  (212) 506-1800

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                                   :

FORTRESS CREDIT OPPORTUNITIES I, LP and
FORTRESS CREDIT OPPORTUNITIES II, LP,

                            Plaintiffs,           :           07-CV-7369 (HB)(DCF)

               -against-             :           JURY TRIAL
                                    :           DEMANDED

WAYNE C. COLEMAN, THE ROYALTY
COMPLIANCE ORGANIZATION and
MOSS ADAMS LLP

                          Defendants.        :

-------------------------------------------------------------------x

**PLAINTIFFS FORTRESS CREDIT OPPORTUNITIES I, LP AND
FORTRESS CREDIT OPPORTUNITIES II, LP'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS WAYNE C. COLEMAN AND
THE ROYALTY COMPLIANCE ORGANIZATION'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS.................................................................................................... 3

ARGUMENT......................................................................................................................... 7

I.    The Claims Against Coleman And RCO Are Not Time Barred Under The Tolling
Agreement ................................................................................................................... 7

II.   The Statute Of Limitations Did Not Accrue Upon Receipt of Defendants' Work
Product......................................................................................................................... 9

      A.    The Statute Of Limitations In Accounting Negligence Actions Begins To
Run Three Years From The Time All Facts Necessary To The Action Have
Occurred ........................................................................................................... 10

      1.    The Bright Line "Upon Receipt Of Work Product Rule" Is Specific To
Negligence In The Preparation Of Tax Returns And Audits....................... 10

      2.    In The Context Of Consummated Transactions, Reliance And Injury Both
Occur And The Statute Of Limitations Accrues Upon Consummation ...... 13

III.  Plaintiffs Allege Facts Sufficient To Establish A Relationship With Coleman
And RCO So Close As To Approach Privity ............................................................ 17

IV.  Defendant Wayne C. Coleman Is Properly Named In This Action......................... 19

V.    There Are No Grounds On Which To Stay This Action ........................................... 21

CONCLUSION ................................................................................................................... 23

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Ackerman v. Price Waterhouse*, 84 N.Y.2d 535, 620 N.Y.S.2d 318 (1994) ............................10-13

*AUSA Life Insur. Co. v. Ernst & Young*, 206 F.3d 202 (2d Cir. 2000) .........................................18

*Bastys v. Rothschild*, 97 Civ. 5154, 2000 U.S. Dist. LEXIS 17944
(S.D.N.Y. Nov. 21, 2000)...............................................................................................9, 10, 13

*Booth v. Kriegel*, 36 A.D.3d 312, 825 N.Y.S.2d 193 (1st Dep't 2006)........................................11

*Caprer v. Nussbaum*, 36 A.D.3d 176, 825 N.Y.S.2d 55 (1st Dep't 2006) ...................................18

*Chemical Bank v. Brout & Co.*, 172 A.D.2d 382, 568 N.Y.S.2d 761
(1st Dep't 1991).......................................................................................................................18

*Chemical Bank v. Sternbach & Co.*, 91 A.D.2d 518, 456 N.Y.S.2d 392
(1st Dep't 1982).......................................................................................................................14

*Cohen v. Abrahams*, 751 F. Supp. 472 (S.D.N.Y. 1990)............................................................14

*Credit Alliance Corp. v. Andersen & Co.*, 101 A.D.2d 231, 476 N.Y.S.2d 539
(1st Dep't 1995).......................................................................................................................16

*Credit Alliance Corp. v Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435 (1985) .................17

*European American Bank and Trust Co. v. Strauhs & Kaye*, 65 N.Y.2d 536,
493 N.Y.S.2d 435 (1985) ........................................................................................................18

*Fernandez v. Chertoff*, 471 F.3d 45 (2d Cir. 2006) ....................................................................12

*Fleet Factors Corp. v. Werblin*, 114 A.D.2d 996, 495 N.Y.S.2d 434 (2d Dep't 1985) ..........13-14

*Global Network Communs., Inc. v. City of New York*, 458 F.3d 150 (2d Cir. 2006) ...................12

*IFD Constr. Corp. v. Corddry Carpenter Dietz and Zack*, 253 A.D.2d 89, 685 N.Y.S.2d 670
(1st Dep't 1999)...................................................................................................................15-16

*Landis v. No. Amer. Co.*, 299 U.S. 248 (1936)............................................................................21

*Mitschele v. Schultz*, 36 A.D.3d 249, 826 N.Y.S.2d 14 (1st Dep't 2006) ....................................11

*Ossining Union Free School District v. Anderson LaRocca Anderson*, 73 N.Y.2d 417,
541 N.Y.S.2d 335 (1989) ....................................................................................................17, 18

*Prudential Ins. Co. v. Dewey Ballantine, Bushby, Palmer & Wood*, 80 N.Y.2d 377,
590 N.Y.S.2d 831 (1992) .........................................................................................................17

*Prudential-Bache Securities, Inc. v. Citibank, N.A.*, 73 N.Y.2d 263, 539 N.Y.S.2d 699 (1989) ..................................................................................................................................21

*Rivello v. Waldron*, 47 N.Y.2d 297, 418 N.Y.S.2d 300 (1979) ............................................... 20-21

*Sierra Rutile, Ltd. v. Katz*, 937 F.2d 743 (2d Cir. 1991) ................................................................21

*Sosnow v. Paul*, 43 A.D.2d 978; 352 N.Y.S.2d 502 (2d Dep't 1974) ..........................................10

*Tesoriero v. MetLife*, 800 N.Y.S.2d 357 (Sup. Ct. Kings' Cty. 2004) ..........................................16

*Video Corp. of Amer. v. Frederick Flatto Assocs., Inc.*, 85 A.D.2d 448, 448 N.Y.S.2d 498 (1st Dep't 1982) ...............................................................................................16

*Williamson v. PriceWaterhouseCoopers LLP*, 9 N.Y.3d 1, 840 N.Y.S.2d 730 (2007)...........10, 11

Plaintiffs Fortress Credit Opportunities I, LP and Fortress Credit Opportunities II, LP, by and through their undersigned attorneys, submit this Memorandum Of Law in opposition to the motion of Defendants Wayne C. Coleman and the Royalty Compliance Organization, pursuant to Fed. R. Civ. P. 12(c) for judgment dismissing the complaint.

## PRELIMINARY STATEMENT

Defendants Coleman and RCO provided their professional appraisal advice directly to Plaintiffs with the intention and knowledge that Plaintiffs would rely on that advice in making a $12 million loan. That loan went into default and the collateral that they had appraised was worth nowhere near the amount at which they had appraised it. Less than three years after they gave their advice and after Plaintiffs made the loan, these defendants entered into a six month tolling agreement and this action was then timely filed within the tolled period. These defendants' motion to dismiss on the grounds of statute of limitations and privity is entirely without merit.

This action was in fact timely filed. Plaintiffs and RCO, on behalf of all its employees, entered into a six-month tolling agreement that prevented either party from pleading a time-related defense that was not available to it prior to the date of the tolling agreement – February 22, 2007 – in any action filed on or before August 22, 2007. The Amended Complaint alleges – and defendants concede in their motion – that they provided their report to Plaintiffs on February 25, 2004. Thus, if the three year statute of limitations for negligence were to run from the date of the report, that period had not yet expired on February 22, 2004, and this action was timely filed within the tolled period on August 17, 2007.

In addition, where, as here, a professional negligence claim is brought by a lender against the borrower's accountant, New York law provides that the cause of action accrues only when all

facts necessary for Plaintiffs to state a claim for injury occurred. Plaintiffs relied on Coleman

and RCO's professional expertise when they agreed to enter into the loan on March 1, 2004,

which is again less than three years before the parties entered into the tolling agreement.

Coleman and RCO rely instead on inapposite case law holding that a malpractice claim

by a client against its own accountant for negligently preparing tax returns or an annual audit

accrues immediately upon receipt of the work product. But they ignore language in the cases

they cite and in others discussed below demonstrating two fatal flaws in their argument: this is

not a case where a client is suing its own accountant for malpractice and this case does not

involve the receipt of financial documents that are final and ready to be filed upon receipt.

Unlike a tax return or an audit provided to a client for filing, Coleman and RCO's report was not

the final step necessary for Plaintiffs to determine whether to provide the loan. Where a third

party receives a report from a professional for use in connection with other subsequently

developed facts and negotiations in determining whether to enter into a transaction, the statute of

limitations accrues when all facts necessary to allege an injury occur – and that was at the time

that Plaintiffs closed the loan with their borrower on March 1, 2004. The statute of limitations

here was tolled on February 22, 2007, which was within the three year limitations period. This

action is timely.

Nor do Coleman and RCO's assertions that there is a lack of privity between Defendants

and Plaintiffs present a bar to this suit under New York law. An accountant incurs a legal duty

of care to another with whom he is not in direct contractual privity if the relationship between

them is so "close as to approach that of privity." The core test in examining the question,

announced by the New York Court of Appeals, is whether the plaintiff's reliance on the

accountant's work was the specific purpose for which the work was being done, in furtherance of

which a known party would rely, and there is some conduct by the accountant linking it to that

party.  All of these factors are met here, where Coleman and RCO transmitted their report

directly to Plaintiffs with the intent and knowledge that Plaintiffs would rely on it in deciding

whether to make a loan to their clients.

Finally, Coleman and RCO make a number of easily disposed arguments.  Plaintiffs do

not seek to pierce RCO's corporate veil, as Defendants assert.  Defendant Coleman is properly

named here as the author of the negligently prepared report, and the Complaint fully alleges all

elements of negligence against him.  Nor is there any reason to stay this action to await the

conclusion of other pending litigation that has no bearing on and will not resolve any of the

issues in this action.  All elements of Plaintiffs' damages and of any potential offsets can easily

be quantified whether that other litigation is concluded or not.

## STATEMENT OF FACTS

This dispute arises out of a March 1, 2004 loan agreement between Fortress Credit

Opportunities I, LP ("Fortress" and, together with Fortress Credit Opportunities II, LP,

"Plaintiffs") and The Songwriter Collective, LLC ("TSC") for $12.12 million (the "Loan").  TSC

was a music publishing company owned by individual songwriters that was intended to

consolidate their various rights to receive royalties on their published songs into this one entity

and then to obtain long-term financing that would be repaid and secured by the royalty streams

on those copyrighted works.  Fortress provided the Loan to serve as a bridge loan to allow start-

up financing for TSC for a period of up to one year while it prepared and implemented its

business plan.  The Loan was secured by the same copyrighted works that were being

consolidated in TSC (the "Collateral").

As a condition to making the Loan, TSC was required to provide Fortress with an appraisal of the Collateral at the time of the closing on the Loan, which occurred on March 1, 2004. TSC consulted with defendants Wayne C. Coleman ("Coleman"), the Royalty Compliance Organization ("RCO"), and Moss Adams LLP ("Moss Adams"), to provide a valuation and other analyses needed to determine the magnitude of TSC's future royalty streams. This information was necessary for Plaintiffs to determine the amount of a loan that could be supported by the Collateral that TSC was providing and the terms and conditions of such a loan based on the risk inherent in that Collateral. Coleman, RCO, and Moss Adams all knew that their valuations and analyses would be used by TSC to obtain a loan from Fortress. Indeed, both RCO and Moss Adams provided copies of their reports directly to Fortress to assist in its analysis of the Loan. Fortress did in fact rely on those valuations and analyses in making the Loan.

### The Songwriter Collective

The Songwriter Collective, LLC was created in 2002 as the first music publishing company owned by and run solely for the benefit of its songwriter members. TSC's members agreed to pledge the royalty streams generated by their individual song catalogues to TSC in return for an ownership share in TSC. In December 2003, TSC began to seek bridge financing from Fortress to, among other things, support TSC's operations until it could complete long-term financing. As a condition precedent to providing the Loan, Plaintiffs required a valuation of TSC's catalogue. The purpose of the valuation was to assist Plaintiffs in determining, among other things: (i) whether the amount and terms of the Loan would be commensurate with the value of the Collateral that TSC was providing; (ii) that TSC's royalty stream would be adequate to finance interest charges on the Loan; and (iii) in the event TSC should default on the Loan, that the value of TSC's catalogue would adequately compensate Plaintiffs for any losses they might suffer from such a default.

TSC retained two expert firms to provide the required estimations, analyses, and valuation of the Collateral on behalf of and for use by TSC and its lender. TSC engaged one of those experts, Moss Adams, to calculate, estimate, and analyze the actual royalty streams that had been generated from the songbooks for the prior five years. Coleman and RCO, in turn, were retained to provide TSC and Fortress with an appraisal of the catalogue assets of TSC in connection with the bridge loan financing from Plaintiffs, relying in part on the Moss Adams data. As discussed further below, Coleman and RCO provided their report directly to Plaintiffs at the same time that they provided it to TSC. Coleman and RCO understood at that time that Fortress would review and analyze their report, together with the data provided by Moss Adams, in order to determine whether and on what terms it would enter into the Loan with TSC.

Moss Adams prepared a "Due Diligence Report" dated February 17, 2004, and provided it to TSC, RCO, and Fortress. RCO received the Moss Adams Due Diligence Report as part of the information it needed to appraise the Collateral based on the future earnings of the catalog. Although Moss Adams referred to its February 17 report as "final" in its transmittal letter to TSC and Fortress, it also advised RCO, TSC and Fortress that it would provide additional information and analysis, as needed. (Harwood Dec. Ex. 1.)

Some time after February 17, 2004, Coleman and RCO provided to Fortress and TSC an undated report setting forth a valuation of TSC's music catalog assets as of January 30, 2004.[1] In preparing the RCO Report, Coleman made various adjustments to the Moss Adams data and applied his own expertise in determining the projected value of the catalog based on those adjusted numbers. According to Coleman and RCO, the report they provided to Fortress and

---

[1] Although this version of the report does not indicate when it was completed and provided to Fortress, and merely says it is "as of January 30, 2004," it relies on data received from Moss Adams and, therefore, it could not have been sent until some time after Moss Adams provided its February 17, 2004 report.

TSC (the "RCO Report") was "designed to estimate the fair market value of [TSC's] Catalogs. . . and [is] intended to be used to assist [TSC] and their representatives in assigning value to those assets."

RCO subsequently updated its initial appraisal and provided Plaintiffs with a valuation as of February 25, 2004.  (Am. Compl. ¶ 40.)  This version of the RCO Report was provided to Fortress on or after February 25, 2004.

Pursuant to the loan agreement between TSC and Fortress, TSC was required to provide Fortress with "an asset valuation report of the Collateral prepared by an asset valuation specialist" that was dated "as of the Closing Date."  (Am. Compl. ¶ 12; Loan Agreement § 3.01(a)(xx), Harwood Dec. Ex. 2.)  TSC delivered the final RCO Report to Fortress at the closing on March 1, 2004.  In reliance on the Moss Adams Report and the RCO Report, Fortress closed on the Loan and provided the $12.12 million to TSC on March 1, 2004.  (Fortress assigned a 40% interest in the loan to plaintiff Fortress Credit Opportunities II, LP in May 2004.)

Thus, Plaintiffs relied on the information and opinions in the RCO Report prepared by Coleman and based in part on data contained in the Moss Adams Due Diligence Report in deciding whether to enter into the Loan, to determine the terms of the Loan, and to justify the Loan amount.  Specifically, Plaintiffs relied on the RCO Report prepared by Coleman to conclude that the royalty revenue streams used by TSC as Collateral were adequate to support the interest charges on the Loan amount for the one year term of the Loan, and that the catalog value adequately collateralized the Loan.

Within several months after origination of the Loan, the actual revenue streams generated by TSC's catalogue proved to be far below the estimates and valuation placed on them by Moss Adams and by Coleman and RCO.  The actual royalty streams were wholly inadequate to

support payments due. The Loan therefore collapsed. Plaintiffs provided notice of default to TSC in or about November 2004.

Plaintiffs entered into a tolling agreement with Coleman and RCO, in a letter dated February 22, 2007, tolling the statute of limitations for six months. The agreement was entered into by Wayne Coleman on behalf of "The Royalty Compliance Organization, or any of its Managing Partners, partners, parents, subsidiaries, affiliated entities, successors, or assigns ("RCO")." (Harwood Dec. Ex. 3.) The agreement provided that RCO and Fortress:

> mutually agree that they waive and will not assert any defense of statute of limitations or laches, or any other time related defenses (whether by contract or by law) in any such action that Fortress, Northlight or RCO commences against the other on or before August 22, 2007, except to the extent that such defense would have been available on or before the date of this letter. [emphasis added]

Thus, RCO agreed to waive any statute of limitations defense that did not exist as of February 22, 2007. Plaintiffs commenced this action on August 17, 2007, within the six-month tolling period.

Plaintiffs have also pursued their remedies against TSC, its individual members and various other responsible parties in separate litigation. Plaintiffs expect to conclude a settlement with all or nearly all principal parties in the very short term.

## ARGUMENT

### I.    The Claims Against Coleman And RCO Are Not Time Barred Under The Tolling Agreement

Plaintiffs and RCO executed a tolling agreement effective February 22, 2007. The agreement tolled the statute of limitations for six months. The tolling agreement plainly states that RCO "waive[s] and will not assert any . . . time related defense . . . in any such action that Fortress . . . commences against [RCO] on or before August 22, 2007, except to the extent that such defense would have been available on or before [February 22, 2007]." This action was

commenced on August 17, 2007, prior to the expiration of the tolling agreement. Thus, the only basis on which RCO and Coleman can argue that the action is time barred is if they can establish that the statute of limitations for Plaintiffs' professional negligence case against them expired prior to February 22, 2007. The unambiguous allegations of the Amended Complaint, which defendants do not dispute, demonstrate that the limitations period had not expired.

As the Amended Complaint alleges, Coleman and RCO provided Fortress with an updated valuation of the Collateral "as of February 25, 2004." (Am. Compl. ¶ 40.) Coleman and RCO do not dispute – indeed they concede in their motion to dismiss – that they provided a copy of their appraisal dated as of February 25, 2004 to Fortress. (D. Br. at 6, 9.) Clearly, that report could not have been provided any earlier than February 25, 2004. Even assuming, *arguendo*, that Coleman and RCO are correct that the cause of action accrued and the statute of limitations began to run upon delivery of their report on February 25, 2004, the statute of limitations would not have expired until February 25, 2007. (Plaintiffs demonstrate in Point II, *infra*, that the cause of action did not accrue until the Loan closed on March 1, 2004, rather than when the report was delivered on or after February 25, 2004.) Therefore, under RCO and Coleman's own theory, they had no statute of limitations defense available as of February 22, 2007. Taking the six month tolling period into account, it is indisputable that this action was timely filed on August 17, 2007.[2] Therefore, the motion to dismiss on the basis of the statute of limitations has no merit whatsoever.

---

[2] Mr. Coleman asserts that he signed the tolling agreement on February 27, 2007 and that it did not become effective until that date. That is incorrect and irrelevant. Inasmuch as the tolling agreement expressly states that he waived any statute of limitations defense that did not exist as of February 22, 2007, when he agreed to the tolling agreement, it is of no import that he then waited several days to actually sign the agreement.

## II.    The Statute Of Limitations Did Not Accrue Upon Receipt of Defendants' Work Product

Coleman and RCO base their entire – and incorrect – statute of limitations argument on their mistaken assertion that the clock on the statute was not tolled until February 27, 2007. Although Plaintiffs have demonstrated that this argument has no merit whatsoever, if it were even in question that the agreement was not effective until February 27, 2007, this action was nonetheless timely filed.

Coleman and RCO mistakenly argue that the statute of limitations applicable in all accounting malpractice actions begins to run when the accountant's work product is received by a plaintiff. Coleman and RCO are wrong, for two reasons. First, Coleman and RCO cite five inapposite cases for this proposition, and fail to address case law holding that an accounting malpractice action "accrues when an injury occurs."[3] The date that the injury occurs will not always be the date that the accountant's work product is received -- and that is certainly not when the injury occurred here. Second, New York law distinguishes between an "accounting malpractice" action between a client and its accountant, as discussed in the cases RCO and Coleman cite, and a negligence action such as here between a lender and the accountant retained by its borrower. There, again, the court must determine when the plaintiff's injury occurred.

As the complaint alleges, it was not until March 1, 2004 that Fortress could have relied on and could have been injured by Coleman and RCO's work product. (Am. Compl. ¶¶ 53, 54.) That is the date on which Fortress was injured, because that is when Fortress closed the Loan and provided the funds to TSC in reliance on the opinions and valuations contained in Coleman and RCO's Report. (Am. Compl. ¶ 54.) Accordingly, the cause of action did not accrue until March 1, 2004.

---

[3] Bastys v. Rothschild, 97 Civ. 5154, 2000 U.S. Dist. LEXIS 17944 (S.D.N.Y. Nov. 21, 2000).

A.    **The Statute Of Limitations In Accounting Negligence Actions Begins To Run Three Years From The Time All Facts Necessary To The Action Have Occurred**

1.    **The Bright Line "Upon Receipt Of Work Product Rule" Is Specific To Negligence In The Preparation Of Tax Returns and Audits**

In New York, the claim accrues and the statute of limitations begins to run in an accounting action "'when all the facts necessary to the cause of action have occurred and an injured party can obtain relief in court.'" Williamson v. PriceWaterhouseCoopers LLP, 9 N.Y.3d 1, 4-5, 840 N.Y.S.2d 730, 733 (2007) (quoting Ackerman v. Price Waterhouse, 84 N.Y.2d 535, 541, 620 N.Y.S.2d 318, 320 (1994)). This is normally the point at which a plaintiff "reasonably relies on the accountant's skill and advice and, as a consequence of such reliance," is injured. Ackerman, 84 N.Y.2d at 541, 620 N.Y.S.2d at 321.

Ackerman and Williamson are the only cases addressing an accountant's professional malpractice that Coleman and RCO cite for their argument that the statute of limitations began to run upon delivery of their report to Plaintiffs.[4] But Coleman and RCO fail to consider the language quoted above from their own cases that the claim accrues when the injury occurs and the plaintiff could have first alleged a cause of action against the accountant. By ignoring this language, Coleman and RCO mistakenly assert that the statute of limitations begins to run -- as a matter of law, in every accounting action -- upon the receipt of the accountant's work product. (D. Br. at 8.) In contrast, relying on Ackerman, this court has recognized that under New York law, an accounting malpractice action accrues "when an injury occurs." Bastys v. Rothschild, No. 97 Civ. 5154, 2000 U.S. Dist. LEXIS 17944, *150 (S.D.N.Y. Nov. 21, 2000).

---

[4] Coleman and RCO also rely on Sosnow v. Paul, 43 A.D.2d 978; 352 N.Y.S.2d 502 (2d Dep't 1974), an architecture case, but that case too undermines their argument. The court there found that accrual occurred upon completion of the project for which the defendants were hired. The analogous date in this case is March 1, 2004, when the Loan "project" for which Coleman and RCO were hired was completed.

In contrast to the facts here, <u>Ackerman</u> and <u>Williamson</u> concerned an accountant's negligent preparation of annual tax returns or audits. <u>See Ackerman</u>, 84 N.Y.2d at 538, 620 N.Y.S.2d at 319; <u>Williamson</u>, 9 N.Y.3d at 2, 840 N.Y.S.2d at 730. When an accountant's work product is a tax return or an audit, it is normally ready to be filed by the recipient as received and therefore may be relied on immediately. Indeed, reliance in such situations consists of nothing further than the ministerial act of filing the tax return or audit. In that context, the <u>Ackerman</u> court held that receipt of the tax return from the accountant is "the first time the client can rely on the alleged negligent work product," and it thus held that the statute of limitations began to run upon receipt. <u>Ackerman</u>, 84 N.Y.2d at 538, 620 N.Y.S.2d at 319. <u>See also</u> <u>Mitschele v. Schultz</u>, 36 A.D.3d 249, 252, 826 N.Y.S.2d 14, 18 (1st Dep't 2006) ("claim of negligently given incorrect accounting information or advice therefore normally accrues, under <u>Ackerman</u>, upon receipt of negligently prepared <u>tax documents</u>") (emphasis added); <u>Booth v. Kriegel</u>, 36 A.D.3d 312, 315, 825 N.Y.S.2d 193, 195 (1st Dep't 2006) (the receipt of work product rule applied where "the particular transactions at issue are the 14 annual federal tax returns" defendant prepared for plaintiff). Thus, in that context, the date of receipt and the date of reliance -- and therefore the date of injury -- will always be the same.

Here, the date that Coleman and RCO provided their valuation opinion to Plaintiffs was not the same as the date of reliance or the date when all facts necessary to allege injury occurred. Coleman and RCO were aware when they delivered their Report to TSC and Fortress that it would be used by Fortress to evaluate the sufficiency of TSC's Collateral. (Am. Compl. ¶ 48.) Coleman and RCO were aware upon their engagement that Plaintiffs would rely on their determination of the potential amount of Collateral that could be available to Plaintiffs in the event that TSC were to default on its obligation to Plaintiffs. (Am. Compl. ¶ 49.) Coleman and

RCO were thus aware upon their engagement that Plaintiffs would rely, in part, on their expertise to enter into the Loan.

Coleman and RCO were aware when they issued their report to Plaintiffs that TSC was still in negotiations with Plaintiffs and, unlike the ministerial act of filing a tax return or an audited financial statement upon receipt, Coleman and RCO were aware that those negotiations would not be concluded on the same day that they sent their report to Plaintiffs. (Am. Compl. ¶ 61.) Indeed, the Amended Complaint alleges that RCO and Coleman provided one version of their appraisal as of January 30, 2004, and then updated it with a subsequent appraisal as of February 25, 2004. This demonstrates that Coleman and RCO understood that their work was not completed upon delivering their initial appraisal or even their updated appraisal.[5] Their work was not complete until Fortress relied on it to close the Loan with TSC.

Fortress was not, and could not have been, injured until it determined the terms, interest charges, and loan amount that would be appropriate to TSC's catalog based on Coleman and RCO's conclusions regarding the value of the royalty revenue streams used by TSC as Collateral, and relied on those reports by closing the Loan. (Am. Compl. ¶¶ 53, 54.)

The RCO Report valuing the Collateral was received at the closing and the Loan closed on March 1, 2004. (Compl. ¶ 50.) That is the date on which Plaintiffs "reasonably relie[d] on the accountant's skill and advice and, as a consequence of such reliance" could have been injured. Ackerman, 84 N.Y.2d at 541, 620 N.Y.S.2d at 321. Coleman and RCO did not prepare any work product analogous to a tax return on which Plaintiffs could have possibly relied upon receipt. The analysis in Ackerman and Williamson regarding tax return and audit preparation is

---

[5] On a motion to dismiss, the Court should make all reasonable inferences in favor of Plaintiffs. Global Network Communs., Inc. v. City of New York, 458 F.3d 150, 154 (2d Cir. 2006); Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006).

not applicable to the facts here involving a valuation of property to be pledged as collateral for a commercial loan.

Indeed, this court has recognized the distinction under New York law where an accounting malpractice action concerned a sale transaction rather than a tax filing or audit. As noted above, the court in Bastys, 2000 U.S. Dist. LEXIS 17944, *150, stated that the cause of action accrues "when an injury occurs" (quoting Ackerman). There, the plaintiff transferred real property in 1992, relying on work performed by his accountant in 1989. The court found that the "alleged injury resulting from these negligent acts or omissions is the loss of Plaintiff's property in St. Croix in 1992, when Plaintiff transferred it." Id. at *151. Accordingly, the court held that the action accrued in 1992, at the time the transfer was consummated, and not at the time that the accountant's report was received. Id.

The bright line "upon receipt" rule applicable in tax return or audit cases and urged by Coleman and RCO is inapplicable here.

   2.    **In The Context Of Consummated Transactions, Reliance And Injury Both Occur And The Statute Of Limitations Accrues Upon Consummation**

Coleman and RCO also ignore a central distinction between the facts alleged in the Amended Complaint and the facts in Ackerman and Williamson. In each of those cases, the plaintiff was the direct client of the defendant accountant rather than a third party lender to the accountant's client. This distinction was expressly noted as relevant to the analysis of when the statute of limitations accrues in Fleet Factors Corp. v. Werblin, 114 A.D.2d 996, 997, 495 N.Y.S.2d 434, 435-36 (2d Dep't 1985). There, the plaintiff approved advances to its borrower upon receipt of financial statements from its borrower's accountant, and the court held:

> The Statute of Limitations for professional malpractice is three years, and in those cases where the plaintiff is the client of the professional the cause of

action accrues upon the performance of the work by the professional [citations omitted]. However, <u>where, as here, the action is brought by a third party who was not the client, the action is not strictly speaking one for malpractice, but is one for simple negligence. And the statute begins to run, in such a case, from the date of the injury</u> [citation omitted].

<u>Id</u>. (emphasis added). The court dismissed the action because the plaintiff commenced it more than three years after it provided advances to its borrower upon receipt of the defendant's negligently prepared financial reports. <u>Id</u>. It was plaintiff's distribution of the loan funds in reliance on the accountant's work product that constituted the harm -- that is when the cause of action accrued.

Similarly, in <u>Chemical Bank v. Sternbach & Co.</u>, 91 A.D.2d 518, 456 N.Y.S.2d 392 (1st Dep't 1982), the plaintiff lent money to a third party in reliance on financial statements it received from the defendant, the borrower's accountant. The court dismissed the action because the lender commenced the action "more than three years after it <u>received and relied upon</u> the certified statements to extend credit to [the borrower]." <u>Id</u>. (emphasis added).

This court in <u>Cohen v. Abrahams</u>, 751 F. Supp. 472 (S.D.N.Y. 1990), reached the same result. There, an accountant not retained by the plaintiff provided an assessment of the financial condition of corporations to which the plaintiff made loans. The court held that the action was time barred because it was brought, unlike here, more than three years after "the last loan made to any of [the] corporations in reliance upon" the defendant's work product. <u>Id</u>. at 473. Again, this court measured the statute of limitations from the dates when the lender advanced the funds. This decision was made on a motion for summary judgment and the court noted that although the complaint, filed in 1987, alleged that loans had been made as late as 1985, plaintiffs produced no evidence showing any loans after 1982. <u>Id</u>. at 473-74.

14

It should be noted that while the courts in all four of the non-tax return cases discussed above (<u>Batsys</u>, <u>Chemical Bank</u>, <u>Fleet</u>, and <u>Cohen</u>) stated that they would look to when the plaintiffs actually relied on the financial statements that they had received, in both <u>Fleet</u> and <u>Cohen</u> the courts observed that the financial statements that triggered the loans were received by the plaintiffs in the course of an ongoing lending relationship. In those two cases, the plaintiffs – unlike Fortress – were in a position to rely on the work product upon its receipt without any further work or analysis necessary before advancing loan funds. Even so, those courts also measured reliance, and thus accrual, from the time the loan funds were advanced. Of course, the facts here are different. Coleman and RCO's delivery of their Report to Fortress and TSC was not the final step necessary before Plaintiffs could have relied on their analysis. Coleman and RCO knew that their Report would be used to assist Fortress in determining the terms, interest charges, and the loan amount that would be appropriate to TSC's catalog value. (Am. Compl. ¶ 54.) It was not until Plaintiffs received the final information and decided to enter into the Loan transaction with TSC that it could have relied upon the RCO Report. And the Amended Complaint specifically alleges that the final RCO Report was delivered at the closing.

Thus, all of the facts necessary for Plaintiffs to assert that they were injured, and the cause of action accrued, on March 1, 2004 when Plaintiffs relied on Coleman and RCO's final report by making the Loan and disbursing the funds to TSC.

This accrual rule is the same where a plaintiff enters into a transaction in reliance on the work of professionals in fields other than accounting. <u>IFD Constr. Corp. v. Corddry Carpenter Dietz and Zack</u>, 253 A.D.2d 89, 685 N.Y.S.2d 670 (1st Dep't 1999), is particularly instructive in that it relies on the same body of law as the accounting cases cited above. The plaintiff received allegedly defective work product from an engineering firm it had not directly retained. The

defendant had negligently misrepresented the condition of the property that it had been hired to assess, and the plaintiff formulated its offer "on the basis of documents and specifications prepared by the defendant."

The court first recognized "the differing rights of the owner who retained the engineer and a party outside of that relationship who is allegedly injured as a result of the engineer's negligence." Id. at 92, 685 N.Y.S.2d at 671. The court then cited Ackerman, and Credit Alliance Corp. v. Andersen & Co., 101 A.D.2d 231, 476 N.Y.S.2d 539 (1st Dep't 1995), rev'd on other grounds, 65 N.Y.2d 536 (1985), for the proposition that "the date the work product is received . . . is the earliest date on which the injured party, who did not retain the professional, could have relied upon it [emphasis added]." In IFD, however, the court held that the statute of limitations began to run not upon receipt of the negligent report but when the plaintiff actually relied upon the report when it consummated the transaction. "Having allegedly relied on the [defendant's] negligent misrepresentations in the contract documents in formulating its supposed unrealistically low bid, [plaintiff] was, for purposes of the Statute of Limitations, injured" when it entered into the contract. 253 A.D.2d at 93, 685 N.Y.S.2d at 672.[6]

The result is the same here because here, too, Plaintiffs did not and could not have relied on the Coleman and RCO report immediately upon receipt of the first version of that report.

_____

[6] Coleman and RCO rely on Video Corp. of Amer. v. Frederick Flatto Assocs., Inc., 85 A.D.2d 448, 448 N.Y.S.2d 498 (1st Dep't 1982), which concerned a claim for the sale of inadequate insurance. The standard for accrual was not at issue there; rather, the litigated point, irrelevant here, was whether a six or three year statute applies to negligence in the performance of a contract. However, relevant here is the court's determination of the accrual date, which it measured from completion of the injury more than a year after the sale of the policy, when plaintiffs' uncovered loss occurred. 85 A.D.2d 454, 448 N.Y.S.2d 503. Were the accrual method applied in Video Corp. applied here, the statute of limitations would not have begun to run until the Loan collapsed and Fortress' injury was complete. Coleman and RCO also rely on Tesoriero v. MetLife, 800 N.Y.S.2d 357 (Sup. Ct. Kings' Cty. 2004), an action against an insurance broker in which the court held that insurance brokers are not professionals. The court's analysis of the statute of limitations for professional negligence is thus dicta. That analysis does not aid Coleman and RCO at any rate, as the court held that accrual occurred upon the completed sale of the insurance instruments. Here, the analogous date is the March 1, 2004 closing.

Reliance could not occur until Fortress had the final version of RCO's valuation of the Collateral and of the royalty streams TSC would use to satisfy the Loan. Plaintiffs entered into the Loan, accepting TSC's Collateral as sufficient in reliance on the estimates, analyses, and valuations contained in the RCO Report that Coleman prepared. (Compl. ¶ 53.) Plaintiffs relied on the RCO Report at the closing on March 1, 2004. That is the date that the cause of action accrued.

### III.    Plaintiffs Allege Facts Sufficient To Establish A Relationship With Coleman And RCO So Close As To Approach Privity

Under well-settled New York precedent, a professional incurs a legal duty of care to parties with whom there is no actual privity if the professional's relationship with that party is so "close as to approach that of privity." Prudential Ins. Co. v. Dewey Ballantine, Bushby, Palmer & Wood, 80 N.Y.2d 377, 382, 590 N.Y.S.2d 831, 833 (1992). The Amended Complaint alleges facts sufficient under various of the tests articulated by the Court of Appeals for examining professional relationships.

The Court of Appeals has "articulated the requirement in various ways." Ossining Union Free School District v. Anderson LaRocca Anderson, 73 N.Y.2d 417, 425, 541 N.Y.S.2d 335, 339 (1989). It can be "described as reliance by the plaintiff that was the end and aim of the transaction." Id. (internal quote omitted). The Court in Credit Alliance Corp. v. Andersen & Co., 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 443 (1985), spelled out three criteria to be used in examining whether this standard is met:

> (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes;
> (2) in the furtherance of which a known party or parties was intended to rely; and
> (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.

In the companion case to <u>Credit Alliance</u>, the court emphasized that these criteria were met where the accountant "was well aware that a primary, if not the exclusive, *end and aim* of auditing its client, Majestic Electro, was to provide [Electro's lender] with the financial information it required" to advance a loan. <u>European American Bank and Trust Co. v. Strauhs & Kaye</u>, 65 N.Y.2d 536, 554 493 N.Y.S.2d 435, 445 (1985) (emphasis in original). In <u>Ossining</u>, the court held that the standard was met where the plaintiff alleged that given its contact with the accountant and "the nature of the work, defendants were aware -- indeed, could not possibly have failed to be aware -- that the substance of the reports they furnished would be transmitted to and relied upon by" the plaintiffs. 73 N.Y.2d at 425, 541 N.Y.S.2d at 339.

In a situation analogous to the facts here, the Second Circuit found a relationship sufficiently close to privity to impose a duty on the accountant. The district court had found that the defendant accounting firm "knew that the [plaintiff] insurance companies qua investors existed;" that the defendant knew that the plaintiffs relied on their work product; and that the defendant knew that its client requested certain work product "for the express purpose of being forwarded to" the lenders. <u>AUSA Life Insur. Co. v. Ernst & Young</u>, 206 F.3d 202, 223 (2d Cir. 2000). Therefore, the Second Circuit concluded that these facts satisfied "the second requirement of [the *Credit Alliance*] test [which] required the accountant to be aware its report would be used for a particular investor purpose, 'in the furtherance of which a known party or parties was intended to rely.'" <u>Id</u>. <u>See also</u> <u>Caprer v. Nussbaum</u>, 36 A.D.3d 176, 198, 825 N.Y.S. 2d 55, 74 (1st Dep't 2006) (reversing dismissal of plaintiff's accounting negligence action on privity grounds where, *inter alia*, "it is alleged here that the accountants communicated, on at least one occasion reflected in the record," with plaintiffs); <u>Chemical Bank v. Brout & Co.</u>, 172 A.D.2d 382, 568 N.Y.S.2d 761, 762 (1st Dep't 1991) (holding the complaint sufficient where it

alleged defendants' knowledge that the underlying transaction required provision of its work product, receipt of the work product by plaintiffs, and direct contact.)

Here, Plaintiffs satisfy the three part <u>Credit Alliance</u> test.  RCO and Coleman knew that their appraisal was being used in connection with TSC's efforts to obtain a loan, knew that the appraisal was intended for use by Fortress, and sent their report directly to Plaintiffs in order that Fortress would rely on their work product.  The amended complaint clearly alleges that RCO and Coleman knew when they sent their report to Fortress that Plaintiffs would rely on their expertise to determine the amount and value of the Collateral supporting the Loan.  (Am. Compl. ¶ 48.) RCO and Coleman represented that the report they sent directly to Plaintiffs was "designed to estimate the fair market value of [TSC's] Catalogs . . . and [is] intended to be used to assist [TSC] and their representatives in assigning value to those assets."  (Am. Compl. ¶ 42.)  Finally, the Amended Complaint additionally alleges that "Coleman provided valuation services to borrowers, lenders and rating agencies that conduct transactions involving securitization of royalty revenue streams in the music industry" (Am. Compl. ¶37), demonstrating that they were in the practice of performing these types of appraisals for the very purpose of inducing lenders to rely on their professional expertise.  As in <u>European American Bank</u>, RCO and Coleman were "well aware that a primary, if not the exclusive, *end and aim* of auditing its client, [TSC], was to provide [Fortress] with the financial information it required" to advance a loan.  Accordingly, the complaint here adequately alleges a relationship so close to privity as to create a duty and should not dismissed.

## IV.    Defendant Wayne C. Coleman Is Properly Named In This Action

The Amended Complaint adequately states facts upon which Defendant Wayne C. Coleman may be named, as an individual, in this action for professional negligence.  Plaintiffs do not seek damages from Coleman under a corporate "veil piercing" theory, as Coleman asserts.

Rather, Plaintiffs' Complaint pleads facts establishing that Coleman is directly and individually liable in negligence.

The Complaint alleges that Coleman was retained by TSC to provide a valuation of its catalog assets; that Coleman provided that valuation; that Coleman stated that his work product was "intended to be used to assist [TSC] and their representatives in assigning value to those assets;" that Coleman used his specific expertise regarding music industry trends in performing that valuation; that Coleman "adjusted" the underlying data provided to RCO by Moss Adams; that Coleman was aware Plaintiffs would rely on his expertise in determining the value of TSC's Collateral in deciding whether to provide the Loan to TSC; that Coleman addressed the valuation report on RCO letterhead to TSC and to Fortress at its offices in New York City as well as to Fortress's joint venture partner, Northlight Financial, LLC; that Coleman had a duty to exercise the same degree of skill, prudence, and diligence as other members of the profession engaged in music royalty valuation commonly possess and exercise; and that Coleman breached that duty by, *inter alia*, substantially overstating TSC's anticipated future royalty revenue stream, underestimating the rate at which the catalog would decline in value, and overstating the present value of the Collateral. (Am Compl. ¶¶ 39, 40, 43, 46, 47, 49, 52, 61, 62, 63.)

As Coleman's motion to dismiss acknowledges, Plaintiffs are not at this time, prior to discovery, seeking to impute to Coleman RCO's liability by piercing RCO's corporate veil. Coleman prepared the RCO Report and provided it to Fortress under the letterhead of RCO. Plaintiffs have adequately pleaded professional negligence separately and equally against Coleman and RCO, and the claims against Coleman should accordingly not be dismissed.[7]

---

[7] Indeed, rather than piercing RCO's veil to get to Coleman, the professional services that Coleman negligently provided may be imputed to RCO. It "is hornbook law [that] the doctrine of *respondeat superior* renders a master vicariously liable for a tort committed by his servant while acting within the

### V.    There Are No Grounds On Which To Stay This Action

Nor should this action be stayed due to litigation pending in Tennessee or a possible bankruptcy proceeding that may arise out of the collapse of TSC, as defendants suggest in the alternative. Those proceedings will not resolve the issues presented in this action.

The very cases Coleman and RCO rely on in asking the Court to stay this action demonstrate the lack of merit of their request. A party seeking a stay under this Court's inherent power to manage its docket must "make out a clear case of hardship or inequity in being required to go forward." Landis v. No. Amer. Co., 299 U.S. 248, 255 (1936). It is error for a district court to stay an action where a related proceeding will not substantially resolve the issues in the action. Sierra Rutile, Ltd. v. Katz, 937 F.2d 743, 750 (2d Cir. 1991) (reversing stay order because "[t]he difference between the parties and issues in the court action and in the [related proceeding] undermines the rationale that the [related proceeding] will have an effect on the stayed action").

Coleman and RCO admit that the parties and issues in litigation pending in Tennessee state court are almost entirely different from those here: in Tennessee, certain songwriters brought an action against TSC and Plaintiffs; neither TSC nor any individual songwriters are parties to the present action, and Coleman and RCO are strangers to the Tennessee actions. (D. Br. at 15-16.) The Tennessee actions allege mismanagement and fraud on the part of TSC. (Id.) Those allegations, even if proven true, would have no effect on this action. There is simply no relevant connection between the Tennessee actions and this case, other than that Fortress is a

---

scope of his employment." Rivello v. Waldron, 47 N.Y.2d 297, 302, 418 N.Y.S.2d 300, 302 (1979). The doctrine extends liability to the employer if the employee did not "totally abandon the employer's interests and act entirely for their own or others' purposes." Prudential-Bache Securities, Inc. v. Citibank, N.A., 73 N.Y.2d 263, 276, 539 N.Y.S.2d 699, 706 (1989) (reinstating complaint prior to discovery where employees' aiding and abetting of fraud may conceivably have benefited the employer). Coleman was not merely RCO's owner – he was also the professional appraiser who provided the services for Fortress's benefit.

plaintiff here and a defendant in Tennessee.[8]  Nor have Coleman and RCO presented any

evidence whatsoever of hardship or inequity in going forward, much less the "clear case"

required under Landis.

Finally, Coleman and RCO argue that damages in this action will remain speculative until

the conclusion of all related proceedings, including a foreclosure and auction of the Collateral

that is pending in Tennessee.  Coleman and RCO assert that Plaintiffs' damages cannot be

determined until after all the Collateral has been liquidated and all other sources of recovery

have been exhausted.  This is simply wrong.  Plaintiffs will have to prove their damages at trial,

including any offset from other sources – if Plaintiffs are still in possession of some Collateral,

they will have to put a value on that Collateral to reduce the amount of loss for which defendants

are responsible.  In any event, while Plaintiffs do not agree that this action should await the

resolution of all other efforts to recover for their losses, the point is effectively moot:  Plaintiffs

expect to conclude a settlement with all or nearly all parties in those litigations in the very short

term, likely before these motions are even argued.  Certainly, Plaintiffs will have the burden to,

and will, demonstrate their damages at the time of trial.

Coleman and RCO's remaining argument for a stay is also meritless.  Simply, they

observe that if this action goes forward, they will make counterclaims and third party claims.  (D.

Br. at 16.)  The argument is nearly frivolous:  the prospect that a defendant may bring

counterclaims, third party claims or contribution claims is obviously not grounds for a court to

stay or dismiss the original action.

---

[8]  Although not clear, Coleman and RCO appear to suggest that the Court-ordered return to certain of
TSC's members of title to their songs precipitated the collapse of the Loan (D. Br. at 16).  They are
mistaken.  Defendants' Exhibit E shows that the Order for return of title was entered on July 19, 2005, a
year after the collapse of the Loan at issue in this case and more than seven months after Fortress
provided a notice of default to TSC. (Am. Compl. ¶ 56.)  In any event, these are issues of fact that are
inappropriate on this motion to dismiss.

## **CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that this Court deny

Defendants' Motion For Judgment Dismissing The Complaint.

Dated: New York, New York
       December 5, 2007

                              Respectfully submitted,

                              KASOWITZ, BENSON, TORRES
                                & FRIEDMAN LLP

                              By:_____
                                   Michael C. Harwood (MH 4227)
                                   mharwood@kasowitz.com
                                   Jon Avins (JA 1417)
                                   javins@kasowitz.com

                              1633 Broadway
                              New York, New York  10019
                              Tel:    (212) 506-1700
                              Fax:    (212) 506-1800

                              Attorneys for Plaintiffs

23