Westlaw.

Not Reported in F.Supp.2d                                                                           Page 1
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**Bastys v. Rothschild
S.D.N.Y.,2000.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Jonas BASTYS, Plaintiff,
v.
Alan H. ROTHSCHILD, Esq.; Rothschild,
Himmelfarb, Sher, Pearl & Giacomo, LLP; Norman
D. Himmelfarb, Esq.; Ronald A. Sher, Esq.; Michael
R. Pearl, Esq.; M. Theresa Giacomo, Esq.; Eli Fine
and Eli B. Fine, C.P.A., P.C., Defendants.
Alan H. ROTHSCHILD, Esq.; Rothschild,
Himmelfarb, Sher, Pearl & Giacomo, LLP; Norman
D. Himmelfarb, Esq.; Ronald A. Sher, Esq.; Michael
R. Pearl, Esq.; and M. Theresa Giacomo, Esq., Third-
Party Plaintiffs,
v.
Eli FINE; Heino Bastys; W. Whitfield Wells; and
Klara Jensen Bastys, Third-Party Defendants.
**No. 97 Civ. 5154 CMGAY.**

Nov. 21, 2000.

MEMORANDUM DECISION AND ORDER
DISPOSING OF PENDING MOTIONS FOR
SUMMARY JUDGMENT
MCMAHON, J.
**\*1** Plaintiff Jonas Bastys, who died during this year,
brought this diversity action suit against his former
attorney, Alan Rothschild, Rothschild's former law
firm and partners (collectively "the Rothschild
Defendants"), and his former accountant, Eli Fine,
and Fine's accounting firm ("the Fine Defendants").
Plaintiff asserts numerous claims, all of which are
brought under New York law, sounding in
malpractice, breach of contract, breach of fiduciary
duty, and fraud. The Rothschild Defendants have
brought cross-claims for contribution against
Defendant Fine, Plaintiff's son, Heino Bastys,
Plaintiff's former wife, Klara Bastys, and former
attorney, W. Whitfield Wells. Heino Bastys in turn
has asserted counterclaims against the Rothschild
Defendants for common law negligence, breach of
contract, and breach of fiduciary duty.

All Defendants in the main action have moved for
summary judgment as to Plaintiff's claim in its
entirety. The Third-Party Defendants have also
moved for summary judgment, as have the

Rothschild Defendants with respect to Heino Bastys'
counterclaims. For the reasons that follow: (1) the
Rothschild Defendants motion to dismiss Plaintiff's
claims is granted in part and denied in part; (2)
Plaintiff's claims against the Eli Fine Defendants are
dismissed in their entirety; (3) the third-party claims
are dismissed in their entirety; and (4) Heino Bastys'
counterclaims against Rothschild are dismissed in
their entirety.

STANDARDS FOR SUMMARY JUDGMENT
AND CONNECTED RULINGS

The standards for granting summary judgment
pursuant to Fed.R.Civ.P. 56 are well-settled.
Summary judgment is appropriate when there are no
disputed issues of material fact and the moving party
is entitled to judgment as a matter of law.
See Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 247-50 (1986). A genuine issue
for trial exists if, based on the record as a whole, a
reasonable jury could find in favor of the non-
movant. See Liberty Lobby, 477 U.S. at 248. In
making its determination, the court must resolve all
ambiguities and draw all reasonable inferences in
favor of the non-movant. See id. at 255. To defeat
summary judgment, the non-moving party must go
beyond the pleadings and "must do more than simply
show that there is some metaphysical doubt as to the
material facts." Matsushita Elec. Indus. Co. v. Zenith
Radio Corp., 475 U.S. 574, 586 (1986).

In light of these settled principles, I must, at the
outset, discuss the state of the record before me. The
parties have provided the Court with mountains of
paper in support of and in opposition to this motion.
Insofar as the Fine Defendants' motions are
concerned, the parties on both sides have submitted,
and rely on, competent evidence in support of their
respective positions.

The same cannot be said with respect to the motions
made by the Rothschild Defendants. In support of
those motions, the movants rely in large measure on
the affidavit of defendant Alan Rothschild, the
attorney who stands accused of malpractice, breach
of his fiduciary duty and fraud. In that affidavit, Mr.
Rothschild attests to numerous conversations
between himself and plaintiff Jonas Bastys that took

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 2
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

place during the period 1989 through 1994. Mr. Rothschild testifies both to what he said to Mr. Bastys in these conversations and what Mr. Bastys said to him.

**\*2** Plaintiff has submitted no evidence whatever concerning these conversations from any person who was allegedly present at them, including especially Mr. Bastys. There is a reason for that. Mr. Bastys suffered a highly debilitating stroke in April of 1987. The parties dispute how greatly that episode affected Mr. Bastys' ability to make informed business judgments and assess the advice he was given by his family, friends and advisors, including Mr. Rothschild. Indeed, Plaintiff's allegation that Mr. Rothschild took advantage of Plaintiff's disability underlies every claim in suit. But there is no dispute that Mr. Bastys' ability to communicate was somewhat impaired following the stroke. The parties do disagree over the extent of that impairment.

Rothschild takes the position that Plaintiff was capable of speaking to him throughout the relevant period, and that he fully understood his business affairs. Indeed, Rothschild contends that he discerned no effect on Plaintiff's mental capacity, and asserts that "after the stroke [Plaintiff's] mind appeared sharp, as he could recall details about his financial affairs and holdings, and often reminded me to attend to specific matters on his behalf."(Rothschild Aff. ¶ 23.). Rothschild did acknowledge that Plaintiff would sometimes say "no" when he meant "yes" and vice versa, and would give both "yes" and "no" answers to the same question. (Rothschild Dep. At 122). When asked what steps he took "to determine or to help him figure out that he said the wrong word," Rothschild responded, "I would repeat it, and he would then make it known what he wanted me to do."(Rothschild Dep. at 122.) How Bastys "made it known" to Plaintiff is not clear. He recounted numerous instances when Plaintiff gave him specific instructions about his business affairs-never once indicating whether those "instructions" came in the form of yes or no responses to leading questions, and leaving the reader of his affidavit with the distinct impression that Bastys actually spoke about complex business dealings with his attorney.

The accounts of others, however, differ dramatically. In a letter dated September 11, 1987 from Defendant Fine to the Internal Revenue Service, Fine requested an extension of Baltic's filing deadline because Plaintiff was "unable to communicate as the stroke affected speech, motor control, etc."(Pl.Exh. 34.) Colleen Swearingen, who lived with Plaintiff's son, Jonas Jr., and Plaintiff after Plaintiff moved to California in 1991 (a move occasioned by his wife's decision to obtain a divorce from her then-invalid husband), avers that she "had a very hard time understanding [Bastys]" when she first met Plaintiff in 1991-some four years after the stroke. She gradually began to understand Plaintiff as she became familiar with his gestures. Swearingen also "learned to pull information by asking yes and no questions," though Swearingen adds that "this is not always reliable due to the fact that he is unable to communicate to me that he fully understands the questions being asked. (Swearingen Aff. ¶ 4.) Moreover, in her affidavit, which is dated October 1999, Swearingen stated that Plaintiff "also becomes confused at times and will answer when he means no and no when he means yes," with the effect that he would often rephrase questions to him and get an opposite answer. (Id.¶ 6). This, of course, is the very difficulty that Rothschild acknowledged at his deposition. (See Rothschild Dep. at 122.) Swearingen likened communication with Plaintiff to "a game of charades," in that "[a]t times [Plaintiff] can become quite frustrated" and "quite emotional at times which makes it even more difficult for him to communicate."(Id. at ¶ 8.)

**\*3** Betsey Bartzick, the wife of Bastys' deceased business partner, Hubert Bartzick, gave even more dramatic testimony, describing Plaintiff in the aftermath of the stroke as a "vegetable," and adding:
He was very incapacitated and was living on one secondary artery. And it was a miracle. The doctor said that he wasn't even alive. He wasn't able to do much of anything for himself. And his speech-he was speaking in Lithuanian rather than English most of the time, and he cried very easily. He certainly was a changed man. He was not the businessman that I knew before.

(Elizabeth Bartzick Dep. at 42-43.) Ms. Bartzick did testify that, with respect to his ability to communicate, Plaintiff "seemed to be getting better as time went on," noting that "[h]e seemed to be improving much more than the doctors even hoped for or thought possible."(Id. at 43). Unfortunately, no specifics were elicited from her as to the point in time at which that improvement began or how much of an improvement there was.

Finally, Plaintiff's son, Heino Bastys, avers that his

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

father's speech, "was not getting any better, and started getting worse" after Plaintiff's move to California in 1991. Heino also states that "it can be very difficult to understand my father because he can't repeat questions that you ask."(Id.¶ 8.) According to Heino, Plaintiff "started to do a little better in California," and "[f]or a while ... was semi-independent, but only to the extent of being able to go to the bathroom by himself."(Heino Bastys Aff. ¶ 7.) Additionally, Heino claims that occasionally, Plaintiff will "have better days when he may recall small details surprising me and other days he can't remember details that we had recently discussed making me feel that his condition had worsened."(Id.)

Plaintiff by all accounts could not effectively communicate by the time his deposition was taken in this case. The Court had the unhappy experience of viewing a videotape of some of Mr. Bastys' "testimony," which was taken during 1998. I fear I can only describe what I saw as pathetic. Mr. Bastys, who was once a sharp and successful businessman, could not articulate concepts at all. Indeed, he could not frame a sentence. His yes and no responses to wildly leading questions from his own lawyers (which were asked over the well-taken objection of Defendants' lawyers) were barely intelligible and not always consistent when the same question was asked more than once. Plaintiff repeatedly broke into tears during the session and the camera had to stop filming. Whether that was out of frustration at his inability to communicate or the anxiety and fear of a mentally impaired individual who is thrust into an unfamiliar position is impossible to determine. I would not permit a jury to view this deposition at a trial; it proves nothing other than the Plaintiff's lack of ability to testify.

The same thing apparently occurred at untaped sessions of his deposition. Plaintiff has submitted portions of that deposition for the sole purpose of controverting Mr. Rothschild's assertion that Plaintiff was able to communicate and/or that Plaintiff could have "said" words that Mr. Rothschild, in his affidavit, puts into Bastys' mouth. The submitted examples include the following exchanges:
**\*4** Q. Did you ever sign a deed or an agreement to give Hubert property in St. Croix to settle the dispute?
A. No.
Q. You never did?
A. Yes.

Q. You told us that you and Hubert split Amberlands?
A. Yes.

(Jonas Bastys Dep. at 28.) Similarly, when asked about his lawyer's representation of him in his divorce action, Plaintiff exhibited a similar inability to control his responses:Q. What about Whitfield Wells? Do you know who that is?
A. Yes.
Q. Who is that?
A. Lawyer, one of my lawyers.
....
Q. Did he ever represent you?
A. The-(response indiscernible).
Q. Was he your divorce lawyer?
A. Yes.
....
Q. Did [Wells] send you letters in California?
A. No.
Q. No?
A. Yes.
Q. He did?
A. Yes.

(Rothschild Dep. at 31, attached as Pl. Exh. 43.) Plaintiff encountered the same difficulty at another session of his deposition the following month:Q. Was Whitfield Wells your attorney in the divorce action with [Klara]?
A. No.

(Id. at 45.)

It seems obvious to the Court that the Jonas Bastys of late 1999 was not capable of creating a detailed affidavit to controvert Mr. Rothschild's many assertions about what he said and did five to ten years previously. Plaintiff's attorney attempts to remedy this gaping hole in the record by introducing (1) the complaint; (2) his own affidavit; (3) affidavits or deposition testimony of other individuals, such as Plaintiff's ex-wife Klara, his son Heino, and individuals like Colleen Swearingen and Plaintiff's business manager, Patricia Cummaro; and (4) a mountain of documents. The first two pieces of "evidence" are, of course, no evidence at all: the allegations of the complaint are insufficient to raise a disputed issue of material fact, see*Warren v. Westchester County Jail,* 106 F.Supp.2d 559, 563 (S.D.N.Y.2000), and neither, under long-settled principles of law, is an attorney's affidavit. See*Caracciola v. City of New York,* No. 95 Civ.

Case 1:07-cv-07369-HB    Document 32-2    Filed 12/21/2007    Page 4 of 42

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

3896, 1999 WL 144481,*3 (S.D.N.Y. Mar. 17, 1999). I therefore cannot and do not consider either of these sources of information in connection with this motion. I do consider the testimony of the other individuals and the documents, but to the extent that these affidavits contain conclusory statements from persons who were not present at particular exchanges between Plaintiff and Rothschild, I am constrained to find that they do not raise genuine issues concerning the content of those conversations.

However, I conclude that the evidence submitted on behalf of Plaintiff-including both his own deposition testimony and the testimony of others-is more than sufficient to raise a genuine issue of fact concerning his ability to communicate with Mr. Rothschild in the manner and to the extent recounted by Mr. Rothschild in support of the motion. The deposition excerpts demonstrate that Plaintiff was unable to communicate during the pendency of this action, and the testimony of witnesses like Betsey Bartzick, Heino Bastys and Colleen Swearingen suggests that this difficulty extends back many years, into the period when Rothschild alleges that Plaintiff was effectively communicating with him.

**\*5** I therefore make the following finding that governs my consideration of the Rothschild Defendants' motions: the submissions by Plaintiff's counsel are not sufficient to raise a disputed issue of material fact concerning the contents of statements that Rothschild claims to have made to Bastys, and to the extent that no other witness who is competent to testify has submitted contradictory evidence, they are deemed undisputed. However, to the extent that Rothschild claims that Plaintiff told him various things, the evidence submitted by Plaintiff creates a disputed issue of fact about whether Plaintiff could possibly have communicated those things to his attorney.

### STATEMENT OF FACTS

#### (1) *Rothschild's Representation of Plaintiff*

The Plaintiff in this action, Jonas Bastys, was involved in the business of real estate development and management in Westchester County and elsewhere. The parties do not specify the length of time during which Plaintiff worked in the real estate field, but it is not disputed that his experience dated from at least the late 1970s. Plaintiff's real estate business was conducted variously through a subchapter S corporation named Baltic Estates, Inc. ("Baltic"), in which Plaintiff and his business partner, Hubert Bartzick, were equal shareholders, through a partnership known as the Bastys/Bartzick Partnership, or "B & B Partnership, or in Plaintiff's name individually. Plaintiff served as President of Baltic, bearing primary responsibility for the financial aspects of the business, while Bartzick tended mainly to construction-related matters.

Defendant Alan Rothschild, a partner at the White Plains law firm Rothschild, Himmelfarb, Sher, Pearl & Giacomo, was retained as Baltic's attorney in or about the late 1970s for the purpose of representing Baltic in connection with the conversion of a number of apartment buildings to cooperative ownership. At all times relevant to this action, Rothschild represented Baltic and Plaintiff pursuant to a general, unwritten retainer, until his termination by Plaintiff (or someone acting on his behalf) in or about October 1996. Defendants Norman Himmelfarb, Ronald Sher, Michael Pearl, and M. Theresa Giacomo were Rothschild's partners in the Rothschild, Himmelfarb firm during the time that Rothschild served as counsel for Plaintiff.

Gradually, the scope of Rothschild's representation expanded to the point where he began to act as both general counsel for Baltic and personal lawyer for Plaintiff and Bartzick. For example, in 1981, Rothschild prepared for Plaintiff a prenuptial agreement between Plaintiff and his second wife, Klara Bastys. Plaintiff's relationship with Rothschild eventually became close enough that, in December 1986, Plaintiff executed a general power of attorney in favor of Rothschild.

Plaintiff suffered his stroke in the spring of 1987, entailing the impairments detailed above. At no time, apparently, was a guardian, conservator or committee of Plaintiff's person or property appointed.

**\*6** On June 10, 1987-some two months after his stroke-Plaintiff signed a second general power of attorney to Rothschild.

In 1991, Plaintiff moved to California to live with his son, Jonas Jr. and Jonas Jr.'s girlfriend, Colleen Swearingen.

#### (2) *Plaintiff's Prenuptial Agreement and Divorce*

In or about 1981, Plaintiff, whose first wife had died, married Klara Jensen. Prior to his remarriage, Plaintiff asked Rothschild to prepare a prenuptial agreement. It is undisputed that Rothschild understood Plaintiff wanted to get out of the agreement. Rothschild testified that Plaintiff "wanted an agreement before he got married to [Klara] so that Baltic would remain in his family."[FN1](Rothschild Dep. at 414.) The agreement, which provided that Klara was not to receive any of Plaintiff's premarital property in the event of divorce, was signed in triplicate by Plaintiff and Klara. Rothschild gave both Plaintiff and Klara original executed copies, and kept the third copy in a file located in his office. Rothschild advised both Plaintiff and Klara to keep their copies in safe places in the event that the document should be needed in the future. (Rothschild Aff. ¶ 13.) According to Rothschild, Plaintiff did not ask Rothschild to retain or otherwise safeguard Rothschild's own copy. As this concerns a matter that occurred six years prior to Plaintiff's stroke, I accept Rothschild's uncontroverted statement on this point There is no question that plaintiff was competent and able to communicate at that time.

> FN1. Plaintiff's attorney has also included a brief excerpt from Plaintiff's deposition testimony as evidence of Plaintiff's intent:
> Q. Did you know what you wanted in the agreement?
> A. I don't know.
> Q. Did your lawyer tell you what should go into the agreement?
> A. I don't know.
> Q. The agreement was signed by your wife Lally?
> A. Yes.
> Q. Did you see her sign it?
> A. Yes.
> Q. Did the agreement give her any property?
> A. No.
> Q. Gave her nothing?
> A. Nothing.
> Q. Nothing. Is that what you wanted?
> A. Yes.
> Q. You wanted to give her nothing?
> A. Nothing.
> ....
> Q. What part of the agreement made you unhappy?
> A. I don't know how to say.
> (Jonas Bastys Dep. at 60, 71.)

After the agreement was signed, Plaintiff and Klara took title to several properties as tenants-by-the-entirety, including their marital residence in Croton-on-Hudson, New York, and other real property in Florida, St. Maarten, and Somers, New York. In 1982, Rothschild prepared Plaintiff's will, which left the proceeds of a $1 million life insurance policy, and all of his then owned real property, to Plaintiff's sons. The will named Rothschild as executor.

Plaintiff's marriage to Klara did not survive the horrors of his massive stroke. In June 1991, Plaintiff moved out of the martial home, and on September 17, 1991, Klara filed a divorce action. According to Rothschild's affidavit, Plaintiff thereupon "informed" Rothschild of the action. (Rothschild Aff. ¶ 40.) Rothschild searched his files for his copy of the prenuptial agreement, but was unable to find it. He came to the conclusion that the file had been lost when he moved to new offices in 1984. Rothschild avers that he advised Plaintiff that he could not locate his copy of the agreement, but explained that the loss of the document did not necessarily mean that its terms could not be proven and enforced by a court.

Rothschild also states that he told Plaintiff that his firm could not represent Plaintiff in a divorce action against Klara, citing a conflict of interest-specifically, Rothschild and Klara were friends, and he had represented Klara in various transactions. Rothschild further explained that he was disqualified from representing Plaintiff because his testimony would be needed to prove the terms of the prenuptial agreement. (Id.¶ 41.)Following this conversation, Rothschild continued to search for the missing copy for "quite a long period of time."(Rothschild Dep. at 426.) Plaintiff contends that Rothschild's loss of the agreement constituted malpractice.

**\*7** Another attorney, Third-Party Defendant W. Whitfield Wells, undertook to represent Plaintiff in his divorce action. The genesis of Plaintiff's relationship with Wells is unclear, but Rothschild neither recommended Wells nor referred Plaintiff to him.[FN2]According to Wells' testimony, Plaintiff told Wells that he believed Klara had taken his copy of the prenuptial agreement from his safe deposit box. (Wells Dep. at 11.) Wells advised Plaintiff not to litigate the existence of the prenuptial agreement because of, *inter alia,* the expense involved. (Id.) Ultimately, Plaintiff did not pursue litigation. Thereafter, beginning in late 1991, Wells attempted

Not Reported in F.Supp.2d                                                                                                          Page 6
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

to negotiate a settlement with Klara's attorney, Henry Berman.

> FN2. Plaintiff's present attorney appears to imply that Rothschild retained Wells on Plaintiff's behalf, citing a letter from Rothschild to Wells dated July 15, 1991, which enclosed a check from the Rothschild, Himmelfarb firm's attorney trust account to cover Wells' retainer. (Pl.Exh. 59.) That letter lends no support to Plaintiff's suggestion, as it states clearly that Rothschild was forwarding the check "at the direction of [Plaintiff]." (Id.)Thus, Rothschild's averment that Plaintiff retained Wells remains the only evidence on the question. It is of questionable, value, given that Plaintiff had suffered his stroke four years earlier. The portions of Mr. Wells' deposition testimony in the record before me shed no light on the subject.

Although Wells represented Plaintiff, Rothschild remained involved in the divorce action, though the precise extent and nature of his involvement is disputed. Rothschild states that, with Plaintiff's knowledge and consent, he was involved only in the settlement negotiations, to the extent of providing Wells and Berman with information, and acting as an "intermediary" between Plaintiff and Klara and their attorneys. (Rothschild Aff. ¶ 48.) Rothschild avers that he played no role in preparing the stipulation of settlement, but acknowledges reviewing and correcting the stipulation as it pertained to the disposition of Plaintiff's real estate holdings. (Id.¶ 50.)Plaintiff's attorneys, however, characterize Rothschild's role in the action as far more influential. Specifically, Plaintiff contends that, despite Wells' status as Plaintiff's attorney of record, Rothschild acted as the "attorney-in-fact" for both Plaintiff and Klara, to the extent that he "controlled" the divorce action, and that in this alleged conflicting role, Rothschild breached his fiduciary duty to Plaintiff.

As evidence of this, Plaintiff submits no direct evidence, but argues it as an inference from certain documents, to wit: letters disclosing various marital assets and their respective values by Rothschild to Wells and Klara's attorney, Berman (Pl.Exh. 62, 63, 66, 67, 74, 75, 83); a letter from Berman to Rothschild repeating a prior request for unidentified "documents" (Pl.Exh. 60); a letter from Rothschild to the Columbian Financial Group requesting that the

life insurance policy under the Klara Bastys. Trust be terminated and the proceeds be sent to Rothschild's office (Pl.Exh. 71); letters to Wells, Klara's attorneys, and Plaintiff stating that Rothschild had reviewed and made changes to the proposed stipulation of settlement (Pl.Exh. 76, 89, 91, 93); handwritten notes reflecting Rothschild's attendance at two meetings with the matrimonial attorneys during settlement negotiations (Pl.Exh. 77, 80); an escrow agreement between Plaintiff and Klara pursuant to which Rothschild served as escrow agent (Pl.Exh. 64); and a letter dated August 3, 1993 in which Rothschild informed Plaintiff that Klara might be willing to reconcile provided Heino had no further involvement with Baltic. (Pl.Exh. 79.) [FN3]Plaintiff also argues that Rothschild's alleged involvement can be inferred from the fact that Rothschild's children were beneficiaries of Klara's will to the extent of 20 percent of her assets.

> FN3. Plaintiff's attorney also claims that, in August 1993, "Rothschild conveyed the message to Jonas that Klara is prepared to move to California to resume their relationship under one condition: Heino be kept away from Baltic Estates."(Curtis Aff. ¶ 48(xx).) In support of this contention, he cites Plaintiff's Exhibit 79. No such exhibit is in the record. Accordingly, this assertion is disregarded.

**\*8** On March 4, 1994, Plaintiff and Klara entered into a stipulation of settlement. The stipulation provided that title to the martial residence in Croton, the Somers property, property in St. Croix referred to as "Wood Cottage," and Florida property was to be transferred to Klara. The settlement also required Plaintiff was required to pay Klara maintenance of $72,000 per year until 2006. A judgment of divorce was entered on June 3, 1994.

A marital asset not provided for under the stipulation was a $1.6 irrevocable life insurance trust. On March 27, 1997, almost three years after the divorce judgment was entered, Wells wrote to Klara's attorney asking that Klara renounce her interest in the trust. Why this letter was written is not clear. Klara refused; she insists on taking as the primary beneficiary under the trust. The affidavit of Plaintiff's attorney asserts that, as the "controlling attorney" in the settlement negotiations, Rothschild should have obtained a waiver of Klara's interest in the trust as part of the divorce settlement. The complaint alleges

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

that his failure to do so constituted malpractice.

### (3) Bartzick's Embezzlement Claim

By late 1986, Plaintiff and Bartzick's relationship had begun to sour. In the latter part of that year, Bartzick complained that Plaintiff was charging excessive personal expenses to their business accounts. At a meeting with Plaintiff and Bartzick, Rothschild explained that it would be impermissible for him to represent one against the other in litigation. So in December 1986, Plaintiff and Bartzick decided to "split" the Baltic properties. Because their accountant, Defendant Eli Fine, advised them that a formal deeding of the property would result in adverse tax consequences, Plaintiff and Bartzick decided to divide the properties "informally." In the wake of the "split," at the express request of both Plaintiff and Bartzick, Rothschild continued to provided business and legal advice to both of them individually, and to the business entities in which they continued to have an interest.

Despite their "split," Plaintiff and Bartzick continued to work as partners on certain projects. One of these included their joint purchases of equal interests in several parcels of land in St. Croix between December 1986 and January 1988. Together, these parcels totaled in excess of 500 acres, and included property referred to as "Gonzalez," "Fairleigh Dickinson University" ("FDU") and "Lee ." They purchased the Gonzalez property in December 1986 for $2.6 million, with a $2 million purchase money mortgage providing for four installment payments of $500,000 in December 1987, 1988, 1989 and 1990, plus interest at eight percent per annum. The partners acquired the FDU property in October 1987 for approximately $2.2 million, with a $1.6 million purchase money mortgage providing for four installment payments of $400,000 in June 1988, 1989, 1990 and 1991, plus interest at nine percent per annum. They purchased the Lee property in January 1988 for approximately $1.7 million, with a $1.2 million purchase money mortgage providing for two installment payments of $600,000 in January 1989 and 1990, plus interest at ten and one-half percent per annum. The last two purchases were made after Plaintiff had his stroke. Rothschild represented the partners in these joint transactions.

**\*9** By letter dated March 9, 1989-some 20 months after Plaintiff suffered his stroke-Bartzick advised Rothschild that, based upon Bartzick's review of the books and records of account of Baltic and other entities through which Plaintiff and Bartzick had done business, Bartzick believed that Plaintiff had embezzled "millions of dollars" from Baltic's accounts. As compensation, Bartzick demanded that Plaintiff transfer to him title to their jointly-owned properties in St. Croix and in Yorktown (Westchester County), New York. Bartzick concluded his letter to Rothschild as follows:

Alan, I hope and believe that you will be able to work out a prompt and satisfying settlement with Jonas.... However, should you not be able to, I will understand you cannot serve two masters. In which case, I will be compelled to place the matter in the hands of another in order to rectify this horrendous situation. Embezzlement is a serious crime. Hopefully, the whole world need not know of our problems and that [sic] the matter will be taken care of quietly and discreetly. However, if need be, I will prosecute to the fullest extent of the law.

(Pl.Exh. 50.) Bartzick advised Rothschild that the basis for his allegation was (1) a handwritten ledger and (2) so-called "loan account summaries" that were compiled by Bartzick from 752 canceled checks and cash disbursements with the aid of his then-wife, Betsey. Bartzick asserted to Rothschild that the canceled checks demonstrated that, for the period of 1981 through 1987, Plaintiff had used the funds of Baltic and other jointly owned businesses to pay personal expenses, including the mortgage on his residence, travel expenses, and for his sons, Heino and Jonas Jr. Bartzick gave Rothschild a copy of a handwritten ledger that Bartzick said supported his claim, as well as copies of the "loan account" summaries. Rothschild contends that he has never reviewed the ledger or accompanying summaries or undertaken any analysis to determine the validity of Bartzick's claim. (Rothschild Aff. ¶ 29.) Rothschild did, however, keep the ledger and summaries in his files. It is undisputed that the loan accountant analysis prepared by the Fine firm, which reflected all loans taken on the Baltic account at the times relevant to Bartzick's allegation, was accessible to Rothschild when the embezzlement charge was made.

Plaintiff and Bartzick met with Rothschild on June 1, 1989. Rothschild states that he "immediately" reminded Plaintiff and Bartzick that he could not represent either of them in connection with Bartzick's allegations. (Rothschild Dep. ¶ 31.) More precisely, Rothschild testified as follows:

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Q. But yet you say there was a meeting when both [Plaintiff] and [Bartzick] were with you and talked about the discrepancy?
A. They came to me and each pled their cases to what they thought their side of the picture was. And I said, "You"-I said, "Look, I can't do this. You are putting me in the middle, and I can't make a decision as to who owes what monies and if such money is owed."

**\*10** (Rothschild Dep. at 156.) Later in his testimony, Rothschild testified to the following conversation with Plaintiff:A. I said to-I had told [Plaintiff], I said, "Look John, Hubert is claiming that you took a lot more money out of the business than he did."And he came back and said he deserved more because he was more instrumental in all the decisions.... At that time I saw it was not getting resolved, and I said-I said, "John, I said to Hubert that if he wants to pursue the matter, he would have to-he would have to get independent representation and, John, you will have to get independent representation, too."

(Id. at 157.)According to Rothschild, at no time did Plaintiff ask Rothschild to help him review or analyze Bartzick's claim. And Rothschild did not do so. Rothschild testified that he has no knowledge as to whether Bartzick's claim was valid. (Rothschild Dep. at 156.)

In a follow-up letter dated June 23, 1989, Bartzick threatened to bring suit in the event that Plaintiff refused to settle the claim. (Rothschild Def. Exh. H.) By letter dated June 26, 1989, over Plaintiff's signature, and purportedly signed by Plaintiff, the request was made that Bartzick turn over to Plaintiff copies of the checks in question, which the letter said Plaintiff would review "in order to determine the correct amount which may be due to [Bartzick]." (Rothschild Def. Exh. I.) The letter went on to state: "In no way were these checks deceitfully or fraudulently written. A full accounting will be provided. I would suggest that you refrain from using words such as embezzlement."(Id.)

Patricia Cummaro, Baltic's officer manager, his wife, Klara, and his son Heino were asked to assist Plaintiff in evaluating Bartzick's claim. According to Cummaro, Plaintiff asked her to "go back in all of the checkbooks and all of the petty cash and all of this and write down everything that came out of all the books."(Cummaro Dep. at 92.) Cummaro refused to do so, telling Plaintiff that she would "not be a party to this."(Id. at 93.)[FN4]Heino claims that Plaintiff

asked him to categorize and organize the canceled checks compiled by Bartzick, enlisting the help of his then-wife Klara in analyzing those checks. Based upon his review, Heino's conclusion was that "some of [the expenditures] my father was absolutely not responsible for and some of them he was."(Heino Bastys Dep. at 349.) However, Heino also avers that he never reached a conclusion as to the validity of Bartzick's claim, because, in early 1992, for reasons not made clear, Plaintiff told Heino to "drop" his review of the checks. (Heino Bastys Aff. at ¶ 14.) Heino further claims that Plaintiff asked him, "Total? Two million?", to which Heino replied, "It looked about that much." (Id.) Klara testified that she compiled a list of the relevant checks, but did not study them herself. (Klara Bastys Dep. at 559.)

> FN4. Cummaro's testimony suggests that Plaintiff was capable of some communication in 1989, two years after the stroke.

Jeffrey Heilbronn, the accountant who performed most of the accounting work for Plaintiff and Bartzick on behalf of the Fine firm until October 1996, testified that Bartzick's "homemade analysis" was an inaccurate reflection of personal loans because it failed to take into account deposits and adjustments. (Pl.Exh. 55.) Heilbronn explained that Fine's account analyses allocated many of the checks identified by Bartzick to various "sub-accounts." Once that adjustment was made, according to Heilbronn, the partners' loan accounts remained roughly equal between 1981 and 1987. He also testified that the loan account analyses that Fine prepared each year before preparing tax returns demonstrated not only that Plaintiff had not taken a disproportionate amounts of loans from the Baltic account, but also that Bartzick had taken roughly $160,000 more than Plaintiff during the years in question. Heilbronn also claimed that the records demonstrating Bartzick's error were immediately available to both Rothschild and Fine when Bartzick made his allegation in 1989.

**\*11** In or about October 1990, Bartzick retained an attorney, Paul Lewittes, for the purpose of bringing an action for accounting against Plaintiff. Lewittes made a formal demand upon Plaintiff for the monies allegedly owing by letter dated October 24, 1990. (Pl.Exh. 53.) However, Bartzick never took legal action against Plaintiff.

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*(4) The Partnership's Financial Difficulties*

Plaintiff and Bartzick were of course adversely affected by the precipitous downturn in the real estate market that began in or about the late 1980s. At that time, they owned a substantial number of unimproved properties, almost all of which were encumbered by mortgages. Eventually, their indebtedness exceeded the fair market value of certain properties. Since nearly all of the partnership properties were failing to produce income, it became increasingly difficult for them to keep current on their mortgage, tax and other financial obligations incident to their ownership of the unimproved real property.

Beginning in or about December 1989, Plaintiff and Bartzick began to default on various financial obligations on their jointly owned properties in St. Croix. For example, they failed to make a principal payment of $500,000 due on the mortgage on the Gonzalez property in December 1989, and did not make any subsequent mortgage payments of the approximately $1 million in principal plus interest due thereon. They failed to make a principal payment of $400,000 due on the mortgage on the FDU property in June 1991. And by 1992 they owed interest of approximately $315,000 on the mortgage on the Yorktown property, and failed to make any subsequent mortgage payments on the $2.2 million in principal due. The partners also owned in excess of $3.360 million to Barclays Bank in connection with the mortgage encumbering property in Pawling and Croton-on-Hudson, New York. These and other creditors began to make demands for repayment. On behalf of both Plaintiff and Bartzick, Rothschild attempted to defer the payments due on their properties and convince the creditors not to take action against them.

By late 1991 or early 1992, the holders of the mortgages on the FDU and Lee properties in St. Croix had initiated foreclosure proceedings. Rothschild continued his efforts to bring about a settlement with the creditors and to sell some of the properties. Plaintiff was sent a letter during 1992 advising him of these efforts. (Rothschild Def. Exh. X.) Also by this time, the mortgage, taxes and other obligations on the Yorktown property had grown to approximately $2.75 million in the aggregate, with Plaintiff's portion totaling approximately $1.375 million. The holder of the Yorktown mortgage, which had issued an unsecured loan to Plaintiff and Klara in

the amount of approximately $670,000, was threatening to take legal action on the outstanding balance. Rothschild also attempted to negotiate a resolution of those debts. Via letter, Rothschild kept Plaintiff informed of those attempts as well. (Rothschild Exh. Y.)

*(5) Bartzick's Death and the Settlement of His Claim*

**\*12** Against this backdrop of the partners' declining fortunes, Bartzick died on January 14, 1992. Rothschild was named as executor of Bartzick's Estate and administrator of his will. In addition, Rothschild was named as trustee of a trust created under the will, which owned 50 percent of Baltic's stock and partnership property. It is undisputed that, in that role, Rothschild became a partner with Plaintiff in Baltic. Rothschild also served as trustee of a second, irrevocable trust that was paid $10 million upon Bartzick's death. Bartzick's children-Albert Bartzick, Richard Bartzick, and Rosemarie Slachta-and his estranged wife Betsey were the beneficiaries of all of these instruments. Rothschild has also continued to serve as the personal and business attorney for the Bartzick children. (Rosemarie Slachta Dep., attached as Pl. Exh. 106 .)

As to the conflict of interest presented by his new roles with respect to the Estate, Rothschild testified that, at some unidentified point in time, he told Plaintiff, "John, there is a claim by Hubert's estate against you, and I can't represent you in connection with this or-and there is a conflict, and what are you going to do about it?"(Rothschild Dep. at 155.) Rothschild went on to testify more specifically that, after his meeting with the Bartzick children:
I said to Jonas, "John, you know, there-you know that [Bartzick] was making claims for the extra money that you took."And I said, you know, "I am the executor, and I want to know-that means if, in fact, the claim has to be brought, it is going to be brought under my name against you, and therefore, there is going to be conflicts all over the place unless something can be done to work it out, and I will have to excuse myself."

(Rothschild Dep. at 166.)

On March 24, 1992, Rothschild met with the beneficiaries of the Bartzick Estate. Rothschild's handwritten notes indicate that the financial status of several partnership properties were discussed,

Not Reported in F.Supp.2d                                                                                          Page 10
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

including the St. Croix and Yorktown properties. (Pl.Exh. 111.) The precise import of Rothschild's notes is not self-evident, but Rothschild does not dispute Plaintiff's characterization of the notes as placing the Yorktown property's potential value at $8.2 million, yielding a profit of $3.5 million. The beneficiaries also asked Rothschild about the status of their father's 1989 claim against Plaintiff. Rothschild told the children that Plaintiff had denied the claim, and that he would ask Plaintiff about how Plaintiff wanted to handle the dispute. (Rothschild Aff. ¶ 59.) There was also mention of a new sewer district to be developed on the Yorktown property. (Pl.Exh. 113.)

Later that week, Plaintiff flew from California to meet with Rothschild. (Pl.Exh. 110.) At their meeting, there was discussion concerning the possibility of the Estate's buying out his interest in St. Croix and taking over the debts in the Yorktown property. (Rothschild Dep. at 977.) Plaintiff also indicated to Rothschild (somehow) his interest in potential refinancing of Baltic properties in the event that Rothschild was able to negotiate discounted mortgages. Specifically:

**\*13** Q. He wanted to participate in the buyout?

A. Yeah, if he could get the money.

Q. But he wanted to participate in the buyout?

A. He would weigh the decision when he saw how much money he would have.

Q. But he expressed to you that he was interested in participating in the buyout?

A. No, he was interested in investigating the buyout.

....

A. What I honestly saw was a man sitting there, trying to ask me to help investigate different ways that he could save some property and, most importantly, Baltic Estates.

(Rothschild Dep. at 990-91.) Rothschild acknowledged that he did not give Plaintiff any written information about the planned sewer district in Yorktown that he had discussed with the Bartzick children. (Id. at 975.)

Rothschild avers that, at some point during the first half of 1992, Plaintiff decided to convey his interests in the FDU and Lee properties in St. Croix to the Bartzick Estate in exchange for release from the debt on the property, and to settle Bartzick's 1989 embezzlement claim. (Rothschild Aff. ¶ 69.) Rothschild also claims that, at or about that time, Plaintiff decided to transfer his interest in the

Yorktown property to the Estate, in exchange for release from the debt on that property, though he wanted to negotiate the terms of that conveyance to allow him to retain five lots of the property. (Id.¶ 70.)Plaintiff has submitted no evidence as to whether, or at what point in time, he agreed to make these transfers. In any event, Rothschild asked Douglas Brady, an attorney in St. Croix, to prepare a quitclaim deed by which Plaintiff would convey his interest in the "Turner Hole" properties to the Bartzick Estate.[FN5]Brady did so, and forwarded a proposed deed to Rothschild by letter dated May 28, 1992. (Pl.Exh. 116.)

> FN5. The parties refer to the conveyed real estate in St. Croix variously as the "Lee" and "FDU" properties, or, alternatively, the "Turner Hole" properties. Neither party has explained this deviation, but since the parties appear to use these names interchangeably with reference to the transferred property, the Court assumes that the "Turner Hole" properties and the "Lee" and "FDU" properties are one and the same.

Heino testified that, in early 1992 (soon after Plaintiff told him to stop working with the checks), Rothschild "said something like, 'In my experience in law, nobody's 100% right and the other 100% wrong.' He was saying, 'Your father took the money.' " (Heino Bastys Aff. ¶ 15.) Heino also states that he has "some recollection of [Rothschild's] acknowledging that he looked at the checks," but he is no more specific than that. (Id.) Heino further avers that Rothschild said "that he would transfer over St. Croix property and Yorktown for what [Plaintiff] had taken which was the best solution because [Plaintiff] didn't have any money, the Yorktown property wasn't worth the value of the mortgage on it, the St. Croix property had no market, and the Bartzicks would be helping my father get him off the debts"-though his affidavit is unclear as to whether Rothschild made that statement during the same conversation. (Id.)

On July 8, 1992, Rothschild sent Plaintiff a letter informing Bastys of the following: (1) that Rothschild had reviewed Plaintiff's request "to retain 5 lots from the Yorktown subdivision with Hubert's kids"; (2) that Rothschild had enclosed an appraisal of the Yorktown property indicating a value of $2.4 million, and a total debt on the property of $2.75 million; (3) that Plaintiff would be required to pay roughly $50,000 incident to the transfer of the

Case 1:07-cv-07369-HB    Document 32-2    Filed 12/21/2007    Page 11 of 42

Not Reported in F.Supp.2d                                                                    Page 11
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

property in taxes and for deed stamps; (4) that "[i]n view of the foregoing, the kids feel they are relieving you of the debt and in essence paying more than fair market value of the property"; and (5) that Rothschild had enclosed a copy of Klara's latest demands in the divorce action. [by paying the debts on the property] (Pl.Exh. 115.) Rothschild closed by advising Plaintiff that he would be in California on July 17, and would "come to see [Plaintiff] to discuss this and come to a final decision."(Id.) Item (4) was of course predicated on the representation that the value of the Yorktown property was $2.4 million. The potential value of the property and the possibility of a new sewer district serving the property were not mentioned in the letter.

**\*14** Plaintiff's record concerning what was discussed during that meeting is scant, although his son, Jonas Jr., was also present.[FN6] Rothschild's handwritten notes, captioned "Mtg. w/ Jonas in Cal," contain the following details:

> FN6. Jonas Bastys Jr. did not submit an affidavit in opposition to Rothschild's motion, and he apparently was not deposed.

(1) Give-Hubert's Est
Lee-in exchange for any debt owed by Jonas
FDU
(2) Yorktown OK-if [Plaintiff] relieved from bad debt.
(3) Sell int. in Wood Cottage for $600,000 -
(4) Try to get Barclays back up & combine -
(5) Check to see taxes owed on Amberlands.
(6) Try to talk to Pat
(7) Cancel [illegible] policy use surrender value to pay [illegible]
(8) Sewer [illegible]-hold back $ from sale-[illegible]
Barclays & do it @ that time
(9)

(Pl.Exh. 150.) Rothschild also brought to the meeting a deed transferring the St. Croix property, which Brady had sent him. Plaintiff signed that deed, but it was not notarized, which omission Rothschild attributed to the fact that there was no notary nearby. (Pl.Exh. 123.)

Rothschild testified that he and Plaintiff reached "an oral agreement" to convey Plaintiff's interest in the Yorktown property. (Rothschild Dep. at 618.) In his affidavit, Plaintiff's attorney asserts, without identifying any evidence, that Rothschild brought a

copy of a contract for sale of the Yorktown property to this meeting. There is such a contract in the record, signed by Plaintiff, with the typed word "July" crossed out as the month entry, replaced by the handwritten entry "October," appearing beside the date 1992. Granite Knolls is listed as vendee. (Pl.Exh. 151.) A second version of the contract also appears in the record, signed by Plaintiff, with the typewritten date October 1992. (Pl.Exh. 152.) The reason for the subsequent version is not explained. Nor is there any direct evidence in the record to support Plaintiff's contention that Rothschild presented the contract to Plaintiff in California. However, after his return to New York, on July 24, 1992, Rothschild wrote to Mark Hochberg, the attorney for the Bartzick Estate, on stationery legended "The Estate of Hubert Bartzick, c/o Alan H. Rothschild," enclosing a copy of the contract of sale of Plaintiff and Klara's house in Croton. Rothschild informed Hochberg that he would "be forwarding the Yorktown contract of sale shortly."(Pl.Exh. 153.) Thus, viewing the evidence more favorably to Plaintiff, he appears to have signed a contract for the sale of the Yorktown property. However, the contract has never been executed by anyone representing Granite Knolls and no deed was ever executed in connection with that conveyance. Thus record title to the property remains in names of Plaintiff and Bartzick. Rothschild asserts that the transaction was not completed because he had asked Fine to advise him as to how to minimize the tax consequences of the transfer. (Rothschild Aff. ¶ 79.)

Rothschild further claims that "[i]t was clearly understood ... that the deed would be signed when [Plaintiff] was relieved of all mortgage, real estate tax and engineering obligations in connection with the Yorktown property. (Id.) Rothschild cites nothing to support this conclusory statement about what was "clearly understood." However, the Bartzick Estate did in fact satisfy the debts on the property, without Plaintiff's participation, by purchasing the mortgage and paying the back taxes. At his deposition, Rothschild took the position that the Bartzick Estate is the "beneficial owner" of the Yorktown property by virtue of its having paid those debts. Rothschild also contended that the Estate has a viable claim against Plaintiff for specific performance of the July 17 oral agreement, based on the fact that the Estate's "substantial performance" in paying off the debt on the property. (Rothschild Dep. at 618-19.) Nevertheless, the Estate (by its executor, Rothschild) has taken no legal action to enforce any such

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 12
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

agreement or to quiet title.

**\*15** On July 27, 1992, Rothschild wrote to Steven Shanker, one of the attorneys for the Bartzick Estate, informing him that he met with Plaintiff in California and reviewed "the Will" with Plaintiff. Rothschild went on to report: "Now that [Bartzick's] Estate has settled the claim it had against [Plaintiff], he would like me to serve as Executor and Trustee."(Pl.Exh. 120.) Exactly whose will Rothschild had reviewed is not made clear. On July 30, Rothschild wrote the following to Plaintiff:

Enclosed please find the Agreement pertaining to your deeding the Lee and FDU properties to [Bartzick's] estate in exchange for releasing any claim for moneys that you allegedly owe to the Estate and/or Baltic. I have signed on behalf of the Estate and as an officer of Baltic. Please sign two copies and return it [sic] to me at your earliest convenience.

(Pl.Exh. 121.) According to Rothschild, Plaintiff signed these deeds.

On September 30, Rothschild faxed a copy of the signed agreement to Brady, with a cover letter explaining: "For your information, Hubert's Estate had a claim against Jonas for approximately one million dollars for monies that Jonas borrowed from jointly held property. This claim was settled as per the annexed agreement."(Pl.Exh. 123.) However, Rothschild states that, because those deeds were not notarized, it was necessary to execute new deeds. Rothschild claims that he called Plaintiff and asked him whether he wanted Rothschild to send new deeds or whether Rothschild should sign them under the power of attorney Plaintiff had given him. According to Rothschild, Plaintiff responded that Rothschild should sign them. (Rothschild Aff. ¶ 76.) Whether Plaintiff so stated or not, Rothschild did sign them on October 5. In November 1998, the Estate sold a portion of the conveyed St. Croix properties for $1.1 million. (Pl.Exh. 127.)

### (7) *The Discounted Mortgages Obtained on the Conveyed Properties and Development of the Yorktown Property*

#### (a) *The St. Croix Mortgage*

On July 23, 1992-one week after his California meeting with Plaintiff-Rothschild wrote to Brady informing him that the Bartzick children wanted to purchase the mortgage interests of the Lee and FDU properties in St. Croix. (Pl.Exh. 119.) Rothschild wrote that he wanted to "purchase the mortgage for $500,00.00 [sic]," and advised that Brady had the authority to "go up a little" if necessary. Rothschild enclosed a form of assignment of mortgage, and instructed Brady that the named assignees were to be the Bartzick children. Neither the Estate nor the Bartzick children was able to negotiate a favorable resolution with the holder of the mortgage on the Lee property, who foreclosed, resulting in a deficiency judgment against the Estate. (Rothschild Aff. ¶ 77.) The Estate was, however, successful in obtaining an assignment of the FDU mortgage for $450,000 in October 1998. (Pl.Exh. 125.)

The Gonzalez property was also encumbered by a mortgage. By 1989, the debt had been reduced to $1 million, but fell back into arrears. In late 1992, the holder of the St. Croix mortgage declared Plaintiff and Bartzick in default, demanded payment, and threatened foreclosure. (Rothschild Aff. ¶ 87.) Plaintiff's son, Heino, avers that Rothschild "kept on trying to convince my father to give [the Gonzalez property] up to the Bartzicks because it has no market, 'who knows if it's worth anything,' and because, he said, the Bartzicks paid $50,000 on taxes my father owed."(Heino Bastys Aff. ¶ 19.) Heino states that he became "skeptical" about Rothschild's advice, and advised Plaintiff not to convey the property. (Id.)

**\*16** Brady, who had been negotiating with the mortgage holder, was able to settle the mortgage claim for $500,000. Whether Rothschild disclosed the settlement to Plaintiff is disputed. Rothschild maintains that "Jonas was advised and asked if he wanted to participate," but declined because he lacked sufficient funds to do so, and agreed that the Bartzick children should purchase the mortgage. (Rothschild Aff. ¶ 88.) Heino, however, avers that Rothschild never informed him or Plaintiff about the possibility of securing a discount or the fact that the Bartzicks had made plans to do so. (Heino Bastys Aff. ¶ 19.) Colleen Swearingen states that, at a 1993 meeting that she attended in New York between Plaintiff, Jonas Jr., and Rothschild, Rothschild "strongly urged" Plaintiff to transfer the property to the Bartzicks, because the mortgage holder was threatening foreclosure and because the Bartzicks had been paying the taxes on the property. (Swearingen Aff. ¶ 14.) She also avers that Rothschild told Plaintiff "that the property wasn't worth much and he

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 13
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

had no money to pay the mortgages," but mentioned nothing about a discounted mortgage. (Id.¶ 15.)In addition, Swearingen recalls Rothschild's "being quite strong in his urging [Plaintiff] to sign the property over," and Plaintiff's being "emphatic amount not wanting to lose the property."(Id.¶ 17.)

On October 19, 1994, Rothschild sent a fax to Brady advising that Rothschild was arranging for $500,000 to be wired to Brady's account. (Pl.Exh. 129.) On November 3, the Gonzalez mortgage was assigned to the Bartzick children for $500,000. (Pl.Exh. 128.) As far as this Court is aware, Plaintiff never agreed to convey his interest in that property, and title to it is still in the names of Plaintiff and Bartzick.

  (b) *Planned Development of the Yorktown Property and the Yorktown Mortgage*

Before Plaintiff allegedly agreed to convey the Yorktown property to the Estate, Rothschild and Granite Knolls (the development entity owned by the Bartzick sons, of which Rothschild was Vice-President) made plans to secure approval from the Yorktown Planning Board for an affordable housing development on the property. In addition, after Plaintiff allegedly agreed to the transfer of the property, Rothschild obtained a discounted mortgage for the Yorktown property. Whether Rothschild adequately disclosed to Plaintiff the prospects for a discounted mortgage and the plans to further develop the property before obtaining Plaintiff's oral agreement to the conveyance or his signature on the contract of sale is a matter of dispute.

  (i) *The Proposed Affordable Housing Subdivision*

Well before Plaintiff's alleged oral agreement to convey Yorktown, Rothschild was aware of the property's potential value. In a letter dated December 18, 1987, roughly one year after Plaintiff and Bartzick had purchased the land as tenants-in-common for approximately $1.3 million, Rothschild reported to Marine Midland Bank that offers to purchase the property for $7 million had been received. (Pl.Exh. 131.) An appraisal sent to Rothschild in November 1988 valued the property at $5 million "as is," and $10 million after development approval for 140 lots. (Pl.Exh. 132.) During negotiations with the mortgage holder, American Savings Bank, Rothschild wrote to the Bank's outside counsel, Robert Fischer, in a letter dated December 3,

1991, that, with respect to the property's 130 lots, "there is every reason to believe that the lots can be 'blown-out' at $75,000 per lot; or a total of $9,750,000."Rothschild added, "The value is there, we need only ride out the difficult times."(Pl.Exh. 136.)

**\*17** In late March 1992, Rothschild met with the Bartzick children (but no representative of Plaintiff) to discuss plans to seek approval from the Yorktown Planning Board for construction of affordable housing units. Rothschild's handwritten notes indicate a total value after approval, with no improvement, of $8,280,000. (Pl.Exh. 137.) On April 2, Rothschild wrote to Fisher, informing him that Rothschild had discussed the proposed subdivision with "knowledgeable brokers," who projected a total, after-approval value of at least $5.8 million. (Pl.Exh. 138.) Rothschild added, "Therefore, I believe it is in our best interests to 'hang in' and bring this property to a successful conclusion."(Id.) On April 9, Rothschild, Albert and Richard Bartzick, and their engineers met with the Yorktown town planner. (Pl.Exh. 139.) The possibility of obtaining a 50 percent "bonus" in the number of housing units-from 55 to 73-was on the agenda of that meeting. (Id.)

Rothschild frequently corresponded with the engineers for Granite Knolls, Kellard & Federico, who kept Rothschild abreast of their communications with the Planning Board. On April 27, 1992, Rothschild wrote to Anthony Federico asking that all fees for engineering services be divided equally between Plaintiff and the Bartzick Estate, and that half of the monthly bill be sent to each. (Pl.Exh. 142.) On that same day, Rothschild also wrote to Plaintiff, advising him that the town was rethinking its position on granting a "bonus," and other related developments in connection with the subdivision application. Rothschild wrote that he expected the town to accept the proposal, "plus or minus a few townhome sites; and the subdivision will be granted on an expedited basis."(Pl.Exh. 143.) Rothschild added, "Hopefully, we can then sell it."The engineers continued to keep Rothschild informed of their discussions with the town during May and June 1992.

On July 8, Rothschild wrote Plaintiff informing him of his planned July 17 visit to California. (Pl.Exh. 148.) In that letter, Rothschild enclosed an appraisal of the Yorktown property, indicating a total value of $2.4 million. The letter also noted that the total debt on the property was $2.75 million. Rothschild wrote:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

"In view of the foregoing, the kids feel they are relieving you of the debt and in essence paying more than their fair market value of the property."(Id.) The letter contained none of the information about development or appraisals that is recounted above.

As discussed above, at the July 17 meeting, Plaintiff is alleged to have agreed orally to convey the Yorktown property to the Estate. On September 24, 1992, Rothschild wrote a check for $169,330.26 payable to his firm from the Bartzick irrevocable life insurance trust. That check was used to pay back taxes on Yorktown. (Pl.Exh. 159.)

### (ii) The Yorktown Mortgage

On June 19, 1992, the Federal Deposit Insurance Corporation ("FDIC") informed Plaintiff by letter that American Savings Bank had been declared unsound and placed into receivership of the FDIC. (Pl.Exh. 146.) Rothschild placed the letter in his file. There is no evidence that Rothschild communicated this development to Plaintiff. Rothschild did, however, begin negotiating with the FDIC.

**\*18** In addition to the mortgage, American Savings Bank had also been the holder of a credit line taken out by Plaintiff and Klara. (Rothschild Aff. ¶ 80.) After the FDIC took over the bank, the unsecured loan to Plaintiff and Klara was reduced to a judgment and converted into a secured loan. The FDIC indicated to Rothschild that the mortgage would not be settled without the judgment being settled as well. (Id.) To assist in the negotiations, Rothschild retained the Farragut Group, a Washington D.C. based organization with experience in negotiating work outs with the FDIC. (Id. ¶ 81; Pl. Exh. 162.) Rothschild claims that Plaintiff, Klara and the Bartzick children consented to his hiring of Farragut. He also states that "[a]t each step of the way, all concerned were advised of the progress of the negotiations."(Rothschild Aff. ¶ 81.) He does not detail any corrections or provide any letters setting out specifics, however. In fact, Rothschild does not specifically include Plaintiff in the phrase "all concerned." Plaintiff has put no evidence into the record on the question of whether or how closely Rothschild kept him informed about developments during Farragut's negotiations. However, Heino Bastys avers that "[t]he discounting of the Yorktown mortgage was also something we never knew about and never had an opportunity to explore."Heino also claims that Rothschild knew before the St. Croix and Yorktown mortgages were discounted that Heino had roughly $450,000 to invest, because he (Heino) had previously asked Rothschild about investment opportunities. (Heino Bastys Aff. ¶ 21.) Plaintiff contends that the lack of communication from Rothschild about the negotiations is evidence of his failure to disclose the settlement to Plaintiff.

By letter dated October 5, 1993, Rothschild made an offer "on behalf of Granite Knolls Development Corp. and/or a partnership or corporation to be formed" to purchase the Yorktown mortgage for $1.1 million. (Pl.Exh. 171.) On October 20, 1993, Rothschild signed a personal financial statement prepared for Plaintiff that estimated the value of the Yorktown property as $700,000. (Pl.Exh. 172.) Neither party offers evidence as to the purpose for which the statement was prepared, or specifies to whom the statement was sent.

In late October 1993, Rothschild's negotiations proved fruitful. The FDIC had agreed to settle its claims, which totaled in excess of $3.5 million, for roughly $1.25 million. (Rothschild Aff. ¶ 82.) Rothschild's avers that he informed Plaintiff of the settlement, and asked whether Plaintiff wanted to proceed. According to Rothschild, Plaintiff agreed to go forward, provided that the Estate pay the potion attributable to Yorktown. However, when the time came for payment, Rothschild states, neither Plaintiff nor Klara had sufficient funds for their share of the settlement. Granite Knolls advanced the money to them in exchange for their promise to repay the funds within 6 months, with interest. (Id. at ¶ 83.)In addition to the settlement amount, the Bartzick children paid in excess of $109,000 in back property taxes and approximately $45,000 in engineering fees. Rothschild states that in so doing, the Estate performed its obligations under the oral agreement to convey the Yorktown property and claimed beneficial title thereto. (Id.¶ 84.)The mortgage was assigned to Granite Knolls on November 3, 1993. (Pl.Exh. 173.) Heino's testimony (cited above) supports Plaintiff's position that the Bartzick camp knew nothing about this settlement and was never offered the chance to participate.

### (iii) The Alleged Fraudulent Statements by Rothschild

**\*19** Plaintiff alleges that Rothschild made several fraudulent misrepresentations indicating that Granite Knolls was the sole owner of the Yorktown property.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 15
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiff appears to contend that Rothschild made these false statements in order to ensure that the Bartzick children, to the exclusion of Plaintiff, would reap the benefit of the discounted mortgage and planned affordable housing development. In his affidavit, Plaintiff's attorney enumerates a number of such alleged misrepresentations:

(1) On October 14, 1992, Hochberg, the Bartzick Estate's attorney, filed an IRS Form 706 on behalf of the Estate, listing Yorktown as a partnership asset, and listing on the attached Schedule C $985,000 as "Receivable from Jonas Bastys." (Pl.Exh. 160.) Plaintiff's attorney, apparently contending that the $985,000 constitutes a misrepresentation, asserts that Rothschild "caused" the Form 706 to be filed. The tax return, however, is signed by Hochberg, and the document contains no indication that Rothschild "caused" its filing;

(2) The undated notes of Klara's divorce lawyer, Henry Berman, reflecting an unidentified communication with Rothschild, do not include Yorktown among the discussed marital assets. (Pl.Exh. 163.) Plaintiff does not articulate the nature of the "misrepresentation" contained therein, and none can be identified, since there is no evidence that the notes were intended to list all of the marital assets;

(3) In another undated, handwritten memorandum following a meeting with Plaintiff, Klara, Rothschild and Wells, Henry Berman, Klara's matrimonial attorney, wrote the following note next to the heading "Yorktown": "He executed deed Hubert's estate offset what is [illegible]" (Pl.Exh. 164);

(4) Following a meeting with Rothschild and Klara on April 7, 1993, Berman wrote with respect to Yorktown: "Taxes owed 1992 ... He on behalf [Bartzick] trying to settle this."(Pl.Exh. 165);

(5) In notes dated October 6, 1993, Wells wrote, "Yorktown-... H deeded to Hubert's estate to offset *overdraws*... H has no interest."(Pl.Exh. 168);

(6) Another set of notes also dated October 6, written by an unidentified party, reads under the caption "Yorktown": "Jonas owed Hubert [illegible] of extra draws."(Pl.Exh. 169); and

(7) In a letter to Berman dated October 13, 1993

outlining the proposed terms of settlement of the matrimonial action, Rothschild stated that the Yorktown property was "deeded to Bartzick in partial settlement of claim."(Pl.Exh. 170.) On June 14, 1994, Fine met with Rothschild, and wrote in his notes of that meeting: "Jonas deeded his 1/2 interest in the Yorktown property to Hubert and Hubert now owns 100% of the Yorktown property after their transaction was closed."(Pl.Exh. 174.)

(8) *The Role of Eli Fine*

Defendant Eli Fine and his firm, Eli Fine, C.P.A., P.C., served as accountants for Plaintiff and Bartzick for approximately thirty years. (Fine Aff. ¶ 4.) Jeffrey Heilbronn, a former employee of Fine who is not a party to this action, was principally responsible for the accounting services provided to Plaintiff and Bartzick on behalf of the Fine firm. (Heilbronn Aff. ¶ 2.) Plaintiff's claims that the Fine Defendants committed malpractice by (1) breaching his fiduciary duty to Plaintiff by failing to investigate or disprove the Bartzick claim; and (2) preparing and altering financial statements and tax returns, at the direction of Rothschild, to reflect sole ownership of the Yorktown property by Granite Knolls.

**\*20** The Fine Defendants never undertook any investigation of Bartzick's embezzlement claim. According to Fine, Plaintiff never asked him to investigate the claim or otherwise intercede in the dispute (Fine Aff. ¶ 14), and Plaintiff offers no evidence to the contrary. Furthermore, Fine avers that he was not involved in any way with the negotiation or execution of the settlement of the claim. (Id.¶ 23.)

In early February 1994, Rothschild asked Heilbronn to prepare a compilation statement for the Bartzick Estate. (Fine Aff. ¶ 26.) On February 28, Heilbronn produced the statement. It identified the Yorktown as being fully owned by the Bartzick Estate. (Pl.Exh. 179.) According to Fine, Yorktown was listed as an asset of the Estate because Rothschild had told him that Plaintiff had transferred the Yorktown property to the Estate. (Fine Aff. ¶ 27.) As of February 1994, however, Fine was unaware that Plaintiff had not executed a deed with respect to that transfer. (Fine Aff. ¶ 26 .)

Plaintiff claims that, at the instruction of Rothschild, Fine retroactively changed the worksheets for the partnership to eliminate Yorktown as a partnership

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                         Page 16
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

asset. His evidence to support that assertion is a worksheet for B & B dated December 31, 1994. (Pl.Exh. 180.) However, nothing on the face of that worksheet-which is barely legible-indicates any such change, given that Yorktown still appears as an entry. To the contrary, Fine avers that no entries were made in the B & B partnership books to reflect the transfer of the Yorktown property during 1994. (Fine Aff. ¶ 27.) The property was dropped from the 1995 worksheet. (Pl.Exh. 181.)

In a letter dated June 26, 1995 to Mark Hochberg explaining changes in the Estate's 1995 compilation statement, Rothschild wrote:
The mortgage liability for the Yorktown property increased to 100% because Jonas quitclaimed his interest to Hubert. It is my belief that as soon as this property is subdivided it will be worth a lot more than the mortgage and Hubert's investment will be recouped with a profit. This increase is approximately $1.1 million.

(Pl.Exh. 182.) Hochberg in turn gave the same explanation to David Sokoroff, an attorney at Shearman & Sterling (whose involvement in this case is not explained), in a letter dated July 7, 1995. (Pl.Exh. 183.)

Although it was not on the Estate's 1994 compilation statement, the Yorktown property was included as a partnership asset on the 1994 partnership tax return. Fine attributes this to the fact that the firm "had forgotten that the transfer had taken place."(Id.¶ 27.)Sometime after the 1994 return was filed, Rothschild informed the Fine firm that the Yorktown property should not have been included on the partnership return. (Id.) Because the Yorktown property was, at that time, unimproved vacant land, which does not depreciate, the erroneous inclusion of the property on the tax return did not result in any tax consequences or other damages to Plaintiff. For that reason, Fine deemed it sufficient to correct the error by simply dropping the property from the 1995 partnership return. (Id.¶ 28.)

**\*21** On May 17, 1995, Rothschild faxed Fine computations for amounts owing on several mortgages, including those on the FDU, Gonzalez and Yorktown properties.[FN7](Pl.Exh. 176.) On May 22, 1995, Fine and Heilbronn faxed a draft compilation statement for the Bartzick Estate to Rothschild for his review and comment. (Pl.Exh. 177.) Two days later, Rothschild faxed his comments

to Fine as follows:

> FN7. The cover sheet to that fax reads: "Eli, please find the computations for the amounts owing *as requested"* (emphasis added). Plaintiff's attorney misquotes this communication as " 'the amounts owing us' (the Bartzicks)." (Curtis Aff. ¶ 94.)

Eli, the value of Yorktown was listed at $1.2 million which is 50%; you listed the mtge at the full amt. Please change the value to $2.4 million and change the schedules accordingly.
(Pl.Exh. 178.) Fine carried out this instruction.

The Bastys and Bartzick families retained Steven Kaplan and his former firm, Marshall Granger & Company, P.C., to prepare and file the 1996 partnership tax return and review the 1995 return prepared by the Fine Defendants. (Pl.Exh. 188.) Kaplan testified that one of his difficulties in carrying out these tasks was Fine's reluctance to turn over needed documents. (Kaplan Dep. at 31-33.) Another problem that Kaplan cited were the conflicting roles of Rothschild, which made it "hard to understand at different times whether I was dealing with him as an attorney for the estate, whether I was dealing with him as an officer of one of the entities I was-or dealing with him as counsel to any of those."(Id. at 18.)Kaplan also claimed that Fine's loyalties were unclear, particularly because Fine indicated that he was working under Rothschild's direction.[FN8](Id. at 43.)

> FN8. Specifically, Kaplan testified:
> When at times I did meet-whatever-and I would ask for documents, [Fine] would say there were none, and that-that is what Mr. Rothschild told me to do. And sometimes the cooperation was more-he said he didn't have the backup and it was [Rothschild's] directives, and that was it. And I took his word for it, and that is what he told me. (Kaplan Dep. at 43.)

Additionally, Kaplan encountered difficulty in obtaining needed information from Rothschild and Fine. On May 28, 1997, Kaplan wrote to Filberti, DiPietro & Fine, which had acquired Fine's firm, requesting various records, including tax returns, ledgers, and bank statements for Baltic and the partnership entities. (Pl.Exh. 190.) Fine did not

Not Reported in F.Supp.2d                                                    Page 17
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

respond until July 15, when, by letter, he referred Kaplan to Ann Farrissey Carlson, an attorney for the Bastys family, and attached a letter from Carlson acknowledging receipt from Fine of Baltic Records for 1993-96, and an inventory of those records. (Pl.Exh. 191.) However, only Baltic records were contained in that inventory; partnership records, as requested, were not listed. Kaplan testified: "I would say it is not what I asked for. It wasn't enough for me to complete my assignment to put everything together."(Kaplan Dep. at 39.) Kaplan also testified that Fine canceled scheduled meetings and that Fine's successor, Cilberti (whose first name is not identified), failed to call Kaplan for an appointment as Kaplan expected.(Id. at 31, 41.)

By letter dated July 16, 1997, Kaplan asked Rothschild to turn over several documents, including evidence of ownership or transfer of Bastys or Bartzick family ventures, closing statements for all real property purchased by Baltic or related entities between 1993 and 1997, and copies of deeds to all real estate owned by the Bastys and Bartzicks. (Pl.Exh. 193.) As of August 6, 1997, Rothschild had not responded, and Kaplan sent a follow-up letter on that date. Kaplan wrote: "Your assistance is critical because the five S-Corp. entities have 1996 returns due on September 15, 1997, and Bastys/Bartzick Partners return is due October 15, 1997."(Pl.Exh. 194.) Kaplan also asked for an explanation with respect to the following:

**\*22** Mr. Fine indicates that many transactions and entries are the result of your directives (either directly or indirectly via Baltic's bookkeeper Pat), or based upon transactions either planned by or carried out at your behest. I do not know whether these directions came from you as executor of the Estate of Hubert Bartzick, as an officer in Baltic Estates and related entities, or as legal counsel to the enumerated entities. Further, you and your firm acted as legal counsel and settlement attorney's [sic] in many transactions, based upon closing and other documents I have examined. Inasmuch as Mr. Fine recorded these transactions, I would expect that he have written backup to support them. To date he has not been able to provide any such documentation. Accordingly, I am sending this letter to Mr. Fine as well, hoping that between you and Mr. Fine, all information can be obtained.

(Id.) Additionally, Kaplan also requested clarification of 17 ambiguities in the records he had received.

Rothschild responded by letter dated August 18, stating the following:
At the outset, I note that in your introductory comments in the August 6, 1997 letter, you make numerous general and conclusory statements (allegedly based upon Mr. Fine's "indications" and "statements" to you) which are obviously untrue, and therefore I note my objections for the record.

(Pl.Exh. 195.) Rothschild further stated that he lacked sufficient knowledge to answer eleven of the questions posed by Kaplan in his August 6 letter. With respect to this correspondence, Kaplan testified to his opinion that "[i]t was reasonable to assume that [Rothschild] had all that information, and I certainly believed he should have it because if he did the closings, most attorneys would keep a set for themselves."(Kaplan Dep. at 87-88.)

On January 6, 1998, Kaplan wrote to Guy DiPietro at Fine's new firm, listing 13 categories of documents that were "due" to him from Fine and Heilbronn. (Pl.Exh. 192.) There is no information as to whether DiPietro responded to this letter. In any event, Kaplan testified that he stopped work on behalf of the two families because he felt that he "was not in a position to finish at that time ... there was still things owed to me by various parties."(Kaplan Dep. at 145-46.)

Warren Koch, an accountant hired to set up a computerized records system for Baltic in 1995, states in his affidavit that he had difficulty obtaining needed records from Fine on a number of occasions. For example, Koch avers that Fine failed to respond to his request for information about the Bastys and Bartzick entities in July 1995. (Koch Aff. ¶¶ 3, 5.) In January 1996, Koch asked Fine for accounting records he needed in connection with a switch to accounting on a current basis that Koch had undertaken for Plaintiff. According to Koch, Fine responded, "Why should I give you the files when I haven't been paid?"(Id.¶ 7.) Additionally, in April 1996, Koch asked Fine for particular financial information to allow Koch to set up accounting records to track the assets of the entities in which Plaintiff had an interest. Fine failed to send many of those records to Koch. (Id.¶ 13.)

**\*23** Koch also describes a June 1996 meeting with Fine, Heilbronn and Rothschild. At that meeting, Koch asked about the loan accounts in connection with Bartzick's embezzlement claim. Koch states that

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

he was told that the accounts "were all lumped together and could not be easily broken apart."(Id.¶ 14.)On July 15, Koch wrote to Fine, on behalf of Heino, in response to a bill that Fine had sent to Heino:

[Heino] has asked me to respond to your billing and to advise you that he has not retained you nor has he agreed to pay you for work that you should have been doing all along, work that is incorrect, that you will not be doing any further work for Bastys, and he has a right to see the firm books since he is the appointed representative of Jonas Bastys who owns 50% of the stock of the corporation.

(Exh. 16 to Koch Aff.) Koch also requested copies of financial statements prepared since 1984, ledgers, tax returns and related documents, and informed Fine that he would be preparing Plaintiff's 1995 tax returns.

Fine sent two letters after that date, both dated July 19, 1996. The first repeated a prior offer to prepare Plaintiff's tax returns at no charge to Plaintiff (Exh. 17 to Koch Aff.). The second, apparently in response to Koch's letter, stated: "I have been in business for over fifty (50) years and have always treated other accountants professionally and have no reason to change this policy today. If you will call my office, my associate Jeff Heilbronn, will provide you with any reasonable request or assistance."(Exh. 18 to Koch Aff.) Koch states that he met with Heilbronn on July 31, and that Heilbronn did not provide any documents, but provided some of the information requested in Koch's letter-in particular, information showing that the consolidated worksheet Koch had prepared was incorrect. (Koch Aff. ¶ 18.) Koch claims that Heilbronn promised to provide a correct one, but never did. He also avers that he was informed, for the first time, about which entities owned by Plaintiff owned which properties.

On September 19, 1996, Ann Carlson, Plaintiff's new attorney, wrote to Fine requesting that Fine return all accounting records and work papers for Baltic to her. (Exh. 20 to Koch Aff.) Fine did so, and Carlson provided him with copies of the documents that he turned over. (Exh. 21 to Koch Aff.) Koch, however, avers that the documents "contained only one-third of the information needed," in that they were missing, inter alia, information about certain Bastys and Bartzick entities. (Koch Aff. ¶ 21.) Based on the lack of necessary information, Koch advised Heino to retain a neutral accountant to obtain the required

documents from Fein; Heino retained Marshall Granger & Company, Kaplan's employer. (Id.) Heino discharged Fine in or about October 1996.

In January 1997, at Heino's request, Koch took over all of the accounting for the Bastys side of Baltic and the partnership. In this capacity, Koch wrote to Fein again in February regarding his confusion about the Yorktown property, noting: "Yorktown property-This is owned by the Estate of Hubert Bartzick and title should have been transferred to that estate."(Exh. 23 to Koch Aff.) Koch claims that he was under the assumption that Yorktown was an asset of the Estate because Rothschild had repeatedly told him that Plaintiff had agreed to transfer the property to settle Bartzick's embezzlement claim. (Koch Aff. ¶ 24.) Koch also asked Fine to explain the disappearance of over $1.3 million in land assets from the partnership's closing balance for 1995 and of over $1.8 million in mortgage obligations. Koch states that he never received a response to his inquiry, but that he listed Yorktown as a partnership asset when he filed the 1996 partnership return in 1998.

**\*24** In January 1999, while inspecting documents turned over by Fine in this action, Koch discovered the list of checks charged to the individual loan accounts of Plaintiff and Bartzick from 1981 to 1987, which Fine had prepared during those years. Fine states that a review of Fine's records revealed that, rather than Plaintiff having embezzled funds, Bartzick owed Plaintiff nearly $160,000. (Id.¶ 29.)Koch claims that neither Fine nor Heilbronn ever produced or informed him of this document before January 1999.

### THE PRESENT ACTION

Plaintiff filed suit on July 15, 1997, naming Rothschild, his former partners, and the Rothschild, Himmelfarb firm as defendants. The Rothschild Defendants asserted third-party claims for contribution against the Fine Defendants. In December 1997, the Rothschild Defendants filed an amended third-party complaint, asserting contribution claims against additional Defendants Heino Bastys, Klara Bastys, and W. Whitfield Wells. Heino Bastys then brought counterclaims against the Rothschild Defendants for negligence, breach of contract and breach of fiduciary duty.

The case was reassigned to me at the end of October

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

1998. By memorandum decision and order dated May 4, 1999, this Court granted Plaintiff leave to amend his complaint in order to add claims against the Rothschild Defendants for breach of fiduciary duty and common law fraud, and against the Fine Defendants for accounting malpractice. That decision also denied Plaintiff leave to add a claim for spoliation of evidence against the Rothschild Defendants, and for breach of fiduciary duty and common law fraud against the Fine Defendants. The proposed fraud claim against the Fine Defendants was not allowed as insufficiently particular under Fed. R. Civ. P 9(b); Plaintiff did not replead that claim. Plaintiff's claims thus consist of the following:

(1) breach of professional services contract against the Rothschild Defendants, arising out of Rothschild's loss of the prenuptial agreement between Plaintiff and Klara;

(2) legal malpractice against the Rothschild Defendants, also arising from Rothschild's loss of the prenuptial agreement, and from Rothschild's alleged advice that Plaintiff settle the divorce action rather than litigate;

(3) breach of fiduciary duty against the Rothschild Defendants, arising from:

(a) Rothschild's simultaneous representation of the conflicting interests of Plaintiff and Bartzick and/or the Bartzick Estate,

(b) Rothschild's failure to disclose to Plaintiff information about the discounted mortgages and/or planned development of the conveyed St. Croix properties and the Yorktown property;

(c) Rothschild's failure to protect Plaintiff's interests in those transactions;

(d) Rothschild's failure to disclose to Plaintiff that Rothschild "exercised full control" over and represented the interests of Klara in the divorce action; and

(e) advising Plaintiff to settle rather than litigate the divorce action.

**\*25** (4) breach of bailment contract against the Rothschild Defendants, based on Rothschild's loss of his copy of the prenuptial agreement;

(5) breach of fiduciary duty against Rothschild individually and as Executor of the Bartzick Estate," arising out of, *inter alia,* Rothschild's disclosure of confidential information to Klara during the divorce, serving as attorney for Klara and Plaintiff despite the fact that Rothschild would be required to testify at trial, failing to adequately investigate Bartzick's embezzlement claim or inform Plaintiff that his claim was false, and failing to provide Plaintiff with adequate information about the value of the

properties Plaintiff transferred to the Bartzick Estate;

(6) common law fraud against Rothschild individually and as Executor of the Bartzick Estate and against Granite Knolls arising from the allegedly false statements made by Rothschild or by Fine under Rothschild's direction that the Bartzick claim had merit and that the Yorktown property was wholly owned by Granite Knolls;

(7) violation of New York Judiciary Law § 487 against Rothschild and the firm, arising from Rothschild's function during the divorce action as the actual attorneys for Plaintiff and concealment of that role from the court, and concealment of the fact that Rothschild simultaneously represented the interests of Plaintiff and Klara in that action, in which manner Rothschild deceived Plaintiff into believing that a settlement was his only option; and

(8) accounting malpractice against the Fine Defendants arising from the firm's failure to investigate or take other action to discredit Bartzick's embezzlement claim, and improper designation of the Yorktown property as a B & B asset facts relating to Fine's role in Bartzick's embezzlement claim and failing to disclose the conflict of interest.

I note that the claims outlined here are those that Plaintiff has briefed in opposition to the present motions. Any allegations raised in Plaintiff's lengthy complaint that Plaintiff has not addressed in his memorandum of law are deemed abandoned.[FN9]

> FN9. This includes the allegations in Plaintiff's original complaint relating to the loss of his interest in a piece of land referred to as "the Hendry parcel," which Plaintiff has not addressed on the present motions.

On an unidentified date during this year, Plaintiff died. On July 19, 2000, the Fine Defendants filed a suggestion on the record of a party's death pursuant to Fed.R.Civ.P. 25(a)(1). No party has as of yet filed a motion for substitution of parties as provided under that Rule.[FN10]

> FN10.Fed.R.Civ.P. 25(a)(1) provides in pertinent part:
> (1) If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties. The motion for substitution may be made by any party or by the successors or representatives of the deceased party.... Unless the motion for substitution is made not later than 90

days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party.

On September 22, 1999, following several months of protracted discovery disputes before Magistrate Judge George Yanthis, the Fine Defendants moved to dismiss Plaintiff's amended complaint and the Rothschild Defendants' cross-claim for contribution under Fed.R.Civ.P. 12(b)(6). Because the Fine Defendants have submitted several affidavits and exhibits in support of its motion, the Court elects to treat is motion to dismiss as a motion for summary judgment pursuant to Fed.R.Civ.P. 56(c).

On September 23, the Rothschild Defendants moved for summary judgment as to Plaintiff's amended complaint in its entirety.

**\*26** For the reasons that follow, the pending motions are disposed of as follows:

(1) the Rothschild Defendants' motion for summary judgment is granted as to Plaintiff's claims for breach of professional services contract, legal malpractice, breach of bailment contract, and violation of N.Y. Judiciary Law § 487, and granted in part and denied in part as to the claims for breach of fiduciary duty and fraud; (2) the Fine Defendants' motion to dismiss the Rothschild Defendants' cross-claims is granted in its entirety; and (3) the Rothschild Defendants motion to dismiss the counterclaims by Heino Bastys is granted in its entirety.

CONCLUSIONS OF LAW

I. THE ROTHSCHILD DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

A. *Plaintiff's Failure to Disclose Experts*

As a preliminary matter, the Rothschild Defendants argue that this Court should decline to consider the affidavits of three experts submitted by Plaintiff in opposition to the Rothschild Defendants' motion under Fed.R.Civ.P. 37(c)(1), on the ground that Plaintiff failed to identify any experts during discovery. Those experts-Timothy Tippins, Plaintiff's legal malpractice expert (Pl.Exh. 2), Dr. Dana Luck, Plaintiff's medical expert (Pl.Exh. 28), Professor

Bruce Green, Plaintiff's legal ethics expert (Pl.Exh. 109), and Richard Ferrarone, a real estate appraiser (Pl.Exh. 186)-were not disclosed despite Defendants' service of a Notice for Disclosure of Expert Witness Information in June 1998 (attached as Exh. A to Affidavit in Further Support of Defendants' Motion for Summary Judgment), or at any other point prior to the close of discovery. I have already issued an order striking this, as well as other expert affidavits served after the discovery cutoff, in an order dated May 11, 2000. Defendants' argument on the present motion provides an opportunity for fuller discussion of the law on this issue.

Federal Rule of Civil Procedure 37(c)(1) provides in pertinent part:
A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

As amended in 1993, this rule provides for automatic exclusion of expert information that was not disclosed despite the existence of an independent duty to disclose under Rule 26(a) and 26(e)(1).*See* Advisory Committee Notes, 146 F.R.D. 682, 691 (1993). This new sanction was "intended to put teeth into the mandatory initial disclosure requirements added by the 1993 amendments." 8A Charles Alan Wright, Arthur Miller & Richard Marcus, *Federal Practice and Procedure:* Civil 2d § 2289.1, at 704.

In this case, the Rothschild Defendants note, the Court ordered all discovery-including expert witness discovery-to be completed by March 1, 1999, a deadline that I extended to July 23, 1999 after Plaintiff filed his amended complaint. Moreover, by memorandum endorsed dated September 28, 1999, I advised Plaintiff's attorney that there would be no further expert discovery in this case. Defendants claim that they decided not to call any expert witnesses at trial in reliance on these events, and contend that Plaintiff is now precluded under Fed.R.Civ.P. 37(c)(1) from relying on any expert affidavits or reports in opposition to Defendants' motion.

**\*27** Imposition of sanctions under Rule 37 is a "drastic remedy," and should only be applied "in those rare cases where a party's conduct represents flagrant bad faith and callous disregard" of the

Not Reported in F.Supp.2d                                                                    Page 21
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Federal Rules. See*Sterling v. Interlake Industries, Inc.,* 154 F.R.D. 579, 587 (E.D.N.Y.1994). Additionally, failure to make the required disclosure may be excused if the offending party's failure to disclose was either "harmless" or "substantially justified." See*Hinton v. Patnaude,* 162 F.R.D. 435, 439 (N.D.N.Y.1995).

Mindful of the harshness of the Rule 37(c) penalty, I am nevertheless constrained to conclude that neither of the conditions for excusing noncompliance with Rule 26 are present here. First, Plaintiff has neither responded to Defendants' application nor articulated a justification for his failure to comply with Rule 37(c)(1). Second, Plaintiff asserted his malpractice claim in his original complaint filed in July of 1997, nearly a year before Defendants served their Notice for Disclosure. Discovery in this case was extended to July 1999. Plaintiff has had ample time to locate and disclose the identity of his experts. Thus, his failure to do so cannot reasonably be characterized as "substantially justifiable." Nor was Plaintiff's failure to disclose harmless: Defendants retained no experts of their own as a consequence of Plaintiff's neglect to identify his experts. Moreover, this is not a case where an expert merely testified on matters outside the scope of his Rule 26 report, *see,e.g.,Matter of Kreta Shipping, S.A.,* 181 F.R.D. 273 (S.D.N.Y.1998) (declining to exclude testimony under Rule 37(c)), or where the party seeking disclosure failed to adequately identify the subject of the expert's testimony. *See,e.g.,Sterling,* 154 F.R.D. at 587 (same). I therefore find that preclusion of the Tippins affidavit is appropriate in this case. *SeeDay v. Consolidated Rail Corp.,* No. 95 Civ. 968, 1996 WL 257654 (S.D.N.Y. May 15, 1996) (expert first disclosed in pretrial order not permitted to testify under Rule 37(c) where plaintiff failed to respond to application for sanction or otherwise justify failure to disclose). Accordingly, the Tippins, Luck, Green, and Ferrarone affidavits are stricken from the record. The Court will give further direction to the parties concerning trial experts after disposing of the instant motions and narrowing the issues.

### Plaintiff's Claims

The Rothschild Defendants argue that all or most of Plaintiff's first, second, third, fourth, fifth and sixth claims for relief are time-barred under their respective statutes of limitation. Where, as here, diversity of citizenship is the basis of jurisdiction, a federal court in New York must apply New York's borrowing statute New York's borrowing statute, CPLR § 202, which requires that the claim of a nonresident plaintiff that accrued outside the state be timely under both the statute of limitations of both New York and the state where the claim accrued.[FN11]See*Cuccolo v. Lipsky, Goodkin & Co.,* 826 F.Supp. 763, 767 (S.D.N.Y.1993) (citation omitted). Both Plaintiff and the Rothschild Defendants appear to have overlooked this rule.

> FN11.CPLR § 202 provides:
> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state apply.

**\*28** A purely economic injury, such as Plaintiff claims to have suffered here, generally occurs in the state where the plaintiff resides. See*Global Financial Corp. v. Triarc Corp.,* 93 N.Y.2d 525, 529 (N.Y.1999) (citations omitted). In this case, Plaintiff became a resident of California in 1991. All of his alleged injuries were incurred after that date. The Court must therefore determine whether his claims are timely under the relevant statutes of limitation of both New York and California. If barred by either state's statute of limitations, a claim is barred altogether.

The Rothschild Defendants also contend that all of Plaintiff's claims must be dismissed on their merits. Accordingly, I consider each of Plaintiff's claims in turn.

### A. First Claim-Breach of Professional Services Contract

Plaintiff's first claim is for breach of Rothschild's alleged promise to ensure that Plaintiff's interests in Baltic be passed on to Plaintiff's two sons, to the exclusion of Klara. Plaintiff contends that this was caused by Rothschild's loss of his copy of the 1981 prenuptial agreement. This claim is time barred.

Under New York law, where a professional promises a specific result to his client, the failure to attain such result is actionable as a breach of contract, see*Marcus

Not Reported in F.Supp.2d                                                                        Page 22
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

*Borg Rosenberg & Diamond v. Gilbert Segall and Young, L.L.P.,* 670 N.Y.S.2d 73 (N.Y.App.Div. 1st Dept.1998), and the six-year statute of limitation under CPLR § 213(2) applies. *See*75 N.Y.Jur.2d *Limitations and Laches* § 111 (1989). In New York, a breach of contract claim accrues upon the breach. *See*T & N Plc. v. Fred James & Co. of New York, Inc., 29 F.3d 57, 59 (2d Cir.1994) (citing *Ely-Cruikshank Co. v. Bank of Montreal,* 81 N.Y.2d 399 (N .Y.1993)). Since the breach consists of the failure to obtain the result, it occurs when the result is not obtained.

Here, Plaintiff's claim accrued upon the signing of the stipulation of settlement providing substantial interests in the partnership property to Klara in March 1994. Plaintiff's breach of contract claim, which was interposed on July 15, 1997, was therefore timely under New York law.

Under California law, however, the statute of limitations for breach of contract depends upon whether the contract was written or oral. In this case, Plaintiff has submitted no evidence of any written agreement between him and Rothschild to ensure that his premarital assets pass to his sons. Thus, such agreement can only have been oral.

California Code of Civil Procedure § 339 provides a two-year limitations period for actions on unwritten contracts, *see*Sequist v. Hitachi America Ltd., No. C98-1724, 1999 WL 305512,*2 (N.D.Cal. May 10, 1999), and the claim generally accrues upon the breach. *See*Seelenfreund v. Terminix of Northern California, Inc., 84 Cal.App.3d 133, 136 (Cal.App. 1st Dist.1978).[FN12] In this case, the alleged breach of professional services contract occurred no later than March 1994, more than two years before Plaintiff filed suit. Because this claim is untimely under California law, it must be dismissed, and there is no need to discuss the merits.

> FN12. That section provides in pertinent part:
> Within two years: 1. An action upon a contract, obligation or liability not founded upon an instrument of writing, except as provided in Section 2725 of the Commercial Code [applicable to contracts for sale] or subdivision 2 of Section 337 of this code [applicable to book accounts, accounts stated, and balances due on mutual, open, and current accounts]; or an action founded

upon a contract, obligation or liability, evidenced by a certificate, or abstract or guaranty of title or real property, or by a policy of insurance; provided, that the cause of action upon a contract, obligation or liability evidenced by a certificate, or abstract or guaranty of title of real property or policy of title insurance shall not be deemed to have accrued until the discovery of the loss or damages suffered by the aggrieved party thereunder.
Cal.Civ.Proc.Code § 339(1).

### B. *Second Claim-Legal Malpractice*

**\*29** Plaintiff's second claim is for legal malpractice. It arises from (a) Rothschild's loss of the prenuptial agreement, (b) his alleged advice that Plaintiff settle rather than litigate the divorce action, and (c) his failure to obtain from Klara a waiver of her interest in Plaintiff's $1.6 million life insurance trust in the stipulation of settlement.[FN13]

> FN13. For multiple reasons, it must be dismissed.

#### (a) *Statute of Limitations*

CPLR § 214(6) provides that "an action to recover damages for malpractice, other than medical, dental or podiatric malpractice, regardless of whether the underlying theory is based in contract or tort," must be brought within three years. A legal malpractice claim generally accrues at the time the malpractice is committed. *See*Goicoechea v. Law Offices of Stephen Kihl, 651 N.Y.S.2d 198 (N.Y.App.Div.2d Dept.1996) (citations omitted).

The first act of alleged malpractice-Rothschild's loss of his copy of the prenuptial agreement-probably occurred during Rothschild's office move in 1984, some 13 years prior to the commencement of this action, and was undisputedly communicated to Plaintiff in 1991. Thus it is presumptiously time-barred. As for the second act, Plaintiff offers no evidence of when Rothschild allegedly advised him to settle-indeed, he offers no competent evidence that Rothschild (as opposed to Wells) even offered such advice. Thus, he has failed to raise a triable issue as to this claim, and it is dismissed on the merits. The third alleged act of malpractice-Rothschild's failure to obtain a waiver of the insurance trust-occurred no

Not Reported in F.Supp.2d                                                                                       Page 23
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

later than the signing of the divorce stipulation in March 1994.

Although the remaining acts occurred more than three years prior to the filing of his complaint, Plaintiff argues that his malpractice claim is nevertheless timely under the so-called "continuous representation doctrine" under New York law. That doctrine provides that the statute of limitations for a legal malpractice action runs "from the end of the attorney's representation of the client in connection with the matter giving rise to the malpractice claim."*Mason Tenders District Council Pension Fund v. Messera,* 958 F.Supp. 869, 888 (S.D.N.Y.1997) (citing *Glamm v. Allen,* 57 N.Y.2d 87, 94 (N.Y.1982)).*"New York Courts have repeatedly held that the doctrine is strictly limited to instances where the continuing representation pertains specifically to the matter in dispute, and is not applicable where an attorney provides ongoing general representation."Id. at 889* (citations omitted). Therefore, in order to rely upon the doctrine, a plaintiff must "affirmatively demonstrate ongoing representation in connection with the specific matter from which the malpractice claim arose."*Id.* (citing *Zaref v. Berk & Michaels,* 595 N.Y.S.2d 772 (N.Y.App.Div. 1st Dept.1993)).

Rothschild's negotiation of the prenuptial agreement was not part of any services he provided in connection with the divorce action, which was not even commenced until a decade later. The fact that the prenuptial agreement was negotiated as a contingency in the event the marriage failed does not mean that any work Rothschild did during the divorce amounted to continuing representation on the agreement. Furthermore, Wells, not Rothschild, represented Plaintiff in the divorce.

**\*30** The evidence shows that Rothschild gave information to both sides during the divorce (because he had it), but does not suggest that he or his firm represented Plaintiff in connection therewith. Therefore, to the extent that Plaintiff's malpractice claim is based upon Rothschild's loss of the prenuptial agreement, it is time-barred and the continuing representation doctrine cannot revive it.

Plaintiff contends that Rothschild's failure to obtain a waiver under the insurance trust is timely because Rothschild continued to represent Plaintiff in connection with the divorce action continued after the stipulation was signed in March 1994. Plaintiff so contends because Rothschild handled the property transfers that Plaintiff was required to make under the Stipulation of Settlement. There is evidence that Rothschild represented Plaintiff in the transfer of property in St. Croix known as "Wood Cottage" from Plaintiff to Klara as provided under the Stipulation-specifically, Rothschild's signature on the bargain and sale deed effecting that transfer, which was recorded on August 1, 1996 (Pl.Exh. 25), a date within one year of the filing of Plaintiff's malpractice claim. This is the only evidence offered by Plaintiff of Rothschild's continuing representation.

Plaintiff's argument fails. The specific matter in dispute is Rothschild's alleged failure to secure a waiver under the insurance trust. The continuing representation consists of Rothschild's handling of the transfer of the Wood Cottage property under the stipulation. These are separate, unrelated acts of representation. Thus, Plaintiff's malpractice claim arising from Rothschild's failure to obtain a waiver from Klara is ineligible for the continuing representation toll.

Plaintiff also argues that his malpractice claim is timely because he brought it within a "reasonable time" following the September 4, 1996 amendment of CPLR § 214(6). As amended, that subsection provides that all claims for professional malpractice, whether pleaded in tort or in contract, are subject to a three-year limitations period. The New York legislature passed that amendment in order to overrule the New York Court of Appeals' decision in *Santulli v. Englert, Reilly & McHugh, P.C.,* 78 N.Y.2d 700 (1992), which held that, in certain cases, claims for professional malpractice could be brought on a breach of contract theory, subject to a six-year statute of limitations. *SeeDurkin v. Shea,* 957 F.Supp. 1360, 1375 (S.D.N.Y.1997). As Plaintiff notes, several courts have held that due process considerations require that litigants be afforded a "reasonable time" after the amendment's effective date in which to bring malpractice suits that would have been timely under the six-year limitation period provided under *Santulli.See,e.g.,Coastal Broadway Associates v. Raphael,* 246 A.D.2d 445 (N.Y.App.Div. 1st Dept.1998). Plaintiff argues that the nearly ten months that elapsed between the passage of the amendment and the interposition of his malpractice claim constitutes a "reasonable time" within the meaning of these cases.

**\*31** While the courts have set forth no bright-line rule

Not Reported in F.Supp.2d                                    Page 24
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

defining the outer limits of a "reasonable time" after September 4, 1996, the case law suggests that the span of time between the amendment and the filing of Plaintiff's complaint in this case is beyond the pale of "reasonable time." *See,e.g.,Marine Midland Bank v. McCarthy, Fingar, Donovan, Drazen & Smith,* 271 A.D.2d 414 (N.Y.App.Div.2d Dept.2000) (57 days was reasonable time); *Iocovello v. Weingrad & Weingrad,* 262 A.D.2d 156,157 (N.Y.App.Div. 1st Dept.1999) (eight months reasonable); *Middle Market Financial Corp. v. D'Orazio,* No. 96 Civ. 8138, 1998 WL 397867,[*]9 n.4 (S .D.N.Y. Jul. 15, 1998); *Coastal Broadway Associates,* 246 A.D.2d 445 (N.Y.App.Div. 1st Dept.1998) (five and one half months reasonable).*Compare,e.g.,Early v. Rossback,* 262 A.D.2d 601, 602 (N.Y.App.Div.2d Dept.1999) (seven months not reasonable time); *Ruggeri v. Menicucci,* 262 A.D.2d 391, 392 (N.Y.App.Div.1999) (one year not reasonable); *Lefkowitz v. Preminger,* 261 A.D.2d 447, 448 (N.Y.App.Div.2d Dept.1999) (six months and one day not reasonable); *Panigeon v. Alliance Navigation Line, Inc.,* No. 97 Civ. 8350, 1997 WL 473385,[*]3 n.5 (noting, in dicta, that 44 days not reasonable).

Moreover, *Iocovello,* the case upon which Plaintiff relies, is inapposite to this case. The Appellate Division in that case held that eight months was a reasonable time in the specific circumstance where the plaintiff had brought suit only 5 weeks after the new, three-year statute of limitations had expired. *SeeIocovello,* 262 A.D.2d at 157. Here, the limitations period on Plaintiff's malpractice claims expired no later than March 1994-more than three years before Plaintiff interposed his claim. I therefore conclude that Plaintiff's malpractice claim was not brought within a "reasonable time" of the amendment of CPLR § 214(6). His second claim for relief is dismissed is time-barred under New York law.

### (2) Merits of the Malpractice Claim

Plaintiff's malpractice allegations are also meritless.[FN14]

> FN14. In his affidavit, Plaintiff's attorney makes the additional allegation that "Rothschild concealed his own children's 20% interest in the $3,000,000 of known assets transferred to Klara Bastys under the stipulation of settlement."(Curtis Aff. ¶ 51.) Because this allegation is made in cursory fashion at the end of the discussion of

Rothschild's alleged malpractice, it is unclear whether he asserts this allegation as legal malpractice or breach of fiduciary duty. In either case, the only evidence to which Plaintiff cites in support is a June 1989 letter from Rothschild to an attorney at Shanker & Hochberg informing her that Klara wanted to bequeath 20 percent of her estate to Rothschild's three children. (Pl.Exh. 12.) There is no evidence whatsoever that Rothschild did not disclose that bequest to Plaintiff. This allegation is therefore dismissed.

To prevail on a claim of legal malpractice under New York law, a plaintiff must establish: (1) a duty, (2) breach of that duty, and (3) proof that actual damages were proximately caused by the breach. *SeeTinelli v. Redl,* 199 F.3d 603, 606 (2d Cir.1999) (per curiam) (citing *Marshall v. Nacht,* 569 N.Y.S.2d 113, 114 (2d Dept.1991)). It is not disputed that Rothschild, as Plaintiff's attorney, owed Plaintiff a duty of care. Rather, determination of this claim centers upon whether Rothschild breached that duty, and, if so, whether Plaintiff's damages were proximately caused by Rothschild's negligence.

"To survive summary judgment, the plaintiff in a malpractice case cannot rest on his 'allegations of what [he] views as deficiencies in defendant's conduct as his attorney,' but must offer 'evidence to establish the standard of professional care and skill that [defendant] allegedly failed to meet." " *Hatfield v. Herz,* No. 96 Civ. 5530, 2000 WL 1154064,[*]2 (S.D.N.Y. Aug. 15, 2000) (quoting *Thaler & Thaler v. Gupta,* 617 N.Y.S.2d 605, 606 (N.Y.App.Div.3d Dept.1994)). Although this burden is generally satisfied by way of expert testimony, "the requirement that plaintiff come forward with expert evidence on the professional's duty of care may be dispensed with where 'ordinary experience of the fact finder provides sufficient basis for judging the adequacy of the professional service," ' *Estate of Nevelson v. Carro. Spanbock, Kaster & Cuiffo,* 686 N.Y.S.2d 404, 405-06 (N.Y.App.Div. 1st Dept.1999)-an argument Plaintiff has not made here. In this case, Plaintiff's record contains no expert evidence on the standard of care, as the affidavit of his expert, Timothy Tippins, Esq., has been stricken under Fed.R.Civ.P. 37(c) due to Plaintiff's failure to disclose him.

**\*32** New York courts have identified two specific

Not Reported in F.Supp.2d                                                                                                                    Page 25
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

situations in which a juror's ordinary experience will suffice to establish the relevant standard of care in the absence of expert testimony. The first is where the attorney's departure from the applicable standard involves a failure to perform a ministerial task necessary to the basic purpose of the representation. *See,e.g.,S & D Petroleum Co ., Inc. v. Tamsett,* 144 A.D.2d 849 (N.Y.App.Div.3d Dept.1988) (failure to file security agreement). The second is where the lawyer expressly promises to achieve a specific result and fails to do so, on the rationale that, on such facts, principles of contract and agency, rather than negligence, control. *See,e.g .,Serhofer v. Groman & Wolf, P.C.,* 203 A.D.2d 354 (N.Y.App.Div.2d Dept.1994) (promise to procure buy-sell agreement).

Plaintiff's first allegation of malpractice fails on the merits because he has failed to raise a triable issue with respect to a breach of duty. Defendants assert that under the circumstances of this case, where Plaintiff did not ask Rothschild to keep his copy of the prenuptial agreement, and Rothschild gave Plaintiff his own original copy of the agreement and told Plaintiff to keep the document in a safe location, Rothschild's loss of his own copy cannot constitute negligence.

Neither of the circumstances in which expert testimony may be dispensed with is implicated by this fact pattern-nor has Plaintiff so argued. There is no evidence that Rothschild's preservation of his copy of the prenuptial agreement was necessary to its enforceability, particularly given the undisputed facts that Rothschild gave Plaintiff his own copy of the document, and that even after the loss of both copies, the option remained of proving the agreement's existence at trial. There is also no evidence in the record that Rothschild made any promise in connection with the prenuptial agreement-a point that Plaintiff appears to concede, as he does not respond to it in his memorandum of law. At most, there is evidence that Rothschild was aware of Plaintiff's intent in entering into the agreement-i.e., to preserve the assets of Baltic for his sons against any claims by Klara. (See Rothschild Dep. at 414.) Therefore, in the absence of expert testimony as to Rothschild's duty of care, Plaintiff's malpractice claim for failure to preserve the written agreement therefore cannot survive the Rothschild Defendants' motion for summary judgment. It is dismissed.

Plaintiff's second allegation-that Rothschild negligently advised him to settle the matrimonial action must be dismissed because Plaintiff has failed to adduce any evidence that Rothschild gave any such advice to Plaintiff. Plaintiff repeats this allegation over and over, but offers nothing to support it. (Pl. Br. at 10.) While Plaintiff's record contains evidence that *Wells* recommended settlement to Plaintiff, (see Wells Dep. at 11), there is no indication that Rothschild did so. The Rothschild Defendants' motion for summary judgment is, therefore, granted as to this allegation.

**\*33** Finally, Plaintiff contends that Rothschild committed malpractice by failing to obtain a waiver from Klara of her interest in Plaintiff's $1.6 million irrevocable insurance trust. In his affidavit, Plaintiff's attorney asserts that Rothschild had a duty to ensure such a waiver "as was agreed," without specifying when or between whom such agreement was reached. (Curtis Aff. ¶ 50.) There is no evidence of any "agreement" concerning a waiver of Klara's interest in the trust, and the bald assertion of Plaintiff's counsel to that effect must be disregarded.

Plaintiff points to the following as evidence of Rothschild's negligence: (1) a letter dated June 6, 1991 to Rothschild from a legal assistant at Shanker & Hochberg, the firm that prepared Plaintiff's will, asking whether Plaintiff and Klara's assets had been retitled to reflect ownership by their revocable living trusts "in order that the trusts may accomplish their designated purpose" (Pl.Exh. 99); (2) the testimony of Steven Shanker that Plaintiff's irrevocable trust "was probably the only insurance he would ever be able to have again for the rest of his life" (Pl.Exh. 100); (3) Wells handwritten notes reflecting his knowledge that the trust existed (Pl.Exh. 101); (4) handwritten notes of Klara's attorney, Henry Berman, indicating that he wanted a copy of the trust (Pl.Exh. 102); (5) a letter dated October 4, 1991 from Rothschild's secretary to Berman enclosing a copy of the trust as requested (Pl.Exh. 103); (6) a letter dated March 27, 1997 from Wells to an attorney at Berman's firm enclosing an unexecuted form of waiver of interest in the trust, which Wells asked be forwarded to Klara for her signature (Pl.Exh. 104).

This evidence is insufficient to raise a triable issue as to breach of a duty of care by Rothschild. Neither of the scenarios where negligence may be proved without expert testimony is present here. There is nothing in the record to suggest that Rothschild promised Plaintiff that he would secure a waiver from Klara. Nor does Plaintiff contend that inclusion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-07369-HB     Document 32-2     Filed 12/21/2007     Page 26 of 42

Not Reported in F.Supp.2d                                                              Page 26
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

of such a waiver in the stipulation of settlement constitutes the type of ministerial act necessary to effectuate the basic purpose of the his representation that would allow this claim to reach a jury without expert evidence.

### C. *Third Claim-Breach of Fiduciary Duty against the Rothschild Defendants*

For the reasons stated below, Plaintiff's Third Claim is fatally deficient under the relevant statutes of limitations *and* on the merits. Plaintiff's third claim for relief, which is brought against Rothschild, his former partners and former firm, arises from (1) Rothschild's alleged role in the divorce action-i.e., his failure to disclose that he exercised "full control" over the divorce action and represented Klara's interests therein; (2) Rothschild's simultaneous representation of Plaintiff and Bartzick or the Bartzick Estate; (3) Rothschild's conflicting role as executor of the Bartzick Estate; (4) Rothschild's failure to disclose to Plaintiff information about the discounted mortgage on the Gonzalez property purchased in November 1994; and (5) Rothschild's failure to disclose information about the discounted mortgage on the Yorktown property purchased in November 1993.[FN15]

> FN15. These are the alleged breaches of fiduciary duty in Plaintiff's third claim as analyzed in the Rothschild Defendants' memorandum of law (Def. Br. at 4). Plaintiff does not dispute this summary or address breaches other than those enumerated by the Rothschild Defendants. Accordingly, that is the basis on which I analyze Defendants' motion with respect to this claim.

#### (1) *Statute of Limitations*

**\*34** The Rothschild Defendants concede that the allegation relating to the purchase of the Gonzalez mortgage in November 1994, is timely. They argue, however, that the remainder of the allegations in Plaintiff's third claim are time-barred. In this, they are correct.

The applicable statute of limitation for breach of fiduciary duty claims under New York law depends upon the substantive remedy sought. *See* *Loengard v. Santa Fe Industries, Inc.,* 70 N.Y.2d 262, 266 (N.Y.1987). Where the relief sought is equitable, the

six-year limitations period of CPLR § 213(1) controls.[FN16] *Seeid.* at 267 (citations omitted). Where suits alleging breach of fiduciary duty seek only money damages, however, the courts have viewed such actions as alleging "injuries to property," and thus covered by the three year statute of limitations under CPLR § 214(4).[FN17] *SeeWhitney Holdings. Ltd. v. Givotovsky,* 988 F.Supp. 732, 741 (S.D.N.Y.1997) (citations omitted). Here, Plaintiff seeks both legal relief and equitable remedies-namely, disgorgement of Rothschild's fees in connection with the disputed transactions, and imposition of a constructive trust on the profits earned by Rothschild for the Bartzick Estate while he served as Plaintiff's partner.

> FN16. Section 213 provides in pertinent part: The following actions must be commenced within six years:
> (1) an action for which no limitation is specifically prescribed by law;....

> FN17. Section 214 provides in pertinent part: The following actions must be commenced within three years:
> ...
> (4) an action to recover damages for an injury to property except as provided in section 214-c;....

With respect to accrual, the rule in New York is that if a breach of fiduciary duty claim is not based upon fraud, the statute of limitation begins to run upon the breach, and not when the plaintiff discovers the breach. *See* 75 N.Y.Jur.2d *Limitations and Laches* § 186 (1989) (citing *Campell v. Culver,* 67 N.Y.S. 469 (N.Y.App.Div. 4th Dept.1900)). Where the alleged breach of fiduciary duty involves actual fraud, however, the claim does not accrue until the plaintiff's actual or constructive discovery of the facts constituting the fraud, *see* *Elghanayan v. Victory,* 596 N.Y.S.2d 35, 36 (N.Y.App.Div. 1st Dept.1993). Thus, the New York statute of limitations for fraud claims-six years from the commission of the fraud or two years from the discovery-applies.[FN18] *SeeDymm v. Cahill,* 730 F.Supp. 1245, 1264 n. 7 (S.D.N.Y.1990). Furthermore, the discovery rule applies "only to claims of actual fraud-that is, fraud claims alleging an intent to deceive." *SeeWhitney Holdings,* 988 F.Supp. at 744. Claims of constructive fraud-i.e., "a fiduciary's simple nondisclosure of facts it is obligated to disclose"-accrue upon breach. *Seeid.*

> FN18. The question of when a breach of

Not Reported in F.Supp.2d                                                                     Page 27
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

fiduciary duty claim accrues has been complicated by certain federal cases stating that the discovery rule applies in all breach of fiduciary cases, without mention of the distinction between fiduciary duty claims involving fraud and those without allegations of fraud. *See,e.g.,Netzer v. Continuity Graphic Assocs., Inc.,* 963 F.Supp. 1308, 1322 (S.D.N.Y.1997); *Ferber v. Ehrlich,* No. 93 Civ. 818, 1994 WL 132168 (S.D.N.Y. Apr. 14, 1994); *Zola v. Gordon,* 685 F.Supp. 354, 374 (S.D.N.Y.1988) (citations omitted). This apparent dispute was recognized by the Court in *Dymm.SeeDymm,* 730 F.Supp. 1245, 1264 n. 7. In that case, however, Judge Mukasey noted that in cases like *Dymm,* which involved allegations of both fraud and breach of fiduciary duty, New York courts had addressed the fraud and fiduciary duty claims together, and thus applied the fraud standard to both claims. *Seeid.* (citing *Whalen v. Gerzof,* 546 N.Y.S.2d 705, 708 (N.Y.App.Div.1989); *Fava v. Kaufman,* 511 N.Y.S.2d 447, 448 (N.Y.App.Div.3d Dept.1987)). Indeed, nearly all of the cases whose language might be read to suggest that the discovery rule applies to all fiduciary duty claims involved alleged breaches of fiduciary duty that were based on fraud. *See,e.g.,Ferber,* 1994 WL at [*]1 (defendant misrepresented risks of investment); *Zola,* 685 F.Supp. at 358 (defendant misrepresented valuation of investment). Conversely, fiduciary duty cases that were not based upon allegations of fraud have applied the rule that the claim accrues upon the breach. *See,e.g.,Mejia-Ricart v. Bear Stearns & Co.,* No. 95 Civ. 582, 1996 WL 94810, [*]4 (S.D.N.Y. Mar. 4, 1996) (alleged breach arose from contractual breach of Customer Agreement); *Central General Hosp. v. Bramex, Ltd.,* 570 N.Y.S.2d 670 (N.Y.App.Div.2d Dept.1991) (same). I agree with the distinction drawn by the *Dymm* Court, and conclude that the discovery rule applies to fiduciary duty claims involving fraud, while the breach rule applies to other fiduciary duty claims.

Plaintiff's third claim for relief falls into the latter category. Each of the allegations contained in that claim concerns Rothschild's failure to disclose facts

relating to his conflicting representation of Bartzick, Bartzick's Estate and Klara, or information about the discounted mortgages on the Yorktown and Gonzalez properties. Thus, the statute of limitations on Plaintiff's third claim for relief began to run upon the breach.

#### (b) *California Law*

Breach of fiduciary duty claims under California law are subject to the four-year statute of limitations provided pursuant to California Code of Civil Procedure § 343.[FN19]*SeeStalberg v.. Western Title Ins. Co.,* 230 Cal.App.3d 1223, 1230 (Cal.App. 6th Dist.1991). The claim accrues when the plaintiff "discovered, or in the exercise of reasonable diligence could have discovered, that facts had been concealed."*Seeid.*(citing *Sanchez v. South Hoover Hospital,* 18 Cal.3d 93, 101 (1976)).

> FN19. That section provides:
> An action for relief not hereinbefore provided for must be commenced within four years after the cause of action shall have accrued.
> Cal.Civ.Proc.Code § 343.

**\*35** Under California law, the defendant generally bears the burden of proving that an action is time-barred. *SeeO'Connor v. Boeing North American, Inc.,* 92 F.Supp.2d 1026, 1037 (C.D.Cal.2000) (citing *California Sansome Co. v. U.S. Gypsum,* 55 F.3d 1402, 1406 (9th Cir.1995). However, where the discovery rule applies, the plaintiff bears the burden of showing that "he was not negligent in failing to make the discovery sooner and that he had no actual or presumptive knowledge of facts sufficient to put him on inquiry."*Seeid.*(citations omitted).

I note that, having failed to brief the question, Plaintiff does not argue that the continuing representation toll is applicable to claims for breach of fiduciary duty under California law. In any event, the Court has found no California authority to support that proposition.

#### (i) *Rothschild's Role in the Divorce Action*

The first allegation stems from Rothschild's failure to disclose to Plaintiff that he "controlled" the divorce action and represented Klara's interest therein. This alleged breach occurred no later than March 1994,

Not Reported in F.Supp.2d                                                                          Page 28
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

when that action was settled-a date more than three years before Plaintiff's claim was interposed. As Plaintiff correctly notes, however, under New York law, the "continuing representation" doctrine applies to claims for breach of fiduciary duty as well as those for legal malpractice. *See,e.g.,Zaref v. Berk & Michaels, P.C.,* 595 N.Y.S.2d 772, 773-74 (N.Y.App.Div. 1st Dept.1993). However, a Plaintiff can only take advantage of this doctrine when there was, in fact, a continuing representation. Here, Plaintiff has failed to offer sufficient evidence from which a reasonable juror could conclude that Rothschild "represented" Klara in the divorce or "controlled" the divorce action. (See infra Section 2(a)). Thus, either the continuing representation doctrine has no place in the analysis, and this contention is time-barred.

### (ii) *Rothschild's Conflicting Representation of Bartzick and the Bartzick Estate*

Plaintiff next contends that Rothschild breached his fiduciary duty to Plaintiff by representing Bartzick and the Bartzick Estate leading up to the settlement of the Bartzick claim in July 1992. Thus, this claim accrued more than three years before Plaintiff filed suit. Here, again; Plaintiff argues that the continuing representation doctrine applies. There is no evidence, however, that Rothschild represented Plaintiff in connection with Bartzick's embezzlement claim after July 1992, when the FDU and Lee properties were deeded to the Estate to settle that claim. Therefore, this allegation is untimely under New York law to the extent that Plaintiff seeks damages. It is timely, however, insofar as Plaintiff seeks equitable relief as to this allegation.

Under California law, however, this claim must be dismissed in its entirety. As noted above, California applies a four year statute of limitations and all breach of fiduciary duty claims. (See *supra,* Section 1(b)), Rothschild has testified without contradiction, that he disclosed the possibility of conflicts to Plaintiff as early as 1989 (concerning the Bartzick embezzlement claim) and 1992 (concerning his role as Executor). Thus, Plaintiff's claim runs from the date of that disclosure. It expired in 1996.

### (iii) *Rothschild's Role as Executor of the Bartzick Estate*

**\*36** Plaintiff also claims that Rothschild breached his

fiduciary duty in his conflicting role as executor of the Bartzick Estate. Rothschild assumed that role in 1992, when Bartzick died. This claim is therefore untimely insofar as Plaintiff seeks damages, but timely to the extent that he seeks equitable relief. However, for the reasons discussed above, it is time-barred under California law.

### (iv) *Rothschild's Failure to Disclose the Yorktown Mortgage*

The last allegation that the Rothschild Defendants argue is time-barred is that Rothschild failed to disclose to Plaintiff the discounted mortgage that was assigned to Granite Knolls in November 1993. Again, Plaintiff argues that the continuing representation toll applies to this claim. There is nothing in the record, however, to suggest that Rothschild provided any representation to Plaintiff in connection with that mortgage after that date. Therefore, this claim is untimely under New York law to the extent that Plaintiff seeks legal relief, but timely to the extent that Plaintiff seeks equitable relief.

I decline to dismiss this claim as time-barred under California law. As will be discussed in greater detail below the record does not unambiguously support Defendant's contention that Plaintiff had knowledge of facts sufficient to put him on inquiry about the Yorktown mortgage in timely fashion. However, for reasons to be discussed, the claim fails on the merits.

### (2) *Merits*

"[A]n attorney stands in a fiduciary relationship to the client."*Estate of Joseph Re v. Kornstein Veisz & Wexler,* 958 F.Supp. 907, 924 (S.D.N.Y.1997) (quoting *Graubard Mollen Dannett & Horowitz v. Moskovitz,* 86 N.Y.2d 112, 118 (N.Y.1995)). As such, an attorney is "charged with a high degree of undivided loyalty to his client."*Id.* (citing *Kelly v. Greason,* 23 N.Y.2d 368, 375 (1968)).

Plaintiff is also correct that, upon Bartzick's death, Rothschild, as Executor of Bartzick's Estate, trustee of a trust that owned 50 percent of Baltic's assets and administrator of Bartzick's will, became a partner at will in Baltic with Plaintiff, and thus, became bound by a second fiduciary duty to Plaintiff in his partnership role. Absent a contrary provision in the partnership agreement, continuation of the business of the former partnership following the death of a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

partner creates a new partnership at will. *See*15A N.Y.Jur.2d *Business Relationships* § 1585 (1996). It is undisputed that Rothschild continued the real estate business of Baltic in his role as Executor. Therefore, his association with Plaintiff constituted a new partnership, terminable at the will of either party. As partners, Plaintiff and Rothschild, of course, owed to each other a fiduciary duty of loyalty. *See*Ebker v. Tan Jay International, Ltd., 741 F.Supp. 448, 469 (S.D.N.Y.1990). Moreover, "[t]he fact that the partnership is one terminable at the will of either party does not diminish a partner's duty to his associate as long as the partnership in fact exists."*Id.* (citation omitted).

**\*37** "Where a confidential or fiduciary relationship exists, it is the duty of the person in whom the confidence is reposed to exercise the utmost good faith in the transaction and to refrain from abusing such confidence by obtaining any advantage to himself at the expense of the confiding party."60 N.Y.Jur.2d *Fraud and Deceit* § 14 (1987)."Should he retain such advantage, he will not be permitted to retain the benefit; and the transaction will be set aside even though it could not have been impeached had no such relationship existed."*Id.*

With these principles in mind, and assuming arguendo that the claims are timely (which, for the most part, they are not), we turn to their merits.

(a) *Rothschild's Role in the Matrimonial Action*

Plaintiff claims that Rothschild failed to disclose to Plaintiff that he "controlled" the course of the matrimonial proceeding and represented the conflicting interests of Plaintiff and Klara therein. Having reviewed the multitude of documents that Plaintiff has submitted in support of this claim, I conclude that Plaintiff's evidence is insufficient to raise a triable issue of fact on this contention.

Plaintiff's evidence on this issue can be categorized as follows: (1) letters disclosing various marital assets and their respective values by Rothschild to Wells and Klara's attorney, Berman (Pl.Exh. 62, 63, 66, 67, 74, 75, 83), none of which can be read to suggest that Rothschild was representing Klara's interests in that action; (2) a letter from Berman to Rothschild repeating a prior request for unidentified "documents" (Pl.Exh. 60); (3) a letter from Rothschild to the Columbian Financial Group

requesting that the life insurance policy under the Klara Bastys Trust be terminated and the proceeds be sent to Rothschild's office (Pl.Exh. 71); letters to Wells, Klara's attorneys, and Plaintiff stating that Rothschild had reviewed and made changes to the proposed stipulation of settlement (Pl.Exh. 76, 89, 91, 93); (5) handwritten notes reflecting Rothschild's attendance at two meetings with the matrimonial attorneys during settlement negotiations (Pl.Exh. 77, 80); (6) an escrow agreement between Plaintiff and Klara pursuant to which Rothschild served as escrow agent (Pl.Exh. 64); (7) in a letter dated August 1993, Rothschild reported to Plaintiff that he had met with Klara, and conveyed to Plaintiff that Klara was prepared to move to California to resume their relationship provided that Heino not be involved in Baltic (Pl.Exh. 79); and (8) the fact that Rothschild's children were beneficiaries of Klara's will to the extent of 20 percent of her assets.

The only evidence submitted by either party on the issue of disclosure or representation is Rothschild's averment that "[w]ith Jonas' knowledge and consent, I was involved in the negotiations by providing both Wells and Berman with information regarding Jonas' assets, as well by acting as an intermediary between Klara and Jonas, and/or their matrimonial attorneys."(Rothschild Aff. ¶ 48 .) Additionally, Rothschild acknowledges reviewing and correcting the proposed stipulation "as it pertained to the disposition of Jonas' real estate holdings."(Id.¶ 50.)Plaintiff's evidence, however, suggests that Rothschild's role was at least somewhat broader, in that he also arranged for the liquidation of Klara's life insurance trust and served as escrow agent.

**\*38** Nevertheless, I conclude that no reasonable juror could determine from the record before me that Rothschild represented Klara's interests at any stage during the divorce proceedings, much less that Rothschild "controlled" those proceedings. While Plaintiff's evidence might permit a reasonable fact-finder to conclude that Rothschild acted on *Plaintiff's* behalf during the divorce action, it does not support a reasonable inference that Rothschild advanced the interests of Klara. To the contrary, Plaintiff's record contains several documents suggesting that Rothschild's role was adversarial to Klara. For example, Berman's letter to Rothschild, dated August 30, 1991, complains that he still had not received "documents" that Rothschild had promised him "several months ago," and threatened to serve a formal demand on Rothschild if the documents were

not delivered within two weeks. (Pl.Exh. 60.) By letter to Rothschild dated October 14, 1993, Berman responded to several proposed terms of settlement, referring to Plaintiff as "your client." (Pl.Exh. 84.) And in a letter dated October 22, 1993, Rothschild informed Berman that he had "forwarded [Berman's] counter proposal to [Plaintiff] for his review," and that "[a]s a final gesture to settle the matter [several] compromises are being offered to Klara."(Pl.Exh. 85.) This evidence, coupled with the absence of any evidence affirmatively showing that Rothschild represented Klara or promoted her interests, compels a finding that no reasonable juror could fairly infer that Rothschild acted on Klara's behalf during the course of the negotiations.

(b) *Rothschild's Failure to Disclose the Yorktown Mortgage*

Plaintiff next contends that Rothschild failed to disclose to him the opportunity to participate in the discounted mortgage on the Yorktown property that was assigned to Granite Knolls in November 1993. His evidence to support this allegation consists of the following: (1) the fact that, in his July 8, 1992 letter informing Plaintiff of his planned visit to California, Rothschild did not mention the fact that the FDIC had taken over the mortgage holder, American Savings Bank, a fact that, Plaintiff argues, heightened the possibility of obtaining a discounted mortgage; (2) that his written offer to purchase the mortgage for $1.1. million made no reference to Plaintiff; and (3) Heino Bastys averment that "[t]he discounting of the Yorktown mortgage was also something we never knew about and never had an opportunity to explore."(Heino Bastys Aff. ¶ 21.)

Heino's affidavit does not enable this claim to withstand a motion for summary judgment. Federal Rule of Civil Procedure 56 requires that affidavits on a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."Fed.R.Civ.P. 56(e).

Rothschild avers that at "each step" of the negotiations with the FDIC, "all concerned were advised of the progress," and that, after the settlement was reached, Rothschild reviewed the settlement amount of $1.25 million with Plaintiff and asked whether Plaintiff wanted to proceed with the settlement (Rothschild Aff. ¶ 82.) According to

Rothschild Plaintiff responded in the affirmative, "provided that the Estate or the Bartzick children would pay the portion attributable to Yorktown."(Id.) As discussed above, however, the questions of fact surrounding Plaintiff's ability to communicate are sufficient to raise a triable issue as to whether Plaintiff actually told Rothschild that he did not wish to participate in the buyout of the Yorktown mortgage. Moreover, by using the fudge-phrase "all concerned," rather than by identifying what he said to whom, Rothschild has not offered sufficient evidence to warrant judgment in his favor as a matter of law.

**\*39** Defendants argue, however, that this claim, as all of Plaintiff's claims that Rothschild's actions injured his property interest in Yorktown, must be dismissed, because Plaintiff has submitted no evidence that he has suffered any injury with respect to that interest. Although "breaches of a fiduciary relationship in any context loosen normally stringent requirements of causation and damages,"*seeMilbank, Tweed, Hadley & McCloy v. Boon,* 13 F .3d 537, 543 (2d Cir.1994), it is also true that "the proponent of a claim for breach of fiduciary duty must, at a minimum, establish that the offending parties' actions were 'a substantial factor' in causing an *identifiable loss.*"*SeeGibbs v. Breed, Abbott & Morgan,*-N.Y.2d - , 710 N.Y.S.2d 578, 584 (N.Y.2000) (citations omitted) (emphasis added).

Record title to the Yorktown property undisputedly remains in the names of Plaintiff and Bartzick, and Plaintiff does not concede that the Bartzicks own the property. Nonetheless, Plaintiff argues that the oral promise made by Plaintiff to Rothschild to convey the property to the Estate at their July 1992 meeting (presumably complied with his signing a contract for sale and the Bartzick children; payment of all subsequent expenses in connection with the land) created a "cloud" on Plaintiff's title, and claims that his injury consists of the possibility that the Bartzick Estate might enforce that promise, or alternatively, bring an action for ouster. Therefore, Plaintiff contends, "this Court or the jury here must determine the nature and amount of [Plaintiff's] damages, i.e., whether [Plaintiff] is still a 50% owner of Yorktown and if he is not, because of the cloud on his title, what the value is of his lost ownership interest."(Curtis Aff. ¶ 87.)

A "cloud on title," as that terms is generally used, is an apparent title or encumbrance that is in fact invalid. *See*91 N.Y.Jur.2d *Real Property Sales and*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

*Exchanges* § 89 (1991). Thus, "a cloud on title may be an outstanding instrument, record, claim, or encumbrance that is actually invalid or inoperative, but which may nevertheless, because of its apparent validity, impair or affect injuriously the title to property."*Id.* Here, Plaintiff is arguing that his interest in the Yorktown property *may* be adjudicated invalid *should it come to pass* that the Bartzick Estate seeks to enforce his oral promise to convey complied with their payment of debts on the property, or sues for ouster-in other words, that these *hypothetical* claims *may be valid.*Thus, the injury that Plaintiff is alleging is not a "cloud," as that term is defined in New York, but rather, the prospect that, at some future point, his existing title to the Yorktown property may be lost if the Bartzick children opt to pursue legal action against him.

This injury is purely speculative. Plaintiffs make much of the fact that, at his deposition, Rothschild took the position that the contract is enforceable and the Estate is the "beneficial owner" of the property because the Estate rendered "substantial performance under the agreement. (Rothschild Dep. at 617-19.) It is not disputed that the Estate paid off the mortgage and back taxes on the property, as per the terms of Plaintiff's alleged agreement with Rothschild. To date, however, the Estate has taken no legal action with respect to title in the Yorktown property. Nor has it sued Plaintiff for his fair share of what the Bartzicks paid out. And Plaintiff has not brought and lost an action to quiet title. Therefore, Plaintiff's claim is not ripe for adjudication under Article III of the United States Constitution. "Federal courts may adjudicate only those 'real and substantial controvers[ies] admitting of specific relief ... as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Auerbach v. Board of Educ. of the Harborfields Central Sch. Dist. of Greenlawn,* 136 F.3d 104, 108 (2d Cir.1998) (quoting *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477 (1990)). "When the events alleged in a plaintiff's cause of action have not yet occurred, a federal court is precluded from exercising subject matter jurisdiction because a real case or controversy does not exist for purposes of Article III." *Id.* (citation omitted). This is just such a case. Accordingly, Plaintiff's breach of fiduciary duty claim, inasmuch as it arises from alleged injury to his interest in the Yorktown property, is dismissed on ripeness grounds.

(c) *Rothschild's Failure to Disclose the Gonzalez*

*Mortgage*

**\*40** Plaintiff next asserts that Rothschild breached his fiduciary duty by encouraging Plaintiff to sell his interest in the Gonzalez property to the Estate, without disclosing to Plaintiff the "discounted" mortgage that Brady negotiated on the property in November 1994. Plaintiff alleges that Rothschild was aware of the likelihood that the mortgage would be discounted, but failed to so inform Plaintiff.

Plaintiff's evidence consists of the following: (1) the averments of Heino Bastys and Colleen Swearingen that Rothschild encouraged Plaintiff to transfer his interest in the property to the Bartzick Estate because of its diminished value and Plaintiff's debts without disclosing the discounted mortgage; and (2) the fact that Brady negotiated the discounted $500,000 mortgage roughly one year after the 1993 meeting at which, according to Swearingen, Rothschild urged Plaintiff to relinquish his interest in the Gonzalez property.

It is undisputed, however, that Plaintiff never agreed to convey his interest in the Gonzalez property, title to which remains in the names of Plaintiff and Bartzick. Although the Bartzick Estate paid the entirety of the discounted mortgage that Brady negotiated, there is nothing in the record before me to suggest that Plaintiff's interest in that property has been in any way altered or impaired. Indeed, as no one has yet challenged his title to the property, he appears to have benefitted by having the Bartzicks pay his share of the expenses associated with the property. Thus, the record in this case contains no evidence of any "identifiable loss" to Plaintiff with respect to the Gonzalez property. Plaintiff's fiduciary duty claim in connection with that property is therefore dismissed.

D. *Fourth Claim-Breach of Bailment Contract*

Plaintiff's claim for breach of bailment contract stems from Rothschild's loss of the prenuptial agreement. The applicable statute of limitations is six years, *see*9 N.Y.Jur.2d *Bailments and Chattel Leases* § 141 (1980), and starts to run when demand for delivery is refused. *See* 75 N.Y.Jur.2d *Limitations*§ 141 (1989). Here, it is not disputed that Rothschild first informed Plaintiff that he was unable to locate his copy of the agreement at some point prior to July 1991, more than six years before the claim was interposed.

Not Reported in F.Supp.2d                                                                                                        Page 32
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiff argues that, because Rothschild acknowledged searching for the agreement for "quite a long period of time" after informing Plaintiff of its loss, his claim did not accrue until Rothschild terminated his search and it became definite that the agreement would not be produced-a contention for which Plaintiff cites no authority. That, however, is not the law. As noted, the statute of limitations begins to run when delivery is refused-here, prior to July 1991. Plaintiff's fourth claim for relief is therefore dismissed as time-barred.

Even if Plaintiff's breach of bailment contract claim were timely, it would be dismissed on the merits. To create an effective bailment, the bailor must relinquish exclusive possession and control over the bailed property. *SeeHutton v. Public Storage Management, Inc.,* 177 Misc.2d 540 (N.Y.App.Div.2d Dept.1998). This requirement cannot be met here, as it is undisputed that both Plaintiff and Klara possessed their own original signed copies of the prenuptial agreement.

*E. Fifth Claim-Breach of Fiduciary Duty against Rothschild Individually and as Executor of the Bartzick Estate*

**\*41** Plaintiff's fifth claim, which is brought against Rothschild individually and in his capacity as Executor of the Bartzick Estate, alleges breach of fiduciary duty, on multiple grounds pertaining to his divorce action, Bartzick's embezzlement claim, and Rothschild's failure to disclose to Plaintiff information about the discounted St. Croix and Yorktown mortgages. Several of Plaintiff's contentions are duplicative of the allegations in Plaintiff's third cause of action, specifically: (1) Rothschild's conflicting representation of Plaintiff and Klara in the divorce action; (2) Rothschild's conflicting role as executor of the Bartzick Estate; and (3) Rothschild's failure to inform Plaintiff of the discounted mortgages on the Gonzalez and Yorktown properties. Thus, the rulings made there concerning the statute of limitations and the merits pertain equally here, and I need not respect them.

Plaintiff's fifth claim, which was first asserted in an amended complaint dated February 1999, does add several new allegations. I consider only those that Plaintiff has briefed. These include: (1) Rothschild settled Bartzick's embezzlement claim for Plaintiff

despite his knowledge that the claim was baseless; (2) Rothschild failed to inform Plaintiff of the value of the FDU and Lee properties before transferring them to the Estate on Plaintiff's behalf; (3) Rothschild failed to investigate the Bartzick claim in order to determine whether it had any merit; (4) Rothschild made various false statements asserting that Plaintiff had executed a deed conveying his interest in the Yorktown property to the Estate; and (5) Rothschild failed to disclose to Plaintiff the potential value of the Yorktown property as developed before Plaintiff agreed to convey it to the Estate.

(i) *Failure to Inform Plaintiff of the Value of St. Croix Properties*

Statute of Limitations

This claim alleges non-disclosure, or constructive fraud. Thus, to the extent Plaintiff seeks legal relief in connection with these allegations, they are subject to the three-year limitations period under CPLR § 214(4), and accrued upon the breach. To the extent Plaintiff seeks equitable relief, they are subject to the six-year statute of limitations under CPLR § 213(8).

The FDU and Lee properties were conveyed to the Estate pursuant to the settlement in July 1992. Any breach based on Rothschild's failure to inform Plaintiff of the values of those properties cannot have occurred after that date. This claim was not interposed until Plaintiff filed his amended complaint in February 1999, more than six years after it accrued.

Plaintiff argues, however, that his amended claims relate back to his original complaint under Fed.R.Civ.P. 15(c)(2), which permits relation back to the date of an original pleading when the new claim "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."The central inquiry under Rule 15(c) is "whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations 'by the general fact situation alleged in the original pleading.'" *Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 87 (2d Cir.1999) (citation omitted). Plaintiff's original complaint contained allegations concerning Rothschild's failure to make value related disclosures concerning the St. Croix property. (Cplt.¶ 22.) This is sufficient to have put the Rothschild Defendants on

Not Reported in F.Supp.2d                                                                 Page 33
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

notice of the St. Croix related allegations in the amended pleading. Relation back is therefore granted.

**\*42** Plaintiff's original complaint was filed in July 1997. Under New York law, this claim is untimely to the extent that Plaintiff seeks damages, but timely insofar as he seeks equitable relief.

Under California law, as discussed above, the statute of limitations for breach of fiduciary duty does not begin to run until the plaintiff's discovery of the breach. *See,e.g.,Rosenblatt v. Ernst & Young International, Ltd.,* 87 F.Supp.2d 1048, 1053 (N.D.Cal.2000) (citations omitted); *Stalberg,* 230 Cal.App.3d at 1230. More specifically, the cause of action accrues under California law when "plaintiff either (1) actually discovered his injury and its negligent cause or (2) could have discovered injury and cause through the exercise of reasonable diligence."*SeeRosenblatt,* 87 F.Supp.2d at 1053 (quoting *April Enterprises, Inc. v. KTTV,* 147 Cal.App.3d 805, 826 (Cal.App.2d Dist.1983)). This inquiry is substantially similar to the analysis for accrual of fraud based breach of fiduciary duty claims under New York law.

Plaintiffs offered no evidence about when he discovered Rothschild's failure to inform him of the value of the FDU and Lee properties, as is his burden under California law. This allegation must therefore be dismissed as untimely under the California statute of limitations.

### (ii) *Failure to Disclose Potential Development Value of Yorktown Property*

Plaintiff allegedly agreed to convey his interest in the Yorktown property to the Estate in July 1992. (Pl.Exh. 182.) His allegations pertaining to the development value of the Yorktown property, however, were not interposed until Plaintiff filed his amended complaint in February 1999, more than six years after his claim accrued.

However, Plaintiff's original complaint also contained allegations of Rothschild's failure to make value-related disclosures concerning the Yorktown property. (Cplt.¶ 23.) This is sufficient to have put the Rothschild Defendants on notice of the matters raised in the original pleading. Relation back is therefore granted. Thus, this claim is untimely under

New York law insofar as Plaintiff seeks damages, but timely to the extent that he seeks equitable relief.

### (iii) *Rothschild's Failure to Investigate the Bartzick Claim*

Rothschild testified that, after Bartzick made his allegation of embezzlement in 1989, Rothschild informed both Plaintiff and Bartzick that he could not represent either one in connection with that claim. Plaintiff has not submitted any competent evidence to dispute that testimony. Therefore, any fiduciary duty that Rothschild owed to evaluate the claim was breached when he informed Plaintiff that he would not represent him in relation to the embezzlement claim. Moreover, as the original complaint contained no allegations concerning the Bartzick claim, it cannot relate back to Plaintiff's original complaint. This claim is therefore untimely under New York law.

### (iv) *False Statements Regarding Ownership of Yorktown Property*

**\*43** The next allegation in Plaintiff's fifth claim is that Rothschild made a number of false statements asserting that Plaintiff had deeded his interest in the Yorktown property to Granite Knolls. This allegation, in contrast to the other alleged breaches of fiduciary duty in the fifth claim, sounds in actual fraud (i.e., affirmative representation) and not constructive fraud. Accordingly, these allegations are subject to the statute of limitations for fraud under CPLR § 213(8).

In New York, a claim of fraud must be brought within six years of the occurrence of the fraud or two years from the time the plaintiff discovered the fraud or could have discovered the fraud through the exercise of reasonable diligence, whichever is longer. *SeeGhandour v. Shearson Lehman Brothers,, Inc.,* 624 N.Y.S.2d 390 (N .Y.App. Div. 1st Dept.1995). The discovery of facts that give rise to the accrual of the fraud claim "must be discovery of the facts constituting the fraud itself and not those merely constituting evidence of them; knowledge of the fraudulent act is required and mere suspicions will not constitute a sufficient substitute."*75 N.Y.Jur.2d Limitations and Laches* § 179 (1989) (citations omitted) "But when facts are known from which the inference of fraud flows, there is a discovery of fraud within the terms of the statute."*Id.* Moreover, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 34
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

burden of proving the time of discovery of a fraud in order to avoid the bar of the statute of limitations falls upon the party asserting the fraud. *Seeid.* § 181.

The record indicates that the most recent of Rothschild's alleged fraudulent statements concerning ownership of the Yorktown property occurred on June 14, 1994, at a meeting with Fine. (Pl.Exh. 174.) Plaintiff interposed his claim in February 1999, which is less than 6 years after the alleged fraudulent representation occurred. This claim is therefore timely under New York law.

### (v) *Fraudulent Settlement of the Bartzick Claim*

Plaintiff next alleges that Rothschild settled the Bartzick claim on Plaintiff's behalf despite his knowledge that it was meritless. Although this allegation involves no affirmative misrepresentation, "[c]oncealment becomes a fraud where there is any act which affirmatively tends to a suppression or disguise of the truth or to a withdrawal or distraction from the real facts."60 N.Y.Jur.2d *Fraud and Deceit* § 89 (1987). "Under such circumstances, fraud springs from the overt act of misconduct relied upon with the same force and effect as an actual verbal misrepresentation." *Id.* Here, Rothschild's settlement of the claim can fairly be characterized as an act tending to disguise the truth-i.e., the falsity of Bartzick's claim-and thus, constitutes a fraud. This allegation is therefore governed by CPLR § 213(8) as well.

Bartzick's claim was settled in July 1992, a date more than six years before Plaintiff filed his amended complaint. Plaintiff's attorney, however, argues that, even though the loan account summaries had been provided to Plaintiff each year from 1981 to 1987, and were produced to his attorney during discovery, Plaintiff could not have discovered Rothschild's fraud until February 1999. Plaintiff's attorney explains as follows:

**\*44** Mr. Koch came across the loan account analyses conducted by Jeff Heilbronn each year from 1981 to 1987, the set of documents we have come to call the "smoking gun." While these documents themselves did not provide the balances in the partners' loan accounts, they lead directly to these balances and unlocked Fine's accounting records once we had full access to the files. That happened during the examination of Mr. Heilbronn on February 9, 1999. It was only then, a month after Koch first gained access to Fine's complete accounting records and when Fine

was producing his complete files for the Heilbronn deposition, that year by year, 1981 through 1987, we found the entries in black and white that showed the loan accounts to be equal for Jonas and Hubert.[FN20]

> FN20. Plaintiff's attorney adds in a footnote: A more apt analogy might be the "key" to the false embezzlement claim. We have readily acknowledged that these documents were given to Jonas each year from 1981 and 1987 (before his stroke) and, in fact, they were produced by Rothschild as part of document discovery (although he tried to attribute them at his deposition as Bartzick-created documents, not Fine related documents). Their significance as the "key" to unlocking the Fine accounting records once we had access to them can not be over-emphasized.
> (Curtis Aff. n. 66.)

(Curtis Aff. ¶ 117.) Plaintiff's attorney thus appears to contend that, even though he and Plaintiff were in possession of the very records that he claims revealed Rothschild's fraud (though neither party specifies the date when these documents were produced to Plaintiff), Plaintiff's fraud claim did not accrue until Plaintiff's accountant, Koch, deduced from the Fine's loan account analyses that Bartzick's claim was baseless. I reject this argument. Under New York's discovery rule, a fraud claim accrues when the *party asserting it* could, with reasonable diligence, could have discovered the fraud-not when one of the party's agents actually did discover it during discovery. Thus, Plaintiff has failed to meet his burden of raising a triable issue as to the timeliness of this claim under New York's discovery rule.

### (b) *California Law*

As noted above, under California law, Plaintiff bears the burden of demonstrating that he was not negligent in failing to discover Rothschild's alleged fraud. For the reasons discussed above, he has failed to do so. Thus, the claim is time-barred.

### (2) *Merits*

After dismissing most allegations as either time-barred or duplication of claims already dismissed under the third cause of action what remains are these two contentions: (1) Rothschild settled the Bartzick

Not Reported in F.Supp.2d                                                                                          Page 35
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

claim on Plaintiff's behalf despite his knowledge that the claim was unfounded; and (2) Rothschild falsely stated to various parties that Granite Knolls was the sole owner of the Yorktown property. The remaining allegations, which are duplicative of those dismissed in Plaintiff's third cause of action, are dismissed for the same reasons discussed above.

### (a) *Settlement of the Bartzick Claim*

Plaintiff contends that Rothschild breached his fiduciary duty to Plaintiff by settling Bartzick's embezzlement claim, knowing that the claim had no merit. Plaintiff's evidence that Rothschild knew that the Bartzick claim was baseless consists of (1) the undisputed fact that Rothschild had immediate access to the loan account summaries prepared by Eli Fine between 1981 and 1987, which, according to the affidavit of Warren Koch, demonstrate that loans taken from Baltic by the two partners between those years were roughly equal, (2) the failure of Fine and Rothschild to turn over various accounting records as requested by Warren Koch and Steven Kaplan, the Bastys' accountants, during 1996 and 1997; and (3) a September 1993 letter from David Sislen of the Farragut Group to a Christopher Kane, whose role is not identified, stating that "the loans from Baltic Estates to Messrs Bartzick and Bastys (approximately $3.2 million each) were made incrementally over the past twenty years."(Pl.Exh. 56.) Plaintiff's attorney reasons that, because Rothschild provided financial information about Baltic to the Farragut Group (an assertion for which he identifies no evidence), he also must have known that each partner borrowed roughly the same amount of money from the partnership.

**\*45** I decline to dismiss this claim. Obviously, the failure of Fine and Rothschild to turn over accounting documents in 1997 (assuming that this occurred) is not evidence that Rothschild knew a claim was baseless when he settled it in 1992. Similarly, Plaintiff's unsubstantiated claim concerning Rothschild's dealings with Farragut is not evidence of bad faith settlement. However, there is enough evidence about Rothschild's conflicting roles in his dealings with Plaintiff and the Bartzick Estate to warrant a trial on this issue. The material issues of fact surrounding Plaintiff's ability to communicate or supervise the disposition of his assets, Rothschild's conflicting roles as attorney for Plaintiff and the Estate, and his financial interest in the Bartzick Estate in his roles as executor and trustee, preclude summary judgment. The Rothschild Defendants'

motion as to this claim is denied.

### (b) *Rothschild's False Statements about Ownership of the Yorktown Property*

Plaintiff argues next that Rothschild breached his fiduciary duty by making several statements falsely asserting that Granite Knolls or the Bartzick Estate owned Yorktown in its entirety.

The alleged fraudulent statements concerning ownership of Yorktown consist of: (1) Rothschild's statement to the Yorktown "town fathers" that Granite Knolls was the sole owner of the Yorktown property; (2) Rothschild's statement at a meeting with Berman that Plaintiff executed a deed to the Yorktown property to the Bartzick Estate; (3) Rothschild's statement at a meeting with Wells in October 1993 that Plaintiff deeded Yorktown to the Estate "to offset overdraws"; (4) Rothschild's letter to Berman dated October 13, 1993 stating that the Yorktown property was "deeded to Bartzick in partial settlement of claim"; and (5) Rothschild's statement to Fine at a June 1994 meeting that Plaintiff deeded his interest in Yorktown to Bartzick.

As to the first statement, the Rothschild Defendants note that there is no evidence that Rothschild ever represented to the town fathers of Yorktown that the Yorktown property was owned entirely by Granite Knolls. Plaintiff has not disputed this assertion, and it is therefore dismissed.

A reasonable juror could conclude, however, that Rothschild breached his fiduciary duty to Plaintiff by making the remaining statements concerning ownership of the Yorktown property. Given that an issue of fact exists as to whether Plaintiff ever agreed to convey his interest in that property, a reasonable juror could conclude that Rothschild acted against Plaintiff's interests by falsely asserting that Plaintiff no longer owned that property. However, because I have determined that the record fails to raise a triable issue as to any injury to Plaintiff, because he still owns the Yorktown property and no one has challenged that ownership, no trier of fact could fairly determine that these statements resulted in any identifiable injury to Plaintiff. The claim must, therefore, be dismissed.

### F. *Sixth Claim-Common Law Fraud*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

**\*46** Plaintiff's sixth claim, which is asserted against Rothschild individually and as executor of the Bartzick Estate, is for common law fraud, and arises from eight alleged misrepresentations. Of those, Plaintiff has briefed only the following: (1) Rothschild's statement to Plaintiff at the July 17, 1992 meeting in California that Plaintiff owed the Bartzick Estate one million dollars; (2) Rothschild's preparation of a settlement agreement in July 1992 stating that the Bartzicks had alleged that "certain moneys" were "due and owing" from Plaintiff; (3) Rothschild's false statement in a letter to Douglas Brady in September 1992 that the Bartzick Estate "had a claim against [Plaintiff]"; (4) Rothschild's statement to the Yorktown town fathers that the Bartzick Estate owned the Yorktown property in its entirety; (5) the creation of financial statements for the Estate reflecting that it was the sole owner of the Yorktown property in 1994 at Rothschild's direction; (6) the removal of the Yorktown property from the 1995 B & B partnership returns, also at Rothschild's direction; and (7) Rothschild's statements to Berman, Wells and Fine at various meetings that Plaintiff had "deeded" the Yorktown property to Bartzick or the Bartzick Estate. Defendants argue that, to the extent Plaintiff's fraud claim is based upon the first three statements, which relate to the Bartzick claim, it is time-barred. They challenge the rest on the merits.

(a) *Statute of Limitations*

As to the first three allegations, which relate to Bartzick's embezzlement claim, Plaintiff's counsel argues that Plaintiff's fraud claim did not accrue until February 1999, when Koch determined from studying Fine's loan account analyses that Bartzick's claim was baseless. As discussed above, the undisputed evidence indicates that Plaintiff had all the information necessary to evaluate Bartzick's claims at or about the time the claims were made, and in any event during 1991 and 1992, when Heino and Klare went through the checks. Thus, these claims are time-barred. Under New York's "six years from the fraud or two years from discovery" rule. N.Y. C.P.L.R. § 213(8) (McKinney 1990). California law is to the same effect.

The remaining three allegations involve fraudulent statements relating to ownership of the Yorktown property. The Rothschild Defendants do not argue that these allegations are untimely.

(2) *Merits*

In the contentions that remain, Plaintiff alleges that Rothschild defrauded Plaintiff of his interests in the Yorktown property and in the FDU and Lee properties in St. Croix. This claim is based upon the following alleged misrepresentations: (1) Rothschild's alleged statement to the Yorktown fathers asserting that Granite Knolls was the sole owner of the Yorktown property; (2) the creation of financial statements at Rothschild's direction indicating that the Estate was the sole owner of the Yorktown property; (3) the removal of the Yorktown property from the 1995 B & B partnership tax return; (4) Rothschild's statements to Berman, Wells and Fine that Plaintiff had "deeded" the Yorktown property to Bartzick or the Bartzick Estate.

**\*47** To establish a claim of fraud under New York law, a plaintiff must show (1) a material false representation by the defendant, (2) an intent to defraud thereby, (3) reasonable reliance on the misrepresentation, (4) causing damages to the plaintiff. *See*Chanavil v. Gulati, 169 F.3d 168, 171 (2d Cir.1999). Moreover, "the burden of proof rule is somewhat relaxed in cases where a fiduciary relationship exists between the parties to a transaction, and where one has a dominant and controlling force over the other."60 N.Y.Jur.2d Fraud and Deceit § 232 (1987)."In such case, if the superior party obtains a possible benefit, equity raises a presumption against the validity of the transaction, and casts upon such party the burden of proving its honesty and integrity, thereby overcoming such inference."*Id.*

Plaintiff alleges that Rothschild (1) told Plaintiff at the July 17, 1992 meeting in California that Plaintiff owed Bartzick one million dollars because Plaintiff had taken excessive loans from the Baltic account; (2) included language in the agreement settling the claim that the Bartzick Estate "ha[s] alleged that certain monies are due and owing from [Plaintiff]"; and (3) stated to Douglas Brady in an undated letter that the Bartzick Estate "had a claim against [Plaintiff] for approximately one million dollars for monies that Plaintiff borrowed from jointly held property."

As to the first fraudulent statement alleged-i.e., Rothschild's statement to Plaintiff that he actually owed Bartzick the disputed sum-there is no evidence whatsoever in the record that any such statement was made. Indeed, Defendants note that Plaintiff

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

"testified" at deposition (in response to a leading question) that he never discussed the validity of the claim with Rothschild. Plaintiff has pointed to no evidence to the contrary.

With respect to the other two statements concerning the Bartzick claim, Defendants argue that Plaintiff cannot satisfy the first element of his fraud claim, because neither of those statements was false, given that Bartzick or the Bartzick Estate had in fact asserted a claim against Plaintiff at the time each statement was made. Plaintiff does not challenge this argument either. Plaintiff's sixth claim is therefore dismissed to the extent it is based upon statements relating to the Bartzick claim.

(b) *Rothschild's Settlement of the Bartzick Claim*

Plaintiff next claims that Rothschild committed fraud by setting the Bartzick claim despite his knowledge that it was false. I have already determined that there are material issues of fact surrounding Rothschild's settlement of the Bartzick claim. Summary judgment as to this claim is therefore denied.

(a) *Statement to the Yorktown Town Fathers*

Plaintiff has alleged that Rothschild told the Yorktown town fathers in 1998 that Plaintiff had no interest in the Yorktown property. As the Rothschild Defendants point out, there is no evidence that Rothschild ever made any such statement-a point that Plaintiff evidently concedes, as he does not dispute it in his reply memorandum of law.

(b) *Creation of Financial Statement for Bartzick Estate*

**\*48** Plaintiff next claims that, in 1994, Rothschild directed Fine to prepare a fraudulent financial statement for the Bartzick Estate listing the Yorktown property as an asset of the Estate. However, Plaintiff has adduced no evidence whatsoever that any improper designation of ownership on the 1994 financial statement affected his interest in the Yorktown property. While it is plausible that the balance sheet might be relied upon as evidence that Plaintiff did not own the Yorktown property, there is no evidence that it has, in fact, been used for any such purpose, or that the document has, in any manner, affected Plaintiff's ownership interest in Yorktown. This claim is therefore dismissed.

(c) *Removal of the Yorktown Property from Partnership Tax Return*

Plaintiff also alleges that Rothschild committed fraud by instructing Fine to remove the Yorktown property from the 1995 B & B partnership tax returns. Plaintiff has not cited, and the Court is unaware of, any legal authority for the proposition that an error in a tax return may operate as an instrument of conveyance, or otherwise, by itself, alter title to real property. Nor does the record contain any evidence that the 1995 partnership return has in any way been relied upon to challenge Plaintiff's ownership interest in Yorktown. This claim is therefore dismissed as well.

(d) *Statements about the Yorktown Property*

Finally, the Rothschild Defendants argue that, as to the statements allegedly made by Rothschild to Wells, Berman and Fine that Plaintiff "deeded" the Yorktown property to Bartzick or his Estate, Plaintiff has failed to raise a triable issue as to the third element of his fraud claim-i.e., that Plaintiff relied upon these statements. There is no evidence in the record that Plaintiff relied upon these statements, or that he was even aware of them, given that they were made at meetings at which Plaintiff was not present. Moreover, as noted, there is evidence of an identifiable injury flowing from these statements. Accordingly, this claim is dismissed.

G. *Tenth Claim-Violation of <u>New York Judiciary Law § 487</u>*

Plaintiff's last claim against Rothschild is brought under <u>Section 487 of the New York Judiciary Law</u>, and arises from Rothschild's alleged failure to conceal from Plaintiff and from the state court before whom the matrimonial action was pending the facts that (1) Rothschild served as the "actual counsel" for Plaintiff, despite the fact that Wells was Plaintiff's counsel of record, and (2) Rothschild represented the conflicting interests of both Plaintiff and Klara in the divorce action. In his memorandum of law, Plaintiff adds the allegation that Rothschild made "misleading representations about plaintiff's need to settle."(Pl. Br. at 22.)

"<u>Section 487</u> broadly provides for a private civil cause of action for treble damages against lawyers who deceive any party or the court."*Schweizer v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-07369-HB    Document 32-2    Filed 12/21/2007    Page 38 of 42

Not Reported in F.Supp.2d                                                                 Page 38
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*Mulvehill,* 93 F.Supp.2d 376, 408 (S.D.N.Y.2000).[FN21] The statute is " 'little known and seldom used,' and is reserved for instances of attorney misconduct amounting to a 'chronic and extreme pattern of delinquency.' " *Brignoli v. Balch, Hardy & Scheinman, Inc.,* 126 F.R.D. 462, 467 (S.D.N.Y.1989) (quoting *Wiggin v. Gordon,* 115 Misc.2d 1071 (N.Y. City Civ.Ct., Queens County 1982)). Moreover, to recover under Section 487, a plaintiff must prove both actual deceit by the attorney, *see* *Schweizer,* 93 F.Supp.2d at 408 (citation omitted), and causation-i.e., that the deceit or collusion actually caused the plaintiff's damages. *See* *id.* (citations omitted).

> FN21. Section 487 provides as follows:
> An attorney or counselor who:
> 1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or
> 2. Wilfully delays his client's suit with a view to his own gain; or, wilfully receives any money or allowance for or on account of any money which he has not laid out for, or becomes answerable for,
> Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

**\*49** As discussed above, Plaintiff has adduced no evidence that Rothschild advised Plaintiff to settle his matrimonial action. With respect to his remaining allegations-that Rothschild and the firm deceived Plaintiff and the court by concealing Rothschild's role in the divorce action on behalf of both Plaintiff and Klara-I have already determined that Plaintiff has failed to raise a triable issue with respect to any such role. But even taking Plaintiff's assertion as true for the sake of argument, the type of "central role" alleged by Plaintiff, without more, is insufficient to support a Section 487 claim. An attorney's failure to disclose a conflict, while actionable as a breach of fiduciary duty, is not tantamount to deceit for purposes of Section 487. *See* *Gonzalez v. Gordon,* 233 A.D.2d 191 (N.Y.App.Div. 1st Dept.1996). Plaintiff has pointed to no evidence from which a reasonable juror could infer that Rothschild intended to deceive Plaintiff or the Court in the matrimonial action. His Section 487 claim therefore cannot survive Defendants' motion. *See* *id.;* *Goldner v. Sullivan, Gough, Skipworth, Summers and Smith,* 105 A.D.2d 1149, 1151 (N.Y.App.Div. 4th Dept.1984) (section 487 claim dismissed absent allegation of any specific fraudulent or deceitful communication). Accordingly, summary judgment is granted as to Plaintiff's tenth claim for relief.

While very little remains of Plaintiff's claims against Alan Rothschild, the Court is constrained to note that his conduct in connection with this matter left much to be desired. It appears to me that Rothschild violated numerous Disciplinary Rules and Ethical Considerations under New York's Code of Professional Responsibility by acting as Bartzick's executor and by joining forces with the Bartzick children in renegotiating mortgages and taking steps to develop various jointly-owned properties. The story does not pass the "smell" test. Thus, my dismissal of nearly all the complaint should not be viewed as an endorsement or exoneration of Rothschild's behavior.

That said, plaintiff, and the people who should have been looking out for his interests if he was incompetent, were incredibly dilatory in taking the steps necessary to protect his interests, including bringing in new counsel. Their inaction caused the loss some claims to limitations and others for lack of evidence. They must live with the consequences of their delay.

### H. *Liability of the Rothschild, Himmelfarb Partners*

The Rothschild Defendants assert that, because the Rothschild Firm is a limited liability partnership, and none of Rothschild's alleged wrongs were committed under the supervision or control of any of the other Firm Defendants, pursuant to New York Partnership Law § 26(b) and (c), there is no basis for liability against those Defendants.[FN22] Plaintiff responds that the Firm did not register as a limited liability partnership until 1995. Section 26(b) clearly provides that partners in a limited liability partnership are insulated from liability for the wrongs of their partners incurred "while such partnership is registered as a limited liability partnership." *See* N.Y. Partnership Law § 26(b). As the Rothschild Defendants note, Plaintiff has put no evidence whatsoever into the record concerning the partnership status of the Rothschild, Himmelfarb firm at any time relevant to this litigation. Since I am dismissing the claims against them on other grounds, however, I need not reach this question.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 39
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

FN22.Section 26 of the Partnership Law provides in pertinent part:

(b) Except as provided by subdivisions (c) and (d) of this section, no partner of a partnership which is a registered limited liability partnership is liable or accountable, directly or indirectly ... for any debts, obligations or liabilities of, or chargeable to, the registered limited liability partnership or each other, whether arising in tort, contract or otherwise, which are incurred, created or assumed by such partnership *while such partnership is a registered limited liability partnership*.... (emphasis added).

(c) Notwithstanding the provisions of subdivision (b) of this section, (i) each partner, employee or agent of a partnership which is a registered limited liability partnership shall be personally and fully liable and accountable for any negligent or wrongful act or misconduct committed by him or her by any person under his or her direct supervision and control while rendering professional services on behalf of such registered limited liability partnership....

## II. THE FINE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S MALPRACTICE CLAIM

**\*50** Plaintiff's only claim against the Fine Defendants alleges that Fine and his Firm committed malpractice by: (1) failing to conduct an analysis of the Bartzick claim or to inform Plaintiff that the claim was false; (2) altering entries on accounting records at the direction of Rothschild to indicate falsely that the Yorktown property was fully owned by the Bartzick Estate, and (3) preparing tax returns for 1994 indicating that the Yorktown property was a partnership asset, but preparing a financial statement that same year indicating that the Estate was the sole owner of the property.

### A. *Statute of Limitations*

The Fine Defendants argue that Plaintiff's malpractice claim, which was interposed on February 16, 1999, is time-barred. Under New York CPLR § 202, Plaintiff's malpractice claim must be timely under the relevant statutes of limitation of both New

York and California. However, I need not reach the issue of whether Plaintiff's claim is timely under California law, as I conclude that it is time-barred under the applicable New York statute of limitation.

In New York, a malpractice action "sounds in tort and, therefore, absent fraud, accrues when an injury occurs, even if the aggrieved party is then ignorant of the wrong of injury."*Ackerman v. Price Waterhouse,* 84 N.Y.2d 535, 541 (N.Y.1994) (citations omitted). Where the malpractice involves a negligently prepared work product, such as annual tax returns, the action accrues "upon the client's receipt of the accountant's work product ."*See id. at 541.*In so holding, the Court of Appeals expressly rejected the plaintiff's contention that her claim did not accrue until the plaintiff learned of the malpractice, reasoning that adoption of a discovery rule would be "inconsistent with the definite statutory period governing negligence actions intended to bar adjudication of stale and groundless claims."*See id.* at 542-53.

### (1) *Malpractice Arising from the Bartzick Claim*

The first category of alleged malpractice arises from Fine's failure to advise Plaintiff in 1989 that the "homemade" accounting statement prepared by Bartzick was incorrect, to conduct an independent analysis of that statement, or otherwise take action to discredit Bartzick's claim. Additionally, in his memorandum of law, Plaintiff alleges that Fine's malpractice also consisted of "silently adopting the veracity of the claim."(Pl. Br. at 7.) The alleged injury resulting from these negligent acts or omissions is the loss of Plaintiff's property in St. Croix in 1992, when Plaintiff transferred it to the Bartzick Estate, some seven years prior to Plaintiff's suit. Therefore, to the extent Plaintiff's malpractice claim against the Fine Defendants relates to the Bartzick claim, it is time-barred.

Plaintiff contends that the statute of limitations did not begin to run until late 1998, when Fine produced all of his files to Plaintiff, reasoning that before that point, the "critical facts" were "within Fine's exclusive knowledge and possession."(Pl. Br. at 8.) "And it was only after Fine finally turned over plaintiff's records to his new accountant ... that the evidence of the lie of the embezzlement claim and plaintiff's 'settlement' of it came to light."(Id. at 8-9.)Plaintiff thus appears to be arguing that a discovery rule should apply to his malpractice claims.

Not Reported in F.Supp.2d                                                Page 40
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

As discussed above, however, that is precisely the position rejected by the Court of Appeals in *Ackerman.*To the extent that this argument aims to suggest complicity in Rothschild's alleged scheme to defraud Plaintiff, it is merely an attempt to recast Plaintiff's disallowed fraud claim under a malpractice theory. Since I have already held that Plaintiff failed to plead fraud against Fine with requisite particularity, and I will not entertain this argument.

**\*51** Plaintiff also argues that his malpractice claims are entitled to the continuous representation toll. First, Plaintiff asserts that Fine's failure to intercede in the Bartzick dispute amounted to an "ongoing activity" that continued until Plaintiff fired Fine in 1996. This argument is simply irrelevant to the continuing representation doctrine, since a professional's failure to act does not constitute representation with respect to the specific matter giving rise to the malpractice claim, as the doctrine requires. *SeeAshmead v. Cooper,* 673 N.Y.S.2d 779 (N.Y.App.Div.3d Dept.1998) (professional's failure to take action or provide services necessary to protect a client's interests cannot of itself amount to continuous representation).

Second, Plaintiff's counsel contends that the continuing representation toll applies because, until his termination, Fine continued to exercise responsibility for reconciling the partners' loan and capital accounts, which "brought continually into focus the fact that there was in reality no embezzlement"-assertions for which Plaintiff cites no support in the record. (Pl. Br. at 9.) In other words, Plaintiff argues that the continuing representation doctrine applies because the falsity of Bartzick's claim was evident in the loan and capital account records that were prepared under Fine's supervision after 1989. This argument, too, is completely inapposite to the continuing representation doctrine. Plaintiff appears to be under the misapprehension that the doctrine is triggered where a professional fails to remedy the effects of her alleged malpractice after the plaintiff's injury. However, as discussed in detail above, the continuing representation toll comes into play where the professional continues to perform services for the plaintiff that relate to the specific matter in dispute, not merely the continuation of a general professional relationship. *SeeAckerman v. Price Waterhouse,* 252 A.D.2d 179, 197 (N.Y.App.Div. 1st Dept.1998), *aff'd*84 N.Y.2d 535 (N.Y.1994). Here, there is no evidence to suggest that Fine *ever* performed services for Plaintiff in connection with the matter in dispute-i.e., Bartzick's embezzlement claim. Indeed, that is the very basis for Plaintiff's claim against Fine.

In this respect, the present case is fully distinguishable from the case Plaintiff cites to support his argument, *Hall & Company, Inc. v. Steiner and Mondore,* 147 A.D.2d 225 (N.Y.App.Div.3d Dept.1989). In that case, the plaintiff's malpractice claim was based on its accountants' failure to disclose certain irregularities in the plaintiff's books while performing its annual review, a service that the defendant had performed for plaintiff since the early 1970s. *Seeid.* at 226-27.The plaintiff did not discover the irregularities until 1985. The Court determined that the continuing representation toll applied, because the matter in dispute-the defendant's failure to disclose accounting errors-was part of the very same service that the defendant performed for Plaintiff until 1985. *Seeid.* at 229.

*(2) Malpractice Arising from Preparation of Records Pertaining to Yorktown Property*

**\*52** The remainder of Plaintiff's malpractice claim against the Fine Defendants is based on the following allegations: (1) Fine improperly and illegally listed the Yorktown property as an asset of the partnership in Plaintiff's 1994 partnership income tax return, while listing that property as an asset of the Bartzick Estate in the 1994 balance sheet he prepared for the Estate; (2) Fine failed to list the Yorktown property as a partnership asset on Plaintiff's 1995 partnership income tax return; and (3) Fine acted under Rothschild's direction without objecting to the creation of these entries and documents, which he knew to be false. It is undisputed that Fine entered the Yorktown property on the Estate's asset statement in February 1994, and that the Yorktown property was not included as an asset on the partnership income tax return for 1995.

Plaintiff argues that the continuing representation toll applies to these claims as well. Here, Plaintiff's contention has merit. Each of these allegations stems from the Fine Defendants' preparation of financial statements and tax returns for Plaintiff-which services the Fine firm continued to perform for Plaintiff until Plaintiff terminated Fine on October 10, 1996. Because these services do relate to the matter in dispute-i.e., Fine's alleged falsification of tax and financial documents-they are subject to the continuing representation toll as articulated by the

Not Reported in F.Supp.2d                                                           Page 41
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Appellate Division in *Hall.*Because Plaintiff discharged the Fine firm within three years of the date on which his malpractice claims were interposed, this claim is timely to the extent it is based on the allegations pertaining to document falsification. I therefore turn to its merits.

### B. *The Merits of Plaintiff's Malpractice Claim*

Certified public accounts make up a skilled professional class, and thus, are generally subject to the same rules of liability for negligence in the practice of their profession as are members of other skilled professions. *See*76 N.Y.Jur.2d *Malpractice § 6 (1989).* A claim of professional negligence requires the plaintiff to demonstrate that "there was a departure from the accepted standards of practice and that the departure was a proximate cause of the injury."*Herbert H. Post & Co. v. Sidney Bitterman, Inc.,* 219 A .D.2d 214, 223 (N.Y.App.Div. 1st Dept.1996)* (citation omitted)."The negligence must be shown to be the cause of the event that produced the harm."*Id.* (citation omitted)."Proof of proximate causation is an essential element of any malpractice claim, including an accountant's malpractice."*Id.* (citation omitted).

Here, Plaintiff alleges that Fine's negligence-namely, Fine's improper inclusion of the Yorktown property on the Estate's balance sheet and omission of the property from Plaintiff's 1995 partnership tax return-has injured him by placing a "cloud" on his title. More simply, Plaintiff claims that Fine's negligence has jeopardized his property interest in Yorktown. This case is thus distinguishable from the more typical accounting malpractice cases, where, for instance, a negligently prepared tax return is the direct cause of an IRS audit or penalty, *see,e.g.,Ackerman,* 84 N.Y.2d at 539-40, or an improperly compiled balance sheet conceals financial losses to the client. *See,e.g.,*Hall, 147 A.D.2d 225.

**\*53** Plaintiff has failed to submit any evidence of a breach of Fine's professional standard of care with respect to the erroneous information on the tax return and compilation statement prepared by Fine. His record does contain the affidavit of an accounting expert, Vincent Love. (Pl.Exh. 57.) However, that affidavit concludes only that Fine breached the professional standard of care with respect to his failure to investigate the embezzlement claim. It does not address Plaintiff's other allegations of malpractice. Plaintiff has therefore failed to meet his burden of raising a triable issue with respect to breach of duty by Fine.

But even assuming *arguendo* that Fine departed from the standard of care, as discussed above under Plaintiff's common law fraud claim against Rothschild, Plaintiff has adduced no evidence that the allegedly erroneous information in these documents has harmed his interest in the Yorktown property. Plaintiff has therefore failed to raise a question of fact as to whether any malpractice on Fine's part proximately caused his alleged injury. Accordingly, the Fine Defendant's motion for summary judgment is granted.

### III. THE FINE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE ROTHSCHILD DEFENDANTS' CONTRIBUTION CLAIMS

The Rothschild Defendants have brought six claims for contribution against the Fine Defendants, pursuant to Fed.R.Civ.P. 13(g), on the theory that Plaintiff's injuries are solely attributable to Fine. They concede that if Plaintiff's claims do not survive the Fine Defendants' motion for summary judgment, their cross-claims cannot survive. (Rothschild Def. Third-Party Pl. Br. at 4-5.) Accordingly, their cross-claims are dismissed.

### V. HEINO BASTYS' COUNTERCLAIMS AGAINST THE ROTHSCHILD DEFENDANTS

Heino Bastys, as a third-party defendant, has asserted the following counterclaims against the Rothschild Defendants, all based upon Rothschild's loss of his copy of the prenuptial agreement: (1) negligence; (2) breach of contract; and (3) breach of fiduciary duty. The Rothschild Defendant have moved for summary judgment as to each.

#### (1) *Negligence*

Heino first claims that Rothschild is liable to him for professional negligence in misplacing the prenuptial agreement, on the rationale that Heino was the intended beneficiary of the agreement.

It is long since settled under New York law that in the absence of fraud, collusion, malicious acts, or other special circumstances, an attorney is not liable to third parties not in privity, or in a "special

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

relationship" approaching privity, for injury caused by professional negligence. *SeeScomello v. Caronia, 232 A.D.2d 625, 626 (N.Y.App.Div.2d Dept.1996)* (citations omitted). Heino argues that he and Rothschild stood in a "special relationship" approaching privity as one of the intended beneficiaries of the prenuptial agreement. That exception, however, applies only in the narrow circumstance where a professional-generally an accountant-has made a negligent misrepresentation to known third parties whom the professional knew would rely on the misrepresentation. *SeeDoehla v. Wathne Limited, Inc.,* No. 98 Civ. 6087, 1999 WL 566311,[*]19-[*]20 (S.D.N.Y. Aug. 3, 1999) (citing *Prudential Ins. Co. of America v. Dewey, Ballantine, Bushby, Palmer & Wood,* 80 N.Y.2d 377 (N.Y.1992)). In this case, Rothschild is not alleged to have made any misrepresentation with respect to the prenuptial agreement. The "special relationship" exception is thus inapplicable here. Heino's first counterclaim is therefore dismissed.

### (2) Breach of Contract

**\*54** Heino next asserts a cause of action against Rothschild for breach of the alleged professional services contract under which, Plaintiff claims, Rothschild promised to safeguard Plaintiff's interest in Baltic for his sons. Because I have already determined that there is no evidence of any such contract, this claim falls away and is dismissed.

### (3) Breach of Fiduciary Duty

Finally, Heino asserts a breach of fiduciary duty claim against the Rothschild Defendants, alleging that Rothschild breached his fiduciary duty to Heino in losing Rothschild's copy of the agreement. Rothschild responds, correctly, that this claim is untenable, as there is no evidence that a fiduciary relationship ever existed between him and Heino.

Under New York law, a fiduciary relationship arises when parties "agree to and accept the responsibilities that flow from ... a contractual bond."*SeeNortheast General Corp. v. Wellington Advertising, Inc.,* 82 N.Y.2d 158, 160 (N.Y.1993)."Courts will not impute a fiduciary relationship unless the parties' conduct and agreements indicate that the parties intended to create a fiduciary relationship."*Rogath v. Koegel,* No. 96 civ. 8729, 1998 WL 695668,[*]4 (S.D.N.Y. Oct. 6, 1998) (citing *Northeast General Corp.,* 82 N.Y.2d at

162). Here, while there is evidence that Heino was substantially involved in his father's business and legal affairs, there is no evidence of an attorney-client relationship, partnership, joint venture, or any other type of arrangement between Heino and Rothschild from which a reasonable juror could infer that the two intended to create a fiduciary relationship. Summary judgment as to Heino's third counterclaim is therefore granted.

### CONCLUSION

For the above reasons, (1) the Rothschild Defendants' motion for summary judgment is granted as to Plaintiff's claims for breach of professional services contract, legal malpractice, breach of bailment contract, and violation of N.Y. Judiciary Law § 487, and granted in part and denied in part as to Plaintiff's claims for breach of fiduciary duty and common law fraud; (2) the Fine Defendants' motion for summary judgment dismissing all claims and cross-claims asserted against them is granted in its entirety; and (3) the Rothschild Defendants' motion to dismiss the counterclaims of Heino Bastys is granted in its entirety.

This constitutes the order and decision of the Court.

S.D.N.Y.,2000.
Bastys v. Rothschild
Not Reported in F.Supp.2d, 2000 WL 1810107 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.